# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| TGI Friday's Inc., *et al.*,[1] | Case No. 24-80069-sgj11 |
| Debtors. | (Joint Administration Requested) |

## DECLARATION OF KYLE RICHTER, CHIEF
## RESTRUCTURING OFFICER OF THE DEBTORS, IN SUPPORT
## OF THE DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

I, Kyle Richter, hereby declare under penalty of perjury to the best of my knowledge, information, and belief:

1.      I am the Chief Restructuring Officer ("CRO") of debtor and debtor in possession TGI Friday's, Inc., ("TGIF" and together with its affiliates, the "Company", and together with certain of its affiliates that are debtors and debtors in possession, the "Debtors" and, each individually, a "Debtor").  I have served as the Debtors' CRO since November 1, 2024 and prior to becoming the Debtors' CRO, I advised the Debtors in my capacity as managing director with

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are: TGI Friday's Inc. (7117); TGI Friday's NY, LLC (2281); TGIF Holdings, LLC (7999); TGIF Midco, Inc. (7296); TGIF Parent, Inc. (1781); Burlington Towne Crossing, Inc. (7501); T G I Friday's of Greenbelt, Inc. (5617); T G I Friday's of Towson, Inc. (5450); T G I Friday's of Wisconsin, Inc. (7600); T.G.I. Friday's Marketing Advisory Council (6527); T.G.I. Friday's of Charles County, Inc. (3516); T.G.I. Friday's of Frederick County, Inc. (2547); T.G.I. Friday's of Harford County, Inc. (0072); T.G.I. Friday's of Washington County, Inc. (6174); TGI Friday's of Annapolis, Inc. (8315); TGI Friday's of Howard County, Inc. (0119); TGI Friday's of Rockville, Inc. (2004); TGI Friday's of Texas LLC (3931); TGI Friday's of the Rockies, Inc. (7885); TGIF/DFW Manager, LLC (N/A); TGIF/DFW Partner, LLC (N/A); TGIF/JDC Restaurant Development, LLC (N/A); WEBCO Products Incorporated (3014).  The Debtors' service address is 19111 North Dallas Parkway, Suite 200, Dallas, TX 75287.

DEBTORS EXHIBIT 1
Page 1 of 25

Berkeley Research Group, LLC ("BRG"). The BRG team has served as the Debtors' principal financial advisors since October 7, 2024.

2. On November 2, 2024 (the "Petition Date"), each of the Debtors filed a voluntary petition (collectively, the "Petitions") in the United States Bankruptcy Court for the Northern District of Texas (this "Court") for relief under chapter 11 of title 11 of the United States Code, as amended (the "Bankruptcy Code"). To facilitate the Debtors' transition into chapter 11, the Debtors have requested certain "first day" relief in various applications and motions filed with the Court (collectively, the "First Day Motions"). The First Day Motions, as applicable, seek relief intended to avoid immediate and irreparable harm to the Debtors' estates and to preserve their value, by, among other things, providing the Debtors with access to necessary liquidity, including the use of cash collateral, and paying certain tax, prepetition, and administrative obligations to facilitate the Debtors' restructuring efforts. The First Day Motions also seek certain procedural relief that will facilitate the Debtors' orderly transition into chapter 11.

3. As a result of my service for the Company, review of relevant documents, and discussions with other members of the Company's management team and the professionals, I am familiar with the Company, and in particular the Debtors' day-to-day operations, business affairs, and books and records. I am authorized to submit this declaration (the "Declaration") in support of the Petitions and the First Day Motions to assist the Court and other parties in interest in understanding the Company's corporate history, business operations, prepetition corporate and capital structure, and the circumstances leading to the commencement of these chapter 11 cases.

4. Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my discussions with other members of the Company's management team

DEBTORS EXHIBIT 1
Page 2 of 25

and the Company's advisors, my review of relevant documents and information concerning the Company's financial affairs and restructuring initiatives, or my opinions based upon my experience and knowledge. If called as a witness, I could and would testify competently to the statements set forth in this Declaration on that basis, as the information in this Declaration is accurate and correct to the best of my knowledge, information, and belief.

## PRELIMINARY STATEMENT

5. Opening its first restaurant in 1965, the Company develops, operates, and franchises restaurants based on an iconic American casual dining bar and grill concept. The Company's restaurants are full-service locations with regionally tailored menus and full bar offerings where "People of All Stripes" can connect over handcrafted food and drink. In 1986, the Company became the first U.S. casual dining concept to expand internationally. As of the Petition Date, the Company's global restaurant system consists of more than 461 locations across the U.S. and 40 countries. Of those, 39 restaurants are Company-owned and approximately 122 are franchised inside of the U.S., and approximately 316 are franchised internationally. For the 52 weeks ending on December 25, 2023, the Company generated global restaurant sales of $1.4 billion. In the same time, the Company generated $62 million in revenue from its asset-light operations in the U.S. and internationally.

