**ROPES & GRAY LLP**
Chris L. Dickerson (*pro hac vice* pending)
Rahmon J. Brown (*pro hac vice* pending)
191 North Wacker Drive, 32nd Floor
Chicago, Illinois 60606
Telephone: (312) 845-1200
Facsimile: (312) 845-5500
chris.dickerson@ropesgray.com
rahmon.brown@ropesgray.com

*Proposed Counsel for the Debtors*

**FOLEY & LARDNER LLP**
Holland N. O'Neil (TX 14864700)
Mark C. Moore (TX 24074751)
Zachary C. Zahn (TX 24137675)
2021 McKinney Avenue, Suite 1600
Dallas, TX 75201
Telephone: (214) 999-3000
Facsimile: (214) 999-4667
honeil@foley.com
mmoore@foley.com
zzahn@foley.com

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| TGI Friday's Inc., *et al.*,[1] | Case No. 24-80069-sgj11 |
| Debtors. | (Jointly Administered) |

**DEBTORS' EMERGENCY MOTION FOR ENTRY OF AN ORDER
APPROVING (I) BIDDING PROCEDURES, THE SALE TIMELINE, AND THE FORM
AND MANNER OF NOTICE THEREOF; (II) THE DEBTORS' ENTRY INTO
AND PERFORMANCE UNDER A STALKING HORSE APA; (III) ASSUMPTION
AND ASSIGNMENT PROCEDURES; AND (IV) GRANTING RELATED RELIEF**

EMERGENCY RELIEF HAS BEEN REQUESTED. RELIEF IS REQUESTED NOT LATER THAN 11:00 A.M. ON NOVEMBER 18, 2024.

IF YOU OBJECT TO THE RELIEF REQUESTED OR YOU BELIEVE THAT EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU MUST APPEAR AT THE HEARING IF ONE IS SET, OR FILE A WRITTEN RESPONSE PRIOR TO THE DATE THAT RELIEF IS REQUESTED IN THE

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are: TGI Friday's Inc. (7117); TGI Friday's NY, LLC (2281); TGIF Holdings, LLC (7999); TGIF Midco, Inc. (7296); TGIF Parent, Inc. (1781); Burlington Towne Crossing, Inc. (7501); T G I Friday's of Greenbelt, Inc. (5617); T G I Friday's of Towson, Inc. (5450); T G I Friday's of Wisconsin, Inc. (7600); T.G.I. Friday's Marketing Advisory Council (6527); T.G.I. Friday's of Charles County, Inc. (3516); T.G.I. Friday's of Frederick County, Inc. (2547); T.G.I. Friday's of Hartford County, Inc. (0072); T.G.I. Friday's of Washington County, Inc. (6174); TGI Friday's of Annapolis, Inc. (8315); TGI Friday's of Howard County, Inc. (0119); TGI Friday's of Rockville, Inc. (2004); TGI Friday's of Texas LLC (3931); TGI Friday's of the Rockies, Inc. (7885); TGIF/DFW Manager, LLC (N/A); TGIF/DFW Partner, LLC (N/A); TGIF/JDC Restaurant Development, LLC (N/A); WEBCO Products Incorporated (3014). The Debtors' service address is 19111 North Dallas Parkway, Suite 200, Dallas, TX 75287.

> **PRECEDING PARAGRAPH. OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.**

TGI Friday's Inc. and its affiliated debtors and debtors in possession (each a "Debtor" and, collectively, the "Debtors") in the above-captioned chapter 11 cases, by and through their undersigned proposed counsel, hereby submit this motion (this "Motion") for entry of an order granting the relief described below.  In support hereof, the Debtors rely on the *Declaration of Kyle Richter, Chief Restructuring Officer of the Debtors, in Support of the Debtors' Chapter 11 Petitions and First Day Motions* [Docket No. 30] (the "First Day Declaration"),[2] and further represent as follows:

## JURISDICTION AND VENUE

1.      The United States Bankruptcy Court for the Northern District of Texas (the "Court") has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334.

2.      This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue of these chapter 11 cases and this Motion is proper in this district under 28 U.S.C. §§ 1408 and 1409.

3.      The statutory bases for the relief requested herein are sections 105, 363, 365, and 1123 of title 11 of the United States Code, as amended (the "Bankruptcy Code"), Rules 2002, 6004, and 6006 of the Federal Rules of Bankruptcy Procedures (the "Bankruptcy Rules"), and rule 2002-1 of the Local Bankruptcy Rules of the United States Bankruptcy Court for the Northern District of Texas (the "Local Rules").

## RELIEF REQUESTED

4.      By this Motion, the Debtors seek entry of an order approving, among other things, certain dates critical to the Debtors' proposed bidding and sale process, the Debtors' proposed Sale

---

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the First Day Declaration.

Timeline, and assumption and assignment procedures (the "Bidding Procedures Order") in substantially the form attached hereto as **Exhibit A**. The Debtors will seek approval of an order, substantially in a form or forms to be filed prior to the Sale Hearing (as defined below), (the "Sale Order"): (a) approving one or more sales of the Assets (as defined below) free and clear of liens, claims, interests, and encumbrances; (b) approving the assumption and assignment of the Debtors' executory contracts and unexpired leases (if any) as may be requested by a Stalking Horse Purchaser or the Successful Bidder(s) and the proposed cure amounts with respect thereto; (c) approving the assumption of certain liabilities; and (d) granting related relief

5.    The relief sought in the proposed Bidding Procedures Order includes but is not limited to the following:

(a)    setting Friday, December 13, 2024 at 4:00 p.m. (prevailing Central Time) as the bid deadline with respect to the Debtors' proposed sale of substantially all of their assets (the "Bid Deadline");

(b)    setting Wednesday, December 18, 2024 as the date on which the Debtors will conduct an auction with respect to their proposed sale of substantially all of their assets (the "Auction");

(c)    scheduling a hearing on approval of the proposed sale or sales (the "Sale") of some or all of the Debtors' assets (the "Assets"), on or before Friday, December 20, 2024 (the "Sale Hearing") or as soon thereafter as the Court may be available (together with (a), (b), and (c), the "Sale Timeline"), and approving the form and manner of notice thereof;

(d)    approving bidding procedures for the Sale (collectively, the "Bidding Procedures," a copy of which is attached as **Exhibit 1** to the Bidding Procedures Order), and the form and manner of notice thereof;

(e)    approving a form of asset purchase agreement (a "Stalking Horse APA") to be filed prior to the hearing on this Motion;

(f)    approving the Bid Protections (as defined herein);

(g)    approving procedures for the assumption and assignment of certain executory contracts and unexpired leases in connection with the Sale (each, an "Assumed Contract" and collectively, the "Assumed Contracts"), and approving the form and manner of notice thereof, attached as **Exhibit 3** to the Bidding Procedures Order (the "Assumption Notice"); and

(h)    granting related relief.

## PROVISION HIGHLIGHTS PURSUANT TO SECTION E OF THE COMPLEX CASE PROCEDURES

6.    The below chart contains a summary of the material terms of the proposed Bidding Procedures Order, as required by Section E of the Complex Case Procedures:[3]

| Relevant Complex Case Procedure | Summary | References |
|---|---|---|
| **Provisions Providing Bid Protections to "Stalking Horse" or Initial Bidder.**<br><br>Complex Case Procedures ¶ 19(a) | Stalking Horse Declaration and Bid Protections: In the exercise of their business judgment and in their sole discretion, the Debtors may at any time prior to the Auction, without further order of the Bankruptcy Court, without any obligation to do so, and after consulting with the Consultation Parties, select one or more bidders to act as a stalking horse (each being a "Stalking Horse Purchaser" with the relevant bid being a "Stalking Horse Bid") for some or all of the Debtors' assets. The Debtors may, but are not required to, agree to provide (i) stalking horse expense reimbursement of up to $50,000 (the "Expense Reimbursement") and (ii) a break-up fee in an amount not to exceed 3% of the cash component of the Stalking Horse Bid (if any) (the "Break-Up Fee" and together with the Expense Reimbursement, the "Bid Protections"); *provided* that the Bid Protections shall only be paid pursuant to the terms of an order approving a Sale Transaction. The Bid Protections shall only be payable if (i) a Stalking Horse Bidder, being ready, willing, and able to close its Transaction is not the Winning Bidder at the Auction, (ii) the Bankruptcy Court authorizes the Debtors to enter into an Alternative APA, and (iii) if such Alternative APA is for a Sale, such Sale actually closes.<br><br>To the extent a determination is made to provide Bid Protections, the Debtors will file notice of the same with the Bankruptcy Court, and such Bid Protections may be paid without further action or order of the Bankruptcy Court.<br><br>Notwithstanding anything herein to the contrary, the Stalking Horse Purchaser will be deemed to be a Qualifying Bidder (as defined below), and the Stalking Horse Bid (including as it may be modified at the Auction (if any) in | Bidding Procedures Order ¶¶ D, 10<br><br><br><br>Bidding Procedures §§ 1, 11(g) |