6. The Company experienced difficulties weathering the COVID-19 pandemic and volatile macroeconomic environment. In response to these developments, the Company reengineered its operations, working to increase its off-premises sales from 8% pre-COVID to approximately 25% of sales prepetition.[2] The Company accomplished this by accelerating

---

[2]  Off-premises sales figures do not include DFW Airport restaurants.

DEBTORS EXHIBIT 1
Page 3 of 25

diversification to online and mobile ordering, pick-up, and white label delivery. The Company also acquired locations from underperforming or retiring franchisees, which the Company either continues to operate, closed, or assigned to third parties.

7. The Company also reconsidered its business strategy to reduce its exposure to the volatility associated with directly running a hospitality business and ensure predictable, consistent revenue streams going forward.

8. The Company ultimately determined in its business judgment that chapter 11 was the best option for the Company which will maximize value for all stakeholders. Further, the Company has been actively seeking to develop strategic alternatives, including by soliciting bids for some of the Company's assets. The Company is in fact actively engaged in discussions with a potential acquirer for some of their assets. The Company intends to utilize the chapter 11 process to make further operational improvements to the Company's business, including potentially further reducing the Company's footprint and rejecting or renegotiating unfavorable contracts and leases, and, if applicable, effectuating a sale of the Company's assets.

9. To assist the Court and parties in interest in understanding the Company's business generally and the relief the Debtors are seeking in the First Day Motions, this Declaration is organized as follows:

- *Part I* provides a general overview of the Company's corporate history and business operations;

- *Part II* provides an overview of the Debtors' prepetition capital structure;

- *Part III* describes the circumstances leading to the filing of these chapter 11 cases; and

- *Part IV* discusses the First Day Motions.

DEBTORS EXHIBIT 1
Page 4 of 25

## I. Corporate History and Business Operations

10. The Company develops, operates, and franchises the original casual dining bar and grill, TGI Fridays, offering classic American food and beverages, with 39 restaurant locations being owned and operated by the Company. The Company is known for bringing people together to socialize and celebrate the liberating spirit of "Friday." The Company has historically generated revenue primarily by selling food and beverage items through its company-owned restaurants and from royalties and fees from its franchising operations.

11. The Company has a rich heritage, demonstrated by its operating history spanning nearly 60 years, which the Company believes has driven strong brand awareness with customers. The Company is known for its all-American hospitality, providing an accessible, social experience with craveable menu offerings, distinctive beverages, and welcoming and fun atmosphere. In addition to its strong U.S. presence, the Company has built a vast international store operating structure, known for its strong brand equity and iconic, all-American dining experience.

### A. Franchise Agreements

12. Historically, the Company entered into franchise agreements with its U.S. and non-U.S. franchisees. The Company provided support and services to its franchisees to promote quality and consistency across its restaurant system, and to improve the customer experience.

13. Under the franchise agreements, the franchisees were generally granted the right to operate a restaurant in a particular location for a term of ten years, with an ability to renew for two successor terms of five years each if certain conditions are met. Each franchisee was generally required to pay a $50,000 initial franchise fee and a monthly royalty fee of 4.0% of gross sales. Additionally, the Company's franchise agreements required each U.S. franchise location to

DEBTORS EXHIBIT 1
Page 5 of 25

contribute a percentage of its net sales to fund marketing and advertising campaigns. The Company also entered into development agreements with franchisees interested in developing multiple franchise locations. These development agreements typically grant the franchisee exclusive development rights within a specified geographic area, in exchange for the obligations to build a certain number of restaurants pursuant to a pre-determined schedule.

14.     The terms of the non-U.S. franchise agreements vary, but the rights and obligations under most of such agreements are similar to the U.S. franchise agreements in that franchisees pay an initial franchise fee, make monthly royalty payments and contribute money to an advertising fund.  The initial non-U.S. franchise fee ranges from $25,000 to $75,000 and monthly royalty fees average at 3.8% of net sales.  Agreements are generally for a term of ten to fifteen years, with options to renew for additional terms.  As in the U.S., the Company also entered into development agreements with non-U.S. franchisees.

15.     However, as further discussed in Section III, TGI Friday's, Inc. was terminated as Manager (as defined below) of the franchises on September 3, 2024.  TGI Friday's Inc. continues performing duties and providing services for the franchise entities during the Manager transition under the terms of a TSA (defined below).

## II.    THE DEBTORS' PREPETITION CORPORATE AND CAPITAL STRUCTURE

16.     A summary chart depicting the Debtors' corporate structure is attached hereto as **Exhibit A**.  As of the Petition Date, the Debtors have approximately $46.75 million of funded principal debt and interest obligations, consisting of the: (i) BofSA OpCo Loan; (ii) Yadav Kids Note, (iii) Table Turn Note, (iv) Freebird Note, (v) Gold Coast Notes and (vi) SRG Notes.