---

[3] This summary is qualified in its entirety by reference to the provisions of the documents referenced.  In the event of any inconsistencies between this summary and such documents, the terms of the applicable documents shall control.

| | | |
|---|---|---|
| | accordance with the terms therein and herein) will be deemed to be a Qualifying Bid (as defined below).<br><br>Initial Overbid and Bidding Increments:  The Auction shall be conducted in an open cry format (and not by way of sealed bids).  Bidding shall commence at the amount of the Baseline Bid(s), and the Auction Bidders may submit successive bids in increments of at least $100,000.00, *provided* that: (i) each such successive bid must be a Qualifying Bid; and (ii) the Debtors shall retain the right to modify the bid increment requirements at the Auction<br><br>The Bidding Procedures Order does not include no-shop or non-solicitation provisions, or any requirement that a Stalking Horse Bidder (if any) receive a "credit" equal to the Break-Up Fee. | |
| **Provisions Governing Qualification of Bidders.**<br><br>Complex Case Procedures ¶ 19(b) | Qualified Bidders: Other than in the case of the Stalking Horse Purchaser and the Stalking Horse APA, which shall be considered a Qualifying Bidder and a Qualifying Bid, respectively, for all purposes under the Bidding Procedures, without any regard to any of the requirements or conditions set forth therein and without any other or further action by the Stalking Horse Purchaser, to be deemed a "Qualifying Bid," a bid must be received from a Potential Bidder before the Bid Deadline and satisfy each of the following requirements (each, a "Bid Requirement"):<br><br>a.        be in writing;<br><br>b.        include a clean and duly executed asset purchase agreement (an "Alternative APA") and a marked copy of the Alternative APA and an alternative Sale order showing any variations from the Stalking Horse APA or the Sale Order, as applicable;<br><br>c.        fully disclose the identity of the Potential Bidder (and to the extent that the Potential Bidder is a newly formed acquisition entity or the like, the identity of the Potential Bidder's parent company or sponsor), and details regarding the ownership and capital structure of the Potential Bidder, as well as the identity of any controlling persons, significant direct or indirect equity or debt investors, and/or guarantors of such entity, and any known connections the Potential Bidder has to the Debtors or their advisors, any official committee appointed in these chapter 11 cases, or its advisors, the DIP Lender or its advisors, or any creditor or equity security interest holder of the Debtors and provide the contact information of the specific person(s) whom the Debtors or their advisors should contact in the event that the Debtors have any questions or wish to discuss the bid submitted by the Potential Bidder;<br><br>d.        set forth the purchase price to be paid by such Potential Bidder, which purchase price shall include an aggregate amount of cash sufficient to pay all DIP | Bidding Procedures Order ¶¶ 8, 23<br><br><br>Bidding Procedures § 7 |

Obligations (as defined in the DIP Order) in cash in full at closing;

e.        identify separately any cash and non-cash components, which non-cash components shall be limited only to credit bids in accordance with section 363(k) of the Bankruptcy Code and assumed liabilities;

f.        state the liabilities proposed to be paid or assumed by such Potential Bidder;

g.        specify the Assets that are included in the bid and state that such Potential Bidder offers to (i) purchase the Assets, or a number or combination of the Assets, and (ii) assume liabilities, upon substantially the same terms as, or terms more favorable to the Debtors and their estate than, the terms set forth in the Stalking Horse APA;

h.        state that such Potential Bidder's offer is formal, binding and unconditional, and is irrevocable until two (2) business days after the closing of the Sale with respect to the applicable Assets;

i.        to the extent that a bid is not accompanied by evidence of a Potential Bidder's capacity to consummate the applicable Sale with cash on hand, the bid must include unconditional committed financing from a reputable financing institution, documented to the satisfaction of the Debtors in consultation with the Consultation Parties, including appropriate contact information for such financing sources, that demonstrates that the Potential Bidder has:  (i) received sufficient debt and/or equity funding commitments to satisfy the Potential Bidder's purchase price and other obligations under its bid; and (ii) adequate working capital financing or resources to finance going concern operations for the Assets.  Such funding commitments or other financing must be unconditional and must not be subject to any internal approvals, syndication requirements, diligence, or credit committee approvals, and shall have covenants and conditions reasonably acceptable to the Debtors, in consultation with the Consultation Parties;

j.        contain such financial and other information to allow the Debtors to make a reasonable determination, after consultation with the Consultation Parties, as to the Potential Bidder's financial and other capabilities to close the transactions contemplated by the applicable Alternative APA, including, without limitation, such financial and other information supporting the Potential Bidder's ability to comply with the requirements of adequate assurance of future performance under section 365(f)(2)(B) and, if applicable, section 365(b)(3) of the Bankruptcy Code, including the Potential Bidder's financial wherewithal and willingness to perform under any contracts and leases that are assumed and assigned to the Potential Bidder, in a form that allows the Debtors to serve such information on any counterparties to such contracts or leases in connection

with the Sale within one (1) business day after the Debtors' receipt of such information. To the extent that the Potential Bidder (other than the Stalking Horse Purchaser) is a newly formed acquisition entity or the like, the financial and other information supporting the Potential Bidder's financial wherewithal shall include financial and other information supporting the financial wherewithal of the Potential Bidder's parent company or sponsor;

k.    identify with particularity each and every executory contract and unexpired lease, the assumption and assignment of which is a condition to close the transactions contemplated by the Alternative APA;

l.    include closing conditions that are no less favorable to the Debtors than the closing conditions contained in the Stalking Horse APA (and specify such closing conditions in the applicable Alternative APA);

m.    include a statement that the bid does not request or entitle such Potential Bidder to any break-up fee, termination fee, expense reimbursement, or similar type of payment or reimbursement;

n.    not contain any contingencies of any kind, including, without limitation, contingencies related to financing, internal approval, or due diligence, other than Bankruptcy Court approval of the Sale;

o.    contain a written acknowledgement and representation that the Potential Bidder (i) has had an opportunity to conduct any and all due diligence regarding the Assets, (ii) has relied solely upon its own independent review, investigation or inspection of any documents and other information in making its bid, and (iii) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Assets, or the completeness of any documents or other information provided in connection with the Bidding Procedures and the Sale;

p.    set forth any regulatory and third-party approvals required for the Potential Bidder to close the transactions contemplated by the Alternative APA, and the time period within which the Potential Bidder expects to receive such regulatory and third-party approvals (and in the case that receipt of any such regulatory or third-party approval is expected to take more than five (5) days following execution and delivery of such Potential Bidder's Alternative APA, those actions the bidder will take to ensure receipt of such approval(s) as promptly as possible); *provided* that a Potential Bidder agrees that its legal counsel will coordinate in good faith with the Debtors' legal counsel to discuss and explain the Potential Bidder's regulatory analysis, strategy, and timeline for securing all such approvals as soon as reasonably practicable, and in no event later than the time period contemplated in the

<table>
<tr><td></td><td>

Alternative APA; *provided*, *further* that the bid contains a covenant to cooperate with the Debtors to provide pertinent factual information regarding the bidder's operations reasonably required to analyze issues arising with respect to any applicable antitrust laws and other applicable regulatory requirements;

q.      provide for a binding commitment of the Potential Bidder to serve as a backup bidder (the "<u>Back-Up Bidder</u>") if the Potential Bidder's bid is the next highest or otherwise best bid (the "<u>Back-Up Bid</u>") after the Winning Bid, with respect to the applicable Assets;

r.      include written evidence of authorization and approval from the Potential Bidder's board of directors (or comparable governing body) with respect to the submission, execution, and delivery of the Alternative APA;

s.      provide a good faith cash deposit (the "<u>Deposit</u>") in an amount equal to ten percent (10%) of the aggregate purchase price provided for in the Alternative APA (or such additional amount as may be determined by the Debtors in their reasonable discretion);

t.      state or otherwise estimate the types of, and costs or charges for, transition services, if any, the Potential Bidder would require of or provide to the Debtors, including an estimate of the time any such transition services would be required of or provided to the Debtor; and

u.      provide that in the event of the Potential Bidder's breach of, or failure to perform under, the Alternative APA, the Debtors and their estates shall be entitled to pursue all available legal and equitable remedies, including, without limitation, retention of the Deposit as part of the damages resulting to the Debtors and their estates for such breach or failure to perform.