6

DEBTORS EXHIBIT 1
Page 6 of 25

17.     The following table summarizes the Debtors' prepetition capital structure (as of the

Petition Date) with respect to funded debt, inclusive of accrued but unpaid interest and fees.

| Instrument | Approx. Amount Outstanding | Rate | Security |
|---|---|---|---|
| **BofSA OpCo Loan** | $18,000,000 | | |
| • Term Loan | $17,500,000 | Floating, Prime Rate – 0.25% | Substantially all assets relating to the Borrower's TGI Friday's restaurants, subject to exceptions as defined in the Commercial Security Agreement, dated as of March 3, 2022. |
| • Revolving Line of Credit | $500,000 | Floating, Prime Rate – 0.25% | |
| **Yadav Kids Note** | | | |
| • Term Loan | $2,500,000 | Fixed, 18.00% | Substantially all assets relating to the Borrower's TGI Friday's restaurants, subject to exceptions as defined in the Commercial Security Agreement, dated as of December 20, 2023. |
| **Table Turn Note** | | | |
| • Term Loan | $10,000,000 | Fixed, 18.00% | Substantially all assets relating to the Borrower's TGI Friday's restaurants, subject to exceptions as defined in the Commercial Security Agreement, dated as of December 20, 2023. |
| **Freebird Note** | | | |
| • Term Loan | $2,734,000 | Fixed, 15.00% until November 22, 2024 and 18.00% thereafter | Substantially all assets relating to the Borrower's TGI Friday's restaurants, subject to exceptions as defined in the Commercial Security Agreement, dated as of December 20, 2023. |
| **Gold Coast Notes** | | | |
| • Term Loan | $888,710.16 | Fixed, 4.00% | Unsecured |
| **SRG Notes** | | | |
| • Term Loan | $2,755,396.18 | Fixed, 4.00% | Unsecured |
| **Total** | **$46,878,106.34** | | |

DEBTORS EXHIBIT 1
Page 7 of 25

### A. BofSA OpCo Loan

18.     On March 3, 2022, the Company entered into that certain loan agreement dated
March 3, 2022 (as amended, restated, supplemented, amended and restated, extended or otherwise
modified from time to time prior to the Petition Date, the "BofSA OpCo Loan Agreement"),
between the Company and Texas Partners Bank (d/b/a The Bank of San Antonio, "BofSA") as the
lender, pursuant to which BofSA agreed to provide the Company with (i) a term loan facility in an
aggregate principal amount equal to $17.5 million (as amended, restated, supplemented, amended
and restated or otherwise modified from time to time prior to the Petition Date, the "BofSA OpCo
Term Loan") and bears interest at a floating rate equal to the "prime rate" published in the Wall
Street Journal from time to time minus a rate spread of 0.25%, and (ii) a revolving line of credit in
an aggregate principal amount equal to $1 million (the "BofSA OpCo RLOC" and, together with
the BofSA OpCo Term Loan, the "BofSA OpCo Loan") and bears interest at a floating rate equal
to the "prime rate" published in the Wall Street Journal from time to time minus a rate spread of
0.25%.  The BofSA OpCo Loan has a maturity of the earlier of (x) October 13, 2024 and the
consummation of the sale of any of the Company's TGI Friday's restaurants at the Dallas Fort
Worth International Airport (the "DFW Airport"), or of any of the membership interests in any of
the Company's subsidiaries holding an interest (directly or indirectly) in such restaurants,
including without limitation the membership interests in TGIF/DFW Partner, LLC, a Texas limited
liability company.

19.     As of the Petition Date, there is approximately $17.5 million outstanding on the
BofSA OpCo Term Loan and approximately $500,000 in letters of credit outstanding on the BofSA
OpCo RLOC.

DEBTORS EXHIBIT 1
Page 8 of 25

20.     The obligations of the Company under the BofSA OpCo Loan Agreement are secured by substantially all assets relating to the Company's TGI Friday's restaurants, subject to exceptions as defined in the Commercial Security Agreement, dated as of March 3, 2022 (as amended, restated, amended and restated, supplemented, extended or otherwise modified the "BofSA Security Agreement"), subject to customary exclusions as set forth in the BofSA Security Agreement.

**B. Yadav Kids Note**

21.     On December 20, 2023, the Company entered into that certain loan agreement dated December 20, 2023 (as amended, restated, supplemented, amended and restated, extended or otherwise modified from time to time prior to the Petition Date, the "Subordinated Loan Agreement"), between the Company and Yadav Kids LLC ("Yadav Kids") as the lender, pursuant to which Yadav Kids agreed to provide the Company with a term loan facility in an aggregate principal amount equal to $2.5 million (as amended, restated, supplemented, amended and restated or otherwise modified from time to time prior to the Petition Date, the "Yadav Kids Note") and bears interest at a fixed rate equal to 15.00% until June 30, 2024 and 18.00% thereafter.