A bid from a Potential Bidder satisfying all of the above requirements, as determined by the Debtors, in consultation with the Consultation Parties, shall constitute a Qualifying Bid.   The Debtors reserve the right, in their business judgment and in consultation with the Consultation Parties, to waive any of the Bid Requirements or work with any Potential Bidder in advance of the Auction to cure any deficiencies in a bid that is not initially deemed a Qualifying Bid.

Each Potential Bidder submitting a bid shall be deemed to: (a) acknowledge and represent that it is bound by all of the terms and conditions of the Bidding Procedures; and (b) have waived the right to pursue a substantial contribution claim under section 503 of the Bankruptcy Code related in any way to the submission of its bid, the Bidding Procedures, the Auction, or the Sale.

</td><td></td></tr>
<tr><td>

**Provisions Governing
Qualified Bids.**

</td><td>

<u>Bid Deadline</u>: A Potential Bidder, other than one designated as the Stalking Horse Purchaser, that desires to make a bid

</td><td>

Bidding Procedures
§ 8

</td></tr>
</table>

| | | |
|---|---|---|
| Complex Case Procedures ¶ 19(c) | shall deliver a written and electronic copy of its bid in both PDF and MS-WORD format to the Bidding Procedures Notice Parties (as defined herein) and the Consultation Parties so as to be received on or before **Friday, December 13, 2024  at 4:00 p.m. (CT)** (the "Bid Deadline"); *provided* that the Debtors may extend the Bid Deadline without further order of the Court, after consultation with the Consultation Parties and upon consent of the DIP Lender. To the extent that the Bid Deadline is extended for all parties, the Debtors shall file a notice on the docket of their chapter 11 cases indicating the same.  **Any party that does not submit a bid by the Bid Deadline will not be allowed to (a) submit any bids after the Bid Deadline or (b) participate in the Auction.** | |
| **Modification of Bidding and Auction Procedures.**<br><br>Complex Case Procedures ¶ 19(d) | Reservation of rights: Notwithstanding any of the foregoing, the Debtors, in consultation with the Consultation Parties, may (a) upon consent of the DIP Lender, extend the deadlines set forth in the Bidding Procedures Order or the Bidding Procedures, and (b) adopt, implement, and waive such other, additional or existing procedures or requirements that, in their business judgment, will encourage an orderly Auction and bid process, including, but not limited to, the imposition of a requirement that all Qualifying Bidders submit sealed Qualifying Bids during the Auction, all without further notice except to the Auction Participants, as appropriate; *provided*, however, that the prior written consent of the DIP Lender is required to modify the minimum amount of consideration required for an Alternative APA to be the Baseline Bid pursuant to Section 9.<br><br>The Debtors, in consultation with the Consultation Parties, may (a) determine which Qualifying Bid(s), if any, is the Winning Bid(s) with respect to any subset of Assets, and (b) reject at any time before entry of the Sale Order approving the Winning Bid(s), any bid (other than the Stalking Horse Bid) that, in the discretion of the Debtors, in consultation with the Consultation Parties, is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bankruptcy Code or the Bidding Procedures, or (iii) contrary to the best interests of the Debtors' estates and their creditors.  At or before the conclusion of the Auction, the Debtors, in consultation with the Consultation Parties, may impose such other terms and conditions upon Qualifying Bidders as the Debtors determine to be in the best interests of the Debtors' estates in these cases. | Bidding Procedures Order ¶¶ 4, 26<br><br>Bidding Procedures § 18 |
| **Closing with Alternative Back-Up Bidders.**<br><br>Complex Case Procedures ¶ 19(e) | Back-Up Bidder: Notwithstanding any of the foregoing, in the event that a Sale to the applicable Winning Bidder is terminated or fails to close by the outside date identified in the Winning Bid (or such date as may be extended by the Debtors in consultation with the Consultation Parties and upon consent of the DIP Lender), the applicable Back-Up Bid will be deemed to be the Winning Bid with respect to the Applicable Assets, the applicable Back-Up Bidder will be deemed to be the applicable Winning Bidder, and the Debtors shall be authorized to close the Sale of the | Bidding Procedures Order ¶ 8<br><br>Bidding Procedures § 13 |

|  |  |  |
|---|---|---|
|  | applicable Assets to such Back-Up Bidder on the terms of its Back-Up Bid without the need for further order of the Court and without the need for further notice to any interested parties. |  |
| **Provisions Governing the Auction.**<br><br>Complex Case Procedures ¶ 19(f) | Auction: If the Debtors timely receive one or more Qualifying Bids other than the Stalking Horse Bid, then the Debtors shall conduct an auction (the "Auction"). Following the Auction, the Debtors will determine, in consultation with the Consultation Parties, which Qualifying Bid or combination of Qualifying Bids is the highest or otherwise best bid for the Assets, which will be determined by considering, among other things, the following non-binding factors: (a) the number, type and nature of any changes to the Stalking Horse APA requested by each Qualifying Bidder; (b) the extent to which such modifications are likely to delay closing of the Sale and the cost to the Debtors and their estates of such modifications or delay; (c) the total consideration to be received by the Debtors and their estates (provided, for the avoidance of doubt, that a credit bid shall not be considered inferior to a comparable cash or other non-cash bid because it is a credit bid); (d) the transaction structure and execution risk, including conditions to, timing of and certainty of closing, termination provisions, availability of financing and financial wherewithal to meet all commitments, and required governmental or other approval; (e) the net benefit to the Debtors' estates; and (f) any other factors the Debtors may reasonably deem relevant in their business judgment.<br><br>Closing of Auction and Selection of Successful Bid: Upon the conclusion of the Auction, the Debtors shall determine, in consultation with the Consultation Parties, and subject to Court approval, the offer or offers for the Assets (or any subset thereof, if applicable) that is or are the highest or otherwise best from among the Qualifying Bids submitted at the Auction (the "Winning Bid"). In making this decision, the Debtors shall consider, in consultation with the Consultation Parties, the amount of the purchase price, the assumption of liabilities, the likelihood of the bidder's ability to close the proposed transaction and the timing thereof, the number, type and nature of any changes to the Stalking Horse APA or the applicable Alternative APA(s), as applicable, requested by each bidder, and the net benefit to the Debtors' estates. The bidder(s) submitting such Winning Bid at the Auction shall become the "Winning Bidder," and shall have such rights and responsibilities of the purchaser as set forth in the Stalking Horse APA or any Alternative APA, as applicable. The Debtors shall designate a Back-Up Bid (and the corresponding Back-Up Bidder) to purchase the Assets (or any subset thereof, if applicable) in the event that the Winning Bidder does not close the applicable Sale.<br><br>No Collusion: Prior to the start of the Auction, each of the Auction Bidders shall confirm that they have not engaged | Bidding Procedures Order ¶ 8<br><br>Bidding Procedures § 11 |

| | in any collusion with respect to the Bidding Procedures, the Auction or the Sale. | |
|---|---|---|

## BACKGROUND

1.       On November 2, 2024 (the "<u>Petition Date</u>"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors remain in possession of their property and continue to operate and manage their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request has been made for the appointment of a trustee or examiner, and no official committee has been appointed in the Chapter 11 Cases.

2.       Founded in 1965 in New York City, New York, the Debtors are the owners and franchisors of original casual dining bar and grill, TGI Fridays, offering classic American food and beverages, with 39 restaurant locations being owned and operated by the Debtors.  The Debtors are known for bringing people together to socialize and celebrate the liberating spirit of "Friday."  The Debtors boast a considerable international presence, and the vast majority of its restaurants are franchises.

7.       On November 4, 2024 the Court entered the *Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (III) Authorizing the Use of Cash Collateral, (IV) Modifying the Automatic Stay, and (V) Scheduling a Final Hearing* [Docket No. 61] (the "<u>Interim DIP Order</u>").  Pursuant to the Interim DIP order, the Debtors Texas Partners Bank, a Texas state bank doing business as The Bank of San Antonio, as lender (the "<u>DIP Lender</u>") agreed to certain case milestones ("<u>DIP Financing Milestones</u>") to preserve and maximize the value of the Debtors' assets and operations.