22.     As of the Petition Date, there is approximately $2.50 million outstanding on the Yadav Kids Note.

23.     The obligations of the Company under the Subordinated Loan Agreement are secured by substantially all assets relating to the Company's TGI Friday's restaurants, subject to exceptions as defined in the Commercial Security Agreement, dated as of December 20, 2023 (as amended, restated, amended and restated, supplemented, extended or otherwise modified the

DEBTORS EXHIBIT 1
Page 9 of 25

"Subordinated Security Agreement"), subject to customary exclusions as set forth in the Subordinated Security Agreement.

> Subordination of the Subordinated Loan Agreement in favor of the BofSA OpCo Loan

24. The rights of Yadav Kids to receive payments under the Subordinated Loan Agreement are subordinated in favor of BofSA pursuant to the terms of the Subordination Agreement, dated as of December 20, 2023 (as amended, restated, amended and restated, supplemented, extended or otherwise modified the "Subordination Agreement").

**C. Table Turn Note[3]**

25. On February 14, 2024, Mr. Anil Yadav and Mr. Rohit Manocha entered into that certain loan agreement (as amended, restated, supplemented, amended and restated, extended or otherwise modified from time to time prior to the Petition Date, the "YM Loan Agreement"), among, Mr. Anil Yadav and Mr. Rohit Manocha, as borrowers, the Company, as guarantor and BofSA as lender, pursuant to which BofSA agreed to provide Mr. Anil Yadav and Mr. Rohit Manocha a revolving credit facility in an aggregate principal amount of $10 million (the "BofSA RLOC"). The obligations of Mr. Anil Yadav, Mr. Rohit Manocha and the Company under the BofSA RLOC are secured by substantially all assets relating to the Company's TGI Friday's restaurants, subject to customary exclusions as set forth in the BofSA Security Agreement.

---

[3] On February 14, 2024, the Company entered into that certain loan agreement (as amended, restated, supplemented, amended and restated, extended or otherwise modified from time to time prior to the Petition Date, the "YM Loan Agreement"), among Mr. Anil Yadav and Mr. Rohit Manocha, as borrowers, the Company, as guarantor and BofSA as lender, pursuant to which BofSA agreed to provide Mr. Anil Yadav and Mr. Rohit Manocha a revolving credit facility in an aggregate principal amount of $10 million (the "BofSA RLOC"). The obligations of Mr. Anil Yadav, Mr. Rohit Manocha and the Company under the BofSA RLOC are secured by substantially all assets relating to the Company's TGI Friday's restaurants, subject to customary exclusions as set forth in the BofSA Security Agreement.

DEBTORS EXHIBIT 1
Page 10 of 25

26.     In connection with, and with the proceeds of, the BofSA RLOC, Mr. Anil Yadav and Mr. Rohit Manocaha, through Table Turn LLC("Table Turn"), agreed to provide the Company with a term loan facility in an aggregate principal amount equal to $10 million (as amended, restated, supplemented, amended and restated or otherwise modified from time to time prior to the Petition Date, the "Table Turn Note") and bears interest at a fixed rate equal to 15.00% until June 30, 2024 and 18.00% thereafter.

27.     The Company modified the Subordinated Loan Agreement and the Subordinated Security Agreement to provide for the Table Turn Note as an additional tranche of term loans and to appoint Yadav Kids as the administrative and collateral agent on behalf of each of Yadav Kids, as lender under the Yadav Kids Note and Table Turn LLC as lender under the Table Turn Note.

28.     As of the Petition Date, there is approximately $10 million outstanding on the Table Turn Note.

**D.  Freebird Note**

29.     On July 8, 2024, the Company modified the Subordinated Loan Agreement and the Subordinated Security Agreement to provide for an additional tranche of term loans and to appoint Yadav Kids as the administrative and collateral agent of Freebird SPV, LLC ("Freebird") in addition to Yadav Kids and Table Turn.

30.     Under the further modified Subordinated Loan Agreement, Freebird agreed to provide the Company with a term loan facility in an aggregate principal amount equal to $10 million (as amended, restated, supplemented, amended and restated or otherwise modified from time to time prior to the Petition Date, the "Freebird Note") and bears interest at a fixed rate equal to 15.00% until November 22, 2024 and 18.00% thereafter.

DEBTORS EXHIBIT 1
Page 11 of 25

31.     As of the Petition Date, there is approximately $2.734 million outstanding on the Freebird Note.

**E. Subordination Agreement**

32.     On December 20, 2023, BofSA, acting in its capacity as lender under the BofSA OpCo Loan Agreement and Yadav Kids, acting in its capacity as lender under the Subordinated Loan Agreement entered into that certain subordination agreement (as amended, restated, supplemented, amended and restated or otherwise modified from time to time prior to the Petition) (the "Subordination Agreement").

33.     On February 14, 2024 and then again on August 23, 2024, the existing Subordination Agreement was modified to add Mr. Anil Yadav, Mr. Rohit Manocha, Table Turn and Freebird as additional parties party thereto.