## THE PROPOSED BIDDING PROCEDURES AND SALE

**A.     The Events Leading to the Sale Process**

8.     Similar to its peers, the Company has struggled with rising costs in recent years, particularly as consumers have shifted towards limited-service options.  In addition, decreased sales have led to tightened liquidity.  For example, the Company's U.S. sales have declined by 15% over the last year, which was due to unit closures and weaker average unit volumes.

9.     On March 2, 2017, the Company and Citibank, N.A., as trustee (the "Trustee") entered into a base indenture (the "Indenture") and management agreement (the "Management Agreement").  The transaction was a whole business securitization, where the Company issued two series of notes.  The notes were collateralized by the Company's existing and future franchise agreements, existing and future company-operated restaurant royalties, license agreements, existing and future intellectual property, and related revenues.  Under the Management Agreement, TGIF Fundings, LLC, TGI Fridays Franchisor, LLC, and TGIF SPV Guarantor, LLC (collectively, the "Securitization Entities") engaged TGI Friday's, Inc. as manager (the "Manager") to enforce their rights and powers and perform their duties.  Pursuant to the Indenture, the Manager was required to furnish a report by independent auditors or the back-up manager summarizing the findings of certain agreed upon procedures within a set time period (the "Manager Report").

10.     On September 3, 2024, the Trustee declared a manager termination event, which terminated TGI Friday's Inc. as Manager.  The termination was purportedly due to several reasons, including, among other things, the Manager's failure to furnish the Manager Report. TGI Friday's Inc. continues to provide management services under the terms of a TSA (defined below).  Until a successor is named, FTI Consulting, Inc. ("FTI") has served and will continue to serve as the back-up Manager.  FTI's responsibilities included exercising inspection and audit rights against

the securitization entities, restructuring and re-negotiating transaction documents those entities entered into, implementing personnel decisions, and liquidating collateral if reasonably necessary.

11.     As a result of the termination of TGI Friday's Inc. as Manager, the Company lost a significant portion of its revenue stream as the Company would no longer receive the benefit of the restaurant royalty payments.

12.     Without a viable path forward on an out-of-court basis, and facing an increasing liquidity strain and imminent debt maturities, the Debtors began considering in-court options and eventually filed chapter 11 petitions on the Petition Date.  The Debtors determined that the most actionable path forward under the circumstances was to conduct a sale of all or a portion of their assets pursuant to the procedures set forth herein.  In order to receive DIP Financing, the Debtors agreed, as part of the DIP Financing Milestones, to (i) hire an investment banker to assist with a robust marketing process for the Debtors assets and (ii) execute an asset purchase agreement with a stalking horse bidder.

13.     In November 2024, the Debtors engaged Hilco Corporate Finance, LLC ("Hilco") to serve as their investment banker, and the Debtors began actively evaluating potential strategies to address their balance sheet, litigation, and liquidity needs.

14.     The Debtors determined that the most actionable path forward under the circumstances was to conduct a sale of all or a portion of their assets (the "Assets") pursuant to the procedures herein.  The Debtors intend to identify a Stalking Horse Purchaser and enter into a Stalking Horse APA with the Stalking Horse Purchaser prior to the Auction.  The Stalking Horse APA will contemplate that the Assets will be sold free and clear (subject to certain Permitted Encumbrances and Assumed Liabilities (each as defined in the Stalking Horse APA)) following a robust marketing, auction, and sale process to determine whether or not the bid submitted by the

Stalking Horse Purchaser (if any) (the "Stalking Horse Bid") is the highest or otherwise best bid

for the Debtors' assets.

**B.      The Proposed Sale Timeline**

15.      The Debtors request that the Court approve the following dates in connection with

the Bidding Procedures and the Sale Timeline:[4]

| Event | Proposed Deadline |
|---|---|
| Entry of the Bidding Procedures Order | On or before Monday, November 18, 2024 |
| Deadline to serve Bid Packages | Within three (3) business days after entry of the Bidding Procedures Order |
| Deadline to file initial list of potential Assumed Contracts and Cure Notice | Within ten (10) business days following entry of the Bidding Procedures Order |
| Deadline for Cure Objections and deadline for counterparties to request adequate assurance documentation from the Debtors | Within fourteen (14) days following service of the Cure Notice |
| Deadline to file Notice of Proposed Sale Order | Friday, December 6, 2024 at 4:00 p.m. (prevailing Central Time) |
| Qualifying Bid Deadline | Friday, December 13, 2024 at 4:00 p.m. (prevailing Central Time) |
| Auction Date (if necessary) | Wednesday, December 18, 2024 |
| Deadline to file Notice of Winning Bidder and for Debtors to provide adequate assurance documentation relating to Winning Bidder and the Back-Up Bidder to counterparties who have requested the same | One (1) day following the closing of the Auction, or as soon as reasonably practicable |
| Deadline to return deposits to non-Qualified Bidders | Within (5) business days following the Qualified Bid Deadline |
| Deadline to Object to the Sale | Thursday, December 19, 2024 at 4:00 p.m. (prevailing Central time) |
| Deadline to object to adequate assurance of future performance by the Stalking Horse Purchaser or other Winning Bidder | Thursday, December 19, 2024 at 4:00 p.m. (prevailing Central time) |
| Deadline to file schedule of Assumed Contracts | Thursday, December 19, 2024 at 4:00 p.m. (prevailing Central time) |
| Hearing to Consider the Sale Order | On or before Friday, December 20, 2024 (subject to the Court's availability) |
| Entry of the Sale Order | No later than Thursday, January 2, 2025 |
| Sale(s) Closing Date | Five (5) days after entry of the Sale Order |
| Deadline to return deposits to non-Winning Bidders or Back-Up Bidders | Within five (5) business days following the closing of the Sale(s) |

16.      The Debtors believe that the Sale Timeline is reasonable in time and scope and

affords parties and creditors with sufficient time to gather information necessary to formulate a

---

[4]      The following dates are consistent with the milestones set forth in the Interim DIP Order [Docket No. 61], or have otherwise been adjusted upon the consent of the DIP Lender.

competitive bid that should maximize the value of the Assets for the benefit of the Debtors' estates and their stakeholders.  Accordingly, the Debtors believe that the Sale Timeline is in the best interests of the Debtors' estates, will establish whether and to what extent a market exists for the Assets, will provide interested parties with sufficient opportunity to participate in any sale transaction(s), and ultimately, will drive a higher and better value for the Assets under the circumstances.

17.    A party's failure to timely file or make an objection in accordance with the Bidding Procedures Order shall forever bar such a party from asserting any objection to the Debtors' consummation of the Sale and the assumption and assignment of certain executory contracts and unexpired leases, and such failure shall be deemed to constitute consent by such contract counterparty to (a) the assumption and assignment of such executory contracts and unexpired leases and (b) consummation of the Sale.

**C.    The Proposed Sale Process**

18.    Among other things, the proposed Bidding Procedures and the Sale Timeline will provide a transparent and comprehensive avenue through which the Debtors will solicit competing bids for the Assets.  Indeed, this work has already begun.  The Stalking Horse APA will serve as the baseline for all prospective bidders to negotiate from, and will be subject to higher or otherwise better bids for the Assets pursuant to the Bidding Procedures.

19.    Consistent with the DIP Financing Milestones, the Debtors have filed this Motion seeking authority to proceed with a bidding and auction process to consummate a sale (or series of sales) that the Debtors expect will generate higher or better value for their Assets.  To facilitate the Sale, the Debtors, in consultation with Hilco and their other professional advisors, are seeking approval of the Bidding Procedures to preserve flexibility in the Sale Process, generate substantial interest in the Assets, and receive the highest or otherwise best value for the Assets.

20.     The Debtors believe the Bidding Procedures create an appropriate timeline for the

Sale Process, consistent with the DIP Financing Milestones.  The Bidding Procedures do not

contemplate exclusivity for the Stalking Horse Purchaser.  Rather, approval of the Debtors' entry

into a Stalking Horse APA benefits the Debtors by serving as a baseline for the Sale Process to

ensure that the Debtors receive the highest or otherwise best offer for the Assets.  Accordingly, the

Debtors do not believe the Bidding Procedures will chill or otherwise hinder additional bids.