34.     The Subordination Agreement, among other things, governs the relative contractual rights of (i) BofSA under the BofSA OpCo Loan and the BofSA RLOC, in each case where BofSA is a 'senior creditor', and (ii) each of Mr. Anil Yadav, Mr. Rohit Manocha, Yadav Kids, Table Turn and Freebird under the Yadav Kids Note, Table Turn Note and Freebird Note, in each case as 'junior creditors'. The Subordination Agreement controls the rights and obligations of holders of the obligations outstanding under the BofSA OpCo Loan Agreement, the BofSA RLOC, the Yadav Kids Note, the Table Turn Note and the Freebird Note with respect to, among other things, priority, the use of cash collateral and adequate protection.

**F. Gold Coast Notes**

35.     On 13 November 2018, the Company entered into an asset purchase agreement with (i) GC Fridays Florida, LLC, GC Fridays Rhode Island, LLC, GC Fridays Boston, LLC, GC

DEBTORS EXHIBIT 1
Page 12 of 25

Fridays NJ-PA, LLC, GC Fridays NY, LLC (together, the "GC Sellers"), (ii) RMET Holdings, Inc. and GC Restaurants, LLC (together, the "GC Guarantors"), (iii) Manny Kadre and Stephen Levit (the "GC Principals"), and (iv) Republic of Texas, Inc. as escrow agent, which has been subsequently amended further to a number of amendment agreements (the "GC APA"), wherein the Company acquired 61 restaurants and associated assets from the GC Sellers.

36.    Pursuant to the terms of the GC APA and further to a separate letter dated March 27, 2024, between the Company and ERAN Holdings, Inc. (to whom the rights of the GC Sellers concerning the monthly consideration payments was assigned by way of a separate agreement), it was agreed that the Company would pay to ERAN Holdings, Inc. (on behalf of the GC Sellers), $1 million, which would fully discharge the outstanding payment obligations and liabilities of the Company under the GC APA.

37.    As of the Petition Date, there is approximately $880,710 outstanding under the Gold Coast Notes.

**G. SRG Notes**

38.    On 9 March 2022, the Company entered into an asset purchase agreement with Southeast Restaurant Group – Main, LLC and Southeast Restaurant Group – Harvey, LLC (together, "SRG") and Ms. Elie V. Khoury as guarantor (the "SRG APA"), wherein the Company acquired five restaurants and associated assets from SRG.

39.    Pursuant to the SRG APA, the Company agreed to pay the remaining consideration due to SRG under the SRG APA, in monthly instalments, having subtracted unpaid franchise royalties, marketing fees, and other amounts due to the Company plus interest at a rate of 4% per annum (the documentation evidencing such payment obligation, the "SRG Notes").

DEBTORS EXHIBIT 1
Page 13 of 25

40.     The SRG Notes are due to mature on May 10, 2026 and as of the Petition Date, there is approximately $2.755 million outstanding.

### H.  General Unsecured Claims

In the ordinary course of business, the Debtors incur obligations to vendors, suppliers, and trade counterparties, including, but not limited to, the following approximate outstanding amounts as of the Petition Date: $2.5 million to employees on account of payroll, $49.7 attributable to customer programs (not included in accounts payable), and approximately $51.8 million in accounts payable outstanding before application of any setoffs, credits, or deductions that may be available to the Debtors.

## III.   EVENTS LEADING TO THESE CHAPTER 11 CASES

41.     As detailed herein, these chapter 11 cases arose from a number of factors that affected the Debtors' performance and available liquidity.  Accordingly, the Debtors have determined that seeking relief pursuant to chapter 11 and continuing in their efforts to implement value maximizing transactions in chapter 11 provides the best option for the Debtors and their stakeholders at this time.

### A.      Overview of Prepetition Initiatives

42.     The Company focused on various strategic actions to obtain additional liquidity and increase operational efficiency.  This included refranchising company-owned restaurants, growing same-store sales, accelerating new franchise restaurant openings internationally, increasing its presence in airports internationally and testing entry into U.S. hotels, capitalizing on digital platforms and increasing third-party delivery sales, revitalizing the Company's brand, and amending license agreements to pay down existing debt.

14

DEBTORS EXHIBIT 1
Page 14 of 25

       i.       <u>Re-franchising Company-Owned Restaurants</u>

43.     Currently, the Company has approximately 39 company-owned restaurants. The Company sought to focus on an asset-light strategy, potentially enabling the Company to become nimbler and more strategic in its deployment of capital with a more predictable income stream from franchisees.

       ii.     <u>Increased Same-Store Sales and Presence</u>

44.     The Company focused on growing its restaurant sales across its global system. The decision to focus on growing same-store sales was to improve restaurant profitability for the restaurants, which in turn would drive new restaurant openings. To drive this growth, the Company innovated and elevated its menu, created product promotions and marketing messages, focused on guest experience, enhanced its digital capabilities, reorganized its U.S. store operations, and provided expert training and support.