**D.      The Stalking Horse APA**

21.     Prior to the hearing on this Motion, the Debtors intend to file an asset purchase

agreement for use and modification by potential bidders (the "Stalking Horse APA").  The Stalking

Horse APA will serve as a baseline for negotiations with all prospective bidders.  The Debtors

seek approval of the Stalking Horse APA, subject to such modifications as may be submitted by

potential bidders and accepted by the Debtors, after consultation with the Consultation Parties in

connection with the Proposed Sale and in the exercise of the Debtors' business judgment. Given

the exigencies of the Debtors' financial condition, the timely sale of the Assets, in accordance with

the DIP Financing Milestones, is a prudent way to ensure that the Debtors obtain the highest or

otherwise best value for their Assets.  The Debtors believe that consummating the transaction

contemplated by the Stalking Horse APA, or a transaction contemplated by a bid that is higher or

otherwise better, will maximize value for the Debtors' estates, and afford the Debtors an

opportunity to continue to service their customers and maintain business relationships with their

partners and vendors.  The Stalking Horse APA will include various customary representations,

warranties, and covenants by and from the Debtors and the Stalking Horse Purchaser, and certain

conditions to closing and rights of termination related to the Sale and these chapter 11 cases.  The

transactions contemplated by the Stalking Horse APA will be subject to approval by the Court and

entry of the Sale Order.

E.        **The Proposed Bidding Procedures**

22.        The Debtors have developed and proposed the Bidding Procedures to facilitate a fair and efficient process for soliciting, receiving, and evaluating bids.  Consistent with the Debtors' goal of implementing a cost-effective Sale, the proposed Bidding Procedures are designed to promote a competitive and value-maximizing sale process and create a path toward entry of the Sale Order that will secure the highest or otherwise best value for the Assets.  In addition, the Debtors believe the Bidding Procedures provide potential bidders with ample notice and time to conduct thorough due diligence and submit binding bids in advance of the Sale Hearing.  As such, the Debtors believe the proposed Bidding Procedures are fair and in the best interests of their estates and stakeholders and should be approved.

23.        The Bidding Procedures describe, among other things, (a) the Assets available for sale, (b) the manner in which bids become "qualified," (c) the coordination of diligence efforts among the bidders and the Debtors, (d) the receipt and negotiation of bids received, (e) the conduct of any Auction, and (f) the selection and approval of the Winning Bidder and the selection of the Back-Up Bidder (as defined below).  The Bidding Procedures reflect the Debtors' objective of conducting the Sale Process in an orderly, fair, and open manner, while ensuring that the highest or otherwise best bid is generated for the Assets.  The Bidding Procedures are attached as **Exhibit 1** to the Bidding Procedures Order.  The Bidding Procedures shall apply to Interested Bidders, Potential Bidders, Qualifying Bidders, the submission, receipt, analysis of all bids relating to the Sale, and the conduct of the Sale and the Auction.

24.        The Debtors respectfully submit that the timeline set forth in the Bidding Procedures, and the Bidding Procedures themselves, are reasonable and necessary under the circumstances of these chapter 11 cases.  Such timeline provides parties in interest sufficient time to diligence the opportunity presented here, and to formulate bids for the Assets.  The Bidding

Procedures were designed with the objective of generating interest in, and driving higher and better value for, the Assets, while allowing the Debtors to close the Sale in a timely and efficient manner.

25.    The Debtors and their professional advisors respectfully submit the Bidding Procedures and the other relief requested herein will facilitate the sale of the Assets for the highest or otherwise best value, help preserve jobs for the Debtors' employees, afford the Debtors with an opportunity to continue their relationships with their customers and vendors, and otherwise maximize recoveries for all stakeholders.    Finally, the robust auction and sale process, contemplated by the Bidding Procedures will also serve as a market test to ensure that the Sale is a value-maximizing transaction for the Debtors and their stakeholders.

26.    The Bidding Procedures contemplate that the Debtors may declare a Stalking Horse Bidder at any time prior to the Auction.  The Stalking Horse Purchaser, if any, will be deemed to be a Qualifying Bidder (as defined in the Bidding Procedures) and the Stalking Horse APA is deemed to be a Qualifying Bid (as defined in the Bidding Procedures).

27.    Nothing in the Bidding Procedures will impose any obligation on the board of directors, board of managers, or similar governing body of a Debtor or its Debtor or Non-Debtor affiliates to take or refrain from taking any action if they reasonably determine, in good faith and after consulting their outside counsel, that such action or inaction would be inconsistent with applicable law or their fiduciary duties under applicable law.  Therefore, the Bidding Procedures do not hinder the Debtors' ability to consider all Qualified Bid proposals and preserve the Debtors' right to modify the Bidding Procedures as necessary or appropriate to maximize value for their estates.

## II.    Notice Procedures for the Sale, Bidding Procedures, Auction, and Sale Hearing

28.    The Debtors also request approval of the Sale notice (the "Sale Notice"), substantially in the form attached to the Bidding Procedures Order as **Exhibit 2**.

29.     Within three (3) business days after entry of the Bidding Procedures Order, the Debtors will serve a package (the "Bid Package") containing the Bidding Procedures Order, the Bidding Procedures, the Stalking Horse APA (if any), and the notice of Bid Deadline, Auction, and Sale Hearing, substantially in the form attached to the Bidding Procedures Order as **Exhibit 2** by electronic or by first class U.S. mail, postage prepaid, upon the following: (i) the Office of the United States Trustee for the Northern District of Texas; (ii) counsel to any official committee appointed in the Bankruptcy Case; (iii) all entities known to have expressed an interest in a transaction with respect to the Assets during the past twelve (12) months; (iv) all counterparties to any contracts or leases, whether executory or not; (v) all parties known by the Debtors to assert a lien, encumbrance, or any other interest in or on any of the Assets, including, without limitation, preferential purchase rights or rights of first refusal on, any of the Debtors' Assets; (vi) all affected federal, state and local governmental regulatory and taxing authorities, including the Internal Revenue Service and State Attorney General in each State in which the Debtors conduct business; (vii) all known holders of claims against and equity interests in the Debtors, (viii) all of the Debtors' insurers; (ix) counsel to the DIP Lender; (x) Midland Loan Services, a Division of PNC Bank, National Association as servicer and control party (the "Control Party"); (xi) all parties that have filed and not withdrawn requests for notices pursuant to Bankruptcy Rule 2002; and (xii) all other parties that have filed a notice of appearance and demand for service of papers in these chapter 11 cases as of the service date; and (ii) provide on a confidential basis a copy of the Sale Notice, along with other marketing materials deemed appropriate by the Debtors and their advisors to any parties who express, to the Debtors or their advisors, an interest in acquiring some or all of the Assets (the parties in (i) and (ii) collectively, the "Sale Notice Parties"). As part of the Sale

Process, the Debtors (directly or through their advisors) will keep a log of the Sale Notice Parties that they provide materials to pursuant to clause (ii) in the prior sentence.

30.    The Debtors will also cause the Sale Notice to be published in the national edition of *The Wall Street Journal*, with any modifications necessary for ease of publication, and post the Sale Notice and the Bidding Procedures Order on Debtors' case website at https://cases.stretto.com/TGIFridays (the "Case Website") maintained by Debtors' claims and noticing agent, Stretto, Inc. ("Stretto").

31.    The Debtors submit that the foregoing Sale Notice is reasonably calculated to provide timely and adequate notice of the Sale, the Bidding Procedures, the Auction, and the Sale Hearing to the Debtor's creditors and other parties in interest, as well as to those who are likely to have an interest in bidding on the Assets.

**F.    Assumption and Assignment Notice**

32.    The Debtors are also seeking approval of certain procedures to facilitate the fair and orderly assumption and assignment of executory contracts and unexpired leases in connection with the Sale transaction (the "Assumption Procedures").  Because the Bidding Procedures Order sets forth the Assumption Procedures in detail, they are not restated herein.  Generally, however, the Assumption Procedures (a) outline the process by which the Debtors may serve notice to certain executory contract and unexpired lease counterparties regarding the proposed assumption and assignment and related cure amounts, if any, informing such parties of their right and the procedures to object thereto, and (b) establish objection and other relevant deadlines and the manner for resolving disputes relating to the assumption and assignment of the Contracts to the extent necessary.

**BASIS FOR RELIEF**

I.    **The Court Should Approve the Sale Timeline Because it is in the Best Interests of the Debtors' Estates and is Reasonable in Time and Scope**

33.    The Debtors seek entry of the Bidding Procedures Order for purposes of setting the Sale Timeline and providing parties with as much notice and clarity as possible.  The proposed Sale Timeline contemplates an efficient Sale Process and the Debtors want to ensure that all interested parties, and any potential bidders, understand the timeline to participate in the Sale Process and submit Qualifying Bids.