45.     At the same time, the Company continued to grow its global restaurant base through targeted expansion of its franchise network. The Company identified several markets to drive global restaurant openings, including Southeast Asia, Mexico, Brazil, Canada, India, and continental Europe. The Company focused on its non-U.S. franchises due to their attractive return on investment. To further this goal, the one of the Company's non-Debtor subsidiaries, TGI Fridays Franchisor, LLC, has entered into development agreements with franchisees to open approximately 156 additional international restaurants through the end of 2034.

46.     Inside the U.S., the Company focused its efforts on actively adding more sites to its airport portfolio. This decision was based, in part, by the success of the Company's locations in the Dallas Fort Worth International Airport, which generated sales of $44.5 million in the 52 weeks

DEBTORS EXHIBIT 1
Page 15 of 25

ending on December 25, 2023.  Given the operational expertise the Company has gained from running these units and additional airport locations, the Company decided to test its entry into a capital light hotel strategy.  Accordingly, the Company opened its first unit in Hollywood, California, on May 21, 2024.

    iii.    <u>Capitalize on Digital Platforms and Increase Third-Party Delivery Sales</u>

47.    Over recent years, the Company has invested capital to modernize its information technology capabilities, including online and mobile ordering, delivery, and loyalty. In the U.S. the Company has partnered with leading third-party delivery services providers to promote off-premises sales.  For the current calendar year through November 1, 2024, total off-premises sales (online, mobile, and delivery service) represented approximately 25% of total sales, up from 8% pre-COVID. Additionally, the Company has amassed just over 2 million reward and email club members. Through strong engagement and special offers, the brand has driven higher visit frequency from these guests.

48.    This year the Company launched a new menu that features new appetizers, burgers, salads, bowls, desserts, kids' menu items and cocktails. Guest response to the new menu was quite positive, resulting in improved sales trends following the launch. A new bar menu was also introduced, which features new cocktails, selected appetizers and a "happy hour" offering.  The Company has also launched several initiatives which have improved its value proposition to guests. These include a new value menu comprised of 10 full meals starting at $9.99, a "happy hour" program, direct mail offers, and new, compelling loyalty offers. These efforts have been paying off.  Independent, third-party data indicates that the Company's price net sentiment scores have

DEBTORS EXHIBIT 1
Page 16 of 25

drastically improved from the first to second quarter of 2024, with its quarter-over-quarter results having improved by over fifteen percentage points.

49.     Finally, the Company has developed an events calendar designed to delight guests throughout the year with compelling in-restaurant activities and promotions. Successful examples include "National Teachers Day," "National BBQ Day," and others.

    iv.     <u>Kraft Heinz License</u>

50.     On April 25, 2024, the Company and Kraft Foods Group Brands LLC ("<u>Kraft Heinz</u>") executed an amended and restated license agreement (the "<u>Kraft Heinz License</u>"). Kraft Heinz paid the Company $140 million in cash consideration for the Kraft Heinz License, and no ongoing royalties will be due to the Company. Under the Kraft Heinz License, the Company granted Kraft Heinz a perpetual, irrevocable, and exclusive license under certain of the Company trademarks for use by Kraft Heinz in manufacturing, distributing, marketing, and selling frozen starters and frozen snacks in certain retail distribution channels in the United States, Canada, Mexico, the Caribbean, and Central and South America. The Company used the proceeds from the Kraft Heinz License, along with similar license agreements, to pay down $145 million of existing debt.

    **B.     Recent Headways and Liquidity Pressures**

51.     The Company and its franchisees operate in the branded casual dining space in the U.S., Americas, Asia, Australasia and the Middle East. All of these geographies have been through recent turbulence which has significantly impacted and altered the casual dining market. Conflicts in the Middle East and Ukraine disrupted supply chains, in particular of ingredients and food produce. Global inflation increases have resulted in significant interest rate increases with respect

DEBTORS EXHIBIT 1
Page 17 of 25

to the Company's debt and has made obtaining additional financing more difficult. In addition, these pressures have also resulted in universal pressure on individuals' finances, resulting in generally less disposable income and, therefore, less of an ability to dine out in casual dining establishments.

52. With lingering volatility and inflation, customers in 2023 and 2024 continued to feel the effects of inflation, and increasingly became cost-conscious for out-of-home dining and sought out value. Compared to US publicly traded competitors with large advertising budgets, the Company had much more limited resources to market on a national scale and lost market share as a result. Into 2024, the Company's strategy shifted to provide value, without significantly impairing margin, and focused its marketing strategy on local, store-level advertising, programming, and events to drive traffic.

53. Similar to its peers, the Company has struggled with rising costs in recent years, particularly as consumers have shifted towards limited-service options. In addition, decreased sales have led to tightened liquidity. For example, the Company's U.S. sales have declined by 15% over the last year, which was due to unit closures and weaker average unit volumes.