34.    The Debtors further submit that the Sale Timeline is appropriate.  The Debtors and their advisors have evaluated a number of qualitative and quantitative factors in designing a process that they believe will maximize the value of the Assets and result in a successful restructuring of their estates.  The Debtors and their advisors have negotiated a timeline that balances the need to provide adequate notice to parties in interest, including to sufficiently market the Assets in the context of a postpetition Sale Process, with the need to quickly and efficiently consummate one or more Sale transactions.  The Sale Timeline is a product of good-faith, arm's-length negotiations and reflects the best option for maximizing the value of the Assets under the circumstances of these chapter 11 cases.

35.    The Debtors believe that the Sale Timeline is reasonable in time and scope and affords parties with sufficient time to gather information necessary to formulate a competitive, value-maximizing bid.  Accordingly, the Debtors believe that the Sale Timeline is in the best interests of the Debtors' estates, will assist in establishing whether and to what extent a market exists for the Assets, and provides interested parties with sufficient opportunity to participate in any sale transaction(s), and ultimately, will result in the highest or otherwise best bid for the underlying Assets under the circumstances.

36.     Access to the DIP Facility is critical to the Debtors' ability to operate their businesses through the completion of the Sale Process and during the pendency of these chapter 11 cases.  Failure to adhere to the DIP Financing Milestones, which are reflected in the Sale Timeline, could jeopardize the Debtors' available borrowing under the DIP Facility and, in turn, compromise the Debtors' ability to effectuate the proposed Sale transaction.  Given the anticipated cost of administering these chapter 11 cases, the Debtors cannot afford any delay in monetizing the Assets. With this in mind, the proposed Sale Timeline provides the Debtors the ability to maximize value while minimizing administrative expenses.

37.     In view of the foregoing, the Debtors request that the Court enter the Bidding Procedures Order, substantially in the form attached hereto as **Exhibit A**, approving the Sale Timeline.

## II.   The Court Should Approve the Bidding Procedures and the Debtors' Entry into and Performance Under a Stalking Horse APA Because it is in the Best Interest of the Debtors' Estates

38.     The key objective in any sale of property of a debtor's estate is to maximize the value received by the estate.  *See Cadle Co. v. Moore (In re Moore)*, 608 F.3d 253, 263 (5th Cir. 2010) (debtor in possession "has the duty to maximize the value of the estate"); *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 352 (1985) (same); *In re Bigler, LP*, 443 B.R. 101, 115 (Bankr. S.D. Tex. 2010) (noting the primary goals for a sale of estate property are "maximizing value for the estate and preserving the integrity of the judicial process").  Procedures used to enhance competitive bidding support this objective and, therefore, are appropriate in the context of bankruptcy sales.  *See In re O'Brien Envtl. Energy, Inc.*, 181 F.3d 527, 537 (3d Cir. 1999); *see also Integrated Res. Inc.*, 147 B.R. at 659 (stating that bidding procedures "encourage bidding and . . . maximize the value of the debtor's assets").

39.    The Debtors and their professional advisors, including Hilco, have designed the Bidding Procedures to promote a competitive and fair bidding process to maximize value for the Debtors' estates and their stakeholders.  The Bidding Procedures will allow the Debtors to conduct the Sale Process in an orderly, fair, and open fashion, which will encourage participation by financially capable bidders, thereby increasing the likelihood that the Debtors will receive the highest or best possible consideration for the Assets.  In addition, by setting a floor for the Sale, the Debtors believe entry into a Stalking Horse APA with a Stalking Horse Purchaser further increases the likelihood of the Debtors receiving the highest or best consideration for the Assets.

40.    Furthermore, the Bidding Procedures and the Stalking Horse APA (if any) provide an appropriate framework for the Debtors and their fiduciaries and professional advisors to review, analyze, and compare any bids received to determine which bids are in the best interests of the Debtors' estates and their creditors.  The Debtors and Hilco, the Debtors' investment banker in connection with the Sale Process, believe that the Bidding Procedures and Stalking Horse APA (if any) are appropriately crafted to and should maximize the value of the Assets.

41.    Moreover, the Debtors are required under the DIP Credit Agreement to complete the Auction and Sale Process on the timetable set forth therein and contemplated by the Bidding Procedures.  The Debtors believe this timetable is fair and reasonable in light of the circumstances of these chapter 11 cases.

42.    The Debtors submit that the Bidding Procedures and entry into a Stalking Horse APA (as applicable) are necessary and promote a fair and transparent sale process for the Debtors to obtain the highest or otherwise best value for the Assets.  Therefore, the Debtors request the Court approve the Bidding Procedures and entry into the Stalking Horse APA through the Bidding Procedures Order.

**III.    The Bid Protections are an Actual and Necessary Cost to Preserve the Value of the Estates**

43.    The Debtors have formulated a bidding process that the Debtors believe will induce prospective competing bidders to expend the time, energy, and resources necessary to submit a bid, and which the Debtors believe is fair and reasonable and will provide a benefit to the Debtors' estates and stakeholders.   Given the Stalking Horse Purchaser's (if any) time and resources expended on, among other things, negotiating the Stalking Horse APA, the Debtors have concluded that the provision of the stalking horse expense reimbursement of up to $50,000 (the "Expense Reimbursement") and break-up fee in an amount not to exceed 3% of the cash component of the Stalking Horse Bid (if any) (the "Break-Up Fee" and together with the Expense Reimbursement, the "Bid Protections") are warranted under the circumstances at hand.

44.    The use of bid protections has become an established practice in chapter 11 asset sales.   Courts have acknowledged that the approval of expenses in connection with substantial sales in bankruptcy is warranted to compensate an unsuccessful acquirer whose initial offer served as the basis and catalyst for higher or better offers.   *See In re Energy Future Holdings Corp.*, 904 F.3d 298, 313 (3d Cir. 2018) (*citing In re O'Brien Env't. Energy, Inc.*, 181 F.3d 527, 535 (3d Cir. 1999)); *In re Reliant Energy Channelview LP*, 594 F.3d 200, 206 (3d Cir. 2010) (holding allowance of expense reimbursement to induce initial bid is permissible); *In re Ebix, Inc.*, No. 23-80004 (SWE) (Bankr. N.D. Tex. Jan. 18, 2024) [Docket No. 199] (approving a break-up fee to a stalking horse bidder); *In re Impel Pharmaceuticals Inc.*, No. 23-80016 (SGJ) (Bankr. N.D. Tex. Jan. 11, 2024) [Docket No. 137] (same); *In re Stone Energy Corp.*, No. 16-26390 (MI) (Bankr. S.D. Tex. Jan. 18, 2017) [Docket No. 316] (same).   The allowability of such expenses, depends upon "the requesting party's ability to show that the fees [a]re actually necessary to preserve the value of the estate." *Energy Future Holdings*, 904 F.3d at 313.

45.     The Debtors submit that the allowance of the Bid Protections is in the best interests of the Debtors' estates and their creditors because it will be: (a) the actual and necessary costs and expenses of preserving the Debtors' estates as defined by sections 503(b) and 507(a)(2) of the Bankruptcy Code; (b) commensurate to the real and substantial benefit conferred upon the Debtors' estates by the Stalking Horse Purchaser if one is identified; (c) reasonable and appropriate considering the size and nature of the proposed sale transaction(s) and comparable transactions, as well as the commitments and efforts made by the Stalking Horse Purchaser (if any); (d) necessary to incentivize the Stalking Horse Purchaser to continue pursuing the sale transaction(s) and abide by the Stalking Horse APA; and (e) subject to all parties in interests' rights to object and be heard with respect to approval of such Bid Protections.

46.     Indeed, the Bid Protections are appropriate because entry into a Stalking Horse APA will enable the Debtors to secure an adequate floor price for the Assets, thereby ensuring that competing Bids would be materially higher or otherwise better than the bid reflected in such Stalking Horse APA—a clear benefit to the Debtors' estates.  Moreover, it is unlikely a Stalking Horse Purchaser would be willing to agree to act in such capacity without being granted the Bid Protections.  Without the Bid Protections, the Debtors may lose the opportunity to obtain the highest or otherwise best offer for the Assets and would certainly lose the downside protection that will be afforded by the existence of the Stalking Horse Purchaser.

47.     Additionally, the Stalking Horse Purchaser will expend considerable time, money, and resources in connection with the transaction proposed in the Stalking Horse APA and will be committed to engaging in extended and lengthy good faith negotiations if any Qualifying Bids are received.  The Stalking Horse Purchaser's efforts, including the due diligence and the negotiation

of transaction documents, will further benefit the process by providing the Debtors and Potential

Bidders with a documented, precedent transaction on which to formulate competing bids.