54. On March 2, 2017, the Company and Citibank, N.A., as trustee (the "Trustee") entered into a base indenture (the "Indenture") and management agreement (the "Management Agreement"). The transaction was a whole business securitization, where the Company issued two series of notes. The notes were collateralized by the Company's existing and future franchise agreements, existing and future company-operated restaurant royalties, license agreements, existing and future intellectual property, and related revenues. Under the Management Agreement, TGIF Fundings, LLC, TGI Fridays Franchisor, LLC, and TGIF SPV Guarantor, LLC (collectively,

DEBTORS EXHIBIT 1
Page 18 of 25

the "Securitization Entities") engaged TGI Friday's, Inc. as manager (the "Manager") to enforce their rights and powers and perform their duties. Pursuant to the Indenture, the Manager was required to furnish a report by independent auditors or the back-up manager summarizing the findings of certain agreed upon procedures within a set time period (the "Manager Report").

55. On September 3, 2024, the Trustee declared a manager termination event, which terminated TGI Friday's Inc. as Manager. The termination was purportedly due to several reasons, including, among other things, the Manager's failure to furnish the Manager Report. TGI Friday's Inc. continues to provide management services under the terms of a TSA (defined below). Until a successor is named, FTI Consulting, Inc. ("FTI") has served and will continue to serve as the back-up Manager. FTI's responsibilities included exercising inspection and audit rights against the securitization entities, restructuring and re-negotiating transaction documents those entities entered into, implementing personnel decisions, and liquidating collateral if reasonably necessary.

56. Subsequently, TGIF and the Securitization Entities entered into that certain *Transition Services Agreement* (the "TSA") dated as of October 29, 2024, pursuant to which the Debtors will continue to provide certain corporate and support services for the benefit of the domestic and international franchisees, including, among other things, services related to marketing, menu and product offerings, vendor management, IT support, intellectual property, and accounting (the "Continued Services"). The TSA provides that the Debtors shall provide the Continued Services through November 15, 2024, which may be (i) upon written notice to TGIF, extended by additional seven day periods until December 31, 2024 and (ii) upon written agreement between TGIF and the Securitization Entities, extended by additional seven day periods until March 31, 2025.

DEBTORS EXHIBIT 1
Page 19 of 25

57.     As a result of the termination of TGI Friday's Inc. as Manager, the Company lost a significant portion of its revenue stream as the Company would no longer receive the benefit of the restaurant royalty payments.

58.     In October 2024, the Company engaged Ropes & Gray LLP and Berkeley Research Group, LLC to assist with prepetition initiatives and engagement with the existing lenders under the Company's capital structure.  The Company and its advisors have worked tirelessly to closely to monitor the Company's liquidity and to strategize and implement various strategic initiatives to address operational and liquidity concerns.  The Debtors' intent is to work as quickly as possible to finalize potential value maximizing transactions and move expeditiously to the successful resolution of these chapter 11 cases.

59.     The Debtors intend to run a marketing process for the sale of substantially all of the Debtors assets under section 363 of the Bankruptcy Code.  The Debtors have received several indications of interest with respect to a sale of the Debtors' assets and believe that they will receive further indications of interest in the coming days.

## IV.     FIRST DAY MOTIONS AND RELATED RELIEF REQUESTED

60.     In connection with the filing of their chapter 11 petitions, the Debtors filed the below-listed First Day Motions requesting relief that the Debtors believe is necessary to enable them to administer their estates with minimal disruption and loss of value during these chapter 11 cases.  The facts set forth in each of the First Day Motions are incorporated herein in their entirety.[4]

---

[4]     Capitalized terms used in this section but not otherwise defined herein shall have the meanings ascribed to them in the respective First Day Motions.

DEBTORS EXHIBIT 1
Page 20 of 25

(i)    **Administrative Motions:**

1.    Joint Administration Motion.  *Debtors Emergency Motion for Entry of an Order Directing Joint Administration of Their Chapter 11 Cases*;

2.    Claims Agent Application.  *Debtors' Application for Entry of Interim and Final Orders Authorizing the Employment and Retention of Stretto, Inc. as Claims, Noticing, and Solicitation Agent Effective as of the Petition Date*; and

3.    Creditor Matrix Motion.  *Debtors' Emergency Motion for Entry an Order (I) Authorizing Debtors to File a Consolidated (A) Creditor Matrix and (B) Top 50 Creditors List, (II) Authorizing Redaction of Certain Personal Identification Information, and (III) Granting Related Relief.*

4.    Schedules and SOFA Extension Motion.  *Debtors' Emergency Motion for Order Extending Time to File Schedules of Assets and Liabilities and Statements of Financial Affairs.*

(ii)    **Financing Motions:**

5.    Debtor-in-Possession Motion.  *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Claims, (III) Granting Adequate Protection (IV) Modifying the Automatic Stay, (III) Scheduling a Final Hearing; and (IV) Granting Related Relief*;

(ii)    **Operational Motions:**

6.    Cash Management Motion.  *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Continue to Operate Their Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms, and (D) Continue Certain Intercompany Transactions, and (II) Granting Related Relief*;