48.     For all of the foregoing reasons, the Debtors believe that granting the Bid Protections

will maximize the value realized for the benefit of the Debtors' estates, their creditors, and other

parties in interest and should therefore be approved.

**IV.   Sufficient Business Justification Exists for Entry into the Stalking Horse APA Under Sections 105(a) and 363(b) of the Bankruptcy Code**

49.     Pursuant to section 105(a) of the Bankruptcy Code, a "[c]ourt may issue any order,

process or judgment that is necessary or appropriate to carry out the provisions of this title."

11 U.S.C. § 105(a).  Section 363(b) of the Bankruptcy Code provides that a debtor, "after notice

and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the

estate." 11 U.S.C. § 363(b).  Although section 363(b) does not specify a standard for determining

when it is appropriate for a court to authorize the use, sale or lease of property of the estate, courts

have required that such use, sale or lease be based upon the sound business judgment of the debtor.

*See, e.g.*, *In re Cont'l Airlines, Inc.*, 780 F.2d 1223, 1226 (5th Cir. 1986); *see also In re ASARCO*

*LLC*, 441 B.R. 813, 824 (S.D. Tex. 2010), aff'd 650 F.3d 593 (5th Cir. 2011); *In re San Jacinto*

*Glass Indus., Inc.*, 93 B.R. 934, 944 (Bankr. S.D. Tex. 1988).

50.     The demonstration of a valid business justification by the debtor leads to a strong

presumption "that in making [the] business decision the directors of a corporation acted on an

informed basis, in good faith and in the honest belief that the action taken was in the best interests

of the company." *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re*

*Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom*,

488 A.2d 858, 872 (Del. 1985)).

51.     The Debtors submit that their decision to enter into a Stalking Horse APA, to the extent a Stalking Horse Purchaser is identified, represents a reasonable exercise of the Debtors' business judgment and should be approved.  The Stalking Horse Purchaser will serve as baseline for all prospective bidders in the sale process.  The proposed Bidding Procedures taken together with a Stalking Horse APA serving as a baseline for Debtors' marketing and sale process will enable the Debtors to achieve substantial interest in, and consideration for, the Assets.  Further, the proposed sale process will confirm whether the Stalking Horse Bid (if any) represents the highest or otherwise best offer for the Assets.

52.     The Debtors will conduct an extensive and fulsome process to market the Assets. The open and fair auction and sale process contemplated by the Bidding Procedures will ensure that the Debtors' estates receive the highest or best value available for the Assets by allowing the market to dictate the value of the Assets and will provide a greater recovery than would be provided by any other available alternative.  Furthermore, compliance with the Bidding Procedures will ensure the fairness and reasonableness of the consideration to be paid by the Stalking Horse Purchaser or, in the event a Stalking Horse Purchaser is not identified or not the Winning Bidder, then the Winning Bidder, and establish that the Debtors and such bidder have proceeded in good faith.

53.     Additionally, the Debtors believe that the notice procedures described above are reasonable and adequate under the circumstances.  Bankruptcy Rules 2002(a) and (c) require the Debtors to notify creditors of the Sale, the terms and conditions of the Sale, the time and place of the Auction, and the deadline for filing any objections.  The Debtors believe that the proposed notice procedures fully comply with Bankruptcy Rule 2002, and are reasonably calculated to provide timely and adequate notice of the Stalking Horse APA, the Bidding Procedures, the

Auction, the Sale Hearing, and the Sale to the Debtors' creditors and all other parties in interest

that are entitled to notice, as well as those parties that have expressed a *bona fide* interest in

acquiring the Assets.

54.     The Sale, conducted in accordance with the Bidding Procedures, will generate

significant value for the Debtors' estates, and represents the best path forward for maximizing

recoveries in connection with these chapter 11 cases.  The Debtors submit that ample business

justification exists for their entry into a Stalking Horse APA and therefore request Court approval

thereof.

## V.     The Assumption and Assignment of the Assumed Contracts in Connection with the Sale Satisfies Section 365 of the Bankruptcy Code

55.     Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a debtor in

possession, "subject to the court's approval, may assume or reject any executory contract or

unexpired lease of the debtor."  11 U.S.C. § 365(a).  Section 365 has been interpreted to authorize

the debtor-in-possession "to assume or reject executory contracts, enabling the [debtor] to

maximize the value of the debtor's estate by assuming executory contracts that benefit the estate

and rejecting those that do not." *Cinicola v. Scharffenberger*, 248 F.3d 110, 119 (3d Cir. 2001).

56.     The standard applied to determine whether the assumption of a contract or an

unexpired lease should be authorized is the "business judgment" standard.  *See NLRB v. Bildisco*

*& Bildisco*, 465 U.S. 513, 523 (1984); *In re AbitibiBowater Inc.*, 418 B.R. 815, 831 (Bankr. D.

Del. 2009) (finding that a debtor's decision to assume or reject an executory contract will stand so

long as "a reasonable business person would make a similar decision under similar

circumstances."); *In re HQ Glob. Holdings, Inc.*, 290 B.R. 507, 511 (Bankr. D. Del. 2003) (stating

a debtor's decision to reject an executory contract is governed by the business judgment standard

and can only be overturned if the decision was the product of bad faith, whim, or caprice).  As

described above, "[t]he business judgment rule 'is a presumption that in making a business

decision the directors of a corporation acted on an informed basis, in good faith and in the honest

belief that the action taken was in the best interest of the company.'" *Integrated Res., Inc.*, 147

B.R. at 656 (quoting *Smith v. Van Gorkom*, 488 A.2d at 872). Indeed, "the sole issue is whether

the rejection benefits the estate." *In re HQ Glob.*, 290 B.R. at 511.

57.     The business judgment rule is crucial in chapter 11 cases and shields a debtor's

management from judicial second-guessing. *See id.*; *see also Comm. of Asbestos Related Litigants*

*and/or Creditors v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 615-16

(Bankr. S.D.N.Y. 1986) ("[T]he Code favors the continued operation of a business by a debtor and

a presumption of reasonableness attaches to a debtor's management decisions."). Generally, courts

defer to a debtor in possession's business judgment to assume or reject an executory contract or

lease. *See Wheeling-Pittsburgh Steel Corp. v. West Penn Power Co., (In re Wheeling-Pittsburgh*

*Steel Corp.)*, 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987) (stating that the business judgment test

"requires only that the trustee [or debtor in possession] demonstrate that [assumption or] rejection

of the executory contract will benefit the estate."); *see also N.L.R.B. v. Bildisco & Bildisco*, 465

U.S. 513, 523 (1984); *Control Data Corp. v. Zelman (In re Minges)*, 602 F.2d 38, 42–43 (2d Cir.

1979); *In re Riodizio, Inc.*, 204 B.R. 417, 424-25 (Bankr. S.D.N.Y. 1997); *In re G Survivor Corp.*,

171 B.R. 755, 757 (Bankr. S.D.N.Y. 1994).

58.     Here, the Debtors have exercised their sound business judgment in determining that

assumption and assignment of the Assumed Contracts is in the best interests of the Debtors and

their estates, and accordingly the Court should approve the proposed assumption under

section 365(a) of the Bankruptcy Code. *See, e.g., In re Tex. Health Enters. Inc.*, 72 F. App'x 122,

127 (5th Cir. 2003) ("[T]he bankruptcy code makes it clear that it is the choice of the debtor-in-

possession, and not the bankruptcy court, to assume or reject an executory contract"); *In re Philadelphia Newspapers, LLC*, 424 B.R. 178, 182-83 (Bankr. E.D. Pa. 2010) (stating that if a debtor's business judgment has been reasonably exercised, a court should approve the assumption or rejection of an executory contract or unexpired lease); *Westbury Real Estate Ventures, Inc. v. Bradlees, Inc. (In re Bradlees Stores, Inc.)*, 194 B.R. 555, 558 n.1 (Bankr. S.D.N.Y. 1996); *Summit Land Co. v. Allen (In re Summit Land Co.)*, 13 B.R. 310, 315 (Bankr. D. Utah 1981) (holding that, absent extraordinary circumstances, court approval of a debtor's decision to assume or reject an executory contract "should be granted as a matter of course").

59.   As set forth above, the Sale will provide significant benefits to the Debtors' estates. To that end, the assumption, assignment, and sale of the Assumed Contracts is necessary for the Debtors to obtain the benefits of a Stalking Horse APA or an Alternative APA, as applicable. The Assumed Contracts are necessary to operate the Debtors' business and, as such, they are essential to inducing the highest or otherwise best bid for the Debtors' Assets. Any purchaser is unlikely to acquire assets on a going-concern basis unless the contracts and leases required to operate the business are included in the contemplated transaction. In addition, the Assumed Contracts will be assumed and assigned through the process approved by the Court pursuant to the Bidding Procedures Order and, therefore, will be reviewed by key constituents in these chapter 11 cases.