7.    Insurance Motion.  *Debtors' Emergency Motion for Entry of an Order (I) Authorizing Debtors to (A) Maintain Existing Insurance Policies and Pay All Insurance Obligations Arising Thereunder, and (B) Renew, Supplement,*

DEBTORS EXHIBIT 1
Page 21 of 25

*Modify, or Purchase Insurance Coverage, (II) Authorizing Continuation and Renewal of Surety Bond Program; and (III) Granting Related Relief;*

8. <u>Taxes Motion</u>. *Debtors' Motion for Entry of an Order (I) Authorizing Debtors to Pay Certain Prepetition Taxes and Fees and (II) Granting Related Relief;*

9. <u>Utilities Motion</u>. *Debtors' Emergency Motion for Entry an Orders (I)(A) Approving Debtors' Proposed Form of Adequate Assurance of Payment for Future Utility Services, (B) Approving the Debtors' Proposed Procedures for Resolving Additional Assurance Requests, and (C) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Services; and (II) Granting Related Relief;*

10. <u>Wages Motion</u>. *Debtors' Emergency Motion for Entry of an Order (I) Authorizing Debtors to (A) Pay Prepetition Wages, Employee Benefits Obligations, and Other Compensation and (B) Continue Employee Benefits Programs and Pay Related Administrative Obligations and (II) Granting Related Relief;*

11. <u>503(b)(9) and PACA/PASA Motion</u>. *Debtors' Emergency Motion for Entry of an Order (I) Authorizing Debtors to Pay Certain Prepetition Claims of Certain Section 503(b)(9) Claimants, and PACA/PASA Claimants (II) Authorizing Banks to Honor and Process Checks and Electronic Transfer Requests, and (III) Granting Related Relief;*

12. <u>Customer Programs Motion</u>. *Debtors' Emergency Motion for Entry of an Order (I) Authorizing Debtors to Maintain and Administer Their Existing Customer Programs and Honor Certain Prepetition Obligations Related Thereto and (II) Granting Related Relief;*

13. <u>Lease Rejection Motion</u>. *Debtors' Emergency Motion for Entry of an Order (I) Authorizing Rejection of Certain Contracts and Nonresidential Real Property Leases, (II) Abandoning Certain Personal Property, and (III) Granting Related Relief;* and

14. <u>Rejection Procedures Motion</u>. *Debtors' Emergency Motion for Entry of an Order (I) Authorizing and Approving Procedures to Reject Executory Contracts and Unexpired Leases and (II) Granting Related Relief.*

61. The First Day Motions request authority to, among other things, honor workforce-related compensation and benefits obligations, pay claims of certain taxing authorities and prepetition trade claimants, continue to honor certain customer programs, extend the deadline

DEBTORS EXHIBIT 1
Page 22 of 25

for filing schedules of assets and liabilities and statements of financial affairs, and continue the Debtors' cash management system and other operations in the ordinary course of business to ensure minimal disruption of the Debtors' business operations during these chapter 11 cases. For the avoidance of doubt, the Debtors request authority, but not direction, to pay amounts or satisfy obligations with respect to the relief requested in the First Day Motions.

62.     The Debtors have tailored their requests for immediate relief to those circumstances when the failure to receive such relief would cause immediate and irreparable harm to the Debtors and their estates. I believe an orderly transition into chapter 11 is critical to the viability of the Debtors' operations and that any delay in granting the relief described below could hinder the Debtors' operations and cause irreparable harm. Other requests for relief will be deferred for consideration at a later hearing.

63.     I have reviewed each of the First Day Motions and am familiar with the content and substance contained therein. The facts set forth in each First Day Motion are true and correct to the best of my knowledge and belief with appropriate reliance on other corporate officers and advisors and I can attest to such facts. I believe the relief requested in each of the First Day Motions listed above (a) is necessary to allow the Debtors to operate with minimal disruption and productivity losses during these chapter 11 cases, (b) is critical to ensure the maximization of value of the Debtors' estates, (c) is essential to achieving a successful reorganization, and (d) serves the best interests of the Debtors' stakeholders.

## CONCLUSION

64.     The Debtors' ultimate goal in these chapter 11 cases is to achieve an orderly, efficient, consensual, and successful reorganization and value maximizing result for the Debtors'

DEBTORS EXHIBIT 1
Page 23 of 25

stakeholders.  To minimize any loss of value, the Debtors' immediate objective is to maintain a business-as-usual atmosphere during the course of these chapter 11 cases, with as little interruption or disruption to the Debtors' operations as possible.  I believe that if the Court grants the relief requested by the First Day Motions, the prospect for achieving these objectives will be substantially enhanced.

[*Remainder of Page Intentionally Left Blank*]

24

DEBTORS EXHIBIT 1
Page 24 of 25

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: November 3, 2024                    /s/ Kyle Richter
                                           Kyle Richter
                                           Chief Restructuring Officer

DEBTORS EXHIBIT 1
Page 25 of 25