60.   In addition, under section 365(k) of the Bankruptcy Code, the assignment by a debtor to an entity of a contract or lease "relieves the trustee and the estate from any liability for any breach of such contract or lease occurring after such assignment." 11 U.S.C. § 365(k). Thus, following an assignment to the Winning Bidder of any Assumed Contract, the Debtors will be relieved from any liability for any subsequent breach associated therewith.

61.    To the extent any defaults exist under any Assigned Contract, any such default will be promptly cured, or adequate assurance that such default will be cured will be provided prior to the assumption and assignment.  If necessary, the Debtors will submit facts prior to or at the Sale Hearing to show the financial credibility of the Stalking Horse Purchaser or other Winning Bidder, as the case may be, and willingness and ability to perform under the Assigned Contracts.  The Sale Hearing will, therefore, provide the Court and other interested parties the opportunity to evaluate and, if necessary and supported by a timely objection in accordance with the Sale Timeline, challenge the ability of the Stalking Horse Purchaser or Winning Bidder, as the case may be, to provide adequate assurance of future performance under the Assigned Contracts, as required under section 365(b)(1)(C) of the Bankruptcy Code.

62.    Section 365(f)(2) of the Bankruptcy Code provides that a debtor may assign an executory contract or unexpired lease of nonresidential real property if "adequate assurance of future performance by the assignee of such contract or lease is provided."  11 U.S.C. § 365(f)(2). The words "adequate assurance of future performance" must be given a "practical, pragmatic construction" in light of the facts and circumstances of the proposed assumption.  *See In re Fleming Cos., Inc.*, 499 F.3d 300, 307 (3d Cir. 2007) (internal citation omitted); *Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1988) (same); *see also In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (finding that adequate assurance of future performance does not mean absolute assurance that debtor will thrive and profit); *In re Bon Ton Rest. & Pastry Shop, Inc.*, 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985) ("Although no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance.").

63.     Specifically, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *See In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (holding that adequate assurance of future performance is given where the assignee of lease has financial resources and expressed a willingness to devote sufficient funding to the business to ensure its success, and that in the leasing context, the chief determinant of adequate assurance is whether rent will be paid).

64.     Here, the Stalking Horse Purchaser (if any) or other Winning Bidder will have provided adequate assurance of future performance with respect to any Assumed Contract.  For its bid to be deemed a Qualifying Bid, each Potential Bidder will be required to provide evidence supporting its ability to comply with the requirements of adequate assurance of future performance under section 365(f)(2)(B) and, if applicable, section 365(b)(3) of the Bankruptcy Code (the "Adequate Assurance Information"), including: (a) the bidder's financial wherewithal and willingness to perform under any contracts that are assumed and assigned to such Potential Bidder; and (b) a contact person for the proposed assignee that the Counterparty may directly contact in connection with the adequate assurance of future performance.  To the extent that the Potential Bidder (other than the Stalking Horse Purchaser) is a newly formed acquisition entity or the like, the financial and other information supporting the Potential Bidder's financial wherewithal shall include financial and other information supporting the financial wherewithal of the Potential Bidder's parent company or sponsor.  Furthermore, given that the Debtors will submit evidence that all requirements for the assumption and assignment of such contracts will be satisfied prior to or at the Sale Hearing, the Court and other interested parties will have the opportunity to evaluate the ability of the Stalking Horse Purchaser (if any) or other Winning Bidder to provide adequate assurance of future performance.

65.     Therefore, the Debtors respectfully request the Court to approve the proposed assumption and assignment of the Assumed Contracts.

**VI.     The Forms of Notice and Notice Procedures for the Bidding Procedures, the Auction, and the Sale Hearing Are Reasonable and Appropriate.**

66.     Pursuant to Bankruptcy Rules 2002(a) and (c), the Debtors are required to notify creditors of the Sale, including a disclosure of the time and place of any auction, the terms and conditions of the Sale, and the deadline for filing any objections thereto.  *See* Fed. R. Bankr. P. 2002 (a), (c).

67.     The Debtors submit that the notice procedures described above fully comply with Bankruptcy Rule 2002 and are reasonably calculated to provide timely and adequate notice of the Bidding Procedures, the Auction, and the Sale Hearing to the Debtors' creditors and all other interested parties that are entitled to notice, as well as those parties that have expressed a bona fide interest in acquiring the Assets.

68.     Accordingly, the Debtors respectfully request that the Court approve the notice procedures set forth herein, including the form and manner of service of the Sale Notice, and that no other or further notice of the Bidding Procedures, the Auction, and the Sale Hearing is necessary or required.

**WAIVER OF STAY UNDER BANKRUPTCY RULE 6004(H) AND 6006(D)**

69.     Pursuant to Bankruptcy Rule 6004(h), "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h).  Furthermore, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease under § 365(f) is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6006(d).  As set forth throughout this Motion,

any delay in the Debtors' ability to consummate the Sale on the timeline contemplated by the Bidding Procedures would be detrimental to the Debtors, their creditors and estates.[5]

70.     For this reason and those set forth above, the Debtors submit that ample cause exists to justify a waiver of the fourteen day stay imposed by Bankruptcy Rule 6004(h) and 6006(d), to the extent applicable.

## NOTICE

71.     Notice of this Motion will be provided to: (a) the Office of the United States Trustee for the Northern District of Texas; (b) counsel to the Stalking Horse Purchaser (c) all parties known by the Debtors to assert a lien, encumbrance, or any other interest in or on any of the Assets, including, without limitation, preferential purchase rights or rights of first refusal on any of the Debtors' Assets; (d) all persons known or reasonably believed to have asserted an interest in or claim to any of the Assets; (e) all non-debtor counterparties to the Assumed Contracts (defined below); (f) the Office of the United States Attorney for the  Northern District of Texas; (g) the Office of the Attorney General in each state in which the Debtors operate; (h) the Office of the Secretary of State in each state in which the Debtors operate; (i) the Internal Revenue Service and all state and local taxing authorities in the states in which the Debtors have or may have any tax liability; (j) all environmental authorities having jurisdiction over any of the Assets, if any; (k) the Federal Trade Commission; (l) the United States Attorney General/Antitrust Division of the Department of Justice; (m) all of the Debtors' other known creditors and equity security holders; (n) counsel to the DIP Lender; (o) Midland Loan Services, a Division of PNC Bank, National Association as servicer and control party (the "Control Party") and (p) all other parties that have

---

[5]     The Debtors will also seek waivers of the stays under Bankruptcy Rules 3020(e) and 6004(h) through entry of the Sale Order.

filed a notice of appearance and demand for service of papers in these chapter 11 cases as of the service date.  The Debtors will also provide copies of the Sale Notice to parties who express, to the Debtors or their advisors, an interest in acquiring some or all of the Assets.  In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

[*Remainder of Page Intentionally Left Blank*]

WHEREFORE, the Debtors request entry of the Bidding Procedures Order and the Sale

Order granting the relief requested herein and such other and further relief as is just and proper.

Dated: November 11, 2024                         Respectfully submitted by:

                                                 */s/ Holland N. O'Neil*
                                                 **FOLEY & LARDNER LLP**
                                                 Holland N. O'Neil (TX 14864700)
                                                 Mark C. Moore (TX 24074751)
                                                 Zachary C. Zahn (TX 24137675)
                                                 2021 McKinney Avenue, Suite 1600
                                                 Dallas, TX 75201
                                                 Telephone: (214) 999-3000
                                                 Facsimile:  (214) 999-4667
                                                 honeil@foley.com
                                                 mmoore@foley.com
                                                 zzahn@foley.com

                                                 - and -

                                                 **ROPES & GRAY LLP**
                                                 Chris L. Dickerson (*pro hac vice* pending)
                                                 Rahmon J. Brown (*pro hac vice* pending)
                                                 191 North Wacker Drive, 32nd Floor
                                                 Chicago, IL 60606
                                                 Telephone: (312) 845-1200
                                                 Facsimile: (312) 845-5500
                                                 chris.dickerson@ropesgray.com
                                                 rahmon.brown@ropesgray.com

                                                 *Proposed Counsel to the Debtors*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on November 11, 2024, a true and correct copy of the foregoing document was served electronically by the Court's PACER system.

/s/ *Zachary C. Zahn*
Zachary C. Zahn