

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed December 6, 2024**

United States Bankruptcy Judge

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| TGI Friday's Inc., *et al.*,[1] | Case No. 24-80069-sgj11 |
| | (Jointly Administered) |
| Debtors. | |

**SUPPLEMENTAL ORDER APPROVING (I) BIDDING PROCEDURES,
THE SALE TIMELINE, AND THE FORM AND MANNER
OF NOTICE THEREOF; (II) THE DEBTORS' ENTRY INTO AND
PERFORMANCE UNDER THE STALKING HORSE APA; (III) ASSUMPTION
AND ASSIGNMENT PROCEDURES; AND (IV) GRANTING RELATED RELIEF**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are: TGI Friday's Inc. (7117); TGI Friday's NY, LLC (2281); TGIF Holdings, LLC (7999); TGIF Midco, Inc. (7296); TGIF Parent, Inc. (1781); Burlington Towne Crossing, Inc. (7501); T G I Friday's of Greenbelt, Inc. (5617); T G I Friday's of Towson, Inc. (5450); T G I Friday's of Wisconsin, Inc. (7600); T.G.I. Friday's Marketing Advisory Council (6527); T.G.I. Friday's of Charles County, Inc. (3516); T.G.I. Friday's of Frederick County, Inc. (2547); T.G.I. Friday's of Harford County, Inc. (0072); T.G.I. Friday's of Washington County, Inc. (6174); TGI Friday's of Annapolis, Inc. (8315); TGI Friday's of Howard County, Inc. (0119); TGI Friday's of Rockville, Inc. (2004); TGI Friday's of Texas LLC (3931); TGI Friday's of the Rockies, Inc. (7885); TGIF/DFW Manager, LLC (N/A); TGIF/DFW Partner, LLC (N/A); TGIF/JDC Restaurant Development, LLC (N/A); WEBCO Products Incorporated (3014). The Debtors' service address is 19111 North Dallas Parkway, Suite 200, Dallas, TX 75287.

Upon consideration of the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") for, *inter alia*, the entry of an Order: (i) approving certain bidding procedures for the Sale (collectively, the "Bidding Procedures"), and the form and manner of notice thereof; (ii) authorizing the Debtors' entry into the Asset Purchase Agreement attached hereto as **Exhibit 1** (the "Stalking Horse APA") with a potential Stalking Horse Purchaser; (iii) approving the Bid Protections; (iv) scheduling an Auction and the Sale Hearing; (v) approving procedures for the assumption and assignment of certain executory contracts and unexpired leases (each, an "Assumed Contract" and collectively, the "Assumed Contracts"); and (vi) granting related relief; and upon consideration of the Motion; and due and proper notice of the Motion having been given; and it appearing that no other or further notice of the Motion is required except as set forth herein; and it appearing that this Court has jurisdiction to consider the Motion in accordance with 28 U.S.C. §§ 157 and 1334; and it appearing that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and it appearing that venue of this proceeding and the Motion is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having reviewed the Motion; and the Court having reviewed the Declarations and the testimony set forth therein; and the Bidding Procedures Hearing having been held; and this Court having found and determined that the relief set forth herein is in the best interests of the Debtors, their estates and creditors and all parties in interest, and that the legal and factual bases set forth in the Motion and the evidence adduced at the Bidding Procedures Hearing establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor,

---

[2]   Capitalized terms used but not defined herein shall have the meanings given them in the Bidding Procedures (as defined below), or to the extent not defined therein, the Motion or the Stalking Horse APA.

**IT IS HEREBY FOUND AND DETERMINED THAT:[3]**

A.      <u>Stalking Horse APA</u>. The Stalking Horse APA provides the Debtors with the opportunity to sell such Assets in a manner designed to preserve and maximize their value and provides a floor for a further marketing and auction process.  Without the Stalking Horse APA, the Debtors are at a significant risk of realizing a lower price for the Assets.  The Stalking Horse Purchaser shall act as a "stalking horse purchaser" pursuant to the Stalking Horse APA and shall be subject to higher or otherwise better offers in accordance with the Stalking Horse APA and the Bidding Procedures.  Designation of the Stalking Horse Purchaser as a "stalking horse purchaser" and the Stalking Horse APA as a "stalking horse purchase agreement" is in the best interests of the Debtors and the Debtors' estates and their creditors, and it reflects a sound exercise of the Debtors' business judgment.  Notwithstanding the foregoing, all parties rights to object to the Sale in connection with the Stalking Horse APA shall be preserved until the Sale Objection Deadline.

B.      <u>Bid Protections</u>. The Bid Protections are reasonable and appropriate under the circumstances and on the terms set forth in the Bidding Procedures, including in light of the time, cost, and resources expended by the Stalking Horse Purchaser and the commitments made by the Stalking Horse Purchaser.   Payment of the Bid Protections as set forth herein shall survive termination of the Stalking Horse APA and shall constitute an administrative expense of the Debtors' estates.

---

[3]   The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

C.     <u>Auction</u>.  The Auction, if held, is necessary to determine whether any entity other than the Stalking Horse Purchaser is willing to enter into a definitive agreement on terms and conditions more favorable to the Debtors and their estates than the Stalking Horse APA.

**NOW, THEREFORE, IT IS HEREBY ORDERED THAT:**

1.     Those portions of the Motion seeking approval of (a) the Debtors' entry into the Asset Purchase Agreement attached hereto as **<u>Exhibit 1</u>** (the "<u>Stalking Horse APA</u>") with the Stalking Horse Purchaser and (b) the Bid Protections, are hereby GRANTED to the extent set forth herein.

2.     For all purposes under the Bidding Procedures: (a) the Stalking Horse Purchaser shall be considered a Qualifying Bidder, and the Stalking Horse APA shall be considered a Qualifying Bid; (b) the Stalking Horse Purchaser will be deemed to be a Qualifying Bidder for all purposes under the Bidding Procedures without regard to any of the requirements or conditions set forth herein or the Bidding Procedures and without any other or further action by the Stalking Horse Purchaser; and (c) in determining whether any Potential Bidders constitute Qualifying Bidders, the Debtors may consider a combination of bids for the Assets.

3.     The Debtors are authorized to enter into and perform all of their respective pre-closing obligations under the Stalking Horse APA; *provided* that for the avoidance of doubt, approval and consummation of the transactions contemplated by the Stalking Horse APA shall be subject to the terms and conditions herein and the entry of an order approving the Sale of the Assets and the satisfaction or waiver of the other conditions to closing on the terms set forth in the Stalking Horse APA.

4.     This Order shall be effective immediately upon entry, and any stay of orders provided for in Bankruptcy Rules 6004(h) or 6006(d) or any other provision of the Bankruptcy

Code, the Bankruptcy Rules or the Local Rules is expressly waived.  The Debtors are not subject to any stay in the implementation, enforcement or realization of the relief granted in this Order, and may, in its sole discretion and without further delay, take any action and perform any act authorized or approved under this Order.

5.      The Debtors are authorized to take all steps necessary or appropriate to implement the relief granted in this Order.

6.      This Court shall retain exclusive jurisdiction with respect to all matters arising from or related to the implementation or interpretation of the Order.

**# # # End of Order # # #**

Order submitted by:

*/s/ Holland N. O'Neil*

**FOLEY & LARDNER LLP**
Holland N. O'Neil (TX 14864700)
Mark C. Moore (TX 24074751)
Zachary C. Zahn (TX 24137675)
2021 McKinney Avenue, Suite 1600
Dallas, TX 75201
Telephone: (214) 999-3000
Facsimile:  (214) 999-4667
honeil@foley.com
mmoore@foley.com
zzahn@foley.com

**-AND-**

**ROPES & GRAY LLP**
Chris L. Dickerson (admitted *pro hac vice*)
Rahmon J. Brown (admitted *pro hac vice*)
191 North Wacker Drive, 32nd Floor
Chicago, Illinois 60606
Telephone: (312) 845-1200
Facsimile:  (312) 845-5500
chris.dickerson@ropesgray.com
rahmon.brown@ropesgray.com

*Proposed Counsel for the Debtors*

## EXHIBIT 1

**The Stalking Horse APA**

*Execution Version*
*Confidential*

## ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (this "Agreement") is made and entered into as of December 2, 2024 ("Effective Date") by and among **TGI FRIDAY'S INC.**, a New York corporation, as debtor and debtor-in-possession (collectively, with the other parties listed as "Sellers" on the signature pages hereto, "Seller") and **SUGARLOAF CONCESSIONS LLC**, a Delaware limited liability company ("Buyer" and, together with Seller, the "Parties").

## RECITALS

WHEREAS, on November 2, 2024 (the "Petition Date"), Seller and certain of its affiliates, as debtors and debtors in possession, commenced case No. 24-80069-sgj11 (the "Bankruptcy Case") by filing voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division ("Bankruptcy Court");

WHEREAS, Seller is the owner of a restaurant company providing full service restaurant services to the general public through a number of company owned restaurant locations (such businesses, as presently conducted by Seller, shall be collectively referred to herein as the "Business"), as debtor and debtor-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code;

WHEREAS, Seller owns all of the issued and outstanding Equity Interests (the "Transferred Interests") of each of TGIF/DFW Partner, LLC and TGIF/DFW Manager, LLC (the "Acquired Companies");

WHEREAS, Seller wishes to sell, transfer, convey, assign and deliver to Buyer, in accordance with Sections 363 and 365 and the other applicable provisions of the Bankruptcy Code, all of the Acquired Assets (defined below), including the assets of certain company owned restaurants owned by Seller and/or one or more of its Affiliates and the Transferred Interests, together with the Assumed Liabilities of Seller (defined below), upon the terms and subject to the conditions set forth in this Agreement (hereinafter collectively referred to as the "Transaction");

WHEREAS, Buyer wishes to purchase and take delivery of such Acquired Assets and assume such Assumed Liabilities upon such terms and subject to such conditions;

WHEREAS, in connection with the Transaction, Buyer intends to take assignment of or enter into new franchise agreements with TGI Fridays Franchisor, LLC ("Franchisor") for the operation of the Restaurants by Buyer as TGI Fridays™ Restaurants (such assigned or new franchise agreements, the "Franchise Agreements"), all upon the terms and subject to the conditions set forth in the Franchise Agreements and this Agreement;

WHEREAS, the Acquired Assets will be sold pursuant to a Sale Order of the Bankruptcy Court approving such sale under Section 363 of the Bankruptcy Code and such Sale Order will include the assumption and assignment of certain executory contracts and unexpired leases under Section 365 of the Bankruptcy Code and pursuant to the terms and conditions of this Agreement; and

WHEREAS, the performance under this Agreement and the Seller's ability to consummate the transactions set forth in this Agreement are subject to, among other things, the entry of the Sale Order by the Bankruptcy Court.

## AGREEMENT

**NOW, THEREFORE**, in consideration of the mutual covenants, agreements, representations and warranties contained in this Agreement, the Parties hereby agree as follows:

## ARTICLE I
## DEFINITIONS

1.1    <u>Defined Terms</u>.  Unless otherwise defined in this Agreement, all capitalized terms shall have the meanings set forth in **Exhibit 1.1**, attached hereto.  For the sake of clarity, as of the Closing, certain entities listed as "Sellers" party hereto may or may not have any right, title or interest in or to any Acquired Asset or any Excluded Asset or any obligation with respect to any Assumed Liability or any Excluded Liability.

## ARTICLE II
## PURCHASE AND SALE

2.1    <u>Purchase and Sale; Acquired Assets</u>.  Pursuant to Sections 363 and 365 of the Bankruptcy Code, subject to the entry and terms of the Sale Order and on the terms and subject to the conditions of this Agreement, at the Closing, Seller hereby agrees to sell, transfer, convey, assign and deliver to Buyer, and Buyer agrees to purchase, acquire and assume from Seller, all of Seller's right, title and interest in and to, as of the Closing, all of the Acquired Assets, free and clear of all Liens (other than Permitted Liens).

2.2    <u>Excluded Assets</u>.  Notwithstanding anything to the contrary in this Agreement, the Acquired Assets shall not include, and Seller shall not sell, convey, transfer, assign and deliver, the Excluded Assets, which Seller shall specifically retain.  For the avoidance of doubt, Seller shall have the right to remove the Excluded Assets from the Restaurants prior to Closing.

2.3    <u>Assumption of Liabilities</u>.  Subject to the terms and conditions of this Agreement, at the Closing, Buyer shall irrevocably assume only the Assumed Liabilities.  Buyer agrees, effective as of the Closing, to pay, perform, discharge when due or otherwise satisfy in accordance with their terms, the Assumed Liabilities.

2.4    <u>Excluded Liabilities</u>.  Notwithstanding anything to the contrary contained in this Agreement, Buyer shall not assume and shall not be responsible to pay, perform, or discharge any liabilities of Seller or any of its Affiliates of any kind or nature whatsoever other than the Assumed Liabilities (all such Liabilities that are not Assumed Liabilities being referred to collectively herein as the "<u>Excluded Liabilities</u>") and such Excluded Liabilities shall be retained by and remain the Liabilities of Seller or its Affiliates, as applicable.  Without limiting the generality of the foregoing, the Excluded Liabilities shall include, but not be limited to, the enumerated Excluded Liabilities (that are not enumerated Assumed Liabilities) set forth in the definition of "Excluded Liabilities" set forth on **Exhibit 1.1**.  For the avoidance of doubt, in the event any Liability included in the

definition of "Assumed Liabilities" would also be included in one of the categories listed as "Excluded Liabilities" on **Exhibit 1.1**, such Liability shall be considered an Assumed Liability.

2.5     Transferred Interests.  Notwithstanding anything to the contrary contained in this Agreement, the Parties acknowledge and agree (a) that Sections 2.1, 2.3, 2.4 and 2.6 and associated definitions set forth therein speak only to the directly owned assets and liabilities of Seller, and (b) that no provision of this Agreement or any Ancillary Document limits or shall be construed to limit the assets, properties, claims, rights, obligations and liabilities of each Acquired Company that are acquired or assumed by Buyer through its acquisition of the Transferred Interests, it being understood that Buyer will indirectly assume by way of its acquisition of the Transferred Interests all assets, properties, claims and rights of, and assume all obligations and liabilities of, each Acquired Company.

2.6     Assumption/Rejection of Contracts; Assignment of Contracts.

(a)     Assumption and Assignment of Executory Contracts.  Prior to Closing, Seller shall provide timely and proper written notice of the motion to approve the Sale Order to all parties to any executory Contracts to which Seller is a party that are Assigned Contracts and take all other actions reasonably necessary to cause such Contracts to be assumed by Seller and assigned to Buyer pursuant to Section 365 of the Bankruptcy Code to the extent that such Contracts are Assigned Contracts at Closing.  The Sale Order shall provide that as of and conditioned on the occurrence of the Closing, Seller shall assign or cause to be assigned to Buyer, as applicable, the Assigned Contracts, each of which shall be identified by the name or appropriate description and date of the Assigned Contract (if available), the other party to the Assigned Contract and the address of such party for notice purposes, a notice filed in connection with the motion to approve Sale Order or a separate motion for authority to assume and assign such Assigned Contracts.  Such notice shall also set forth Seller's good faith estimate of the amounts necessary to cure any defaults under each of the Assigned Contracts as determined by Seller based on Seller's Records or as otherwise determined by the Bankruptcy Court.  At the Closing, Seller shall, pursuant to the Sale Order assume and assign to Buyer (the consideration for which is included in the Purchase Price), all Assigned Contracts that may be assigned by Seller to Buyer pursuant to Sections 363 and 365 of the Bankruptcy Code, subject to adjustment pursuant to Section 2.6(b).  Any Contracts not listed as an Assigned Contract on **Schedule 2.1 of the Disclosure Schedule** as of the Bid Deadline and any Contract not assumed and assigned at Closing may be rejected pursuant to Section 365 of the Bankruptcy Code at any time after the Bid Deadline and/or the Closing, as applicable.

(b)     Excluding or Adding Contracts; Omitted Contracts.  Buyer shall have the right to notify Seller in writing of any Assigned Contract (other than purchase orders) that it does not wish to assume or a Contract to which Seller is a party that Buyer wishes to add as an Assigned Contract no later than one (1) Business Day prior to the Bid Deadline (as defined in the Bidding Procedures Order), and (i) any such previously considered Assigned Contract that Buyer no longer wishes to assume shall be automatically deemed removed from **Schedule 2.1 of the Disclosure Schedule** and automatically deemed added to **Schedule 2.2 of the Disclosure Schedule**, in each case, without any adjustment to the Cash Payment, and (ii) any such previously considered Excluded Contract that Buyer wishes to assume as an Assigned Contract shall be automatically deemed added to **Schedule 2.1 of the Disclosure Schedule**, automatically deemed removed from **Schedule 2.2 of the Disclosure Schedule**, and assumed by Seller to sell and assign to Buyer, in

4903-2558-8736, v. 1
148483277_14

each case, without any adjustment to the Cash Payment. Buyer shall be solely responsible for the payment, performance and discharge when due of the Liabilities under the Assigned Contracts arising or that are otherwise payable from the time of and after the Closing. With Seller's prior written consent (given or withheld in its sole discretion), from and after the Bid Deadline (as defined in the Bidding Procedures Order), Buyer may request an amendment to **Schedule 2.1 of the Disclosure Schedule** and **Schedule 2.2 of the Disclosure Schedule** to add any Contract to which Seller is a party as an Assigned Contract or to remove any Assigned Contract that Buyer no longer wishes to assume. Notwithstanding anything to the contrary set forth herein, Buyer may not add as an Assigned Contract (i) any Contract which would increase, or would reasonably be expected to increase, the Pre-Closing Tax Amount or (ii) any Contract that relates to any TGI Fridays™ restaurant(s) that are not listed on **<u>Exhibit 1.0</u>** as of the date hereof, in each case, without the prior written consent of Seller.

(c)  <u>Cure Costs</u>.

(i) At the Closing, Buyer shall pay all Cure Costs (up to the Cure Cost Cap) and assume, and thereafter in due course and in accordance with its respective terms, pay and fully satisfy, discharge and perform all of the obligations under each Assigned Contract pursuant to Section 365 of the Bankruptcy Code. If Buyer does not pay all Cure Costs associated with the assignment and assumption of an Assigned Contract (including in the event that Buyer does not pay the Cure Costs associated with the proposed Assigned Contract because the Cure Costs (individually or in the aggregate for all Assigned Contracts) exceed the Cure Cost Cap) or fails to satisfy the counterparty to the proposed Assigned Contract and the Bankruptcy Court as to adequate assurance of future performance, (x) such Contract(s) shall not be an Assigned Contract(s) and such Contract(s) shall be automatically deemed removed from **Schedule 2.1 of the Disclosure Schedule** without any adjustment to the Cash Payment and (y) Buyer is and shall remain obligated to timely consummate the Closing (including paying the Purchase Price in full at Closing) and comply with its obligations under this Agreement and any Ancillary Document and shall not have the right to terminate this Agreement as a result of the failure to assume and assign any such Contract. Notwithstanding anything to the contrary herein, no Seller Party shall be required to pay or assume any Cure Costs or provide any assurances, and Seller shall not be obligated to assume and assign any Contract with respect to which Buyer fails to pay the full Cure Costs at Closing (including in the event that Buyer does not pay the Cure Costs associated with the proposed Assigned Contract because the Cure Costs (individually or in the aggregate for all Assigned Contracts) exceed the Cure Cost Cap) or fails to satisfy the party to the proposed Assigned Contract and the Bankruptcy Court as to adequate assurance of future performance.

(ii) To the extent a counterparty to a Contract objects or otherwise challenges the Cure Costs determined by Seller and asserts a different monetary amount that must be paid and/or nonmonetary obligations that otherwise must be satisfied, including pursuant to Section 365(b)(1)(A) and (B) of the Bankruptcy Code, in order for Buyer to assume such Contract to this Agreement (any such Contract, a "<u>Disputed Contract</u>"), and such objection or challenge has not been resolved prior to the Closing, then Buyer shall provide written notice no later than three (3) Business Days prior to the Closing Date (or such earlier date on which the Bankruptcy Code or Bankruptcy Court otherwise would require a determination to assume or reject any such Contract) either (x) electing to remove any such Disputed Contract from **Schedule 2.1 of the Disclosure Schedule**, in which case the Contract will be an Excluded

4

Contract and not assigned to Buyer or (y) requesting an extension of the period of time following the Closing to resolve any such dispute (such period, an "Extension Period"); provided that any such extension period shall be no longer than thirty (30) days following the Closing Date (or such shorter period of time as required in order to wind-down or liquidate Seller); provided, further, that Seller's obligations to provide such Extension Period is subject to (1) Buyer's ongoing compliance with Buyer's obligations pursuant to the final sentence of this Section 2.6(c)(ii) and (2) Seller determining, in its sole discretion, that the counterparty will not accept assignment of such Disputed Contract to another buyer prior to the expiration of the Extension Period.  If Buyer does not deliver written notice agreeing to assume such Disputed Contract and pay all Cure Costs (disregarding the Cure Cost Cap) associated with such Disputed Contract within three (3) Business Days prior to the expiration of the Extension Period or such dispute is not resolved by the expiration of the Extension Period, such Disputed Contract shall automatically be deemed an Excluded Contract.  Buyer shall be responsible for and reimburse Seller for any Liabilities or obligations of Seller arising following the Closing during any Extension Period, including any incremental costs or expenses (A) that arise out of Seller's extension and continuation of the Bankruptcy Cases that is attributable to the Extension Period and (B) are incurred as a result of the Seller's performance of its obligations under this Section 2.6(c)(ii).

   (d)  Non-Assignment.

    (i) To the extent that any Acquired Asset, Assigned Contract or any claim, right or benefit arising thereunder or resulting therefrom (the "Non-Assignable Asset") is not capable of being sold, assigned, transferred or conveyed without the approval, consent or waiver of another party thereto, or any third person (including a Governmental Authority), or if such sale, assignment, transfer or conveyance or attempted sale, assignment, transfer or conveyance would constitute a breach thereof or a violation of any law, decree, order, regulation or other governmental edict, this Agreement shall not constitute a sale, assignment, transfer or conveyance thereof, or an attempted assignment, transfer or conveyance thereof.  From the date hereof until the earlier of the termination of this Agreement and the Closing Date, Seller shall, if requested by Buyer, use its commercially reasonable efforts, subject to the Conditions, and Buyer shall reasonably cooperate with Seller, to obtain all necessary approvals, consents or waivers, or to resolve any such impediments to transfer as necessary to convey to Buyer each such Non-Assignable Asset as soon as practicable; provided, however, that neither Seller nor Buyer shall be obligated to pay any fees or other consideration to obtain such third party consent for the transfer thereof, except for Cure Costs which shall be paid by Buyer (up to the Cure Cost Cap) and filing fees and other ordinary administrative or other charges provided for in the Assigned Contracts which shall be paid by Buyer to the third party from whom such approval, consent or waiver is requested.

    (ii) To the extent that any of the approvals, consents or waivers referred to in Section 2.6(d)(i) herein have not been obtained by Seller and Buyer as of the Closing, or until the impediments to transfer referred to in Section 2.6(d)(i) are resolved, Seller shall, if requested by Buyer, during the remaining term of such Non-Assignable Asset, use its commercially reasonable efforts to (x) obtain the consent of any such third party, (y) cooperate with Buyer in any reasonable and lawful arrangements designed to provide the benefits of such Non-Assignable Asset to Buyer so long as Buyer cooperates with Seller in such arrangements

5

and reimburses Seller for all expenses incurred by Seller (including ongoing expenses of Seller operating in bankruptcy) and payments made by Seller in connection therewith and indemnifies Seller with respect thereto; and (z) enforce, at the reasonable request of Buyer and at the expense and for the account of Buyer, any rights of Seller arising from such Non-Assignable Asset against such issuer thereof or the other party or parties thereto (including the right to elect to terminate any such Non-Assignable Asset in accordance with the terms thereof upon the advice of, and together with indemnification from, Buyer); provided, that (A) the foregoing shall not restrict or limit wind-down or liquidating plan of Seller following the Closing Date and (B) the foregoing shall be subject to (1) any Orders entered, or approvals or authorizations granted or required, by or under the Bankruptcy Court or the Bankruptcy Code, obligations or limitations arising under or related to the DIP Facility or the DIP Credit Agreement, and each of Seller's obligations to comply with any Order of the Bankruptcy Court (including the Bidding Procedures Order and the Sale Order) and Seller's duty to seek and obtain the highest or otherwise best price for its assets as required by the Bankruptcy Code, (2) limitations on operations imposed by the Bankruptcy Court or the Bankruptcy Code or agreements governing Seller's debtor-in-possession financing or use of cash collateral and (3) limitations arising out of or related to the financial distress of Seller and its Affiliates and the Bankruptcy Cases, including limitations on personnel, funds and other resources ((x) and (y), collectively, and as applicable as used herein, the "Conditions").

(iii) Notwithstanding anything to the contrary herein, Seller shall not be required to compensate any applicable third party, commence or participate in any proceeding or offer or grant any accommodation (financial or otherwise, including any accommodation or arrangement to indemnify, remain primarily, secondarily or contingently liable for any Liability) to any applicable third party in connection with the Seller's obligations under this Section 2.6 or otherwise. Receipt of any third party consent, approval or waiver shall not be a condition to Buyer's obligation to timely consummate the Closing (including Buyer's obligation to pay the Purchase Price in full) or comply with Buyer's obligations under this Agreement or any Ancillary Document and the failure to receive any third party consent, approval or waiver or any actions taken by Seller in connection therewith shall not give Buyer the right to terminate this Agreement.

2.7     Transition Services Agreement. The Parties acknowledge and agree that both Seller and one or more potential buyers of other restaurants and business of the Seller that are not being acquired pursuant to this Agreement (the "Retained Business") may require certain post-Closing transition services from Buyer and Buyer may require certain post-Closing transition services from Seller. After the date hereof, the Parties shall, subject to the Conditions, use commercially reasonable efforts to negotiate and document the terms of a transition services agreement between the Parties on terms mutually acceptable to both Parties to be effective from and after the Closing (the "Transition Services Agreement"). For the avoidance of doubt, entry into any Transition Services Agreement shall not be a condition to Buyer's obligation to timely consummate the Closing (including Buyer's obligation to pay the Purchase Price in full) or comply with Buyer's obligations under this Agreement or any Ancillary Document and the failure to enter into any Transition Services Agreement or any actions taken by Seller in connection therewith shall not give Buyer the right to terminate this Agreement. If the Parties have not entered into a Transition Services Agreement prior to the Closing, the Parties shall, subject to the Conditions,

use commercially reasonable efforts to enter into such a Transition Services Agreement as promptly as reasonably practicable following the Closing.

2.8    Real Property Leases. Buyer has reviewed, or prior to the Bid Deadline will review, all Real Property Leases and, except as may be otherwise provided below, acknowledges that the amount of term remaining under each such lease (specifically excluding any option renewals) is acceptable to Buyer.  Buyer further acknowledges the items set forth on **Schedule 2.8 of the Disclosure Schedule** with respect to the Real Property Leases and agrees Seller may take actions reasonably related to or in furtherance of the matters set forth on or contemplated by such schedule. Seller will reasonably consult with the Buyer in connection with any negotiations relating to renewals, extensions or amendments of the Real Property Leases.

2.9    Assumption of Liabilities under Assigned Contracts.  At the Closing, Buyer shall assume, discharge and become liable for, all liabilities and obligations arising after the Closing Date under the Assigned Contracts, but only to the extent such liabilities and obligations are required to be performed and satisfied after the Closing Date and excluding liabilities and obligations arising as a result of any breach of or default or failure to perform by Seller under any Assigned Contract prior to the Closing Date, other than Cure Costs or any Assumed Liabilities.

2.10    Inspection and Due Diligence.

(a)    From the date hereof until the earlier of the termination of this Agreement and the Closing Date, Seller will use commercially reasonable efforts to (i) make available for Buyer's inspection and copying such material information and other materials requested in writing by Buyer related to the Acquired Assets as may reasonably be in Seller's possession and control, and (ii) promptly respond to any written requests from Buyer for additional information as long as such information is reasonably within Seller's possession and control.

(b)    Buyer hereby acknowledges and agrees, on its own behalf and on behalf of the Buyer Group, that the sale of the Acquired Assets is and will be made on an "as is, where is and with all faults" basis (except for the express representations contained in Article IV, as qualified, amended, supplemented and modified by the Disclosure Schedule and in accordance with the express terms and conditions (including limitations and exclusions) of this Agreement (the "Express Representations")).  The occurrence of Closing shall constitute an acknowledgement by Buyer, on its own behalf and on behalf of the Buyer Group, that the Acquired Assets have been accepted without representation or warranty, express or implied (except for the Express Representations).  Except for the Express Representations, Seller and any other Person on behalf of Seller hereby specifically negates and disclaims any further representations, warranties, or guaranties of any kind or character, whether express or implied, oral or written, past, present, future, or otherwise, of, as to, concerning, or with respect to Seller, the Acquired Assets, or the Assumed Liabilities or with respect to any information, statements, disclosures, documents, projections, forecasts or other material of any nature made available or provided by any Person, or elsewhere to Buyer or any of its Affiliates or advisors on behalf of Seller or any of its Affiliates or Representatives, including (i) any implied representation of merchantability or fitness for any particular use or purpose, (ii) any implied representation regarding the use or operation of the Acquired Assets after the Closing in any manner, and (iii) any implied representation regarding the probable success or profitability of the Acquired Assets.  Buyer further acknowledges that the

7

information provided and to be provided with respect to Seller, the Acquired Assets and the Assumed Liabilities was obtained from a variety of sources and, except as set forth in the Express Representations, Seller, and any other Person on behalf of Seller, (x) has not made any independent investigation or verification of such information and (y) has not made any express or implied, oral or written, representations as to the accuracy or completeness of such information. Notwithstanding the generality of the foregoing, Buyer, on its own behalf and on behalf of the Buyer Group, acknowledges and agrees that it and its Buyer Group have received from Seller (and their Affiliates and Representatives) certain projections, forward-looking statements, forecasts, and prospective or third-party information relating to Seller, the Acquired Companies, the Acquired Assets, the Business, the Excluded Assets, the Assumed Liabilities and the Excluded Liabilities (whether in written, electronic, or oral form) (collectively, "Projections"). Buyer, on behalf of itself and its Buyer Group, acknowledges that (1) such Projections are being provided solely for the convenience of Buyer and its Buyer Group to facilitate their own independent investigation; (2) there are uncertainties inherent in attempting to make such Projections; (3) Buyer and its Buyer Group are familiar with such uncertainties and are taking responsibility for making their own evaluation of the adequacy and accuracy of all such Projections (including the reasonableness of the assumptions underlying such Projections); and (iv) none of the Seller nor any other Person makes any representations or warranties with respect to such Projections. Buyer, on its own behalf and on behalf of its Buyer Group, hereby disclaims reliance on any such Projections. Buyer acknowledges, on its own behalf and on behalf of the Buyer Group, that it has conducted to its reasonable satisfaction an independent investigation and verification of the business including the Acquired Assets, its financial condition, results of operations, assets, Liabilities, properties, Contracts, environmental compliance, employee matters, regulatory compliance, business risks and prospects of Seller, and, in making its determination to proceed with the transactions contemplated by this Agreement, Buyer has relied solely on the results of the Buyer Group's own independent investigation and verification, and has not relied on, is not relying on, and will not rely on, Seller, the Projections or any information, statements, disclosures, documents, projections, forecasts or other material made available to Buyer or any of its Affiliates or Representatives in the Dataroom or otherwise, in each case, whether written or oral, made or provided by, or as part of, any of the foregoing or Seller or any of their respective Affiliates or Representatives, or any failure of any of the foregoing to disclose or contain any information, except for the Express Representations. Without limiting the foregoing, except for breach of the Express Representations, neither Seller nor any other Person will have or be subject to any Liability whatsoever to Buyer, or any other Person in the Buyer Group, resulting from the distribution to Buyer or any of its Affiliates or advisors, or Buyer's or any of its Affiliates' or advisors' reliance on, any such information. This Section 2.10(b) shall survive the termination of this Agreement and the Closing.

2.11    Approval by Bankruptcy Court. This Agreement is subject to and conditioned upon approval by the Bankruptcy Court. At Closing, Seller will convey to Buyer the Acquired Assets pursuant and subject to an Order entered by the Bankruptcy Court approving the sale of the Acquired Assets, which order shall be, prior to submission to the court, in a form reasonably acceptable to Buyer and shall include, without limitation, the following provisions: (x) pursuant to Section 363 of the Bankruptcy Code, sale of the Acquired assets shall be free and clear of all Liens (other than Permitted Liens), interests and rights of set-off, whether known or unknown, disputed, contingent, actual or otherwise arising prior to the Closing, (y) Buyer shall be deemed a good faith purchaser and (z) Buyer shall have no successor liability (the "Sale Order").

4903-2558-8736, v. 1
148483277_14

## ARTICLE III
## PURCHASE CONSIDERATION

3.1    Consideration.

(a)    The aggregate consideration to be paid by Buyer for the acquisition of the Acquired Assets shall be (i) a cash payment of Thirty Million and Five Hundred Thousand and No/100 Dollars ($30,500,000) (the "Cash Payment"); (ii) payment of the Cure Costs (in an amount not to exceed the Cure Cost Cap) and (iii) the assumption by Buyer of the Assumed Liabilities (the sum of the amount of clauses (i), (ii) and (iii), the "Purchase Price").

(b)    At the Closing, Buyer shall deliver, or cause to be delivered, to Seller the Cash Payment *less* (x) the Deposit and (y) the Pre-Closing Tax Amount (the "Closing Date Payment").  The Closing Date Payment and any payment required to be made pursuant to any other provision hereof shall be made in cash by wire transfer of immediately available funds to such bank account as shall be designated in writing by the applicable Party at least two (2) Business Days prior to the date such payment is to be made.  In addition, at the Closing, Buyer shall pay all Cure Costs (up to the Cure Cost Cap).

3.2    Deposit.

(a)    Buyer has, on or prior to the date hereof, made an earnest money deposit (the "Deposit") into escrow, to be held in an account of Buyer's with Texas Partners Bank, in the amount of ten percent (10%) of the Cash Payment by wire transfer of immediately available funds. The Deposit shall not be subject to any Lien, trustee process or any other judicial process of any creditor of any of Seller or Buyer and, at the Closing, shall be deemed automatically released from escrow and credited toward payment of the Cash Payment in accordance with Section 3.1(b).

(b)    If this Agreement has been validly terminated by Seller pursuant to Section 11.1(e) (*Buyer Breach*) or Section 11.1(f) (*Buyer Failure to Close*) (or by Buyer pursuant to Section 11.1(b) (*Court Order*) or Section 11.1(c) (*Outside Date*), in each case, in circumstances where Seller would be entitled to terminate this Agreement pursuant to Section 11.1(e) or Section 11.1(f) (a "Buyer Default Termination")), then the Deposit shall be deemed automatically released from escrow and shall be retained by the Seller for Seller's own account (including, for the avoidance of doubt, any investment income, if any, in respect of the Deposit).

(c)    If this Agreement has been terminated by any Party other than as contemplated by Section 3.2(b) in connection with the Buyer Default Termination, then Seller shall, in accordance with the Bidding Procedures Order, by wire transfer of immediately available funds, return the Deposit to Buyer (provided, for the avoidance of doubt, that Seller shall retain any investment income, if any, in respect of the Deposit) one (1) Business Day after the date of such termination.

(d)    The Parties agree that Seller's right to retain the Deposit, as set forth herein, is not a penalty, but rather is liquidated damages in a reasonable amount that will compensate Seller for its efforts and resources expended and the opportunities foregone while negotiating this Agreement and in reliance on this Agreement and on the expectation of the consummation of the

9

transactions contemplated hereby, which amount would otherwise be impossible to calculate with precision.

3.3     <u>Franchise Agreement</u>.  On or before the Bid Deadline, Buyer, as franchisee, shall either (a) obtain Franchisor's binding written consent to include Seller's existing franchise agreements as an Assigned Contract or (b) enter into, for each Restaurant (other than the DFW Stores), Franchisor's form of franchise agreement attached hereto as **Exhibit 3.3**, unless otherwise mutually agreed between Buyer and Franchisor, together with any applicable state addendum and ancillary documents; <u>provided</u>, that any such new franchise agreement entered into pursuant to <u>Section 3.3(b)</u> must be, for the benefit of Seller, fully executed and binding on the Buyer and Franchisor as of the Bid Deadline, but effective as of the Closing.  In any event and notwithstanding anything in this Agreement or any Ancillary Document to the contrary, assignment of any franchise agreement or entry into a new franchise agreement with Franchisor shall not be a condition to Buyer's obligation to timely consummate the Closing (including Buyer's obligation to pay the Purchase Price in full) or comply with Buyer's obligations under this Agreement or any Ancillary Document and the failure to assign of any franchise agreement or enter into a new franchise agreement with Franchisor or any actions taken by Seller in connection therewith shall not give Buyer the right to terminate this Agreement.

3.4     <u>Allocation of Purchase Price; Withholding; Tax Matters</u>.

(a)     Seller and Buyer agree that the purchase price (for Tax purposes) shall be allocated for tax purposes among the Acquired Assets in accordance with Section 1060 of the Code and the Treasury regulations promulgated thereunder (and any similar provision of state, local or foreign law, as appropriate) and in accordance with the allocation methodology set forth on **Schedule 3.4 of the Disclosure Schedule** (the "<u>Allocation</u>").  The Allocation shall be prepared and delivered by Buyer to Seller within 30 days following the determination of the final Purchase Price pursuant to this Agreement for Seller's review and comment. Buyer shall incorporate any reasonable comments of Seller on such Allocation.  If, within 30 days after the delivery of the Allocation, Seller notifies Buyer in writing that Seller objects to any allocation set forth thereon, Buyer and Seller shall negotiate in good faith to resolve such objection.  Seller and Buyer agree that said allocation of the Purchase Price shall be used by Seller and Buyer in reporting the transactions covered by this Agreement for income and state sales tax purposes and neither Seller nor Buyer will take any position (or will allow any of their respective Affiliates to take any position) (whether in audits, Tax Returns, or otherwise) that is inconsistent with the Allocation, except, in each case, to the extent otherwise required by a final determination pursuant to Section 1313(a) of the Code (or any comparable provision of state, local or foreign law).

(b)     Buyer, the Acquired Companies, and their Affiliates and designees shall be entitled to deduct and withhold any amounts as are required to deduct and withhold under any applicable Tax Law in connection with payments required to be made pursuant to the terms of this Agreement.  To the extent any such withheld amounts are properly deducted and withheld pursuant to applicable Tax Law, such amounts shall be treated for all purposes of this Agreement as having been paid to the person in respect of which such withholding was made and shall be timely paid to the appropriate Taxing Authority.  Any Person intending to withhold will notify such Persons of any amounts otherwise payable to such Persons that it intends to deduct and withhold at least ten (10) Business Days prior to the due date for any relevant payment and the Parties shall

reasonably cooperate with each other, as and to the extent reasonably requested by the other Party, to minimize or eliminate any potential deductions and withholdings that may be required pursuant to this Agreement to make under applicable Tax Law.  Notwithstanding anything to the contrary, the Parties agree that there shall be no withholding or deduction permitted under this Agreement to the extent Seller (or other applicable Person) provides a duly executed and properly completed IRS Form W-9.

(c)     In the case of any Straddle Period, Taxes shall be treated as attributable to the portion of such period that ends on the Closing Date as follows: (i) in the case of any sales, use, value-added, employment, or withholding Tax or any Tax based on or measured by income, profits, gains, receipts, or activities, the level of any item shall be determined based on an interim closing of the books as of the end of the Closing Date (and for such purpose, the taxable period shall be deemed to terminate at such time), except that exemptions, allowances or deductions that are calculated on an annual basis (including depreciation and amortization deductions), other than with respect to property placed in service after the Closing, shall be allocated on a per diem basis ending on the Closing Date and (ii) in the case of all other Taxes, shall be deemed to be the amount of such Taxes for the entire period multiplied by a fraction, the numerator of which is the number of calendar days in the portion of the period ending on the Closing Date and the denominator of which is the number of calendar days in the entire period.

(d)     Buyer and Seller shall reasonably cooperate, as and to the extent reasonably requested by the other, in connection with the filing of Tax Returns and any Action, audit, litigation, or other proceeding with respect to Taxes.

(e)     Buyer shall not make any Tax election, file any amended Tax Return, or settle any Action, audit, litigation, or other proceeding with respect to Taxes, in each case, with respect to any Acquired Asset (including, for the avoidance of doubt, the Acquired Companies and the DFW Entities) that would have retroactive effect to a Pre-Closing Tax Period (including a portion of a Straddle Period) of Seller or any of its Affiliates or the Securitization Entities without the prior written consent of Seller, such consent not to be unreasonably withheld, conditioned or delayed.

(f)     None of the Acquired Companies, the DFW Entities, or any entity acquired in the transactions contemplated by this Agreement, in each case, that is treated as a partnership for U.S. federal income tax purposes, shall make an election under Section 6226 of the Code (or any similar or corresponding provision of state, local, or foreign law) with respect to any Pre-Closing Tax Period (including a portion of a Straddle Period) without the prior written consent of Seller.

3.5     Employees.

(a)     At least five (5) days prior to the Closing, Buyer shall offer at-will employment to all Restaurant Employees, on the terms and subject to the conditions specified by Buyer in its sole discretion; provided, however, that, Buyer shall not be required to offer the same health benefit packages or any other benefits or compensation that may be offered to such employees of Seller as of the Effective Time.  As of the Closing, all Transferred Employees shall

11

have resigned from their employment with Seller or its Affiliates, or Seller or its Affiliates shall have terminated their employment with Seller or its Affiliates.

(b)      Buyer's hiring of the Restaurant Employees is conditioned upon the occurrence of the Closing, and upon satisfaction of such reasonable standard hiring requirements as Buyer may include in its employment letter to such employees (including, without limitation, completion of Form I-9, typical background checks and similar requirements that are imposed on similarly-situated employees of Buyer).  Only upon the reasonable satisfaction of all such conditions shall a Restaurant Employee become a Transferred Employee, and until such time (i) the Restaurant Employees shall not be eligible for compensation from, or to participate in, any benefit plans of Buyer, and (ii) Buyer shall have no liability with respect to the Restaurant Employees.

(c)      Effective as of the Closing, Buyer shall assume all obligations and Liabilities of Seller and its Affiliates for the accrued, unused vacation time and other paid time off of the Transferred Employees; provided, that to the extent any such amounts must be paid to a Transferred Employee upon termination of employment with Seller (or an Affiliate thereof) pursuant to Applicable Law, Buyer shall be responsible for payment of, or shall indemnify and reimburse Seller for, any such payments (collectively, the "Accrued PTO").

(d)      Buyer or one of its Affiliates shall be responsible for satisfying the continuation coverage requirements of COBRA for all individuals who are M&A qualified beneficiaries (as such term is defined in Treasury Regulation Section 54.4980B-9, Q&A-4(a)) ("Post-Closing COBRA Liabilities"); provided that Seller shall make available to Buyer all applicable personnel records and personnel files and such other information as Buyer may reasonably request in order to satisfy its obligations under this Section 3.5(d), to the extent compliant with Applicable Laws.

(e)      Seller shall be responsible for payment of all wages up to the Effective Time for all Restaurant Employees.  Buyer shall be responsible for the payment of, or shall reimburse Seller for, any severance and other Liabilities that arise as a result of Buyer's failure to provide an offer of employment to any Restaurant Employees pursuant to this Section 3.5.

**ARTICLE IV**
**REPRESENTATIONS AND WARRANTIES OF SELLER**

Seller represents and warrants, excepting those matters reflected in a disclosure schedule attached to this Agreement (the "Disclosure Schedule"), which disclosures shall be deemed to constitute representations and warranties of Seller, the following to Buyer as of the date hereof and as of Closing Date:

4.1      Organization.  Seller is a corporation, limited liability company or limited partnership, as applicable, duly incorporated or organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation or formation.

4.2      Power and Authority; Authorization.  Seller has all requisite power and authority to enter into, and perform its respective obligations under, this Agreement and related agreements, subject to the applicable Conditions, including the requisite Bankruptcy Court approvals.  The

execution, delivery and performance of this Agreement and the other agreements contemplated hereby to which Seller is a party, the performance by Seller of its obligations hereunder and thereunder and the consummation by Seller of the transactions contemplated hereby and thereby have been or will be duly authorized by all requisite corporate action prior to the Closing Date, subject to the applicable Conditions, including the requisite Bankruptcy Court approvals.

4.3  Capitalization; DFW Entities.

(a)  All of the Transferred Interests are duly authorized, validly issued, fully paid and nonassessable and are owned beneficially and of record by Seller, free and clear of any Liens, other than Permitted Liens.  None of the Transferred Interests have been issued in violation of, or are subject to, any preemptive, subscription or similar rights, and none of the Transferred Interests were issued in violation of applicable securities Laws. There is no (i) option, warrant, call, right, convertible or exchangeable securities, commitment or agreement pursuant to which any Person may acquire or vote any Equity Interests of any Acquired Company or pursuant to which any Acquired Company may become obligated to issue, sell, purchase, return or redeem any of its Equity Interests, (ii) Equity Interests in any Acquired Company that are reserved for issuance, or (iii) bonds, debentures, notes or other indebtedness having the right to vote on any matters on which the equityholders of any Acquired Company may vote.  There are no outstanding or authorized appreciation, phantom interest, profit participation or similar rights with respect to any Acquired Company.

(b)  **Schedule 4.3(b) of the Disclosure Schedule** sets forth true, correct and complete list of (i) the issued and outstanding Equity Interests of the Acquired Companies and (ii) to the Knowledge of Seller, the issued and outstanding Equity Interests of any Person in which any Acquired Company holds any Equity Interests (the "DFW Entities").

(c)  Each DFW Entity operates DFW Stores pursuant to (i) franchise agreements and ancillary documents with Franchisor and (ii) Concession Lease Agreements with Dallas/Fort Worth International Airport Board set forth on **Schedule 4.3(c)(i) of the Disclosure Schedule** (the "Concession Lease Agreements").  **Schedule 4.3(c)(ii) of the Disclosure Schedule** sets forth a list of the DFW Stores owned by each DFW Entity.

4.4  Enforceability.  This Agreement and each of the other agreements contemplated hereby to which Seller is a party constitutes a valid and legally binding obligation of Seller, enforceable in accordance with the terms hereof, except as such enforceability (a) may be limited by bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and other similar laws of general application affecting or relating to the enforcement of creditors' rights generally and (b) is subject to general principles of equity, whether considered in a proceeding at law or in equity (collectively, the "Enforceability Exceptions") and as subject to the applicable Conditions.

4.5  No Consents or Approvals.  No consent, approval, or authorization of, or declaration, filing, or registration with, any Governmental Authority, or, to the Knowledge of Seller, any other persons is required to be made or obtained by Seller in connection with the execution, delivery, and performance of this Agreement and related agreements and the consummation of the transactions contemplated by this Agreement, other than the Transaction Consents.

4.6     <u>Agreement Will Not Cause Breach or Violation</u>.    Subject to obtaining the Transaction Consents, neither the execution, delivery nor performance of this Agreement or related agreements nor the consummation of the transactions contemplated by this Agreement or any other agreement contemplated hereby will result in or constitute (a) a violation of any constitution, statute, regulation, rule, injunction, judgment, order, decree, ruling, charge, or other restriction of any Governmental Authority to which Seller is subject, (b) a conflict or breach under Seller's organizational documents, (c) a default or an event that, with notice or lapse of time or both, would be a default, breach or violation of the Assigned Contracts or any other material lease, license, promissory note, conditional sales contract, commitment, indenture, mortgage, deed of trust or other agreement, instrument or arrangement to which Seller is a party or by which the Restaurants or Acquired Assets are bound or affected, or (d) the creation or imposition of any Lien (other than a Permitted Lien) on the Acquired Assets or the material assets of any DFW Stores, except, in the case of clause (a), (c) and (d), for such conflicts, breaches, defaults, accelerations, rights or failures to give notice as would not, individually or in the aggregate, result in a Material Adverse Change.

4.7     <u>Financial Statements</u>. Seller has previously furnished Buyer with true and complete copies of all requested unaudited profit and loss statements for each of the Restaurants for Seller's Fiscal Years 2021, 2022, and 2023, and for the ten (10) Fiscal Months from January 1, 2024, to October 31, 2024 (collectively, the "<u>Actual Financials</u>"). The Actual Financials are true, complete, and correct in all material respects and present fairly and accurately the results of operations of each of the Restaurants for the periods indicated. The Records of Seller relating to the Restaurants fully and fairly reflect all transactions, properties, assets and liabilities of the Restaurants.

4.8     <u>Title; Condition of Acquired Assets</u>.

(a)     **Schedule 4.8 of the Disclosure Schedule** lists in all material respects the Fixed Assets owned by, in the possession of, or used by Seller in connection with the Restaurants. The Parties acknowledge and agree that **Schedule 4.8 of the Disclosure Schedule** may be updated by Seller prior to Closing, pursuant to the provisions of <u>Section 6.5</u> hereof.  At Closing, subject to the applicable Conditions, requisite Bankruptcy Court approvals and assumption by the applicable Seller of any applicable Contracts (and satisfaction of any Cure Costs), Seller: (i) shall be the sole owner, beneficially and of record (as applicable), of all of the Acquired Assets; and (ii) shall have good and marketable title to all of the Acquired Assets, whether real, personal, mixed, tangible or intangible. The Acquired Assets along with the inventory that shall be in each Restaurant on the Closing Date, constitute all the assets and interests in assets, other than Intellectual Property, Shared Contracts and any Excluded Assets, that are used in the operation of each Restaurant and are, together with the Franchise Agreements and, with respect to the DFW Stores, together with assets of the Acquired Companies or DFW Entities, and subject to removal or rejection of certain Contracts as Assigned Contracts pursuant to <u>Section 2.6</u>, sufficient to operate each Restaurant in a manner consistent with Seller's Ordinary Course of Business for such Restaurant.  At Closing, subject to the applicable Conditions, requisite Bankruptcy Court approvals and assumption by the applicable Seller of any applicable Contracts (and satisfaction of any Cure Costs), all of the Acquired Assets are or will be free and clear of Liens other than Permitted Liens.

(b)     Except as set forth on **Schedule 4.8(b) of the Disclosure Schedule**, to the Knowledge of Seller, all Acquired Assets have been maintained in all material respects in accordance with generally accepted industry practice, are in all material respects in good operating

14

condition and repair, ordinary wear and tear excepted, and are adequate for the uses to which they are currently being put.

4.9     Restaurants; Leased Property. **Schedule 4.9 of the Disclosure Schedule** lists all the Restaurants and the related Real Property Leases. The Restaurants shall have been continuously open and operated consistent with the Ordinary Course of Business from the date of this Agreement until the Effective Time, subject to the applicable Conditions. The Real Property Leases (a) are valid and in full force and effect, and (b) are not the subject of any default by Seller or event which with notice or lapse of time, or both, would constitute a default, except, in each case, as would not individually or in the aggregate reasonably have a Material Adverse Change. To the Knowledge of Seller, Seller has provided to Buyer true, correct and complete copies of the Real Property Leases. To the Knowledge of Seller, Seller does not occupy or use the premises where the Restaurants are located in material violation of any law, regulation, decree or other restriction.

4.10    Contracts. **Schedule 4.10 of the Disclosure Schedule** lists all Assigned Contracts (other than the Real Property Leases). The Parties acknowledge and agree that **Schedule 4.10 of the Disclosure Schedule** may be updated prior to Closing, pursuant to the provisions of Section 6.5 hereof; provided, for all purposes of the representations and warranties, the Assigned Contracts include only those Contracts listed on **Schedule 4.10 of the Disclosure Schedule** on the date hereof. Seller has provided, or upon finalization of the Disclosure Schedule will provide, to Buyer true, correct and complete copies of the Assigned Contracts. Subject to the applicable Conditions, requisite Bankruptcy Court approvals and assumption by the applicable Seller of any applicable Contracts (and satisfaction of any Cure Costs) and except as a result of the commencement of the Bankruptcy Cases, to the Knowledge of Seller, the Assigned Contracts (a) are in full force and effect and are not subject to any default or event that, with notice or lapse of time or both, would constitute a default by Seller or any other party, (b) are valid, legal, and binding agreements between the parties thereto, enforceable against each party thereto in accordance with its terms, and (c) were entered into in the Ordinary Course of Business. Seller has not received written notice that any party to any agreement intends to cancel or terminate any of the Assigned Contracts or to exercise or not exercise any options under any such agreements with respect to the Restaurants that would reasonably be expected have a Material Adverse Change.

4.11    Tax Matters. Except as set forth on **Section 4.11 of the Disclosure Schedule**:

(a)     Seller has timely filed with the appropriate Governmental Authority (taking into account available extensions of time to file) all income and other material Tax Returns with respect to the Acquired Assets required to be filed by it. Each such Tax Return (taking into account all amendments thereto) is complete and correct in all material respects. All material Taxes with respect to the Acquired Assets owed by Seller that are due have been paid or have been adequately reserved against in accordance with United States generally accepted accounting principles. Seller is not currently the beneficiary of any extension of time within which to file any Tax Return with respect to the Acquired Assets (other than pursuant to extensions of time to file Tax Returns obtained in the Ordinary Course of Business). To the knowledge of Seller, there are no Liens for Taxes on any of the Acquired Assets other than Permitted Liens.

15

(b)        Seller has withheld, collected and paid over to the appropriate Taxing Authority, or is properly withholding for such payment, all Taxes with respect to the Acquired Assets required to have been withheld and paid in connection with any amounts paid or owing to any employee, independent contractor, creditor, member, or other third party.

(c)        Seller is not a party to any Tax allocation or Tax sharing or Tax indemnification or similar agreement; in each case, with respect to the Acquired Assets (other than an agreement entered into in the Ordinary Course of Business the principal subject of which is not Taxes).

(d)        Seller is not (i) a member of an "affiliated group" within the meaning of Section 1504(a) of the Code (or any similar group defined under a similar provision of state, local, or foreign law), (ii) filing a consolidated U.S. federal income Tax Return with any other person, or (iii) liable for the Taxes of any person under Treasury Regulation Section 1.1502-6 or any analogous or similar provision of state, local or foreign law, as a transferee or successor; in each case, with respect to Taxes or Tax Returns of the Acquired Assets. Seller is not an S corporation as defined under the Code.

(e)        Seller has not been notified in writing that it is currently under audit by any Taxing Authority with respect to the Acquired Assets or that any Taxing Authority intends to conduct such an audit, and no action, suit, investigation, claim or assessment is pending or, to the knowledge of Seller, proposed with respect to any alleged deficiency in Taxes with respect to the Acquired Assets. Except as and to the extent shown on **Schedule 4.11 of the Disclosure Schedule**, Seller has not been audited, investigated, received a claim from, assessed by or sued by any Taxing Authority with respect to the Acquired Assets. Except as and to the extent shown on **Schedule 4.11 of the Disclosure Schedule**, all deficiencies asserted or assessments made as a result of any examinations by any Taxing Authority with respect to the Acquired Assets have been fully paid, and there are no other unpaid deficiencies asserted or assessments made by any Taxing Authority against Seller with respect to the Acquired Assets.

(f)        Seller has not (i) waived any statute of limitations in respect of any material Taxes with respect to the Acquired Assets or (ii) agreed to any extension of time with respect to any assessment or deficiency for material Taxes with respect to the Acquired Assets (other than pursuant to extensions of time to file Tax Returns obtained in the Ordinary Course of Business).

(g)        Seller has not entered into any listed, reportable or substantially similar transactions for purposes of Treasury Regulations Section 1.6011-4, or any transaction requiring disclosure under a corresponding or similar provision of Law except, in each case, to the extent that doing so would not adversely impact the Acquired Assets or Buyer's ownership of the Acquired Assets.

(h)        Notwithstanding anything in this Agreement to the contrary, the representations and warranties in this <u>Section 4.11</u> shall constitute the sole representations and warranties with respect to Taxes and Tax Returns of the Seller and with respect to the Acquired Assets. No representation or warranty is made with respect to the validity of any Tax position or the availability of any Tax attribute for any Tax period (or any portion thereof) following the Closing.

16

4.12    <u>Compliance with Laws</u>.

(a)    Except as set forth on **Schedule 4.12(a) of the Disclosure Schedule**, and as subject to the applicable Conditions, Seller has complied in all material respects, with all applicable federal, state and local statutes, laws and regulations (including, without limitation, any applicable building, zoning, health, employment, environmental protection or other law, ordinance or regulation) affecting the Acquired Assets and the operation of the Restaurants and has not been cited for any violation of any such law or regulation, except, in each case, as would not constitute a Material Adverse Change. Seller has in full force and effect all material licenses, permits and other authorizations required for the operation of the Restaurants and in a manner consistent with Seller's Ordinary Course of Business for the Restaurants, except where the failure to hold the same would not reasonably be expected to have a Material Adverse Change on one or more Restaurants or the Acquired Assets and Seller has not received notice of any material default or violation in respect of or under any of the foregoing which could have a Material Adverse Change on one or more Restaurants or the Acquired Assets. Seller has not received any non-compliance orders, warning letters, notices of violation, claims, suits, actions, proceedings, judgments, penalties, fines or judicial or administrative investigations of any nature pending or threatened against or involving the Restaurants or the business, operations, properties of the Restaurants or the Acquired Assets, in each case, which would have a Material Adverse Change on one or more Restaurants or the Acquired Assets.  Notwithstanding the foregoing, the Parties acknowledge and agree that (i) this <u>Section 4.12(a)</u> shall not apply with respect to any matters involving a liquor license to the extent Seller or its Affiliates have received any non-compliance order, warning letter, notice of violation, claim, suit, action, proceeding, plea, settlement, consent, penalty, fine or Judgment relating to any such liquor license utilized at the Restaurants and (ii) <u>Section 4.12(b)</u> below shall be the sole and exclusive representation or warranty with respect to such matters.

(b)    **Schedule 4.12(b) of the Disclosure Schedule** lists in all material respects all material non-compliance orders, warning letters, notices of violation, claims, suits, actions, proceedings, pleas, settlements, consents, penalties, fines or Judgments received by Seller during the past two (2) years that specifically relate to the liquor licenses utilized at the Restaurants.

4.13    <u>Litigation, Etc</u>.  Except as set forth on **Schedule 4.13 of the Disclosure Schedule**, there is no pending, or, to the Knowledge of Seller, any threatened suit, action, arbitration or legal, administrative or other proceeding, or governmental investigation or claim against or affecting the Acquired Assets or the Restaurants which, if determined adversely to Seller, would be material with respect to the Acquired Assets or the Restaurants.  To the Knowledge of Seller, there is no basis for any action, arbitration, or legal, administrative or other proceeding, or governmental investigation or claim against Seller which could have a Material Adverse Change on the Acquired Assets or the Restaurants.

4.14    <u>Employees</u>.

(a)    **Schedule 4.14(a) of the Disclosure Schedule** contains: (i) a list of all Restaurant Employees as of the date of this Agreement; and (ii) each such Restaurant Employee's (A) job title, (B) date of hire, (C) rate of base compensation (hourly wage or annual salary, as applicable) as of the date hereof (D) status as active or in active, and if applicable and known to Seller, the reason for leave status, (E) work location (by store number), (F) accrued vacation or

17

paid time off as of the date of this Agreement (including the portion of which that would be required to be paid upon the cessation of such individual's employment), (G) exempt or non-exempt status under the Fair Labor Standards Act or similar Applicable Law, and (H) years of service credit.  Not less than fifteen (15) days prior to Closing, Seller will deliver to the Buyer an updated **Schedule 4.14(a) of the Disclosure Schedule**, containing the foregoing information relating to Persons who become Restaurant Employees or who are no longer employed by Seller, in each case, following the date of this Agreement.

(b)     (i) Seller is not a party to or bound by any collective bargaining agreement, work rules or other practices or any other labor-related Contract with a labor union, trade union or labor organization ("Collective Bargaining Agreement") in respect of the Restaurants or covering any Restaurant Employees; (ii) there are, and have been in the past three (3) years, no pending, or to the knowledge of Seller, threatened activities or proceedings of any labor union or similar employee or labor organization to organize any Restaurant Employees; and (iii) there are, and have been in the past three (3) years, no unfair labor practice charges, grievances or complaints pending before the National Labor Relations Board or any similar Governmental Authority or, to the knowledge of Seller, threatened by or on behalf of any Restaurant Employees; and (iv) there is, and in the past three (3) years there has been, no material strike, slowdown, work stoppage, lockout or other material labor dispute pending or, to the knowledge of Seller, threatened in respect of the Restaurants, and Seller does not contemplate a lockout of any Restaurant Employees as of the date of this Agreement.

(c)     Except as set forth on **Schedule 4.14(c) of the Disclosure Schedule**, in the past six (6) months, Seller has not triggered any notice requirements under the WARN Act with respect to any Restaurant Employees.

(d)     Seller is not a party to any employment Contract, consulting Contract or other commitment for the employment or retention of any Restaurant Employees, and no Restaurant Employees are otherwise employed by Seller in connection with the business conducted by the Restaurants, other than any such Contract or commitment that can be terminated at will.  Except as set forth on **Schedule 4.14(d) of the Disclosure Schedule**, Seller is not delinquent to, and has not failed to pay, any due wages, bonuses, commissions and other benefits and sums due (and all required taxes, insurance, social security and withholding thereon), including all accrued vacation, sick leave, benefits and payments and pro rata accruals for a portion of the year of this Agreement to the Restaurant Employees pursuant to all Applicable Laws and Seller's current material policies and procedures.

4.15   Employee Benefits.

(a)     Seller is not required to make any contributions to any defined benefit pension for the benefit of Restaurant Employees. Subject to the foregoing, Seller has, as of the date hereof, made all required payments, contributions and filings under or in respect of any such plans or arrangements, and, to the knowledge of Seller, there has not occurred any act, omission, event or condition such as would reasonably be expected to give rise to any material liability of Seller thereunder other than the obligations to make normal payments and contributions thereunder. Each Employee Benefit Plan that is intended to qualify under Section 401(a) of the Code has received a favorable determination or opinion letter from the IRS regarding its

18

qualification thereunder and, to the knowledge of Seller, nothing has occurred since the date of the most recent such determination or opinion letter that could reasonably be expected to adversely affect the qualified status of any of such Employee Benefit Plans.

(b)  Except as set forth in **Schedule 4.15(b) of the Disclosure Schedule**, neither Seller nor any of its ERISA Affiliates within the six-year period preceding the date of this Agreement has sponsored, maintained or contributed to (or has been obligated to contribute to), or has any current or contingent liability or obligation under or with respect to: (i) any "employee pension plan," as defined in Section 3(2) of ERISA, that is or was subject to Title IV of ERISA or Section 412, 430 or 436 of the Code; or (ii) any Multiemployer Plan. No Employee Benefit Plan is a "multiple employer plan" within the meaning of Section 413(c) of the Code or Section 210 of ERISA, or a "multiple employer welfare arrangement" as defined in Section 3(40) of ERISA.

(c)  Neither the execution and delivery of this Agreement, nor the consummation of the transactions contemplated hereby, either alone or in combination with another event, will: (i) entitle any current or former Restaurant Employee, consultant, director or other service provider of the Restaurants (or any dependent or beneficiary thereof) to any payment of compensation; (ii) increase the amount of compensation or benefits due to any such person; (iii) accelerate the vesting, funding or time of payment of any compensation, equity award or other benefit to any Restaurant Employee; (iv) require a contribution to any Employee Benefit Plan in respect of any Restaurant Employee; or (v) result in any payments or benefits under any agreement with the Seller that, individually or in combination with any other payment or benefit, would constitute the payment of any "excess parachute payment" within the meaning of Section 280G of the Code or in the imposition of an excise Tax under Section 4999 of the Code.

4.16  Finder's or Broker's Fees.  Other than Hilco Corporate Finance, LLC, who has been engaged as Seller's investment banker, neither Seller nor any of its directors, officers, managers, employees, agents, consultants, advisors, accountants, legal counselors or other representatives (each, a "Representative") have engaged a broker or finder in connection with any transaction contemplated by this Agreement and no broker or other person is entitled to any commission or finder's fee in connection with any of these transactions as a result of any actions by Seller.

4.17  Environmental Matters.  Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Change with respect to the Acquired Assets:

(a)  Except as set forth on **Schedule 4.17(a) of the Disclosure Schedule**, Seller has not received written notice of any material violation by Seller of Environmental Laws relating to the operation of the Restaurants.

(b)  Seller is not a party to, nor to the Knowledge of Seller, is it subject to any pending or threatened Environmental Claim, and, to the Knowledge of Seller, there are no conditions or occurrences at the Leased Properties or otherwise related to the Restaurants that reasonably could be expected to form the basis for an Environmental Claim against Seller that would have a Material Adverse Change.

(c)  To the Knowledge of Seller, Seller has not caused or permitted Hazardous Substances to be disposed of on or under the land occupied by the Restaurants as (i) a disposal site

or permanent storage site for any Hazardous Substance or (ii) a temporary storage site for any Hazardous Substance. Further, there have been no Releases of Hazardous Substances at, from, or to the land occupied by the Restaurants during Seller's lease. To the Knowledge of Seller, Seller has operated the Restaurants in compliance with all applicable Environmental Laws.

(d)      To the Knowledge of Seller, Seller is in compliance with all permits, certificates, licenses, approvals and other authorizations relating to environmental matters and necessary for its business and its leasing of the property occupied by the Restaurants.

(e)      To the Knowledge of Seller, all Hazardous Substances used or generated by Seller have been generated, accumulated, stored, transported, treated, recycled and disposed of in compliance with all Applicable Laws and regulations. To the Knowledge of Seller, no claim or complaint concerning Hazardous Substances has been filed against Seller. To the Knowledge of Seller, Seller has no liabilities with respect to violations of Applicable Law in respect of Hazardous Substances, and, to the Knowledge of Seller, no facts or circumstances exist which could give rise to any such liabilities, claims or complaints with respect to Hazardous Substances.

4.18    No Other Representations or Warranties.  Except for the Express Representations, no Seller nor any other Person on behalf of Seller makes any express or implied representation or warranty with respect to Seller, the Acquired Assets, the Restaurants, the employees or the Assumed Liabilities or with respect to any information, statements, disclosures, documents, projections, forecasts or other material of any nature made available or provided by any Person (including in any presentations or other materials prepared by Seller or its Representatives) or in that certain datasite administered by CapLinked (the "Dataroom") or elsewhere to Buyer or any of its Affiliates or Representatives on behalf of Seller or any of its Affiliates or Representatives. Without limiting the foregoing, no Seller nor any other Person will have or be subject to any Liability whatsoever to Buyer, or any other Person, resulting from the distribution to Buyer or any of its Affiliates or Representatives, or Buyer's or any of its Affiliates' or Representatives' use of or reliance on, any such information, including the Projections, any information, statements, disclosures, documents, projections, forecasts or other material made available to Buyer or any of its Affiliates or Representatives in the Dataroom or otherwise in expectation of the transactions contemplated by this Agreement or any discussions with respect to any of the foregoing information.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer hereby represents and warrants that the following to Seller as of the date hereof and as of the Closing:

5.1    Organization.  Buyer is a Delaware limited liability company duly organized, validly existing, and in good standing under the laws of the jurisdiction in which it was incorporated or otherwise organized.

5.2    Power and Authority; Authorization.  Buyer has the requisite power and authority to enter into, and perform its obligations under, this Agreement and related agreements. The execution and delivery of this Agreement and the other agreements contemplated hereby to which

Buyer is a party, the performance by Buyer of its obligations hereunder and thereunder and the consummation by Buyer of the transactions contemplated hereby and thereby have been duly authorized by all necessary action on the part of Buyer and neither the execution, delivery nor performance of this Agreement or related agreements or the consummation of the transactions contemplated by this Agreement will result in or constitute a conflict or breach under Buyer's organizational documents.

5.3     <u>Enforceability</u>. This Agreement constitutes a valid and legally binding obligation of Buyer enforceable in accordance with the terms hereof, except as may be limited by the Enforceability Exceptions.

5.4     <u>No Consents or Approvals</u>. Except as set forth on **Schedule 5.4 of the Buyer Disclosure Schedule**, no consent, approval, or authorization of, or declaration, filing, or registration with, any Governmental Authority, or any other Person is required to be made or obtained by Buyer in connection with the execution, delivery, and performance of this Agreement and related agreements and the consummation of the transactions contemplated by this Agreement.

5.5     <u>Non-contravention</u>.  Neither the execution and delivery of this Agreement, nor the consummation of the transactions contemplated hereby, shall (i) violate any constitution, statute, regulation, rule, injunction, judgment, order, decree, ruling, charge, or other restriction of any Governmental Authority to which Buyer is subject, or (ii) conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify, or cancel, or require any notice under any agreement, contract, lease, license, instrument, or other arrangement to which Buyer is a party or by which it is bound or to which any of its assets are subject. Except as set forth on **Schedule 5.5 of the Buyer Disclosure Schedule**, Buyer does not need to give any notice to, make any filing with, or obtain any authorization, consent, or approval of any Governmental Authority in order for the parties to consummate the transactions contemplated by this Agreement.

5.6     <u>Finder's or Broker's Fees</u>. Buyer has not engaged a broker or finder in connection with any transaction contemplated by this Agreement and no broker or other person is entitled to any commission or finder's fee in connection with any of these transactions as a result of any actions by Buyer.

5.7     <u>No Litigation</u>.  There are no Actions pending or, to Buyer's knowledge, threatened against or affecting Buyer that will adversely affect Buyer's performance of its obligations under this Agreement or the consummation of the transactions contemplated by this Agreement.

5.8     <u>Financing</u>. Buyer has delivered to Seller true, complete and correct copies of an executed debt commitment letter, dated as of the date hereof (including all exhibits, annexes, schedules and term sheets attached thereto), and, if applicable, an executed fee letter, dated as of the date hereof (which may be redacted as to fee amounts and other economic and commercial terms so long as none of the redacted terms, either individually or in the aggregate, would (or would be reasonably expected to) materially adversely affect the amount or availability of funds pursuant to the terms of the debt commitment letter) (the "<u>Fee Letter</u>"), from the financing sources party thereto (collectively, the "<u>Debt Commitment Letter</u>"), pursuant to which the lenders and other parties thereto have agreed, on the terms and subject to the conditions set forth or referenced

21

therein, to provide debt financing to Buyer in the amounts set forth therein (collectively, the "Debt Financing"). The Debt Commitment Letter is a legal, valid and binding obligation of Buyer and (with respect to the Debt Commitment Letter and the Fee Letter), to the knowledge of Buyer, each other party thereto, and enforceable against Buyer and, to the knowledge of Buyer, each other party thereto in accordance with its terms, in each case, except as enforceability may be limited by bankruptcy laws, other similar laws affecting creditors' rights and general principles of equity affecting the availability of specific performance and other equitable remedies. The Debt Commitment Letter has not been amended or modified in any respect prior to or as of the date of this Agreement and, as of the date of this Agreement, (a) no such amendment or modification is contemplated (other than modifications to assign or reassign or reallocate commitments and/or roles to lenders, agents, co-agents, arrangers, bookrunners, managers or other roles under the Debt Commitment Letter) and (b) the respective commitments contained in the Debt Commitment Letter have not been withdrawn, rescinded or terminated. As of the date hereof, assuming the accuracy in all material respects of the representations and warranties in Articles IV and V of this Agreement, no event or circumstance has occurred which, with or without notice, lapse of time or both, would constitute a default on the part of Buyer or, to the knowledge of Buyer, any of the other applicable parties thereto, under the Debt Commitment Letter. Assuming the accuracy in all material respects of the representations and warranties in Articles IV and V of this Agreement and the satisfaction of the conditions set forth in Articles VIII and IX, as of the date hereof, Buyer has no reason to believe that the Debt Financing contemplated by the Debt Commitment Letter will not be available as of the Closing. There are (i) no conditions precedent related to the funding of the full amounts of the Debt Financing other than as set forth in the Debt Commitment Letter and (ii) no other agreements that could limit, affect or impair the availability of the Debt Financing necessary to consummate the Closing on the Closing Date, other than as set forth in the Debt Commitment Letter. The aggregate proceeds of the Debt Financing will be sufficient to consummate the transactions contemplated by this Agreement. Buyer has fully paid or caused to be paid any and all commitment fees and any other amounts required by the Debt Commitment Letter and the Fee Letter, in each case, to be paid on or before the date of this Agreement. The obligations of Buyer under this Agreement are not subject to any conditions regarding Buyer's, its Affiliates', or any other Person's ability to obtain financing for the consummation of the Transactions.

5.9    Solvency. Buyer is, and immediately after giving effect to the transactions contemplated by this Agreement shall be, solvent and at all times shall: (a) be able to pay its debts as they become due, (b) own property that has a fair saleable value greater than the amounts required to pay its debt (including a reasonable estimate of the amount of all contingent Liabilities), and (c) have adequate capital to carry on its business. No transfer of property is being made and no obligation is being incurred in connection with the transactions contemplated hereby with the intent to hinder, delay or defraud either present or future creditors of Buyer or Seller. In connection with the transactions contemplated hereby, Buyer has not incurred, nor plans to incur, debts beyond its ability to pay as they become absolute and matured.

5.10    Certain Arrangements. Except as stated in this Agreement, there are no Contracts, undertakings, commitments, agreements or obligations, whether written or oral, between any member of the Buyer Group, on the one hand, and any member of the management of Seller or its respective governing body (or applicable governing body of any Affiliate of Seller), any holder of equity or debt securities of Seller or any of its Affiliates, or any lender or creditor of Seller or any

Affiliate of Seller, on the other hand, (a) relating in any way to the acquisition of the Acquired Assets or the transactions contemplated by this Agreement or (b) that would be reasonably likely to prevent, restrict, impede or adversely affect the ability of Seller or any of its Affiliates to entertain, negotiate or participate in any such transactions.

5.11   <u>Investment; Buyer's Investigation</u>. Buyer is acquiring the Equity Interests of the Acquired Companies for its own account with the present intention of holding such securities for investment purposes and not with a view to, or for sale in connection with, any distribution of such securities in violation of any federal or state securities laws. Buyer is an "accredited investor" within the meaning of Regulation D promulgated pursuant to the Securities Act. Buyer is knowledgeable about the industries in which the Acquired Companies operate and is capable of evaluating the merits and risks of the transactions contemplated by this Agreement and is able to bear the substantial economic risk of such investment for an indefinite period of time.

# ARTICLE VI
## SELLER'S COVENANTS AND AGREEMENTS

6.1   <u>Buyer's Access to Premises and Information</u>.  From the date hereof until the earlier of the termination of this Agreement and the Closing Date, upon reasonable advance written request by Buyer which shall be directed to Hilco or such other Persons as Seller may designate from time to time, Seller will permit Buyer and its counsel, accountants and other Representatives to have reasonable access during normal business hours and in a manner so as not to interfere unreasonably with the regular business operation of Seller, to all properties, accounts, Records, contracts, and employees of Seller relating to the Restaurants, in each case, for the sole purpose of consummating the transactions contemplated hereby and will be governed by all the terms and conditions of the Confidentiality Agreement <u>provided</u> that (a) a Representative of Seller to be designated by Seller shall be present during such access, (b) Buyer and its Representatives shall fully cooperate with Seller to maintain confidentiality regarding the transactions contemplated by this Agreement during such access and (c) could reasonably be expected to cause competitive harm to any Seller if the transactions contemplated by this Agreement are not consummated; <u>provided</u>, <u>however</u>, that, for avoidance of doubt, the foregoing shall not require any Party to waive, or take any action with the effect of waiving, its attorney-client privilege or any confidentiality obligation to which it is bound with respect thereto or take any action in violation of applicable Law.  Seller shall furnish or cause to be furnished to Buyer and its Representatives all data and information concerning the business, finances and properties of Seller relating to the Restaurants that may reasonably be requested.  Buyer will not, and will not permit any member of the Buyer Group to, contact any officer, manager, director, employee, customer, supplier, lessee, lessor, lender, licensee, licensor, distributor, landlord, franchisor, creditor, noteholder or other material business relation of any Seller or its Affiliates prior to the Closing with respect to any Seller, its business or the transactions contemplated by this Agreement without the prior written consent of Seller (which consent shall not be unreasonably delayed, conditioned or withheld) for each such contact.

6.2   <u>Conduct of Business in Ordinary Course</u>.  Seller shall, subject to the applicable Conditions, and except (i) as required to comply with any Applicable Laws (including by Order or directive of the Bankruptcy Court or fiduciary duty of boards of managers (or similar governing bodies) of the Seller and its Affiliates) or any requirements or limitations resulting from the Bankruptcy Cases, or (ii) as contemplated by this Agreement (including as restricted pursuant to

23

Section 6.2), as set **Schedule 6.2 of the Disclosure Schedule** or with the prior written consent (email to suffice) of Buyer which such consent shall not be unreasonably withheld, conditioned or delayed, from and after the date of this Agreement and through the Closing Date (or earlier termination of this Agreement), with respect to the Restaurants, (a) use commercially reasonable efforts to carry on its business solely in the Ordinary Course of Business; (b) use commercially reasonable efforts to preserve and maintain its business organization intact and to maintain its relationships with suppliers, customers and others so that such relationships will be preserved on and after the Closing Date; (c) use commercially reasonable efforts to repair and maintain all tangible properties and assets with respect to the Restaurants in accordance with its usual and ordinary repair and maintenance standards and maintain the Fixed Assets through the Closing Date in substantially the same condition as they were at the time of the Inspections, normal wear and tear excepted (for the avoidance of doubt, subject to the applicable Conditions, including requisite approvals by the Bankruptcy Court and under the DIP Facility or the DIP Credit Agreement on the use of cash); (d) except as otherwise set forth on **Schedule 2.6(c) of the Disclosure Schedule**, not end, terminate or change in any material respect, as related to the Acquired Assets, any lease, contract, undertaking or other commitment, and shall not knowingly do any act or omit to do any act, or permit an act or omission to act, which will cause a material breach of any such lease, contract, undertaking or other commitment unless such modification relates to splitting up any Acquired Assets in connection with Seller separating or duplicating necessary parts of the business to be able to sell non-Transaction related assets to other bidders; (e) except as required by applicable Law or pursuant to the terms of any Employee Benefit Plan, not grant any general increase in the rates of pay of any of its hourly-paid Restaurant Employees, grant any increase in the salaries or other compensation to any Restaurant Employees, or grant any increase in the pension, retirement or other employment benefits of any character of, or grant any new benefits to, such Restaurant Employees; and (f) not make, incur or authorize any dividends or distributions, repurchases or redemptions of Equity Interests, capital expenditures or any indebtedness for borrowed money, other in the Ordinary Course of Business and consistent with past practice; provided, that nothing herein shall limit Seller's right to remove the Excluded Assets from the Restaurants prior to Closing, including any cash other than Restaurant Cash.

6.3    <u>Financing Cooperation</u>.

(a)    Prior to the Closing Date (or the earlier termination of this Agreement), Seller, subject to the applicable Conditions, shall, and shall use its reasonable best efforts to cause its controlled Affiliates and Representatives to, at Buyer's sole cost and expense, provide all customary cooperation as reasonably requested by Buyer and its Affiliates, subsidiaries and Representatives to assist Buyer in the arrangement of the Debt Financing including by (i) assisting with the preparation of the schedules and exhibits to the definitive financing documentation as may be reasonably requested by Buyer, (ii) assisting with the pledging of collateral for the Debt Financing, (iii) cooperating in satisfying the conditions precedent set forth in the Debt Commitment Letter or any definitive document relating to the Debt Financing to the extent the satisfaction of such condition requires the cooperation of, or is within the control of, Seller, (iv) taking corporate actions reasonably necessary to permit the consummation of the Debt Financing, and (v) providing to Buyer and its Financing Sources at least four (4) Business Days prior to the Closing Date all documentation and other information required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including the

24

PATRIOT Act and the Beneficial Ownership Regulation (31 C.F.R. § 1010.230) to the extent requested at least nine (9) days prior to the Closing.

(b)  Notwithstanding anything in this Agreement to the contrary, (i) neither Seller nor its directors, officers, employees or agents shall be required to execute or enter into any certificate, instrument, agreement or other document in connection with the Debt Financing which will be effective prior to the Closing, (ii) nothing herein shall require cooperation or other actions or efforts on the part of Seller or any of its directors, officers, employees or agents in connection with the Debt Financing to the extent it would interfere unreasonably with the business or operations of Seller, (iii) neither Seller nor its directors, officers, employees or agents will be required to pay any commitment or other similar fee that is not reimbursed by Buyer or to enter into any agreement effective in connection with the Debt Financing prior to the Closing, (iv) nothing herein shall require the boards of directors of Seller, prior to the Closing, to adopt resolutions approving or otherwise approve the agreements, documents or instruments pursuant to which the Debt Financing is made and (v) the cooperation required pursuant to this Section 6.3 will not violate this Agreement, any other contractual or analogous obligation of Seller or Applicable Law.

(c)  Buyer shall indemnify and hold harmless Seller and its Affiliates, officers, directors, employees or agents from and against any and all losses, damages or liabilities suffered or incurred by any of them in connection with any of their cooperation or assistance with respect to the Debt Financing except, in each case, to the extent arising from the willful misconduct, gross negligence, intentional fraud or intentional misrepresentation of Seller or its Affiliates, officers, directors, employees or agents in connection with the Debt Financing.  Buyer shall from time to time, promptly upon request by Seller, reimburse Seller for any and all out of pocket expenses incurred in connection with its cooperation or assistance with respect to the Debt Financing.

(d)  Notwithstanding anything to the contrary, Seller shall be deemed to have complied with this Section 6.3 for all purposes of this Agreement (including Article VIII) unless the Debt Financing has not been obtained as a result of Seller's breach of its obligations under this Section 6.3.  For the avoidance of doubt, the Parties acknowledge and agree that the provisions contained in this Section 6.3 represent the sole obligation of Seller and its Affiliates and Representatives with respect to cooperation in connection with the arrangement of the Debt Financing and no other provision of this Agreement (including the Exhibits and Schedules hereto) shall be deemed to expand or modify such obligations.

6.4  Closing Conditions; Reasonable Efforts.  From the date hereof until the Closing (or earlier termination of this Agreement), Seller shall, subject to the applicable Conditions, use reasonable best efforts (a) to take all such actions as are reasonably necessary to expeditiously satisfy the closing conditions set forth herein and to cause the transactions contemplated herein to be effected as soon as practicable, but in any event on or prior to the Outside Date, and (b) to cooperate with Buyer and its Affiliates and Representatives in connection with any step required to be taken as a part of its obligations hereunder. The "reasonable best efforts" of Seller will not require Seller or any of its Affiliates or Representatives to expend any money to remedy any breach of any representation or warranty, to commence any Action, to waive or surrender any right, to modify any Contract or to waive or forego any right, remedy or condition hereunder.

6.5 <u>Supplements to Disclosure Schedule</u>. On or before three (3) Business Days prior to the Bid Deadline, Seller will cause a copy of the final Disclosure Schedule to be delivered to Buyer; <u>provided</u>, <u>however</u>, the Parties acknowledge that **Schedules 2.1**, **2.2** and **2.6(d) of the Disclosure Schedule** may be updated after such date but no later than the applicable dates set forth herein, in each case subject to the express terms of this Agreement. From the date hereof until the Closing, Seller shall use commercially reasonable efforts promptly notify Buyer upon Seller becoming aware (to the Knowledge of Seller) of any material breach by Seller of any representation, warranty, or covenant made by Seller hereunder or occurrence of any event or circumstance which will reasonably result in such a breach. At any time after the Bid Deadline but prior to the Closing, Seller may supplement or amend the Disclosure Schedule to this Agreement to the extent that Seller becomes aware of any matter previously existing or hereafter arising which, if existing, occurring or known as of the date of this Agreement, would have been required to be set forth or described in such Disclosure Schedule or that is otherwise necessary to correct any information in such Disclosure Schedule that has been rendered inaccurate thereby (collectively, the "<u>Schedule Updates</u>"). On or before the day prior to the Closing Date, Seller may deliver an updated set of Disclosure Schedule containing all Schedule Updates through such date in form and substance reasonably agreeable to Buyer. The Schedule Updates may describe facts, circumstances, events or conditions that: (a) did not exist on, or have changed since, the date hereof ("<u>New Information</u>"); or (b) existed on the date hereof ("<u>Correcting Information</u>"). No New Information or Correcting Information set forth in a Schedule Update shall affect the representations or warranties of Seller or Buyer's right to rely thereon, or the conditions to the obligations of the Buyer. Neither the giving of notice nor the delivery of the Schedule Updates shall be deemed to prevent or cure any misrepresentation, breach of representation or warranty, or breach of covenant by Seller, nor shall they affect any right or remedy of Buyer existing or arising by reason of the inaccuracy of any representation or warranty or breach of any covenant.

6.6 <u>Bankruptcy Matters</u>.

(a) <u>Bankruptcy Filings</u>. Seller shall (A) cooperate with Buyer concerning the Bidding Procedures Order, the Sale Order and any other orders of the Bankruptcy Court relating to the transactions contemplated by this Agreement, and (B) use commercially reasonable efforts to provide Buyer with copies of all applications, pleadings, notices, proposed orders and other documents relating to this Agreement or the Transactions, at least three (3) Business Days in advance of the proposed filing date so as to permit Buyer sufficient time to review and comment on such drafts and, with respect to all provisions that materially impact Buyer, such pleadings and proposed orders shall be reasonably acceptable to Buyer and consistent with this Agreement. The Seller shall give Buyer reasonably advance notice of any hearings regarding the motions required to obtain the issuance of the Bidding Procedures Order and the Sale Order.

(b) <u>Bankruptcy Notices</u>. Notice of the hearing on the Sale and Bid Procedures Motion, and request for entry of the Sale Order and the objection deadline shall be served by Seller in accordance with the Bankruptcy Code and the applicable Federal Rules of Bankruptcy Procedure, including Bankruptcy Rules 2002, 6004, 6006 and 9014, any applicable local rules or procedures of the Bankruptcy Court, and any orders of the Bankruptcy Court on all persons required to receive notice, including, but not limited to (i) the Office of the United States Trustee for the Northern District of Texas; (ii) counsel to any official committee appointed in the Bankruptcy Case; (iii) all entities known to have expressed an interest in a transaction with respect

to the Acquired Assets during the past twelve (12) months; (iv) all counterparties to any contracts or leases, whether executory or not; (v) all parties with Liens, claims or encumbrances on or against any of the Seller's assets; (vi) all affected federal, state and local governmental regulatory and taxing authorities, including the Internal Revenue Service and State Attorney General in each State in which the Seller conducts business; (vii) all known holders of claims against and equity interests in the Seller, (viii) all of the Seller's insurers; (ix) all parties that have filed and not withdrawn requests for notices pursuant to Bankruptcy Rule 2002, and (x) to the extent not already included above, all parties in interest listed on the Seller's creditor matrix (collectively, the "Notice Parties"). Seller shall provide notice to the Notice Parties that all responses or objections to the Sale and Bid Procedures Motion shall be served on, among others, counsel to Buyer.

6.7    Seller Receipt of Misdirected Assets; Liabilities.  From and after the Closing, if Seller or any of its respective Affiliates receives any right, property or asset that is an Acquired Asset, the Seller shall promptly transfer or cause such of its Affiliates to transfer such right, property or asset (and shall promptly endorse and deliver any such asset that is received in the form of cash, checks or other documents) to Buyer without the payment of any further consideration therefor, and such asset will be deemed the property of Buyer held in trust by such Seller for Buyer until so transferred.  From and after the Closing, if Seller or any of its respective Affiliates is subject to a Liability that should belong to Buyer pursuant to the terms of this Agreement, Seller shall promptly transfer or cause such of its Affiliates to transfer such Liability to Buyer, and Buyer shall assume and accept such Liability without the payment of any further consideration therefor.

**ARTICLE VII**
**BUYER'S COVENANTS AND AGREEMENTS**

7.1    Cooperation in Securing Consents of Third Parties.  Buyer shall use reasonable best efforts to obtain or, as applicable, to assist Seller in obtaining consents, if any, of all necessary persons and agencies to the assignment and transfer to Buyer of any and all properties, assets and agreements, to be assigned and transferred under the terms of this Agreement, and shall promptly execute all documents reasonably requested by Seller in connection therewith, but Buyer shall not, in order to obtain such consents or otherwise, except as provided for in Section 2.6, Section 7.2 or Section 7.10 (including, for the avoidance of doubt, **Schedule 7.2 of the Disclosure Schedule** and payment of the Cure Costs), be required to give consideration or guarantee any obligations of Seller arising prior to the Closing Date, whether relating to Seller's operation of the Restaurants, ownership of the Acquired Assets or otherwise.  In furtherance of, and in no way limiting the foregoing, within ten (10) days following the execution of this Agreement, Buyer will furnish to Seller (or Seller's designee, including to any Landlord) all information reasonably requested by Seller or its designee in connection with obtaining the consents contemplated by this Agreement. Such information to be provided by Buyer to Seller or its designee may include, but shall not be limited to, (i) current and historical financial statements, (ii) company profiles (including in respect of any proposed assignee of a Real Property Lease), (iii) quantitative and qualitative information regarding the principals and/or owners of Buyer and its parent entities (including any assignee of a Real Property Lease), and (iv) such other information requested by Seller or its designee.

7.2    Required Licenses. To the extent Applications may be made prior to Closing, except as set forth on **Schedule 7.2 of the Disclosure Schedule**, within a reasonable period of time, but

no later than fifteen (15) Business Days following the Effective Date, Buyer shall have completed and filed with the applicable Governmental Authorities all Applications for Conditional Liquor Licenses or a Liquor Licenses reasonably necessary for the operation of the Restaurants to the extent such licenses or permits do not constitute Transferable Permits. To the extent requested by the applicable Governmental Authority, Buyer shall promptly respond and provide such additional information or documentation as may be requested. Buyer shall keep Seller informed regarding the status of such Applications and provide such information as Seller may reasonably request in connection therewith. Buyer and Seller covenant and agree to comply with the obligations set forth on **Schedule 7.2 of the Disclosure Schedule** with respect to liquor licenses and the other matters set forth therein.

7.3    Duplication of Records. Prior to the Closing, Seller and its Affiliates may make, and retain following the Closing, duplicate copies of any Records to the extent such Records are within Seller's and its Affiliates' possession; provided that Seller shall, and shall cause its controlled Affiliates to, only use duplicated copies of Records solely (i) to comply with reporting, disclosure, filing or other requirements imposed on Seller or its Affiliates by a Governmental Authority (including if so required under the Bankruptcy Code, Bankruptcy Court local rules or requested by the Bankruptcy Court), (ii) to prepare financial statements or tax returns, or in order to satisfy audit, accounting or other similar requirements of Seller or its Affiliates, (iii) to defend any Action or (iv) in connection with or related to any wind-down, dissolution, liquidation, reorganization or plan of reorganization of Seller or its Affiliates. In the event any Records are used both by the Restaurants and the Retained Business, each Party agrees to use its commercially reasonable efforts to enter into mutually acceptable arrangements to share such Records with both Seller and its Affiliates and any buyer(s) of, or successor(s) to, the Retained Business, including any trustee.

7.4    Closing Conditions; Reasonable Efforts. From the date hereof until the Closing (or earlier termination of this Agreement), Buyer shall use reasonable best efforts (a) to take all such actions as are reasonably necessary to expeditiously satisfy the closing conditions set forth herein and to cause the transactions contemplated herein to be effected as soon as practicable, but in any event on or prior to the Outside Date, and (b) to cooperate with Seller and its Affiliates and Representatives in connection with any step required to be taken as a part of its obligations hereunder.

7.5    Notice of Breach. From the date hereof until the Closing, Buyer shall promptly notify Seller of any material breach by Buyer of any representation, warranty or covenant made by Buyer hereunder or occurrence of any event or circumstance which will reasonably result in such a breach.

7.6    Back-up Bidder. If an Auction is conducted, and Seller does not choose Buyer as the Winning Bidder, but instead choose Buyer as the Back-up Bidder in accordance with the Bidding Procedures Order, Buyer will serve as the Back-up Bidder. If Buyer is chosen as the Back-up Bidder, Buyer will be required to keep its bid to consummate the transactions contemplated by this Agreement on the terms and conditions set forth in this Agreement (as the same may be improved upon by Buyer prior to or at the Auction) open and irrevocable until the closing of the sale of the Acquired Assets to the Winning Bidder, subject to the Outside Date. If the Alternative Transaction with the Winning Bidder is terminated prior to the termination of this

28

Agreement, Buyer will be deemed to be the Winning Bidder and will forthwith consummate the transactions contemplated by this Agreement on the terms and conditions set forth in this Agreement (as the same may be improved upon by Buyer prior to or at the Auction).

7.7   <u>Wind-Down</u>.

(a)   Notwithstanding anything to the contrary herein, from and after the Closing Date until the later of the conclusion of the Bankruptcy Case and the wind-down and final distribution of all assets of Seller and its Affiliates, Buyer shall give Seller and its Representatives reasonable access during normal business hours upon reasonable advance notice of not less than forty-eight (48) hours before the requested date of access to any books, records and information pertaining to the Acquired Assets and Assumed Liabilities and certain key employees for the purposes of (i) the preparation or amendment of Tax Returns, (ii) the determination of any matter relating to the rights or obligations of Seller under this Agreement, or (iii) as is necessary to administer, or satisfy their obligations in connection with, the Bankruptcy Case and the wind-down of Seller and its assets, in each case of clauses (i)-(iii), in such a manner as not to unreasonably interfere with the conduct of the Business. Notwithstanding anything to the contrary in this Agreement, Buyer and its controlled Affiliates (including the Acquired Companies) shall not be required to disclose any information to Seller if such disclosure would (x) jeopardize any attorney-client or other legal privilege or (y) contravene any applicable Law or fiduciary duty; <u>provided</u>, <u>however</u>, Buyer shall use its commercially reasonable efforts to provide a summary of such privileged information to the extent it would not violate any such privilege, applicable Law or fiduciary duty. Buyer shall, and shall cause each of its controlled Affiliates (including the Acquired Companies) and its Representatives to, cooperate with Seller and its Representatives as may reasonably be requested by Seller for such purposes.

(b)   Notwithstanding anything to the contrary herein, unless otherwise consented to in writing by Seller, Buyer will not, for a period of three (3) years following the Closing Date, destroy, alter, or otherwise dispose of any of the Records without first offering to surrender to Seller such Records or any portion thereof that Buyer may intend to destroy, alter, or dispose of. From and after the Closing, Buyer will, and will cause its employees to, provide Seller and its Affiliates with reasonable assistance, support, and cooperation with Seller's and its Affiliates' wind-down and related activities (*e.g.*, helping to locate documents or information related to preparation of Tax Returns, providing former officers, to the extent employed by or under Buyer's or its Affiliate's control, to sign pre-Closing Tax Returns or prosecution or processing of insurance/benefit claims). Without limiting the generality of the foregoing, Buyer acknowledges and agrees that Seller and its Affiliates may reasonably require (i) ongoing services from one or more former Business employees (and may request, upon the written consent of Buyer (not to be unreasonably withheld, conditioned or delayed) that such Business employee enter into consulting services or similar arrangements) and (ii) reasonable access to or use of certain transferred IT assets solely to the extent required to facilitate Seller's wind-down and related activities, subject in each case to the parameters regarding access in <u>Section 7.7(a)</u>.

(c)   Seller and its Affiliates shall be permitted to keep copies of any Contracts, documents, Records, and other information to the extent reasonably necessary or required by the Bankruptcy Courts or in connection with the Bankruptcy Case or to facilitate any subsequent wind-down proceedings or liquidating plan of Seller or its Affiliates. For the avoidance of doubt, the

4903-2558-8736, v. 1
148483277_14

obligations in this Section 7.7 shall be in addition to, and not limited by, any services to be provided pursuant to any Transition Services Agreement.

7.8    Buyer Receipt of Misdirected Assets; Liabilities. From and after the Closing, if Buyer or any of its Affiliates receives any right, property or asset that is an Excluded Asset, Buyer shall promptly transfer or cause such of its Affiliates to transfer such asset (and shall promptly endorse and deliver any such right, property or asset that is received in the form of cash, checks, or other documents) to Seller, and such asset will be deemed the property of Seller held in trust by Buyer for Seller until so transferred without the payment of any further consideration therefor. From and after the Closing, if Buyer or any of its Affiliates is subject to a Liability that should belong to Seller pursuant to the terms of this Agreement, Buyer shall promptly transfer or cause such of its Affiliates to transfer such Liability to Seller, and Seller shall accept such Liability without the payment of any further consideration therefor.

7.9    Efforts to Obtain Financing.

(a)    Buyer shall use its reasonable best efforts to consummate and obtain the Debt Financing contemplated by the Debt Commitment Letter on the terms set forth therein, including using Buyer's reasonable best efforts to (i) maintain in full force and effect the Debt Commitment Letter (and any definitive agreements entered into in connection therewith) in accordance with the terms thereof, (ii) negotiate and enter into definitive agreements with respect to the Debt Financing on terms and conditions not less favorable to Buyer (as determined by Buyer in good faith) than the terms and conditions contained in the Debt Commitment Letter, (iii) satisfy on a timely basis at or prior to Closing all conditions to obtaining the Debt Financing set forth in the Debt Commitment Letter that are applicable to Buyer and within Buyer's control, (iv) upon satisfaction of the conditions set forth in the Debt Commitment Letter (other than those to be satisfied at the Closing, but subject to the satisfaction or waiver of those conditions at Closing), to consummate the Debt Financing at the Closing; provided, that all of the conditions set forth in Articles VIII and IX (other than those to be satisfied at the Closing, but subject to the satisfaction or waiver of those conditions at Closing) have been satisfied and (v) enforce its rights under the Debt Commitment Letter in a timely and diligent matter (as determined by Buyer).

(b)    Buyer shall give Seller prompt notice upon (A) becoming aware of any material breach or default by any party to the Debt Commitment Letter or any definitive agreements relating thereto or (B) its receipt of any written notice or other written communication from any party to the Debt Commitment Letter with respect to (i) any failure to comply with the terms of the Debt Commitment Letter or any definitive agreements related thereto by any party thereto or (ii) any actual or threatened termination or repudiation (whether in whole or in part) of the Debt Commitment Letter or any definitive agreements related thereto by any party thereto. Upon the request of Seller, Buyer shall inform Seller in reasonable detail of the status of Buyer's efforts to arrange the Debt Financing; provided, however, that nothing in this sentence or the immediately preceding sentence shall require Buyer to disclose any information that is subject to the attorney-client or work product privilege.

(c)    If the Debt Financing contemplated by the Debt Commitment Letter becomes unavailable on the terms and conditions contemplated therein, in whole or in part, for any reason, Buyer shall (i) promptly notify Seller thereof and (ii) use reasonable best efforts to arrange

for and obtain alternative debt financing from other sources on terms and conditions that are not less favorable to Buyer (as determined by Buyer in good faith) than those in the Debt Commitment Letter in respect of the Debt Financing which has become unavailable in an amount sufficient to consummate the transactions contemplated by this Agreement in the timeframe contemplated by this Agreement (the "Alternative Financing") to replace such unavailable Debt Financing and to obtain a new financing commitment letter with respect to such Alternative Financing (an "Alternative Commitment Letter"); provided that if the Debt Financing contemplated by the Debt Commitment Letter becomes unavailable on the terms and conditions contemplated therein, in whole or in part, for any reason, Seller shall have the right, in its sole discretion, to terminate this Agreement under Section 11.1(e) (with such failure being considered a Buyer breach and a Buyer Default Termination pursuant to Section 3.2(b)) at any time following receipt of notice that the Debt Financing contemplated by the Debt Commitment Letter has become unavailable on the terms and conditions contemplated therein, in whole or in part, for any reason.  In the event any Alternative Commitment Letter is obtained, (x) any reference in this Agreement to any "Debt Financing" shall include the financing contemplated by such Alternative Commitment Letter and (y) any reference in this Agreement to any "Debt Commitment Letter" shall be deemed to include the Debt Commitment Letter to the extent not superseded by an Alternative Commitment Letter at the time in question and any Alternative Commitment Letter to the extent then in effect, in each case other than with respect to Buyer's representations set forth in Section 5.8 with respect to the Debt Commitment Letter and Debt Financing.

(d)    Without the prior written consent of Seller (which shall not be unreasonably withheld, delayed or conditioned), Buyer shall not permit any amendment or modification to be made to, or any waiver of any provision or remedy under, the Debt Commitment Letter, or release or consent to the termination of the obligations of the sources of the Debt Financing under the Debt Commitment Letter if such amendment, modification, waiver, consent or termination or release (i) reduces the aggregate amount of the Debt Financing, (ii) imposes additional conditions precedent to the availability of the Debt Financing or amends or modifies any of the existing conditions to the funding of the Debt Financing in a manner that would prevent or materially impede or delay the funding of the Debt Financing on the Closing Date or (iii) adversely impacts the ability of Buyer to enforce its rights against the Financing Sources party to the Debt Commitment Letter (it being understood and agreed that, in any event, Buyer may amend the Debt Commitment Letter to add lenders, arrangers, bookrunners, agents, managers or similar entities that have not executed the Debt Commitment Letter as of the date of this Agreement).

7.10    Guaranty.  *Intentionally deleted*.

7.11    Guarantees and Bonding Requirements.  On or prior to the Closing Date, Buyer or its Affiliates shall provide replacement guarantees, sureties, standby letters of credit or other assurances of payment with respect to all Bonding Requirements, in form and substance reasonably satisfactory to Seller and any banks or other counterparty thereto, and, both prior to and following the Closing, Buyer shall cooperate with Seller to obtain a release in form and substance reasonably satisfactory to Buyer and Seller with respect to all Bonding Requirements. "Bonding Requirements" means standby letters of credit, guarantees, sureties indemnity bonds and other financial commitment credit support instruments issued by third parties on behalf of Seller or any of their respective subsidiaries or Affiliates regarding any of the Acquired Assets.

31

7.12     Directors' and Officers' Indemnification.  Following the Closing until the sixth (6th) anniversary thereof, Buyer shall (a) cause the Acquired Companies and their Subsidiaries not to amend, repeal or otherwise modify the Acquired Companies' and their Subsidiaries' respective constitutive documents as in effect at the Closing, in any manner that would adversely affect the rights thereunder of individuals who are or were directors or officers of the Acquired Companies and their Subsidiaries (the "Indemnified Persons") and (b) cause the Acquired Companies and their Subsidiaries to honor and pay the indemnification, advancement of expenses and exculpation provisions of each of the Acquired Companies' and their Subsidiaries' constitutive documents as in effect at the Closing, in any manner; provided, that all rights to indemnification in respect of any Action pending or asserted or any claim made within such period continue until the disposition of such Action or resolution of such claim.  Buyer shall not cancel or otherwise reduce coverage under any "tail" insurance policies purchased by the Acquired Companies prior to the Closing; provided, that no payments shall be required of the Acquired Companies or the Buyer Group with respect to such policies after the Closing.  Each Indemnified Person is and shall be an intended third party beneficiary of this Section 7.12 and shall have the right to enforce such provisions to the same extent as if it was a party.  The obligations of the Parties under this Section 7.12 will not be terminated or modified in such a manner as to adversely affect any Person to whom this Section 7.12 applies without the consent of such affected Person.

## ARTICLE VIII
## CONDITIONS PRECEDENT TO BUYER'S PERFORMANCE

8.1     Buyer's Closing Conditions.  The obligations of Buyer to consummate the transactions contemplated by this Agreement are subject to the satisfaction, at or before the Closing, of all the conditions set out below.  Buyer may, in its sole discretion, waive any or all of these conditions in whole or in part by giving written notice to Seller; provided, however, that the condition described in Section 8.1(f) shall be deemed automatically and irrevocably waived by Buyer as of 11:59 pm Eastern Time on the day prior to the Bid Deadline regardless of whether or not such condition was satisfied at or prior to such time.

(a)     No Order shall have been issued by any court of competent jurisdiction which enjoins or prohibits the Closing or the consummation of the transactions contemplated by this Agreement that is still in effect.

(b)     The representations and warranties made by Seller in Article IV shall be true and correct in all respects (disregarding all qualifications or limitations as to "materiality" or "Material Adverse Change" and words of similar import set forth therein) as though such representations and warranties had been made on and as of the Closing Date (except that representations and warranties that are made as of a specified date need be true and correct only as of such date), except where the failure of such representations and warranties to be true and correct has not had a Material Adverse Change; provided that the representations and warranties set forth in Sections 4.1, 4.2, and 4.16 shall be true and correct in all material respects on and as of the Closing Date with the same effect as though made at and as of the Closing Date (except for such representations and warranties that are made as of a specified date need be true and correct in all material respects only as of such date).

4903-2558-8736, v. 1
148483277_14

(c)      Seller shall have performed and complied in all material respects with all of the covenants and agreements required by this Agreement to be performed or complied with by Seller on or before the Closing.  For the avoidance of doubt, in the event that Seller has covenanted or agreed to use any degree of effort to achieve an outcome, the failure of such outcome to be achieved does not *per se* mean that Seller has failed to perform or comply in all material respects with such covenant or agreement.

(d)      The Parties shall have received any approvals or consents required from the Dallas/Fort Worth International Airport Board with respect to the Concession Lease Agreements relating to the sale of the Transferred Interests.

(e)      The Bankruptcy Court shall have entered the Sale Order.

(f)      Buyer and Franchisor shall have signed a mutually agreeable franchise agreement in substantially the form attached hereto as **Exhibit 3.3** for each of the Restaurants, or such other form on which Buyer and Franchisor may agree.

8.2      <u>Wavier of Conditions</u>. Upon the occurrence of the Closing, any condition set forth in this <u>Article VIII</u> that was not satisfied as of the Closing will be deemed to have been waived for all purposes by the Party having the benefit of such condition as of and after the Closing.  None of Buyer or Seller may rely on the failure of any condition set forth in this <u>Article VIII</u>, as applicable, to be satisfied if such failure was caused by such Party's failure to perform any of its obligations under this Agreement, including its obligation to use its reasonable best efforts to consummate the transactions contemplated hereby as required under this Agreement.

## ARTICLE IX
## CONDITIONS PRECEDENT TO SELLER'S PERFORMANCE

9.1      <u>Seller's Conditions</u>. The obligations of Seller to consummate the transactions contemplated by this Agreement are subject to the satisfaction, at or before the Closing, of all the conditions set out below. Seller may, in its sole discretion, waive any or all of these conditions in whole or in part by giving written notice to Buyer.

(a)      No Order shall have been issued by any court of competent jurisdiction which enjoins or prohibits the Closing or the consummation of the transactions contemplated by this Agreement that is still in effect.

(b)      The representations and warranties made by Buyer in <u>Article V</u> shall be true and correct in all material respects (disregarding all qualifications or limitations as to "materiality" or "Material Adverse Change" and words of similar import set forth therein) as though such representations and warranties had been made on and as of the Closing Date (except that representations and warranties that are made as of a specified date need be true and correct in all material respects only as of such date).

(c)      Buyer shall have performed and complied in all material respects with all of the covenants and agreements required by this Agreement to be performed or complied with by Buyer on or before the Closing.  For the avoidance of doubt, in the event that Buyer has covenanted or agreed to use any degree of effort to achieve an outcome, the failure of such outcome to be

achieved does not *per se* mean that Buyer has failed to perform or comply in all material respects with such covenant or agreement.

(d) Seller shall have had an opportunity to remove its property and proprietary information from the Restaurants. Seller shall bear the costs of all such removals.

(e) The Bankruptcy Court shall have entered the Sale Order.

(f) The Parties shall have received any approvals or consents required from the Dallas/Fort Worth International Airport Board with respect to the Concession Lease Agreements relating to the sale of the Transferred Interests.

9.2 <u>Waiver of Conditions</u>. Upon the occurrence of the Closing, any condition set forth in this <u>Article IX</u> that was not satisfied as of the Closing will be deemed to have been waived for all purposes by the Party having the benefit of such condition as of and after the Closing. None of Buyer or Seller may rely on the failure of any condition set forth in this <u>Article IX</u>, as applicable, to be satisfied if such failure was caused by such Party's failure to perform any of its obligations under this Agreement, including its obligation to use its reasonable best efforts to consummate the transactions contemplated hereby as required under this Agreement.

**ARTICLE X**
**THE CLOSING**

10.1 <u>Time and Place</u>. The Closing shall take place by telephone conference and electronic exchange of documents at 9:00 a.m. Central Time on the second (2nd) Business Day following full satisfaction or due waiver (by the Party entitled to the benefit of such condition) of the closing conditions set forth in <u>Article VIII</u> and <u>Article IX</u> (other than those conditions that by their terms or nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of those conditions at the Closing), or at such other place and time as the Parties may agree in writing. That date on which the Closing actually occurs is referred to herein as the "<u>Closing Date</u>".

10.2 <u>Seller's Obligations at Closing</u>. At the Closing, Seller shall deliver or cause to be delivered to Buyer:

(a) A certificate from a duly authorized officer of Seller dated as of the Closing Date certifying the satisfaction of the conditions set forth in <u>Sections 8.1(b)</u> and <u>8.1(c)</u>;

(b) Assignment and Assumption Agreement in respect of the Assigned Contracts, substantially in the form set forth on **Exhibit 10.2(b)** hereof, duly executed by Seller;

(c) Instruments of assignment and transfer of all the Acquired Assets, substantially in the form set forth on **Exhibit 10.2(c)** hereof, duly executed by Seller;

(d) The Interim Management Agreements, substantially in the form set forth on **Exhibit 10.2(d)** hereof, executed by Seller;

(e) A Transition Services Agreement, if any, duly executed by Seller;

34

(f)      A duly executed IRS Form W-9 of Seller;

(g)      All other documents, certificates and agreements reasonably necessary to evidence and effect the sale, assignment transfer and delivery of the Acquired Assets (other than the Non-Assignable Assets) to Buyer and assumption of the Assumed Liabilities by Buyer, keys for each of the Restaurants and alarm codes for all security systems at each of the Restaurants, in each case, other than those related to the Non-Assignable Assets (which shall be subject to Section 2.6(d)); and

(h)      A copy of the Sale Order which has become final and non-appealable.

10.3    Buyer's Obligations at Closing.  At the Closing, Buyer shall deliver or cause to be delivered to Seller:

(a)      The Cash Payment;

(b)      A certificate from a duly authorized officer of Buyer dated as of the Closing Date certifying the satisfaction of the conditions set forth in Sections 9.1(b) and 9.1(c).

(c)      Assignment and Assumption Agreement in respect of the Assigned Contracts, substantially in the form set forth on **Exhibit 10.2(b)** hereof, duly executed by Buyer;

(d)      Instruments of assignment and transfer of all the Acquired Assets, substantially in the form set forth on **Exhibit 10.2(c)** hereof, duly executed by Buyer;

(e)      The Interim Management Agreements, substantially in the form set forth on **Exhibit 10.2(d)** hereof, executed by Buyer;

(f)      A certificate from a duly authorized officer of Buyer dated as of the Closing Date (1) attaching a certificate of good standing for Buyer (certified by the appropriate Secretary of State as of a date within ten (10) Business Days of the Closing Date); and (2) certifying the incumbency of the officer(s) of Buyer executing any documents delivered by Buyer in connection with the Closing, and certifying that attached thereto is a true, correct and complete copy of the approval of Buyer's execution, delivery, and performance under this Agreement and the other agreements, certificates, instruments and documents to be entered into by Buyer in connection with the Closing; and

(g)      A Transition Services Agreement, if any, duly executed by Buyer; and

(h)      All other documents, certificates and agreements reasonably necessary to evidence and effect the sale, assignment transfer and delivery of the Acquired Assets to Buyer and assumption of the Assumed Liabilities by Buyer, in each case, other than those related to the Non-Assignable Assets (which shall be subject to Section 2.6(d)).

10.4    Transfer Taxes.    Notwithstanding anything herein to the contrary, Buyer acknowledges and agrees that Buyer shall be solely responsible for all real estate recording fees, title insurance premiums or fees, a prorated share of any prepaid expenses, fees relating to the transfer or issuance of a liquor license or other permits or licenses, and any other similar fees in

connection with the transactions contemplated by this Agreement. Buyer shall timely file and pay all stamp, documentary, registration, value-added, transfer, sales, use, reporting, recording, filing and other similar fees, Taxes and charges including any interest and penalties with respect thereto ("Transfer Taxes") resulting from the transfer of the Acquired Assets effected pursuant to this Agreement to the extent determined to not be exempt in accordance with Section 1146 of the Bankruptcy Code.

**ARTICLE XI**
**TERMINATION**

11.1    Termination of Agreement. This Agreement may be terminated only in accordance with this Section 11.1.  This Agreement may be terminated at any time prior to the Closing:

(a)    by mutual written consent of Buyer and Seller;

(b)    by written notice of either Buyer or Seller, upon the issuance of an Order by a court of competent jurisdiction restraining, enjoining, or otherwise prohibiting the consummation of the Transaction or declaring unlawful the Transaction, and such Order having become final, binding and non-appealable; provided that no termination may be made by a Party under this Section 11.1(b) if the issuance of such Order was caused by such Party's breach of, or failure to perform any of its obligations under, this Agreement;

(c)    by written notice of either Buyer or Seller, if the Closing shall not have occurred on or before February 14, 2025 (the "Outside Date") (or such later date as provided in the Bidding Procedures Order); provided, that a Party shall not be permitted to terminate this Agreement pursuant to this Section 11.1(c) if the failure of the Closing to have occurred by the Outside Date was caused by such Party's breach of, or failure to perform any of its obligations under, this Agreement;

(d)    by written notice from Buyer to Seller, if Seller has breached, or failed to perform, any of its representations, warranties, covenants or agreements set forth in this Agreement, in each case, such that the conditions set forth in Section 8.1(b) or 8.1(c) would not be satisfied; provided, that (i) if such breach or failure is curable by Seller then Buyer may not terminate this Agreement under this Section 11.1(d) unless such breach or failure has not been cured by the date that is the earlier to occur of (A) 30 days after written notice thereof is given to Seller and (B) two (2) Business Days prior to the Outside Date and (ii) the right to terminate this Agreement pursuant to this Section 11.1(d) shall not be available to Buyer at any time that Buyer is in material breach of any representation, warranty, covenant or agreement hereunder;

(e)    by written notice from Seller to Buyer, if Buyer has breached, or failed to perform, any of its representations, warranties, covenants or agreements, set forth in this Agreement, in each case, such that the conditions set forth in Section 9.1(b) or 9.1(c) would not be satisfied, including a breach of Buyer's obligation to consummate the Closing; provided, that (i) if such breach or failure is curable by Buyer, then Seller may not terminate this Agreement under this Section 11.1(e) unless such breach or failure has not been cured by the date that is the earlier to occur of (A) 30 days after written notice thereof is given to Buyer and (B) two (2) Business Days prior to the Outside Date and (ii) the right to terminate this Agreement pursuant to this

4903-2558-8736, v. 1
148483277_14

<u>Section 11.1(e)</u> will not be available to Seller at any time that Seller is in material breach of any representation, warranty, covenant or agreement hereunder;

(f)     by written notice from Seller to Buyer, if (i) all of the conditions set forth in <u>Section 8.1</u> have been satisfied (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions at the Closing) or waived and (ii) Buyer fails to complete the Closing at the time required by <u>Section 10.1</u>;

(g)     by written notice from Seller to Buyer, if the board of directors or similar governing body of Seller determines that proceeding with the transactions contemplated by this Agreement or failing to terminate this Agreement would be inconsistent with such Person's or body's fiduciary duties;

(h)     automatically, if the Bankruptcy Court enters an Order approving an Alternative Transaction and Seller closes and consummates such Alternative Transaction;

(i)     by written notice of either Buyer or Seller, in the event the Bankruptcy Case is dismissed or converted to cases under Chapter 7 of the Bankruptcy Code; or

(j)     by written notice of either Buyer or Seller, if Buyer is not the Winning Bidder or the Backup Bidder at the Auction; <u>provided</u>, that Buyer shall not be permitted to terminate this Agreement pursuant to this <u>Section 11.1(j)</u> until after the 25th day following entry by the Bankruptcy Court of an Order authorizing and approving an Alternative Transaction with the Winning Bidder at the Auction (and, notwithstanding Buyer not having been the Winning Bidder or the Backup Bidder at the Auction, until such time (if any) as Buyer terminates this Agreement pursuant to this <u>Section 11.1(j)</u>, the obligations of Buyer to consummate the transactions contemplated by this Agreement shall remain unaffected by Buyer's right to terminate this Agreement pursuant to this <u>Section 11.1(j)</u>).

11.2     <u>Effect of Termination</u>.  In the event of termination of this Agreement pursuant to <u>Section 11.1</u>, this Agreement shall forthwith become void and there shall be no liability on the part of any Party or any of its partners, officers, directors, managers, equityholders or shareholders; <u>provided</u> that <u>Section 2.10(b)</u>, <u>Section 3.2</u>, this <u>Section 11.2</u> and <u>Article XIII</u> and the definitions referenced in such Sections and Articles, even if not included in such Sections and Articles, shall survive any such termination; <u>provided</u>, <u>further</u>, that no termination will relieve Buyer from any Liability for damages, losses, costs or expenses (which the Parties acknowledge and agree shall not be limited to reimbursement of expenses or out-of-pocket costs, and would include the benefits of the transactions contemplated by this Agreement lost by Seller (taking into consideration all relevant matters, including other combination opportunities and the time value of money), which shall be deemed in such event to be damages of Seller) resulting from any Willful Breach of this Agreement prior to the date of such termination (which, for the avoidance of doubt, will be deemed to include any failure by Buyer to consummate the Closing if and when it is obligated to do so pursuant to this Agreement).  Subject to <u>Section 13.17</u>, nothing in this <u>Section 11.2</u> will be deemed to impair the right of any Party to be entitled to specific performance or other equitable remedies to enforce specifically the terms and provisions of this Agreement.

4903-2558-8736, v. 1
148483277_14

11.3    Break-Up Fee; Expense Reimbursement; Overbid. In consideration of Buyer having expended considerable time and expense in connection with this Agreement and negotiation thereof and Buyer's willingness to act as the "stalking horse" bidder with respect to the Auction, Seller believes that Buyer is entitled to the Bid Protections.

(a)    If this Agreement is terminated pursuant to Section 11.1(d) (*Seller Breach*), or Section 11.1(h) (*Alternative Transaction*), then Seller shall pay the Break-Up Fee and Expense Reimbursement to Buyer in immediately available funds, without need for further order of or from the Bankruptcy Court; provided, however, that the Break-up Fee and Expense Reimbursement shall be paid (i) no earlier than upon consummation of an Alternative Transaction and (ii) out of the proceeds received by Seller from an Alternative Transaction; provided, further, that in the event Seller would otherwise be required to pay the Expense Reimbursement pursuant to both this Section 11.3(a) and Section 11.3(b), Seller shall only be required to pay the Expense Reimbursement pursuant to Section 11.3(b) (and, in any event, Seller shall not be required to pay the Break-Up Fee or Expense Reimbursement more than one time).

(b)    If this Agreement is terminated pursuant to Section 11.1(c) (*Outside Date*) at a time when Buyer would have been permitted to terminate pursuant to Section 11.1(d) (*Seller Breach*), Section 11.1(g) (*Fiduciary Out*), Section 11.1(i) (*Chapter 7*) or Section 11.1(j) (*Buyer Not Winning Bidder*), then Seller shall pay the Expense Reimbursement to Buyer in immediately available funds, without need for further order of or from the Bankruptcy Court, and such Expense Reimbursement shall be due and payable simultaneously with any such termination of this Agreement.

(c)    To the extent that Seller consummates an Alternative Transaction and the Break-Up Fee and Expense Reimbursement are due and owing to Buyer pursuant to this Section 11.3, the Break-Up Fee and Expense Reimbursement shall be paid from the proceeds of a replacement debtor-in-possession financing or from the sale proceeds from such Alternative Transaction whereby the assets contemplated to be sold to Buyer are, instead, sold to a third party. To the extent that Seller does not consummate an Alternative Transaction and the Break-Up Fee or Expense Reimbursement are due and owing to Buyer pursuant to this Section 11.3, the Break-Up Fee and Expense Reimbursement shall be deemed an allowed administrative expense claim in accordance with Sections 503(b) and 507(b) of the Bankruptcy Code.

(d)    Seller acknowledges and agrees that Buyer's due diligence, efforts, negotiation and execution of this Agreement have involved substantial investment of management time and have required significant commitment of financial, legal, and other resources by Buyer and its Affiliates, and that such due diligence, efforts, negotiation, and execution have provided value to Seller and, in Seller's reasonable business judgment, is necessary for the preservation of the value of Seller's estate.  Seller further agrees and acknowledges that the Break-Up Fee and Expense Reimbursement are reasonable in relation to Buyer's efforts, Buyer's lost opportunities from pursuing this Transaction, and the magnitude of the Transaction.  The provision of the Break-Up Fee and the Expense Reimbursement is an integral part of this Agreement, without which Buyer would not have entered into this Agreement.

(e)    If Seller fails to take any action necessary to cause the delivery of the Break-Up Fee or the Expense Reimbursement under circumstances where Buyer is entitled to the Break-

Up Fee or the Expense Reimbursement and, in order to obtain such Break-Up Fee or the Expense Reimbursement, Buyer commences an Action which results in a judgment in favor of Buyer, Seller shall pay to Buyer, in addition to the Break-Up Fee or the Expense Reimbursement, an amount of cash equal to the costs and expenses (including attorneys' fees) incurred by Buyer in connection with such Action.

(f)     Seller hereby acknowledges and agrees that the obligation to pay the Break-Up Fee and the Expense Reimbursement (to the extent due hereunder) shall survive the termination of this Agreement.

## ARTICLE XII
## SURVIVAL; POST CLOSING MATTERS

12.1     <u>Non-Survival of Representations and Warranties and Certain Covenants; Certain Waivers</u>.  Each of the representations and warranties and the covenants and agreements (to the extent such covenant or agreement contemplates or requires performance by such Party prior to the Closing) of the Parties set forth in this Agreement or in any other document contemplated hereby, or in any certificate delivered hereunder or thereunder, and excluding <u>Sections 2.10(b)</u> (*Inspection and Due Diligence)* and <u>5.11</u> (*Investment; Buyer's Investigation)*, will terminate effective immediately as of the Closing such that no claim for breach of any such representation, warranty, covenant or agreement, detrimental reliance or other right or remedy (whether in contract, in tort or at law or in equity) may be brought with respect thereto after the Closing.  Each covenant and agreement that explicitly contemplates performance after the Closing, will, in each case and to such extent, expressly survive the Closing in accordance with its terms, and if no term is specified, then for five (5) years following the Closing Date, and nothing in this <u>Section 12.1</u> will be deemed to limit any rights or remedies of any Person for breach of any such surviving covenant or agreement. Buyer and Seller acknowledge and agree, on their own behalf and on behalf of the Buyer Group or the Seller Parties, as the case may be, that the agreements contained in this <u>Section 12.1</u> (a) require performance after the Closing to the maximum extent permitted by Applicable Law and will survive the Closing for five (5) years and (b) are an integral part of the transactions contemplated hereby and that, without the agreements set forth in this <u>Section 12.1</u>, none of the Parties would enter into this Agreement.  The Buyer Group hereby waives all rights and remedies with respect to any environmental, health or safety matters, including those arising under the Comprehensive Environmental Response, Compensation and Liability Act of 1980, or any other Environmental Laws, relating to this Agreement or the transactions contemplated hereby.

12.2     <u>Post-Closing Access</u>.  To the extent Seller has not completed the removal of its property or proprietary information permitted pursuant to <u>Section 9.1(d)</u> by the Closing Date, Buyer will provide access to the Restaurants during normal business hours, upon reasonable prior notice from Seller, after the Closing for Seller to complete such removal; <u>provided</u>, <u>however</u>, that Seller agrees its removal of its property or proprietary information shall not unreasonably interfere with Buyer's operation of the Restaurants.

12.3     <u>Cooperation Regarding Employment Matters</u>.  Buyer will, and will cause its Affiliates and subsidiaries to: (a) at no cost to Buyer, cooperate with Seller and provide to Seller all assistance reasonably requested in connection with the administration, defense or resolution of

39

any Pre-Closing Employment Claim that has not been fully and finally resolved as of the Closing; (b) at no cost to Buyer, make available to Seller (or its designee) as reasonably requested the Transferred Employees (including, without limitation, for interviews, depositions and witness statements) and all information, records and documents relating to any Pre-Closing Employment Claim, in each case, in connection with any mediation, arbitration, investigation, court, administrative or other proceeding (including any proceeding with a Governmental Authority) which may remain in Buyer's possession; (c) retain any books and records in Buyer's possession as of the applicable Closing Date that Buyer reasonably believes could be necessary or useful in connection with the resolution of any Pre-Closing Employment Claim and, upon written request of Seller or its designee, promptly (but in no event later than five (5) days following such written request) make all such books and records available for inspection, copying or e-discovery (provided that Buyer's failure to maintain such books and records shall not be a breach by Buyer under this Agreement, unless (i) such failure was caused by Buyer's gross negligence or willful misconduct or (ii) such failure relates to any matter set forth or referenced on the Disclosure Schedule or is the subject of a written notice provided by Seller to Buyer regarding a request to retain any information or other documentation relating to a particular matter or Pre-Closing Employment Claim); and (d) promptly notify Seller of any communications received from any person, entity or Governmental Authority with respect to any Pre-Closing Employment Claim. Notwithstanding the foregoing, Seller acknowledges that it will remove from the Restaurants all information, records and documents relating to employment of its employees prior to the Effective Time, including, but not limited to, personnel, human resources, and/or health files for all employees. Once there is clarity that Buyer will be the prevailing Buyer of the Acquired Assets, the Seller and Buyer will reasonably cooperate with one another to initiate the hiring process prior to Closing in accordance with Section 3.5.

## ARTICLE XIII
## MISCELLANEOUS

13.1    Notices. Except as otherwise provided herein, and subject to any requirements as to timing or sequencing set forth herein (e.g., advance or prior notice requirements), all notices, requests, claims, demands, waivers and other communications concerning this Agreement or the transactions contemplated hereby must be in writing and must be personally delivered or sent by overnight courier service or by email as set forth below:

> Notices to Buyer:
> Sugarloaf Concessions, LLC
> 15995 N. Barkers Landing Road
> Houston, TX  77079
> Attention: Ray Blanchette
> Email: RayB@sugarloafhospitality.com
>
> with a copy to (which shall not constitute notice):
>
> Hoover Slovacek LLP
> 5051 Westheimer, Suite 1200
> Houston, TX 77056
> Attention: Edward W. Engel

40

Email: engel@hooverslovacek.com

Notices to Seller:
TGI Friday's Inc.
500 E State Highway 114, Suite 200
Southlake, TX 76092
Attention: Kyle Richter
Email: krichter@thinkbrg.com

with a copy to (which shall not constitute notice):

Ropes & Gray LLP
191 North Wacker Drive, 32nd Floor
Chicago, IL 60606
Attention: Chris L. Dickerson; Ellen Wheeler
Email: chris.dickerson@ropesgray.com; ellen.wheeler@ropesgray.com

and

Foley & Lardner LLP
2021 McKinney Avenue, Suite 1600
Dallas, TX 75201
Attention: Holland N. O'Neil
         Mark C. Moore
         Zachary C. Zahn
Email: honeil@foley.com
         mmoore@foley.com
         zzahn@foley.com

Any Party may specify by written notice in accordance with this Section 13.1 to each of the other Parties a different email or physical address at any time. Written notice shall be effective and deemed to have been given: (a) on the day such notice is sent by email (provided that the Party delivering such notice does not promptly receive notice of unsuccessful transmission and such sent email is kept on file (whether electronically or otherwise) by the sending party); (b) on the next Business Day when sent by reputable overnight courier service (charges prepaid); or (c) on the day such notice is personally delivered. A copy of the e-mail transmission containing the time, date, and recipient e-mail address shall be rebuttable evidence of receipt by e-mail in accordance with clause (a) above. Written confirmation of receipt provided by an overnight courier service shall be rebuttable evidence of delivery by an overnight courier service in accordance with clause (b) above.

13.2    Effect of Headings; Negotiated Agreement. The subject headings of this Agreement are included for convenience only and shall not affect the construction or interpretation of any of its provisions.  This Agreement is the result of negotiations between, and has been reviewed by, the Parties and their respective legal counsel and shall be construed without regard to any

4903-2558-8736, v. 1
148483277_14

presumption or rule requiring construction or interpretation against the party drafting an instrument or causing any instrument to be drafted.

13.3     Entire Agreement; Modification; Waiver. This Agreement and the Disclosure Schedule, as may be amended and updated, together with all Exhibits and schedules hereto or thereto and agreements or instruments executed in connection herewith or therewith, together with the Confidentiality Agreement, constitutes the entire agreement between the Parties pertaining to the subject matter contained in it and supersedes all prior and contemporaneous agreements, representations and understandings of the Parties.  No supplement, modification or amendment of this Agreement shall be binding unless executed in writing by all the Parties; provided that this Section 13.3 and Section 13.18 shall not be amended, supplemented, waived or otherwise modified in a manner adverse to any Financing Source without the prior written consent of each such Financing Source. No waiver of any of the provisions of this Agreement shall be deemed, or shall constitute, a waiver of any other provision, whether or not similar, and no waiver shall constitute a continuing waiver. No waiver shall be binding unless executed in writing by the party making the waiver.  No course of dealing, nor any failure or delay in exercising any right, shall be construed as a waiver, and no single or partial exercise of a right shall preclude any other or further exercise of that or any other right.

13.4     Parties in Interest. Except as otherwise expressly provided herein, including in Sections 7.12 (*Directors' and Officers' Indemnification*), 13.18 (*Non-Recourse*) and Section 13.22 (*Legal Representation*), nothing in this Agreement, whether express or implied, is intended to confer any rights or remedies under or by reason of this Agreement on any persons other than the Parties to it and its respective permitted successors and assigns.

13.5     Binding Effect; Assignment. This Agreement and the rights, interests, and obligations hereunder shall be binding upon Buyer, and, subject to the Bidding Procedures Order (with respect to the matters covered thereby) and the entry and terms of the Sale Order, Seller, and shall inure to the benefit of and be so binding on the Parties and their respective successors and permitted assigns, including any trustee or estate representative appointed in the Bankruptcy Cases or any successor Chapter 7 cases; provided that neither this Agreement nor any of the rights, interests, or obligations hereunder shall be assigned or delegated without the prior written consent of Buyer and Seller, and any attempted assignment or delegation without such prior written consent shall be null and void.

13.6     Signatures. The signatures of the Parties to this Agreement, or to any related document, may be delivered by facsimile or other electronic transmission (such as electronic mail). This Agreement may be executed simultaneously in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

13.7     Governing Law; Jurisdiction.

(a)     Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Agreement, and any Action that may be based upon, arising out of or related to this Agreement or the negotiation, execution or performance of this Agreement or the transactions contemplated hereby will be governed by and construed in accordance with the internal Laws of the State of Texas applicable to agreements executed and performed entirely within such State

4903-2558-8736, v. 1
148483277_14

without regards to conflicts of law principles of the State of Texas or any other jurisdiction that would cause the Laws of any jurisdiction other than the State of Texas to apply.

(b)    Each of the Parties irrevocably agrees that any Action that may be based upon, arising out of, or related to this Agreement or the negotiation, execution or performance of this Agreement and the transactions contemplated hereby brought by any other Party or its successors or assigns will be brought and determined only in (i) the Bankruptcy Court and any federal court to which an appeal from the Bankruptcy Court may be validly taken or (ii) in the event the Bankruptcy Case is closed, or if the Bankruptcy Court is unwilling or unable to hear such Action, any state or federal court within Dallas, Texas ((i) and (ii), the "Chosen Courts"), and each of the Parties hereby irrevocably submits to the exclusive jurisdiction of the Chosen Courts for itself and with respect to its property, generally and unconditionally, with regard to any such Action arising out of or relating to this Agreement and the transactions contemplated hereby. Each of the Parties agrees not to commence any Action relating thereto except in the Chosen Courts, other than Actions in any court of competent jurisdiction to enforce any judgment, decree or award rendered by any Chosen Court, and no Party will file a motion to dismiss any Action filed in a Chosen Court on any jurisdictional or venue-related grounds, including the doctrine of forum non-conveniens. The Parties irrevocably agree that venue would be proper in any of the Chosen Courts, and hereby irrevocably waive any objection that any such court is an improper or inconvenient forum for the resolution of such Action.  Each of the Parties further irrevocably and unconditionally consents to service of process in the manner provided for notices in Section 13.1. Nothing in this Agreement will affect the right of any Party to this Agreement to serve process in any other manner permitted by Law.

13.8    [Reserved.]

13.9    Severability. If any provision of this Agreement is held invalid or unenforceable by any arbitrator or court of final jurisdiction, it is the intent of the Parties that all other provisions of this Agreement be construed to remain fully valid, enforceable and binding on the Parties and such provision will be ineffective only to the extent of such prohibition or invalidity in such jurisdiction, without invalidating the remainder of such provision or the remaining provisions of this Agreement or in any other jurisdiction.

13.10    Expenses.  Whether or not Closing takes place, except as otherwise provided herein, each Party shall pay all costs and expenses incurred or to be incurred by it in negotiating and preparing this Agreement and in closing and carrying out the transactions contemplated by this Agreement.

13.11    Bulk Sales.  The Parties intend that pursuant to section 363(f) of the Bankruptcy Code, the transfer of the Acquired Assets shall be free and clear of any Liens in the Acquired Assets including any liens or claims arising out of the bulk transfer laws except Permitted Liens, and the Parties shall take such steps as may be necessary or appropriate to so provide in the Sale Order. In furtherance of the foregoing, each Party hereby waives compliance by the Parties with the "bulk sales," "bulk transfers" or similar laws and all other similar laws in all applicable jurisdictions in respect of the transactions contemplated by this Agreement.

4903-2558-8736, v. 1
148483277_14

13.12  Disclosure. Seller and its parent organization shall have the right to disclose this Agreement and related agreements in connection with any filings or other disclosures required in connection with compliance with federal and state securities and franchise laws, the rules and regulations of any applicable securities trading organization, or the Bankruptcy Court. Subject to the other provisions of this Agreement, press releases and other publicity materials relating to the transactions contemplated by this Agreement shall be released by the Parties only after review and with the consent of the other Parties. Except as permitted pursuant to this Section 13.12, Seller shall not disclose to anyone, except its Representatives, Affiliates, advisors or agents, without Buyer's prior written consent, the existence or nature of the transactions contemplated by this Agreement. This Section 13.12 does not alter or amend any confidentiality obligations that Buyer may have or will have under the Franchise Agreements. Seller acknowledges and agrees that Buyer's remedy at law for any breach of Seller's obligations hereunder could be inadequate, and that Buyer shall have the right to seek temporary and permanent injunctive relief in any court proceeding to enforce this covenant regarding confidentiality. However, nothing contained herein shall in any way affect Buyer's rights and remedies afforded by law and/or in equity, and Buyer shall retain the right to recover such damages as it may have sustained by reason of any breach hereof, as limited by any cap on Buyer's damages in this Agreement. Notwithstanding the foregoing, Buyer or Seller may disclose to any of its lenders any of the provisions of this Agreement and the documents entered into or to be entered into in connection herewith.

13.13  Further Assurances.  Each Party, as requested by the other, shall use commercially reasonable efforts to execute, acknowledge and deliver any further deeds, assignments, conveyances and other assurances, documents and instruments of transfer, reasonably requested by the other, and shall take any other action consistent with the terms of this Agreement that may reasonably be requested by the other, for the purpose of assigning, transferring, granting, conveying and confirming to such Party, or reducing to possession, any or all property to be conveyed and transferred under this Agreement.

13.14  Limitation of Liability. Except as otherwise provided herein (including as set forth in Section 11.2), in no event will any Party or any of its Affiliates be liable for any special, incidental, indirect, exemplary, punitive or consequential damages (including lost profits, loss of revenue or lost sales) in connection with any claims, losses, damages or injuries arising out of related to this Agreement or the transactions contemplated hereby.

13.15  Casualty and Condemnation.  At all times prior to the Closing, the risk of loss for all Acquired Assets and Restaurants will be retained by the Seller.  If, prior to the Closing, any Restaurant is a C&C Restaurant, Seller shall notify Buyer reasonably promptly of such fact and Buyer's exclusive remedy hereunder shall be as follows: (a) in the case of condemnation or taking, Seller shall assign or pay, as the case may be, any condemnation or taking proceeds thereof (of which are payable to or actually received by Seller) to Buyer at the Closing, and (b) in the case of fire, flood or other casualty to the Restaurant, Seller shall, at Buyer's option and subject to any applicable lease or Contract with the applicable landlord, either use insurance proceeds to restore such damage, or to the extent such proceeds were not previously applied, assign the insurance proceeds therefrom to Buyer at Closing.  For the avoidance of doubt, any casualty or condemnation, including any Restaurant becoming a C&C Restaurant, is not a *per se* breach of any representation, warrant, covenant or agreement and Buyer shall not have the right to terminate this Agreement or assert that any condition to Closing was not satisfied as a result thereof.

4903-2558-8736, v. 1
148483277_14

13.16  <u>Waiver of Jury Trial</u>. EACH OF THE PARTIES KNOWINGLY, VOLUNTARILY AND IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED ON CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT OR THE ANCILLARY DOCUMENTS OR THE ACTIONS OF EITHER PARTY TO THIS AGREEMENT IN NEGOTIATION, EXECUTION AND DELIVERY, PERFORMANCE OR ENFORCEMENT OF THIS AGREEMENT OR THE ANCILLARY DOCUMENTS.

13.17  <u>Specific Performance</u>.  The Parties agree that irreparable damage, for which monetary relief, even if available, would not be an adequate remedy, would occur in the event that any provision of this Agreement is not performed in accordance with its specific terms or is otherwise breached, including if any of the Parties fails to take any action required of it hereunder to consummate the transactions contemplated by this Agreement. It is accordingly agreed that (a) Seller and Buyer will be entitled to an injunction or injunctions, specific performance or other equitable relief to prevent breaches of this Agreement and to enforce specifically the terms and provisions hereof in the courts described in <u>Section 13.7</u> without proof of damages or otherwise, this being in addition to any other remedy to which they are entitled under this Agreement, and (b) the right of specific performance and other equitable relief is an integral part of the transactions contemplated by this Agreement and without that right, neither Seller nor Buyer would have entered into this Agreement. The Parties acknowledge and agree that either Seller or Buyer pursuing an injunction or injunctions or other Order to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement in accordance with this <u>Section 13.17</u> will not be required to provide any bond or other security in connection with any such Order. The remedies available to Seller pursuant to this <u>Section 13.17</u> will be in addition to any other remedy to which they were entitled at law or in equity, and the election to pursue an injunction or specific performance will not restrict, impair or otherwise limit Seller from seeking to collect or collecting damages. If, prior to the Outside Date, either Buyer or Seller bring any action, in each case in accordance with this <u>Section 13.17</u>, to enforce specifically the performance of the terms and provisions hereof by the other, the Outside Date will automatically be extended (i) for the period during which such action is pending, <u>plus</u> ten (10) Business Days or (ii) by such other time period established by the court presiding over such action, as the case may be. In no event will this <u>Section 13.17</u> be used, alone or together with any other provision of this Agreement, to require Seller to remedy any breach of any representation or warranty made by Seller herein.

13.18  <u>Non-Recourse</u>. Notwithstanding anything herein to the contrary:

(a)      this Agreement may only be enforced against, and any Action based upon, arising out of or related to this Agreement may only be brought against, the Persons that are expressly named as parties to this Agreement;

(b)      except to the extent named as a party to this Agreement, and then only to the extent of the specific obligations of such parties set forth in this Agreement, no past, present or future shareholder, member, partner, manager, director, officer, employee, Affiliate or subsidiary, agent, or Representative of any Party (each, a "<u>Non-Recourse Party</u>") shall have any Liability (whether in contract, tort, equity or otherwise) for any of the representations, warranties,

45

covenants, agreements or other obligations or Liabilities of any of the parties to this Agreement or for any claims, causes of action, obligations or liabilities arising under, out of, in connection with or related in any manner to this Agreement or the Ancillary Documents or based on, in respect of, or by reason of this Agreement or the Ancillary Documents or their negotiation, execution, performance or breach;

(c)    the Parties acknowledge and agree not to commence any Action against any Financing Source in connection with such Debt Financing whether under law or equity (whether in tort, contract or otherwise); provided, that nothing in this Section 13.18(c) shall limit the liability or obligations of the Financing Sources under the Debt Commitment Letter or the Fee Letter; provided further, that Buyer (including its permitted successors and assigns under any Debt Financing) at its own direction shall be permitted to bring any claim against a Financing Source for failing to satisfy any obligation to fund the Debt Financing pursuant to the terms thereof;

(d)    each Non-Recourse Party is and shall be an intended third party beneficiary of this Section 13.18 and shall have the right to enforce such provisions to the same extent as if it was a party; and

(e)    this Section 13.18 may not be terminated or modified in any manner that adversely affects any Non-Recourse Party, without the prior written consent of such affected Non-Recourse Party.

13.19    No Right of Set-Off. Buyer, on its own behalf and on behalf of the Buyer Group and its and their respective successors and permitted assigns, hereby waives any rights of set-off, netting, offset, recoupment or similar rights that Buyer, any member of the Buyer Group or any of its or their respective successors and permitted assigns has or may have with respect to the payment of the Purchase Price or any other payments to be made by Buyer pursuant to this Agreement or any other document or instrument delivered by Buyer in connection herewith.

13.20    Fiduciary Obligations. Nothing in this Agreement, or any document related to the transactions contemplated hereby, will require Seller or any of their respective directors, managers, officers or members, in each case, in their capacity as such, to take any action, or to refrain from taking any action, to the extent inconsistent with their fiduciary obligations or applicable Law. Seller retains the right to pursue any transaction or restructuring strategy that, in Seller's business judgment, will maximize the value of their estates. For the avoidance of doubt, the Seller's ability to conduct the sale process (including the Auction) and to consider or advance alternative proposals in a manner consistent with the foregoing and the Bidding Procedures Order shall not be impaired in any respect by this Agreement.

13.21    Seller Representative. Each Party agrees that TGI Friday's Inc. has the power and authority to unilaterally act on behalf of all or any of Seller for the purposes specified under this Agreement. Such power will include the power to make all decisions, actions, consents and determinations on behalf of Seller, including to make any waiver of any Closing condition or agree to any amendment to this Agreement. No Seller shall have any right to object, dissent, protest or otherwise contest the same. Buyer shall be entitled to rely on any action or omission taken by TGI Friday's Inc. on behalf of Seller.

13.22  <u>Legal Representation</u>.

(a)     Buyer agrees, on its own behalf and on behalf of each of its Affiliates (for the avoidance of doubt, including, following the Closing, the Acquired Companies) and its and their respective successors and assigns (collectively, the "<u>Waiving Parties</u>"), that, following the Closing, Ropes & Gray LLP and Foley & Lardner LLP (collectively, "<u>Seller Counsel</u>") may serve as counsel to Seller and its Affiliates in connection with any matters related to this Agreement or the Transactions contemplated hereby, including any litigation, claim or obligation arising out of or relating to this Agreement or such transactions, notwithstanding any representation by Seller Counsel prior to the Closing Date of the Acquired Companies.  Buyer, on its own behalf and on behalf of the other Waiving Parties (including, following the Closing, the Acquired Companies) hereby (i) waives any claim they have or may have that Seller Counsel has a conflict of interest or is otherwise prohibited from engaging in such representation and (ii) agrees that, in the event that a dispute arises after the Closing between any of the Waiving Parties, on the one hand, and any Seller or any of their Affiliates, on the other hand, Seller Counsel may represent Seller and/or any of its Affiliates in such dispute even though the interests of such Person(s) may be directly adverse to the Waiving Parties and even though Seller Counsel may have represented any Acquired Company in a matter substantially related to such dispute.  The Waiving Parties also further agree that, as to all communications among Seller Counsel and the Acquired Companies, Seller or its Affiliates, subsidiaries or Representatives, that relate in any way to this Agreement, the negotiation thereof, or the transactions contemplated hereby, the attorney-client privilege and the expectation of client confidence belongs to Seller and may be controlled by TGI Friday's Inc. on behalf of Seller (collectively, "<u>Pre-Closing Privileges</u>") and shall not pass to or be claimed by the Buyer or any other Waiving Party.  Notwithstanding the foregoing, in the event that a dispute arises after the Closing between a Waiving Party, on the one hand, and a third party other than a party to this Agreement, on the other hand, an Acquired Company may assert a Pre-Closing Privilege to prevent disclosure of confidential communications by Seller Counsel to such third party; <u>provided</u>, <u>however</u>, that such Acquired Company may not waive such privilege without the prior written consent of TGI Friday's Inc. on behalf of Seller.

(b)     All such Pre-Closing Privileges, and the portion of any books and records and other documents of the Acquired Companies containing any advice or communication that is subject to any Pre-Closing Privilege ("<u>Pre-Closing Privileged Materials</u>"), shall be excluded from the transactions contemplated by this Agreement, and shall be distributed to TGI Friday's Inc. on behalf of Seller immediately prior to the Closing with (in the case of the portion of any such books and records) no copies retained by the Acquired Companies.  Absent the prior written consent of TGI Friday's Inc. on behalf of Seller (not to be unreasonably withheld, conditioned or delayed), neither Buyer nor any other Waiving Party (including, for the avoidance of doubt, following the Closing, the Acquired Companies) shall have a right of access to Pre-Closing Privileged Materials.  The Parties further agree and acknowledge that Seller has taken reasonable efforts to segregate and retain Pre-Closing Privileged Materials, that the existence of any remaining Pre-Closing Privileged Materials found in the custody of the Acquired Companies after Closing will not be deemed a waiver of any Pre-Closing Privileges, and that the same will be returned to TGI Friday's Inc. on behalf of Seller promptly after any discovery thereof.

4903-2558-8736, v. 1
148483277_14

       (c)    The Buyer acknowledges that it has consulted with independent counsel of its own choosing with respect to the meaning and effect of this <u>Section 13.22</u>, and understands such meaning and effect.

**[Signature Page Follows]**

48

IN WITNESS WHEREOF, the Parties to this Agreement have duly executed it on the day and year first above written.

**BUYER**

SUGARLOAF CONCESSIONS, LLC
a Delaware limited liability company


By: _Ray Blanchette_ _____
    003B29BB8877463...
Name: Raymond A. Blanchette
Its:    Manager

[SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT]

**SELLER:**

**TGIF HOLDINGS, LLC**
**TGIF MIDCO, INC.**
**TGIF PARENT, INC.**
**TGI FRIDAY'S INC.**
**BURLINGTON TOWNE CROSSING, INC.**
**T.G.I. FRIDAY'S OF CHARLES COUNTY, INC.**
**T.G.I. FRIDAY'S OF FREDERICK COUNTY, INC.**
**TGI FRIDAY'S OF ANNAPOLIS, INC.**
**TGI FRIDAY'S OF GREENBELT, INC.**
**TGI FRIDAY'S OF HOWARD COUNTY, INC.**
**TGI FRIDAY'S OF TOWSON, INC.**
**TGI FRIDAY'S NY, LLC**
**WEBCO PRODUCTS INCORPORATED**
**T.G.I. FRIDAY'S OF HARFORD COUNTY, INC.**
**T.G.I. FRIDAY'S OF WASHINGTON COUNTY, INC.**
**TGI FRIDAY'S OF WISCONSIN, INC.**
**TGI FRIDAY'S OF ROCKVILLE, INC.**
**TGI FRIDAY'S OF TEXAS LLC**
**TGI FRIDAY'S OF THE ROCKIES, INC.**
**TGIF/DFW MANAGER, LLC**
**TGIF/DFW PARTNER, LLC**

By: _____

Name:  Kyle Richter

Its:      Chief Restructuring Officer

[SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT]

**EXHIBIT 1.0**
**RESTAURANTS**

| Current Store Number | City/State |
| --- | --- |
| Site: 60339 | US MD Hanover Anne Arundel Mills |
| Site: 60122 | US MD Owing Mills |
| Site: 60788 | US MD White Marsh |
| Site: 60374 | US MD Waldorf |
| 60843 | US TX DFW Term A* |
| 60851 | US TX DFW Airport E-17* |
| 60852 | US TX DFW Airport B-10* |
| 60856 | US TX DFW Airport C-8* |
| 60857 | US TX DFW Airport C-30* |

**\* Indicates the DFW Stores; asset to be purchased is membership interest in TGIF/DFW Partner, LLC**

Exhibit 1.0 - 1

4903-2558-8736, v. 1
148483277_14

**EXHIBIT 1.1**
**DEFINED TERMS**

"Accounts Receivable" means all accounts receivable, rights to payment, notes receivable and other receivables (including all Credit Card Receivables), but excluding income tax receivables, of the Restaurants, and any security interest, claim, remedy or other right related to any of the foregoing.

"Acquired Assets" means (i) the Transferred Interests and (ii) substantially all of the assets owned by Seller located at and/or exclusively used in the operation of the business of the Restaurants, other than Excluded Assets, whether real, personal, tangible, or intangible (including goodwill), accrued, contingent or otherwise, including, without limitation, the following:

(a)    Fixed Assets;

(b)    Assigned Contracts;

(c)    Transferable Permits;

(d)    subject to Section 2.8, all of Seller's leasehold interest in the Real Property Leases that are Assigned Contracts, in each case together with Seller's interest in all buildings, fixtures, plant, equipment and improvements thereon or attached thereto;

(e)    the Intellectual Property owned by the Seller that is used exclusively in the Restaurants;

(f)    all goodwill associated with the Restaurants, goodwill as a going concern and goodwill associated with all other intangible property owned by the Seller (for clarity, excluding trademark goodwill);

(g)    all transferable telephone numbers, facsimile numbers and related directory listings used exclusively in connection with each of the Restaurants;

(h)    subject to Section 7.3, all past and present customer, supplier, vendor records, files, documents, instruments, and all other books, records, instruments, policies, procedures and documents exclusively pertaining to the operation of the Restaurants or the use of the other Acquired Assets ("Records"), to the extent said Records are within Seller's possession, in each case, other than any Tax Returns of Seller or Tax Returns and other books and records relating to the Restaurants, the Acquired Assets, the Business or the Retained Business (i) that are otherwise reasonably necessary for Seller, its Affiliates or the Securitization Entities for Tax filing or reporting purposes, (ii) that pertain to the Retained Business, which Buyer acknowledges and agrees may be transferred to or used by one or more buyers of the Retained Business or (iii) otherwise reasonably necessary to the wind-down or liquidating plan of any Seller or Affiliate or businesses of Seller or its Affiliates after the Closing;

(i)    all of Seller's Claims, including, without limitation, warranties and indemnification rights;

Exhibit 1.1 - 1

(j)      cash on hand in each of the Restaurants as of the Effective Time ("Restaurant Cash") which cash amount shall not exceed $2,500 in the case of each Restaurant;

(k)      all prepayments and prepaid expenses (other than prepaid insurance) and security and other deposits, including deposits in connection with any Real Property Lease assigned to Buyer, credits, deferred charges, advance payments and rebates (in each case, other than in respect of Taxes), in each case, to the extent such assets exclusively relate to the Acquired Assets;

(l)      all insurance benefits, including rights and proceeds, exclusively arising from or exclusively relating to the Acquired Assets or the Assumed Liabilities before the Effective Time (but only to the extent that such benefits relate to claims or potential claims arising from facts or circumstances existing or arising on or prior to the Closing Date which claims or potential claims have not been paid or resolved by Seller on or prior to the Closing Date); and

(m)      Avoidance Actions that exclusively relate to the Acquired Assets.

For the avoidance of doubt, no assets of any Acquired Company or DFW Entity shall be "Acquired Assets" and Buyer shall acquire such assets only indirectly, as a result of acquiring the Equity Interests of the Acquired Companies.

"Action" means a claim, action, cause of action, demand, lawsuit, arbitration, inquiry, audit, notice of violation, proceeding, litigation, citation, summons, subpoena or investigation of any nature, civil, criminal, administrative, regulatory or otherwise, whether at law or in equity.

"Actual Financials" has the meaning given to it in Section 4.7.

"Agreement" has the meaning given to it in the Caption.

"Affiliate" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by Contract or otherwise.  Neither TGI SPV Guarantor, LLC nor any of its subsidiaries, including TGI Funding, LLC and TGI Fridays Franchisor, LLC (collectively, the "Securitization Entities") shall be "Affiliates" of Seller.

"Alternative Transaction" means any transaction (or series of transactions), whether direct or indirect, whereby any Person or group of Persons (other than Seller and their Affiliates or Buyer and its Affiliates) acquires (i) beneficial ownership of a majority of the equity interests of Seller or (ii) a material portion of the Acquired Assets (but does not mean the sale of assets to customers conducted in the Ordinary Course of Business), in each case, whether by merger, sale of assets or equity, recapitalization, plan of reorganization or otherwise. Notwithstanding the foregoing, a liquidation or wind-down of Seller's estates shall not be an Alternative Transaction.

"Ancillary Documents" means the Assignments and Assumption Agreement, Assignment and Assumption of Leases, the bill of sale, the Interim Management Agreement, Transition

Exhibit 1.1 - 2

Services Agreement, and the other agreements, instruments and documents required to be delivered pursuant to this Agreement or in connection with the transactions contemplated hereunder or at the Closing.

"Applicable Law" means and includes applicable Law, common law and all applicable statutes, laws, rules, regulations, ordinances, policies and procedures established by any Governmental Authority, including, without limitation, those governing the development, construction and/or operation of a TGI Fridays™ Restaurant, including, without limitation, all labor, disability, food and drug laws and regulations, as in effect on the Effective Time hereof, and as may be enacted, modified or amended from time to time thereafter.

"Application" means an application for Buyer's acquisition of a Conditional Liquor License or a Liquor License in the applicable jurisdiction where a Restaurant is located.

"Assigned Contracts" means all of Seller's right, title and interest in and to the executory Contracts and unexpired leases exclusively related to the Restaurants listed on **Exhibit 1.0** as of the date hereof listed on **Schedule 2.1 of the Disclosure Schedule** to be assumed and assigned to Buyer in connection with the Closing of the Transaction (or following the Closing in accordance with the terms of this Agreement to the extent permitted by law and/or court order).

"Assumed Liabilities" means the following Liabilities, in each case, only to the extent not paid prior to the Closing:

(a)    all Liabilities and obligations of Seller for payment and performance under the Assigned Contracts that become due from and after the Closing;

(b)    all accounts payable and trade payables existing on the Closing that relate to post-Closing periods (including, for the avoidance of doubt, (i) invoiced accounts payable and (ii) accrued but uninvoiced accounts payable), of Seller to the extent related to the Acquired Assets;

(c)    all Liabilities and obligations of Seller under the Transferable Permits, but only to the extent such obligations do not arise from or relate to any actual or alleged breach of such Transferable Permit or violation of law, in each case, arising as of, or related to the period prior to, Closing;

(d)    to Transferred Employees;

(e)    any Cure Costs; provided, however, that such Cure Costs shall not exceed an amount equal to $500,000 in the aggregate (the "Cure Cost Cap") except with respect to any Disputed Contract as set forth in Section 2.6(c)(ii);

(f)    any liability for (i) Taxes of Buyer (or any Affiliate of Buyer), (ii) Taxes attributable to the ownership or operation of the Acquired Assets or the Business by Buyer (or any of its Affiliates) for any Post-Closing Tax Period other than any Taxes of (or allocated to) the Seller under applicable Tax Law or pursuant to Section 3.5(c) and (iii) any Transfer Taxes pursuant to Section 10.4;

Exhibit 1.1 - 3

4903-2558-8736, v. 1
148483277_14

(g)      all Liabilities of Seller with respect to utilities for the Restaurants, whether arising prior to, on or after the Closing Date;

(h)      all Liabilities related to, resulting from or arising out of, on or after the Closing, any (i) unredeemed refund amounts or similar items, (ii) customer deposits or (iii) customer promotions and related programs (including customer loyalty programs and gift cards);

(i)      all Liabilities with respect to Restaurant Employees that arise on or after the date of Effective Time;

(j)      all Accrued PTO;

(k)      all Post-Closing COBRA Liabilities;

(l)      all Liabilities or obligations owing from Seller or its Affiliates to any Acquired Company, any DFW Entity or any of their respective Subsidiaries;

(m)      all Liabilities related to the claims incurred as of the Closing Date but not reported in respect of the Seller's self-insured medical and dental plans ("IBNR Claims"); and

(n)      all Liabilities (including all government charges or fees) arising out of the conduct of the business or the ownership or operation of the Acquired Assets, in each case, by Buyer from and after the Closing.

For the avoidance of doubt, no liabilities of any Acquired Company or DFW Entity shall be "Assumed Liabilities" and Buyer shall acquire such liabilities only indirectly, as a result of acquiring the equity interests of the Acquired Companies.

"Auction" has the meaning given to it in the Bidding Procedures Order.

"Avoidance Actions" means any and all actual or potential causes of action to avoid a transfer of property or an obligation incurred by the Seller pursuant to Chapter 5 of the Bankruptcy Code, including Sections 502(d), 510, 541, 542, 543, 544, 545, 547, 548, 549, 550, 551, and 553 or under analogous state or federal statutes and common law.

"Back-up Bidder" has the meaning given to it in the Bidding Procedures Order.

"Bankruptcy Code" means title 11 of the United States Code, 11 U.S.C. §§ 101 et seq, as amended.

"Bid Protections" means the Break-Up Fee and Expense Reimbursement.

"Bidding Procedures Order" means that certain *Order Approving (I) Bidding Procedures, the Sale Timeline and the Form and Manner or Notice Thereof; (II) Assumption and Assignment Procedures; and (III) Granting Related Relief*, entered by the Bankruptcy Court on November 20, 2024 at Docket No. 197 (as may be amended, modified or updated from time to time).

Exhibit 1.1 - 4

"Break-Up Fee" means the amount of $640,000.00, which the Parties agree represents fair consideration of the significant costs, efforts to be expended and risks assumed by Buyer in negotiating the transaction described herein.

"Business" has the meaning given to it in the Recitals.

"Business Day" means any day other than a Saturday, Sunday or other day on which banks in Dallas, Texas or New York, New York are authorized or required by Law to be closed.

"Buyer" has the meaning given to it in the Caption.

"Buyer Group" means Buyer, any Affiliate of Buyer (including, following transfer of the Transferred Interests, the Acquired Companies) and each of their respective former, current or future Affiliates, officers, directors, employees, partners, members, managers, financing sources, agents, advisors and other Representatives, successors or permitted assigns.

"C&C Restaurant" means any Restaurant which has suffered any fire or other casualty with respect to a material portion of the Acquired Assets relating to the particular Restaurant, or a condemnation or other taking of any material portion of the Acquired Assets relating to the particular Restaurant by any Governmental Authority.  For purposes of this definition, "material portion" shall be deemed to mean an amount equal to or greater than seventy-five percent (75%) of the Acquired Assets with respect to a particular Restaurant (with the casualty or condemnation of such material portion of the Acquired Assets resulting in an inability of Seller to operate such Restaurant).

"Cash Payment" has the meaning given to it in Section 3.1(a).

"Claim(s)" means all of Seller's claims or causes action against third parties exclusively arising out of or exclusively arising in connection with the Acquired Assets or the Restaurants, all warranties, rights and claims of Seller under all existing third party warranties exclusively relating to any and all of the Acquired Assets or the Restaurants, including without limitation third party warranties and indemnification rights.

"Closing" means transfer of the Acquired Assets by Seller to Buyer, the assumption of the Assumed Liabilities by Buyer, the delivery of the Purchase Price and the consummation of the Transaction.

"Code" means the United States Internal Revenue Code of 1986, as amended.

"Collective Bargaining Agreement" has the meaning given to it in Section 4.14(b).

"Conditional Liquor License" means a temporary, provisional or conditional alcoholic beverage and liquor license that permits Buyer to serve and sell alcoholic beverages pending the issuance of a Liquor License.

"Conditions" has the meaning given to it in Section 2.6(d).

Exhibit 1.1 - 5

"Confidentiality Agreement" means that certain confidentiality agreement, dated as of November 9, 2024, by and between TGI Friday's Inc. and Sugarloaf Concessions, LLC, amended.

"Contract(s)" means all contracts, agreements, leases, license agreements, arrangements and/or commitments of any kind, and, in each case, other than a purchase order, service order, or sales order.

"COBRA" means the continuation coverage provisions of the Consolidated Omnibus Budget Reconciliation Act of 1985, as codified in Code Section 4980B and ERISA Sections 601 et seq., as amended from time to time, and the regulations and other guidance promulgated thereunder and any other similar provisions of state or local Law.

"Correcting Information" has the meaning given to it in Section 6.5.

"Credit Card Receivables" means all accounts receivable and other amounts owed to any Seller (whether current or non-current) in connection with any customer purchases that are made with credit cards or any other related amounts owing (including deposits or holdbacks to secure chargebacks, offsets or otherwise) from credit card processors to Seller.

"Cure Costs" means cure costs required to be paid pursuant to Section 365 of the Bankruptcy Code in connection with the assumption and assignment of Assigned Contracts.

"DFW Entities" has the meaning given to it in Section 4.3(b).

"DFW Stores" means the five (5) T.G.I. Friday's restaurants operated by the DFW Entities in the Dallas/Fort Worth International Airport as set forth on **Exhibit 1.0**.

"DIP Facility" means the debtor-in-possession financing facility provided to Seller under that certain Senior Secured Superpriority Debtor-in-Possession Credit Agreement, dated as of November 11, 2024, by and among TGI Friday's, Inc., as the borrower representative, the borrower parties thereto, and Texas Partners Bank, as lender (as amended from time to time, the "DIP Credit Agreement")

"DIP Loan" means any amount funded to Seller and/or its Affiliates pursuant to a debtor-in-possession financing loan that has been made pursuant to an Order of the Bankruptcy Court.

"Disclosure Schedule" has the meaning given to it in Article IV.

"Effective Date" has the meaning given to it in the Caption.

"Effective Time" means the time that all of the Restaurants have closed for business on the day preceding the Closing Date or, if any Restaurant closes after midnight on such day, then as of the closing time of such Restaurant on the Closing Date.

"Employee Benefit Plan" means each "employee benefit plan," as defined in Section 3(3) of ERISA (whether or not subject to ERISA), including all other employee benefit and compensation plans or arrangements, including bonus or incentive plans, deferred compensation

Exhibit 1.1 - 6

arrangements, equity or equity-based compensation, severance pay, salary continuation, sick leave, vacation pay, disability, hospitalization, medical, accident, disability and life insurance, worker's compensation, retiree healthcare, retiree life insurance, pension, retirement, scholarship, cafeteria, dependent care, or other insurance or employee benefit or compensation programs, plans, policies, agreements or arrangements, whether written or oral, which are for the benefit of current or former Restaurant Employees or to which Seller contributes or has any material Liability, including due to an ERISA Affiliate, in respect of such Restaurant Employees, other than (i) any Multiemployer Plan and (ii) any plans, programs, agreements or arrangements maintained or sponsored by, or to which contributions are mandated by, a Governmental Authority.

"Entity" means any joint venture, general partnership, limited partnership, limited liability company, corporation, trust, business trust, cooperative, association or other incorporated or unincorporated entity.

"Environmental Claim(s)" means, solely in respect of the Leased Properties, any currently pending investigation, claim, notice of violation, information request, allegation, demand, summons, suit, action, injunction, proceeding, penalty, fine, restriction, lien, encumbrance, judgment, decree, order or agreement from, by or with any Governmental Authority or private party concerning any Environmental Law or any Release of any Hazardous Substance into the environment.

"Environmental Law(s)" means any current Applicable Law concerning (a) the treatment, disposal, emission, discharge, Release or threatened Release of Hazardous Substance or (b) the protection of the environment (including natural resources, air and surface or subsurface land or waters).

"Equipment" means any and all equipment (including the point of sale equipment), computers, computer peripherals, hardware, accessories, furniture, furnishings, fixtures, office supplies, vehicles and all other fixed assets.

"Equity Interests" means (a) with respect to a company or corporation, any and all classes or series of shares, (b) with respect to a partnership, limited liability company trust or similar Person, any and all classes or series of units, interests or other partnership or limited liability company equity securities, and (c) with respect to any other Entity, any other security representing an ownership interest or participation in such Entity.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"ERISA Affiliate" means any Affiliate of Seller and any other entity that, together with Seller, would be treated as a single employer under Section 4001 of ERISA or Section 414 of the Code.

"Excluded Assets" means the following assets, properties and rights of Seller:

(a)     any asset, document, permit or Contract not exclusively used by the Restaurants;

Exhibit 1.1 - 7

(b)      any Claims, causes of action or other rights not exclusively for the benefit of the Restaurants;

(c)      cash and cash equivalents of the Business (other than Restaurant Cash);

(d)      all bank accounts, and all deposits (including maintenance deposits and security deposits for rent, electricity, telephone or otherwise) or prepaid or deferred charges and expenses, including all lease and rental payments, that have been prepaid by any Seller, and any retainers or similar amounts paid to Representatives or other professional service providers;

(e)      income tax receivables;

(f)      deferred tax assets;

(g)      employee advances;

(h)      all current and prior insurance policies of Seller, including, for the avoidance of doubt, all director and officer insurance policies, and all rights and benefits of any nature of Seller with respect thereto, including all insurance recoveries thereunder and rights to assert claims with respect to any such insurance recoveries;

(i)      Contracts and leases that are not Assigned Contracts, including those listed on **Schedule 2.2 of the Disclosure Schedule** (the "Excluded Contracts");

(j)      the Purchase Price and all rights, claims and causes of action of Seller under this Agreement or any agreement, certificate, instrument or other document executed and delivered between any Seller and Buyer in connection with the transactions contemplated hereby, or any other agreement between any Seller and Buyer entered into on or after the date hereof;

(k)      any personnel records and other books, records, and files that Seller is required by law to retain in their possession;

(l)      any claim, right, or interest of Seller in or to any refund, rebate, abatement, or other recovery for taxes, together with any interest due thereon or penalty rebate arising therefrom;

(m)      all demands, credits, statements, allowances, refunds, rebates (including any vendor or supplier rebates), rights (including under or with respect to express or implied guarantees, warranties, representations, covenants and indemnities), claims, counterclaims, defenses, credits, causes of action, rights of set off, rights of recovery or rights of recoupment relating to or arising against suppliers, vendors, merchants, manufacturers and counterparties to leases, licenses or any Contract, arising out of or relating to events occurring on or prior to the Closing;

(n)      every asset of Seller that would otherwise constitute an Acquired Asset (if owned immediately prior to the Closing) if conveyed or otherwise disposed of during the period from the date hereof until the Closing (i) in the Ordinary Course of Business, (ii) as authorized by the Bankruptcy Court, or (iii) as otherwise permitted by the terms of this Agreement;

Exhibit 1.1 - 8

4903-2558-8736, v. 1
148483277_14

(o)     any other prepaid assets or properties set forth on **Schedule 1.1(o) of the Disclosure Schedule**;

(p)     applicable federal, state, and local taxes (including any amounts collected in respect thereof);

(q)     all Intellectual Property owned by a third party and used by Seller under a license or other Contract (other than rights granted to Seller pursuant to an Assigned Contract), including all Intellectual Property held or owned by TGI SPV Guarantor, TGI Funding LLC and TGI Fridays Franchisor, LLC;

(r)     all Intellectual Property owned by the Seller that is not used exclusively in the Restaurants, including the Intellectual Property listed on **Schedule 2.2 of the Disclosure Schedule**;

(s)     all documents prepared or received by Seller or any of its Affiliates or other subsidiaries or their Representatives or on their behalf in connection with the sale of the Acquired Assets, this Agreement or the other Ancillary Documents, the transactions contemplated hereby or thereby or the Bankruptcy Case, including (i) all records and reports prepared or received by Seller or any of their respective Affiliates, subsidiaries or Representatives in connection with the sale of the Acquired Assets and the transactions contemplated hereby, (ii) all bids and expressions of interest received from third parties with respect to the acquisition of any of Seller's businesses or assets, (iii) all privileged materials, documents and records (including any work product) of any Seller or any of its Affiliates or other subsidiaries or Representatives, including any privileged materials, documents and records (including any work product) that are in the possession of any Acquired Company or DFW Entity, (iv) copies of the documents, materials and data related to the Acquired Assets or Assumed Liabilities prior to the Closing Date, (v) confidentiality agreements with prospective purchasers of the Acquired Assets or the Assumed Liabilities or any portion thereof, and (vi) any other files or records to the extent relating exclusively to any Excluded Assets, Excluded Liabilities, the Retained Business or the Bankruptcy Case;

(t)     all documents (including information stored on the computer systems, data networks or servers of any Seller) (i) to the extent they relate to any of the Excluded Assets, the Excluded Liabilities or the Retained Business, (ii) that are Seller's financial accounting documents, all minute books, organizational documents, stock certificates, stock registers and such other books and records of any Seller as pertaining to ownership, organization or existence of such Seller, Tax Returns (and any related work papers), corporate seal, checkbooks and canceled checks, or (iii) that any Seller is required by Law to retain;

(u)     (i) all other Claims, rights, claims, causes of action, rights of recovery, rights of set-off and rights of recoupment of any Seller, in each case, arising out of or relating to events occurring prior to the Closing Date, and (ii) all claims that any Seller may have against any Person with respect to any other Excluded Assets or any Excluded Liabilities;

(v)     any Equity Interests in or assets, properties and rights of any non-Debtor Affiliate of any Seller, including the Securitization Entities;

Exhibit 1.1 - 9

(w)      all Liabilities or other amounts owing from any Seller or any of its Affiliates or subsidiaries, the Acquired Companies, the DFW Entities or any of their Subsidiaries;

(x)      all Accounts Receivable whether current or non-current, and the right to bill and receive payment for products delivered and/or services performed but unbilled or unpaid as of the Closing; and

(y)      any books and records relating to any of the foregoing.

"Excluded Liabilities" has the meaning given to it in Section 2.4 and shall include, but not be limited to, the following:

(a)      any Liability (i) for Taxes of Seller (or any member or Affiliate of Seller (other than the Acquired Companies or the DFW Entities)); (ii) for Taxes relating to or arising from the Business, the Acquired Assets, or the Assumed Liabilities for any Pre-Closing Tax Period (or portion thereof as determined pursuant to Section 3.5(c)); (iii) of Seller for the Taxes of any other Person under Treasury Regulation Section 1.1502-6 (or any similar provision of state, local or foreign law), as a transferee or successor, by contract or otherwise; and (iv) for sales, use, payroll, and withholding (or any other deposits) with respect to the Acquired Assets or the Business for any Pre-Closing Tax Periods;

(b)      all Liabilities arising under Section 503(b)(9) of the Bankruptcy Code;

(c)      all Liabilities of Seller arising or incurred in connection with the negotiation, preparation, investigation and performance of this Agreement, the Ancillary Documents and the transactions contemplated hereby and thereby, including fees and expenses of counsel, accountants, consultants, advisers, and any other Person;

(d)      all Liabilities relating to or arising out of the Excluded Assets;

(e)      all Liabilities in respect of any pending or threatened Action arising out of, relating to, or otherwise in respect of the operation of the Business or the Acquired Assets to the extent such Action relates to such operation on or prior to the Closing Date;

(f)      all Liability or claim for injury or sickness to a Person or property that arises out of or is based upon any express or implied representation, warranty, agreement, or guaranty made by Seller, or by reason of the improper cooking or performance of a service by Seller, including with respect to any drink, food or any other item or sold or any service performed by Seller;

(g)      all Liabilities of Seller arising under or in connection with any employee benefit plan providing benefits to any present or former employee of Seller and all Liabilities of Seller for any present or former employees, officers, directors, retirees, independent contractors, or consultants of Seller, including any Liabilities associated with any claims for wages or other benefits, bonuses, accrued vacation, workers' compensation, or employee deferred compensation, including stock option plans, grants, and agreements, severance, retention, termination, or other payments, in each case, to the extent arising prior to the Effective Time, except as otherwise

Exhibit 1.1 - 10

provided in this Agreement and other than, for the avoidance of doubt, and the Post-Closing COBRA Liabilities, Accrued PTO, IBNR Claim;

(h)      all Liabilities for injury to a Person that arises out of or related to the Business prior to the Closing, including any loss, damage, or injury sustained by any present or former employee or independent contractor of Seller or any other Person while engaging in activities in connection with any Acquired Asset prior to the Closing;

(i)      all Liabilities to indemnify, reimburse, or advance amounts to any present or former officer, director, employee, agent or other Person of Seller (including with respect to any breach of fiduciary obligations by same), except as set forth in this Agreement with respect to the Acquired Companies;

(j)      all Liabilities under any Contracts that are not validly and effectively assigned to Buyer pursuant to this Agreement or the Sale Order;

(n)      all Liabilities associated with debt, loans, or credit facilities of Seller; and

(p)      all Liabilities arising out of, in respect of, or in connection with the failure by Seller or any of its Affiliates to comply with any Law or Order prior to the Closing, other than express Assumed Liabilities (including Cure Costs).

Notwithstanding the foregoing, any Excluded Liability with respect to Taxes shall be exclusively governed by clause (a) of this definition and any Liability or other amounts described in clauses (b) – (p) of this definition shall not include any Liability for Taxes.

"Expense Reimbursement" means all documented and reasonable out-of-pocket expenses incurred in connection with Buyer's efforts to negotiate and consummate the transaction described herein, not to exceed $50,000.00.

"FDD" means Franchisor's Franchise Disclosure Document dated April 28, 2023.

"Financing Sources" means the entities that have committed to provide the Debt Financing or any Alternative Financing in replacement thereof (including the parties to any joinder agreements, credit agreements or other definitive agreements relating thereto) and their respective Affiliates and such entities' (and their respective Affiliates'), officers, directors, employees, attorneys, advisors, agents and representatives involved in the Debt Financing and their successors and permitted assigns.

"Fixed Assets" means all machinery, Equipment, tools, signs, marketing material, tenant improvements, inventories, and other items of tangible personal property located at the Restaurants.

"Franchise Agreement(s)" is defined in the Recitals.

"Governmental Authority" means any (a) foreign, federal, state, local, municipal or other government; (b) department, agency or instrumentality of a foreign or other government; (c) governmental or quasi-governmental authority of any nature; (d) any court or other tribunal; or (e)

Exhibit 1.1 - 11

body exercising, or entitled to exercise, any administrative, executive, judicial, legislative, police, regulatory or taxing authority or power of any nature.

"Hazardous Substance" means any and all substances, materials and wastes which are regulated as hazardous or toxic under applicable local, state or federal law or which are classified as hazardous or toxic under local, state or federal laws or regulations, including, without limitation, (i) those substances included within the definitions of "hazardous substances," "hazardous materials," "toxic substances," "solid waste," "pollutant" or "contaminant" as such terms are defined by or listed in the Comprehensive Environmental Response Compensation and Liability Act of 1980 (42 U.S.C. § 9601 *et seq.*), as amended by Superfund Amendments and Reauthorization Act of 1986 (Pub. L. 99-499 100 Stat. 1613), the Hazardous Materials Transportation Act (49 U.S.C. § 1801 *et seq.*), the Resource Conservation and Recovery Act of 1976 (42 U.S.C. § 6901 *et seq.*), the Toxic Substance Control Act (15 U.S.C. § 2601 *et seq.*), the Federal Insecticide, Fungicide and Rodenticide Act (7 U.S.C. § 136 *et seq.*), the Occupational Safety and Health Act of 1970 (29 U.S.C. § 651 *et seq.*), the Emergency Planning and Community Right to Know Act of 1986 (42 U.S.C. § 11001 *et seq.*), the Hazardous and Solid Waste Amendments of 1984 (Public Law 86-616 Nov. 9, 1984), the Federal Clean Air Act (42 U.S.C. § 7401 *et seq.*), and in the regulations promulgated pursuant to such laws, all as amended, (ii) those substances listed as hazardous substances in the United States Department of Transportation Table (49 CFR 172.101) or 40 CFR Part 302, both as amended, and (iii) any material, waste or substance which is (A) petroleum or refined petroleum by-product, (B) asbestos, in any form, (C) polychlorinated biphenyls, (D) designated as a "hazardous substance" pursuant to Section 311 of the Clean Water Act (33 U.S.C. § 1251 *et seq.*), as amended, (E) flammable explosives, or (F) radioactive materials. Notwithstanding the foregoing, Hazardous Substances do not include any of the foregoing in naturally occurring or *de minimis* amounts or concentrations.

"Inspections" means Buyer's right to reasonably inspect the Restaurants and Acquired Assets to determine if the Fixed Assets are in satisfactory working condition.

"Intellectual Property" means all of the following in any jurisdiction throughout the world: (a) all inventions (whether patentable or unpatentable and whether or not reduced to practice), all improvements thereto, and all patents, patent applications, and patent disclosures, together with all reissuances, continuations, continuations-in-part, revisions, extensions, and reexaminations thereof, (b) all trademarks, service marks, trade dress, logos, designs, shapes, configurations, slogans, trade names, corporate names, Internet domain names, and rights in telephone numbers, together with all translations, adaptations, derivations, and combinations thereof and including all goodwill associated therewith (c) all copyrightable works, all copyrights, moral rights and other rights in any work of authorship, compilation or derivative work and all applications, registrations, and renewals in connection therewith, (d) all mask works and all applications, registrations, and renewals in connection therewith, (e) all trade secrets and confidential business information (including ideas, research and development, know-how, methods, recipes, formulas, compositions, manufacturing and production processes and techniques, technical and other data, designs, drawings, specifications, customer and supplier lists, pricing and cost information, and business and marketing plans and proposals), (f) proprietary rights in software (including source code, executable code, data, databases, and related documentation) and computer programs, (g) Internet domain names and social media accounts, and (h) all other intellectual property rights in the

Exhibit 1.1 - 12

foregoing, including the right to sue and recover for past, present or future infringements, misappropriations or other conflict with any of the foregoing.

"Interim Management Agreement" means an interim management agreement and/or other interim agreement mutually acceptable the Parties contemplated by **Schedule 7.2 of the Disclosure Schedule** with respect to each applicable Restaurant location relating to the offer and sale of liquor and other alcoholic beverages.

"Judgment" means any order, injunction, judgment, decree, ruling, assessment or arbitration award of any Governmental Authority or arbitrator.

"Knowledge of Seller" or words of like import means the actual knowledge without independent verification (and in no event encompass constructive, imputed or similar concepts of knowledge) of Chip Bundick, Michael Taylor, Jamie Murrieta and Ashley Kirkley, none of whom, for the sake of clarity and avoidance of doubt, shall have any personal Liability or obligations regarding such knowledge.

"Law" means any federal, state, provincial, local, municipal, foreign or international, multinational or other law, statute, legislation, constitution, principle of common law, resolution, ordinance, code, edict, decree, proclamation, treaty, convention, rule, regulation, ruling, directive, pronouncement, determination, decision, opinion or requirement issued, enacted, adopted, promulgated, implemented or otherwise put into effect by or under the authority of any Governmental Authority.

"Landlord" means a lessor described in the related Real Property Lease.

"Leased Property(ies)" means the parcel(s) of real property identified on **Schedule 4.9 of the Disclosure Schedule**.

"Liability(ies)" means, as to any Person, any debt, adverse claim, liability, duty, responsibility, obligation, commitment, assessment, cost, expense, loss, expenditure, charge, fee, penalty, fine or contribution obligation of any kind or nature whatsoever, whether known or unknown, asserted or unasserted, absolute or contingent, direct or indirect, accrued or unaccrued, liquidated or unliquidated, or due or to become due, and regardless of when sustained, incurred or asserted or when the relevant events occurred or circumstances existed.

"Lien(s)" means any lien (as defined in Section 101(37) of the Bankruptcy Code), charge, easement, adverse claim, encumbrance, mortgage, security interest, option, pledge, or any other title defect or restriction on transfer or use.

"Liquor License" means an alcoholic beverage and liquor license required by Applicable Law that permits Buyer to serve and sell alcoholic beverages at the applicable Restaurant.

"Marks" means certain proprietary and other property rights and interests in and to the "TGI Friday's™" name and service mark, and such other trademarks, service marks, logo types, and commercial symbols as Seller and Franchisor may from time to time authorize for use by either its licensees or franchisees.

Exhibit 1.1 - 13

"Material Adverse Change" means any effect or change that, individually or in the aggregate, is or would reasonably expected to be materially adverse to the business of the Restaurants; provided that none of the following shall be deemed to constitute, and none of the following shall be taken into account in determining whether there has been a Material Adverse Change: any adverse change, event, development, occurrence or effect (each, an "Effect") in, arising from or relating to (i) general business or economic conditions, including such conditions related to the business of the Restaurants and Effects affecting the industry in which Seller and its Affiliates operate, including Effects arising from or relating to competition or ordinary course matters and other Effects within such industry, new entrants into such industry, new products from other participants in such industry, changes in product pricing due to such competition, changes in market share or financial results due to such competition and other related changes resulting from such competition; (ii) Effects in, arising from or relating to national or international political or social conditions, including tariffs, riots, protests, the engagement by the United States or any other country in hostilities or the escalation thereof, whether or not pursuant to the declaration of a national emergency or war, or the occurrence or the escalation of any military, cyber or terrorist (whether or not state-sponsored) attack upon the United States or any other country, or any of its territories, possessions, or diplomatic or consular offices or upon any military installation, asset, Equipment or personnel of the United States or of any other country; (iii) Effects in, arising from or relating to any fire, flood, hurricane, earthquake, tornado, windstorm, other calamity or act of God, global or national health concern, epidemic, pandemic (whether or not declared as such by any Governmental Authority), viral outbreak (including the worsening thereof) or any quarantine or trade restrictions related thereto or any other *force majeure*; (iv) Effects in, arising from or relating to the decline or rise in price of any currency or any Equipment or supplies necessary to or used in the provision of services by Seller (including any resulting inability to meet customer demands or fulfill purchase orders and any resulting breaches of Contracts); (v) Effects in, arising from, or relating to financial, banking, or securities markets (including (A) any disruption of any of the foregoing markets, (B) any change in currency exchange rates, (C) any decline or rise in the price of any security, commodity, Contract or index, and (D) any increased cost, or decreased availability, of capital or pricing or terms related to any financing for the transactions contemplated by this Agreement); (vi) Effects in, arising from or relating to changes in GAAP or the interpretation thereof; (vii) Effects in, arising from or relating to changes in Laws or other binding directives or determinations issued or made by or agreements with or consents of any Governmental Authority and any increase (or decrease) in the terms or enforcement of (or negotiations or disputes with respect to) any of the foregoing; (viii) Effects in, arising from or relating to (A) any act or omission by any Seller or any of their respective Affiliates required to be taken pursuant to the terms of the DIP Facility or the DIP Credit Agreement or any Order of the Bankruptcy Court or taken at the request of Buyer or actions or omissions of the Seller or any Acquired Company expressly required to be taken (or not taken) in accordance with this Agreement or (B) the negotiation, announcement or pendency of this Agreement or the transactions contemplated hereby, the identity, nature or ownership of Buyer or Buyer's plans with respect to the Acquired Assets and Assumed Liabilities, including the impact thereof on the relationships, contractual or otherwise, of the business of Seller with employees, customers, lessors, suppliers, vendors or other commercial partners or litigation arising from or relating to this Agreement or the transactions contemplated hereby; (ix) Effects in, arising from, or relating to any existing event, occurrence or circumstance that is publicly known or disclosed or with respect to which Buyer has knowledge as of the date hereof; (x) Effects in, arising from or relating to any

Exhibit 1.1 - 14

4903-2558-8736, v. 1
148483277_14

action required to be taken under any existing Contract to which Seller (or any of its assets or properties) is bound; (xi) Effects that arise from any seasonal fluctuations in the business; (xii) any failure, in and of itself, to achieve any budgets, projections, forecasts, estimates, plans, predictions, performance metrics or operating statistics or the inputs into such items (whether or not shared with Buyer or its Affiliates or Representatives) and any other failure to win or maintain customers or business; (xiii) Effects of any action taken by Buyer or its Affiliates with respect to the transactions contemplated by this Agreement or the financing thereof or any breach by Buyer of this Agreement; or (xiv) Effects in, arising from, or relating to (A) the commencement or pendency of the Bankruptcy Case, including any reasonably anticipated effects of the commencement or prosecution of the Bankruptcy Cases or the financial condition of Seller or any Acquired Company or their Affiliates or subsidiaries (including any Action brought against a Seller or any Acquired Company or any of their Affiliates or subsidiaries for breach of Contract in connection with the collection of payment due thereunder (whether alone or with other claims) or any modification of credit, cash on delivery or similar terms of a Contract); (B) any objections in the Bankruptcy Court to (1) this Agreement or any of the transactions contemplated hereby or thereby, (2) the Sale Order or the reorganization or liquidation of Seller or (3) the assumption or rejection of any Assigned Contract; or (C) any Order of the Bankruptcy Court or any actions or omissions of Seller in compliance therewith.

"Multiemployer Plan" means a multiemployer plan as defined in Section 3(37) of ERISA or Section 4001(a)(3) of ERISA.

"New Information" has the meaning given to it in Section 6.5.

"Order" means any order, injunction, judgment, decree, ruling, writ, assessment or arbitration award of a Governmental Authority, including any Order entered by the Bankruptcy Court in the Bankruptcy Case.

"Ordinary Course of Business" means the ordinary and usual course of operations of the business of Seller taken as a whole consistent with past practice, taking into account the contemplation, commencement and pendency of the Bankruptcy Cases and the business and operating practices of Seller in light of its financial condition, financial distress and the Bankruptcy Cases.

"Permitted Liens" means (a) statutory liens of carriers, warehousemen, mechanics, materialmen and other similar common law liens incurred in the Ordinary Course of Business for sums not yet due and payable and that do not impair the conduct of Seller's business or the present or proposed use of the affected property or asset; (b) Taxes for real or personal property Taxes not yet due and payable, being contested in good faith, or the nonpayment of which is permitted or required by the Bankruptcy Code, (c) Liens that are immaterial in character, amount and extent and which do not detract from the value of, or interfere with the present or proposed use of, the properties or assets they affect; (d) any Liens imposed pursuant to the terms of the Real Property Leases, (e) licenses granted on a non-exclusive basis, (f) Liens for utilities and Taxes not yet due and payable, being contested in good faith, or the nonpayment of which is permitted or required by the Bankruptcy Code, (g) easements, rights of way, restrictive covenants, encroachments and similar non-monetary encumbrances or non-monetary impediments against any of the Acquired Assets which do not, individually or in the aggregate, materially and adversely affect the operation

Exhibit 1.1 - 15

of the Acquired Assets and, in the case of the Leased Property, which do not, individually or in the aggregate, materially and adversely affect the use or occupancy of such Leased Property as it relates to the operation of the Acquired Assets, (h) applicable zoning Laws, building codes, land use restrictions and other similar restrictions imposed by Law which are not materially violated by the current use or occupancy of such Leased Property, as applicable, (i) Liens imposed under Seller's certificate of incorporation, certificate of formation, bylaws, operating agreement or similar organizational documents, or under federal or state securities Laws, (j) Liens arising by, through or under Buyer's financing for the transactions contemplated hereby and (k) Liens that will be released by, or that are specifically permitted by, the Sale Order (including any Assumed Liabilities).

"Person" means an individual, firm, Entity, group or organization of any kind, including a Governmental Authority.

"Post-Closing Tax Period" means any Tax period beginning after the Closing Date and that portion of a Straddle Period beginning after the Closing Date.

"Pre-Closing Employment Claim" means any Claim against Buyer or its Affiliates related to the employment or engagement by Buyer or its Affiliates of any Person as an employee, independent contractor or other service provider, or the termination of any such employment or engagement, in each case, to the extent arising prior to the Closing Date.

"Pre-Closing Tax Amount" means an amount equal to any sales and use taxes, together with any penalties, fees or similar for amounts past due, payable by Seller which are past due and outstanding as of the Closing in respect of the Restaurants listed on listed on **Exhibit 1.0** as of the date hereof, but (x) without duplication of any amounts included in Cure Costs, (y) excluding any sales and use taxes for periods of time following the Petition Date that have been collected, but not yet remitted, in the Ordinary Course of Business, and (z) solely to the extent that such amounts are required be paid under Applicable Law as a mandatory pre-condition to the transfer of any Liquor License which is a Transferable Permit to Buyer (and are actually so paid).

"Pre-Closing Tax Period" means any Tax period ending on or before the Closing Date and that portion of any Straddle Period ending on the Closing Date.

"Purchase Price" has the meaning given to it in Section 3.1.

"Real Property Leases" means all of the unexpired leases of real property relating to the Restaurants.

"Release" means, solely in respect of the Leased Properties, the release, spill, emission, leaking, pumping, pouring, emptying, escaping, dumping, injection, deposit, disposal, discharge, dispersal, leaching or migrating of any Hazardous Substance into the environment in violation of Environmental Law.

"Representatives" means, with respect to any Person, any directors, officers, employees, investment bankers, financial advisors, accountants, agents, attorneys, consultants, or other representatives of such Person.

Exhibit 1.1 - 16

4903-2558-8736, v. 1
148483277_14

"Restaurant(s)" means the TGI Fridays™ restaurant(s) which are owned by Seller and being transferred to Buyer pursuant to this Agreement and that are listed on **Exhibit 1.0** attached hereto and the DFW Stores listed on **Exhibit 1.0**.

"Restaurant Employees" means (a) all individuals who are employees of Restaurants, (b) all individuals who are employees of Seller and devote all or substantially all of their working time to the business of the Restaurants, the Acquired Companies or the DFW Entities, and (c) all other employees of Seller or its Affiliates who are listed by employee number and job title on **Schedule 1.1(a) of the Disclosure Schedule**.

"Seller" has the meaning given to it in the Caption.

"Seller Parties" means Seller and each of its former, current, or future Affiliates or other subsidiaries, officers, directors, employees, partners, members, equityholders, controlling or controlled Persons, managers, agents, advisors and other Representatives, successors or permitted assigns.

"Shared Contracts" means Contracts that relate to or are used by both, on the one hand, the Restaurants acquired pursuant to this Agreement and, on the other hand, other restaurants and business of Seller or its Affiliates that is not being acquired pursuant to this Agreement.

"Straddle Period" means any taxable period that includes but does not end on the Closing Date.

"Subsidiary" or "Subsidiaries" means, with respect to any Person, any corporation, limited liability company or other entity of which a majority of the total voting power of shares of stock or other equity interests entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees or other governing body or Person thereof is at the time owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of such Person or a combination thereof or any partnership, association or other business entity of which a majority of the partnership or other similar ownership interest is at the time owned or controlled, directly or indirectly, by such Person or one or more Subsidiaries of such Person or a combination thereof.

"Tax" or "Taxes" means any federal, state, local, or foreign income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental, customs duties, capital stock, franchise, profits, withholding, social security (or similar), unemployment, disability, real property, personal property, sales, use, privilege, transfer, registration, value-added, alternative or add-on minimum, or estimated, tax, including any interest, penalty, or addition thereto, whether disputed or not.

"Tax Return(s)" means any return, declaration, report, claim for refund, or information return or statement filed required to be filed with any Taxing Authority, including any supplement or attachment thereto and including any amendment of any of the foregoing.

"Taxing Authority" means any governmental authority, domestic or foreign, having jurisdiction over the assessment, determination, collection, or other imposition of any Taxes.

Exhibit 1.1 - 17

"Transaction Consents" means the approval of the Bankruptcy Court and the matters contemplated by **Schedule 7.2 of the Disclosure Schedule**.

"Transferable Permits" means, to the extent transferable pursuant to Applicable Law, Seller's interest in certain licenses and permits (including Seller's interest in Liquor Licenses to the extent transferable) granted by Governmental Authorities and held by Seller exclusively in connection with the operation of the Restaurants as listed on **Schedule 2.1 of the Disclosure Schedule**.

"Transferred Employees" means Restaurant Employees who accept an offer of employment from Buyer or its Affiliates.

"Transferred Interests" has the meaning given to it in the Recitals.

"WARN" means the federal Worker Adjustment and Retraining Notification Act of 1988 and any similar applicable foreign, state or local law.

"Willful Breach" shall mean a deliberate act or a deliberate failure to act regardless of whether breaching was the conscious object of the act or failure to act.

"Winning Bidder" means the bidder with the highest or otherwise best bid for the Acquired Assets, as determined in accordance with the Bidding Procedures Order.

In this Agreement, unless expressly stated otherwise:

(i)      the singular includes the plural and vice versa;

(ii)      reference to any person includes such person's successors and assigns, if applicable, but only if such successors and assigns are permitted by this Agreement, and reference to a person in a particular capacity excludes such person in any other capacity;

(iii)      reference to a gender includes the other gender;

(iv)      reference to any agreement, document, or instrument means such agreement, document, or instrument as amended or modified and in effect from time to time in accordance with its terms;

(v)      reference to any law or regulation means that law or regulation as from time to time in effect, including any amendment, modification, codification, replacement, or reenactment of such law or regulation;

(vi)      reference to any section or other provision of any law or regulation means that provision of such law or regulation as from time to time in effect, including any amendment, modification, codification, replacement, or reenactment of such section or other provision;

(vii)      "hereunder," "hereof," "hereto," and words of similar import refer to this Agreement as a whole and not to any particular Section, Subsection, or other provision of this Agreement;

Exhibit 1.1 - 18

4903-2558-8736, v. 1
148483277_14

(viii)   "including" (and with correlative meaning "include") means including without limiting the generality of any description preceding such term;

(ix)   where context permits, "or" is used in the inclusive sense of "and/or";

(x)   "any" means "any and all";

(xi)   with respect to the determination of any period of time, "from" means "from and including" and "to" means "to but excluding";

(xii)   a reference to a document, instrument, or agreement also refers to all addenda, exhibits, or schedules thereto;

(xiii)   a reference to a "copy" or "copies" of any document, instrument, or agreement means a copy or copies that are, to the Knowledge of Seller (where applicable), complete and correct; and

(xiv)   "Sections," "Subsections," "Schedules," "Exhibits," "Annexes," and "Articles," refer to the corresponding Sections, Subsections, Schedules, Exhibits, Annexes and Articles of and to this Agreement unless otherwise stated;

(xv)   the word "will" will be construed to have the same meaning and effect as the word "shall". The words "shall," "will," or "agree(s)" are mandatory, and "may" is permissive;

(xvi)   any document or item will be deemed "delivered," "provided" or "made available" by Seller, within the meaning of this Agreement if such document or item is (A) included in the Dataroom, (B) actually delivered or provided to Buyer or any of Buyer's Representatives (including by email) or (C) made available upon request, including at Seller's offices;

(xvii)   all references to "$" and dollars will be deemed to refer to United States currency unless otherwise specifically provided;

(xviii)   All references to a day or days will be deemed to refer to a calendar day or calendar days, as applicable, unless otherwise specifically provided;

(xix)   The words "to the extent" shall mean "the degree by which" and not simply "if"; and

(xx)   With regard to all dates and time periods set forth or referred to in this Agreement, time is of the essence.

Exhibit 1.1 - 19

4903-2558-8736, v. 1
148483277_14

# EXHIBIT 3.3
# FRANCHISE AGREEMENT

[Attached]

Exhibit 3.3

**TGI FRIDAYS™ RESTAURANT**
**FRANCHISE AGREEMENT**

**STORE NAME – STORE #_____**

Dated: _____, _____

## TABLE OF CONTENTS

**SECTION**                                                                                                                                                                      **PAGE**

1.    GRANT OF FRANCHISE ............................................................................................ 2

2.    TERM ........................................................................................................................ 3

3.    SITE DEVELOPMENT PROCEDURES................................................................... 5

4.    CONSTRUCTION OF THE RESTAURANT ........................................................... 8

5.    OPENING OF THE RESTAURANT........................................................................ 11

6.    FEES......................................................................................................................... 12

7.    RECORDKEEPING AND REPORTS ...................................................................... 16

8.    ADVERTISING AND PROMOTION ...................................................................... 18

9.    MANUALS ............................................................................................................... 25

10.   MODIFICATIONS OF THE SYSTEM .................................................................... 26

11.   TRAINING................................................................................................................ 26

12.   ADDITIONAL SERVICES BY FRANCHISOR ...................................................... 30

13.   PERFORMANCE STANDARDS AND UNIFORMITY OF OPERATION ............. 30

14.   PROPRIETARY MARKS.......................................................................................... 44

15.   INSURANCE ............................................................................................................ 46

16.   ORGANIZATION OF FRANCHISEE ..................................................................... 48

17.   TRANSFERS BY FRANCHISOR ........................................................................... 51

18.   TRANSFERS BY FRANCHISEE............................................................................. 52

19.   GENERAL RELEASE .............................................................................................. 57

20.   COVENANTS ........................................................................................................... 57

21.   DEFAULT AND REMEDIES ................................................................................... 60

22.   OBLIGATIONS ON TERMINATION OR EXPIRATION ...................................... 64

23.   OPTION TO PURCHASE ........................................................................................ 66

24.   RELATIONSHIP OF THE PARTIES AND INDEMNIFICATION......................... 69

25.   CONSENTS, APPROVALS AND WAIVERS ......................................................... 71

26.   NOTICES .................................................................................................................. 72

27.   ENTIRE AGREEMENT ........................................................................................... 72

28.   SEVERABILITY AND CONSTRUCTION ............................................................. 72

29.   GOVERNING LAW, FORUM AND LIMITATIONS ............................................. 73

30.   MISCELLANEOUS ................................................................................................. 75

31.   REPRESENTATIONS .............................................................................................. 76

**TABLE OF CONTENTS**

(continued)

EXHIBIT A:    FRANCHISE INFORMATION
EXHIBIT B:    FRANCHISEES ADVERTISING AND PROMOTION OBLIGATIONS
EXHIBIT C:    LOCAL STORE MARKETING GUIDELINES
EXHIBIT D:    OWNERSHIP INTERESTS
EXHIBIT E:    ACH AUTHORIZATION FORM
EXHIBIT F:    GUARANTY AND ASSUMPTION OF FRANCHISEES OBLIGATIONS
EXHIBIT G:    NON-DISCLOSURE AND NON-COMPETITION AGREEMENT
EXHIBIT H:    TGI FRIDAYS LOYALTY PROGRAM AGREEMENT


RIDER 1: FRANCHISE AGREEMENT EXPIRATION DATE
RIDER 2: ADA CERTIFICATION
RIDER 3: OCCUPANCY CONTRACT PROVISIONS

4931-8848-6658.1

[Store Name #_____]
[Franchisee]/TGIF
FRANCHISE AGREEMENT

*ACTIVE 684889259v1*

## TGI FRIDAYS™ RESTAURANT FRANCHISE AGREEMENT

THIS FRANCHISE AGREEMENT ("**Agreement**") is made as of _____ ("**Effective Date**"), by and between TGI Fridays Franchisor, LLC, a Delaware limited liability company ("**Franchisor**"), with its principal place of business located at 500 East State Highway 114, Suite 200, Southlake, Texas 76082, and _____, a _____ formed in _____ ("**Franchisee**"), with its principal place of business located at _____.

RECITALS:

As a result of the expenditure of time, skill, effort, and money, Franchisor has developed and owns a distinctive system ("**System**") relating to the development, establishment, and operation of full-service casual theme restaurants featuring a specialized menu and full bar service operating in buildings that bear Franchisor's interior and exterior trade dress under the name Fridays or related tradenames (collectively, "**Fridays Restaurants**").

The distinguishing characteristics of the System include, without limitation, distinctive exterior and interior design and layout, including specially designed décor, décor, furnishings and color schemes; special recipes, menu items and full service bar; menu formats; uniform standards; procedures and techniques for food and beverage preparation and service; automated management information and control systems for inventory controls, cash controls and sales analysis; technical assistance and training through course instruction and manuals; and advertising and promotional programs. The System and its components may be changed, improved, and further developed by Franchisor from time to time.

Franchisor identifies the System by means of certain names and marks (including "TGI Fridays," "Fridays," and other names, marks, logos, insignias, slogans, emblems, symbols, and designs (collectively, "**Proprietary Marks**"), which Franchisor has designated, or may in the future designate, for use with the System. The Proprietary Marks used to identify the System, including the principal Proprietary Marks, may be modified by Franchisor and/or its affiliates from time to time.

Franchisor has the exclusive right to use, and permit its franchisees to use, the Proprietary Marks. Franchisor continues to develop, use, and control the use of these Proprietary Marks in order to identify to the public the source of services and products marketed under the Proprietary Marks and the System and to represent the Systems high standards of quality, appearance, and service.

Franchisee desires to obtain a license to use the System and to operate continuously one franchised Fridays Restaurant at a site accepted by Franchisor subject to the terms and conditions of this Agreement and in strict compliance with the standards and specifications established by Franchisor ("**System Standards**").

Franchisee understands and acknowledges the importance of Franchisor's high standards of quality, cleanliness, appearance, operations, and service and the necessity of developing and operating the franchised Fridays Restaurant in strict conformity with this Agreement, the System Standards, and the Fridays Manuals (as defined in Section 9).

Franchisor is willing to grant Franchisee a license to operate a franchised Fridays Restaurant subject to the terms and conditions of this Agreement.

NOW THEREFORE, in consideration of the mutual covenants, agreements and obligations set forth in this Agreement, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.   GRANT OF FRANCHISE

A.   <u>Grant</u>.

(1)   Subject to the provisions of this Agreement, Franchisor hereby grants to Franchisee the right and Franchisee accepts the obligation ("**Franchise**") to (a) continuously operate a franchised Fridays Restaurant under the System ("**Restaurant**"); (b) use, only in connection with the Restaurant, the Proprietary Marks and the System, as they may be modified, improved, or further developed from time to time by Franchisor; and (c) do so only at the site accepted by Franchisor and specified in <u>Exhibit A</u> ("**Premises**").  Franchisee may not operate the Restaurant at any site other than the Premises and may not relocate the Restaurant without Franchisor's prior written consent, which may be withheld by Franchisor in its sole discretion.  Franchisee may be required to participate in Franchisor's delivery and/or takeout programs, in which case Franchisee must make accommodations for delivery and/or takeout programs in compliance with Franchisor's standards and procedures set forth in the Manuals or otherwise in writing.  Should Franchisor require Franchisee to participate in a delivery program, Franchisee will not be guaranteed a particular or exclusive delivery territory, and, should Franchisor designate a territory, it may only be on a non-exclusive basis.

(2)   Unless otherwise permitted by Franchisor, Franchisee shall offer and sell only products and services previously authorized by Franchisor, and only from the Restaurant, only in accordance with the requirements of this Agreement and the procedures set forth in the Manuals, and only to retail customers for consumption on the Premises or for personal, carry-out consumption.  Franchisee shall not offer or sell products or services authorized under this Agreement through any other means, including without limitation, through satellite locations, temporary locations, carts or kiosks, the Internet, or through any form of Digital Media, without the prior written approval of Franchisor, and only in accordance with Franchisor's policies as they may be developed and/or modified from time to time.  As used in this Agreement, the term "**Digital Media**" means one or more related documents, applications, designs, or other communications or forms of media that can be accessed through electronic means, including, but not limited to, the Internet, the World Wide Web, the Fridays Websites (as defined in Section 8.I) or other websites, social networking sites like Facebook, Twitter, TikTok, LinkedIn, Instagram, Snapchat, YouTube, blogs, vlogs, and other applications, and any online equivalent (collectively, "**Social Media**").

(3)   Franchisee may request approval from Franchisor to participate in any catering program permitted by Franchisor and provide the catering services designated by Franchisor from the Restaurant subject to Franchisee's obligation to comply with Franchisor's procedures and menu requirements, purchase all supplies, products and ingredients through Franchisor's approved and designated suppliers and otherwise follow the Manuals with respect to the catering services, which may, among other requirements, limit Franchisee to a specified geographical area for catering.

(4)   Franchisee agrees that it will at all times faithfully, honestly and diligently perform its obligations under this Agreement, that it will continuously exert reasonable efforts to promote and enhance the business of the Restaurant and that it will not engage in any other business or activity that may conflict with its obligations under this Agreement, except the operation of other Fridays Restaurants or other restaurants operated by Franchisee that are franchised by Franchisor or its affiliates.

B.      No Exclusivity.

This Agreement does not give Franchisee any exclusive rights to use the System or the Proprietary Marks in any geographic area. Nothing in this Agreement prohibits Franchisor from, among other things: (1) operating or licensing others to operate at any location, during or after the Initial Term (as defined in Section 2), any delivery or mobile kitchen or any type of restaurant other than Fridays Restaurants; (2) operating or licensing others to operate, during the Initial Term, Fridays Restaurants at any location other than the Premises; (3) operating or licensing others to operate, after this Agreement terminates or expires, Fridays Restaurants at any location, including the Premises; (4) merchandising and distributing goods and services identified by some or all of the Proprietary Marks through any other method or channel of distribution; and (5) purchasing, being purchased by, merging with or combining with businesses that directly or indirectly compete with Fridays Restaurants. Franchisor reserves to itself and its affiliates all rights to use and license the System and the Proprietary Marks other than those expressly granted under this Agreement.

C.      Principal Owners.

Franchisee acknowledges and agrees that certain provisions of this Agreement apply to those individuals and entities who directly or indirectly hold an equity ownership interest in Franchisee of 20% or more ("**Principal Owners**"). Franchisee shall be solely and completely responsible to ensure (and cause) each Principal Owner to comply with the terms of this Agreement. Franchisee agrees that any violation of the terms of this Agreement by Franchisee's Principal Owners shall constitute a default of the terms of this Agreement. In addition, each of Franchisee's Principal Owners must personally guarantee Franchisee's obligations under this Agreement as set forth in Section 16.F.

2.      TERM

A.      Initial Term.

The initial term of this Agreement ("**Initial Term**") and the Franchise granted by this Agreement shall begin on the Effective Date and expire at midnight on the day preceding the 10th anniversary of the date the Restaurant first opened for business, unless this Agreement is terminated at an earlier date pursuant to Section 21. Within 30 days after the Restaurant opens, Franchisor shall complete and forward to Franchisee a notice, in a form substantially similar to attached Rider 1, to memorialize the opening date. Franchisee acknowledges that it does not have the unilateral right to cease operating the Restaurant before the expiration of the Initial Term.

B.      Successor Terms.

(1)      This Agreement and the Franchise shall not automatically renew upon the expiration of the Initial Term. Franchisee shall have an option to remain a franchisee and upon qualification for each successor grant, sign a new Franchise Agreement for each of two successor terms of five years each (each, a "**Successor Term**"). Franchisee shall give Franchisor written notice of whether or not it intends to exercise each option not less than 12 months, nor more than 24 months, before the end of each expiring term. Franchisee's failure to provide Franchisor the required notice in a timely manner constitutes a waiver by Franchisee of its option to remain a franchisee beyond the expiration of the expiring term.

(2)      If Franchisee desires to continue as a franchisee for a Successor Term, Franchisee must comply with all of the following conditions before and at the end of each expiring  initial and successor term to the satisfaction of Franchisor:

(a)      Franchisee shall have timely satisfied all monetary obligations owed to Franchisor and its affiliates; Franchisee shall have operated the Restaurant and all of its other franchised Fridays Restaurants substantially in accordance with the terms of this Agreement and the standards, specifications and procedures of the System as set forth in the Manuals; Franchisee shall not be in default under this Agreement or any other agreements between Franchisee and Franchisor or its affiliates; Franchisee shall not be in default beyond the applicable cure period under any real estate lease, equipment lease or financing instrument relating to the Restaurant; Franchisee shall not be in default beyond the applicable cure period with any vendor or supplier to the Restaurant; and, for the 24 months before the date of Franchisee's notice, Franchisee shall not have been in default beyond the applicable cure period under this Agreement or any other agreements between Franchisee and Franchisor or its affiliates.

(b)      Franchisee must satisfy all of Franchisor's then-current financial requirements (including the analysis of net worth, debt-to-equity ratios and capitalization) for approval of a new franchisee to the System. Franchisee must submit certified financial statements for at least the preceding fiscal year prepared by a certified public accountant, supported by income tax returns and such other documentation as is reasonably requested by Franchisor. If the individual net worth of any of Franchisee's Principal Owners is used to satisfy all or a portion of the financial requirements, the Principal Owner must submit a current certified financial statement.

(c)      Franchisee shall make the capital expenditures required to renovate and modernize the Restaurant to conform to the interior and exterior designs, décor, color schemes, furnishings, equipment, signage, Computer Systems (as defined in Section 13.J), and presentation of the Proprietary Marks consistent with the image of the System for new Fridays Restaurants at the time Franchisee provides Franchisor the notice under Section 2.B(1), including such structural changes, remodeling, redecoration and modifications to existing improvements as may be necessary to do so.

(d)      Franchisee and its employees at the Restaurant shall be in compliance with Franchisor's then-current training requirements.

(e)      Franchisee acknowledges and agrees that the Premises may not meet Franchisor's then-current site selection standards and that Franchisee may need to relocate the Restaurant for the Successor Term(s). Franchisee must submit a site application to Franchisor for the Premises or a new site for the Restaurant and Franchisor will review that application in accordance with its then-current site selection standards and policies.

(f)      Franchisee is able to maintain all licenses and permits, including but not limited to a liquor license, necessary to continue to operate the Restaurant at the Premises for the Successor Term.

(g)      Franchisee, all individuals who executed this Agreement, all guarantors of Franchisee's obligations and any other individual or entity required by Franchisor shall have executed a general release and a covenant not to sue, in a form satisfactory to Franchisor, of any and all claims against Franchisor and its affiliates and their respective past and present officers, directors, shareholders, agents and employees, in their corporate and individual capacities.

(h)    Franchisee must submit to Franchisor all standard form information and documentation reasonably requested by Franchisor as a basis for the issuance and consummation of a franchise.

(3)    Within 4 months after Franchisor's receipt of Franchisee's written notice of its desire to exercise the successor option, Franchisor shall advise Franchisee whether or not Franchisor will permit Franchisee to remain a franchisee for the Restaurant for the Successor Term.  If Franchisor intends to permit Franchisee to remain a franchisee for the Successor Term, Franchisor's notice will contain preliminary information regarding the actions Franchisee must take to satisfy Franchisor's site selection, remodeling, training, management and other criteria for entering into the Successor Term.  If Franchisor chooses not to permit Franchisee to remain a franchisee for the Successor Term, Franchisor's notice shall specify the reasons for that decision and Franchisor shall have the right to unilaterally extend the expiring term of this Agreement as necessary to comply with any applicable laws.

(4)    If Franchisee will remain a franchisee for a Successor Term, Franchisor shall forward to Franchisee a new franchise agreement for that Successor Term for Franchisee's signature.  The form of successor franchise agreement for each Successor Term shall be the form then in general use by Franchisor for Fridays Restaurants (or, if Franchisor is not then granting franchises for Fridays Restaurants, that form of agreement as specified by Franchisor).  Franchisee acknowledges that the terms, conditions, and provisions of the successor franchise agreement, and the obligations of the parties under that agreement, may differ substantially from the terms, conditions, provisions and obligations in this Agreement, including, without limitation, higher fees and advertising contributions.  FRANCHISEE AND FRANCHISOR AGREE THAT THE ROYALTY FEE WILL BE INCREASED TO 4.5% OF GROSS SALES FOR THE FIRST SUCCESSOR TERM AND 4.75% OF GROSS SALES FOR THE SECOND SUCCESSOR TERM.

(5)    Franchisee shall execute the successor franchise agreement for the Successor Term and return the signed agreement to Franchisor before the expiration of the expiring term, along with a successor fee.  The successor fee for the first Successor Term shall be 50% of Franchisor's then- current initial franchise fee for the first Fridays Restaurant to be developed by a new franchisee.  The successor fee for the second Successor Term shall be 30% of Franchisor's then current initial franchise fee for the first Fridays Restaurant to be developed by a new franchisee.  The successor fee shall be in addition to, among other things, the costs and expenses that Franchisee is required to make for any capital expenditures pursuant to Section 2.B(2)(c).  Failure by Franchisee to timely sign the successor franchise agreement and return it to Franchisor (along with the successor fee) shall be deemed an election by Franchisee not to remain a franchisee and shall result in expiration of this Agreement and the Franchise at the expiration of the expiring term.  Provided Franchisee has timely complied with all of the conditions set forth in this Section 2.B, Franchisor shall execute the successor franchise agreement and promptly return a fully-executed copy to Franchisee.  Franchisee shall be solely responsible for meeting the requirements for each Successor Term.  Franchisor shall have no liability, obligations, or responsibility for any reliance or expectation damages in the event Franchisee complies with some, but not all of the foregoing requirements, or otherwise fails to meet all of the requirements set forth in this Agreement within the required timeframes.

3.    SITE DEVELOPMENT PROCEDURES

Except with respect to a relocation contemplated by Section 3.E, Sections 3.A through 3.C shall not be applicable if Franchisor has accepted the Premises in writing as of the Effective Date or to the extent a Development Agreement with Franchisor and Franchisee or its affiliates is controlling.

A.     Site Selection.

If the Premises have not been designated as of the Effective Date, then Franchisee must obtain Franchisor's acceptance of the site for the Restaurant from a designated market area agreed to by the parties and set forth on Exhibit A ("**Site Selection Search Area**") within 90 days after the Effective Date ("**Site Acceptance Period**"). Franchisor will provide Franchisee with the following site selection assistance: (1) Franchisor's site selection guidelines including two sets of Franchisor's standard plans and specifications for the construction of a prototypical Fridays Restaurant and, as Franchisee may request, a reasonable amount of consultation with respect thereto; and (2) such on-site evaluation as Franchisor may deem advisable as part of its evaluation of Franchisee's request for site acceptance. The parties acknowledge and agree that Franchisor providing its standard plans and specifications or any other activities or services to Franchisee before the proposed site being accepted by Franchisor shall not create any reliance or expectation damages or liability for Franchisor nor shall any such activities create any expectations or representations to Franchisee that any proposed site will be accepted by Franchisor.

B.     Real Estate Site Application.

Within 45 days after the Effective Date, Franchisee shall submit to Franchisor a site application for one or more proposed sites for the Restaurant including a description of the site, a feasibility study (including, without limitation, demographic data, photographs, maps, artists renderings, site plans, a copy of the Occupancy Contract (as defined in Section 3.D) and documentation indicating Franchisee's prospects to acquire a possessory interest in the site) and such other information related to the development of the site as Franchisor reasonably requests ("**Real Estate Site Application**"). After Franchisor receives the Real Estate Site Application, if a site meets Franchisor's site acceptance criteria, Franchisor or its designee, in Franchisor's sole discretion, may conduct an on-site evaluation of the proposed site.

C.     Site Acceptance.

(1)     Within 45 days after Franchisor's receipt of the Real Estate Site Application and any additional information that Franchisor may reasonably require, Franchisor shall review that information, evaluate the proposed site and advise Franchisee in writing whether it has accepted a particular site. If Franchisor does not respond within that time period, Franchisor shall be deemed to have rejected the site. It is within Franchisor's sole discretion whether to accept or reject a site. Franchisor may revoke its acceptance of a site at any time if Franchisee commits a default of this Agreement or any agreement with Franchisor or its affiliates (including any development or franchise agreement) and fails to cure that default within the applicable cure period, if any.

(2)     Franchisee acknowledges that, in order to preserve and enhance the reputation and goodwill of all restaurants franchised by Franchisor and the goodwill of the Proprietary Marks, all Restaurants must be properly developed, operated and maintained in accordance with Franchisor's System Standards and specifically that Franchisor may, in its sole discretion, refuse to review or accept any site submitted by Franchisee if Franchisee has failed to meet any of the following requirements:

(a)     All Fridays Restaurants operated by Franchisee and/or any of its affiliates are in good standing with all of Franchisor's operational standards at the time the Real Estate Site Application is submitted;

(b)     Franchisee and any of its affiliates that operate Fridays Restaurants shall have timely paid all sums due to Franchisor under any Franchise Agreement(s) or other agreements(s)

between Franchisee and/or any of its affiliates and Franchisor and/or its affiliates for the six-month period immediately before submission of the Real Estate Site Application; and

(c) Franchisee and Franchisee's Principal Owners shall have submitted the Real Estate Site Application, Franchisee's proposed investment and financing plans, financial statements and any additional information required by Franchisor to demonstrate that Franchisee meets Franchisor's then current standards to develop a Restaurant, including, but not limited to, Franchisor's then-current financial and operational requirements.

D.     Occupancy Contract Provisions.

(1) Franchisee shall provide to Franchisor, for its review and approval, a copy of the proposed agreement or document (including, without limitation, any lease, deed, contract for sale, contract for deed, land contract, management contract, license, or other agreement purporting to grant any right, title, or interest in or to the site) pursuant to which Franchisee shall occupy or acquire rights in the Premises ("**Draft Occupancy Contract**"; the final execution [or executed] version of the Draft Occupancy Contract, together with all amendments, consents, waivers, or other modifications made from time to time, the "**Occupancy Contract**") within 60 days after Franchisor accepts the site for the Premises. The Occupancy Contract shall not contain any covenants or other obligations that would prevent, limit or adversely affect Franchisee from performing its obligations under the Franchise Agreement. The Occupancy Contract shall be executed by all necessary parties within 30 days following Franchisor's approval. Franchisee shall furnish Franchisor a complete copy of the executed Occupancy Contract within 10 days after execution and within 30 days after written request by Franchisor.

(2) Unless waived in writing by Franchisor or unless it conveys to Franchisee fee simple title to the Premises, the Occupancy Contract shall include during the entire term thereof, including any renewal terms, the provisions set forth in Rider 3 attached hereto and incorporated herein by this reference.

(3) Notwithstanding the terms of Rider 3, Franchisee shall: (a) deliver to Franchisor, immediately after delivery to or by Franchisee, any notice of default under the Occupancy Contract which threatens or purports to terminate the Occupancy Contract or result in a foreclosure thereof; (b) permit Franchisor to enter the Premises to protect the Proprietary Marks or the System or to cure any default under the Occupancy Contract or this Agreement, all at Franchisee's expense; and (c) not amend the Occupancy Contract in any way which is inconsistent with the provisions of Rider 3.

E.     Relocation.

Franchisee (1) may, if Franchisee loses the right to occupy the Premises during the Initial Term (other than as a result of default by Franchisee); and (2) shall (but not until Franchisor accepts a Real Estate Site Application regarding a given relocation site), in the event of a casualty or condemnation pursuant to which Franchisee cannot or does not rebuild or restore the Restaurant, apply to Franchisor for the right to relocate the Restaurant to another location within a three-mile radius of the Premises. Franchisee shall notify Franchisor of the termination or non-renewal of its Occupancy Contract at least 30 days in advance of Franchisee's projected last day of possession. In order for Franchisee to obtain Franchisor's approval of a relocation, at the time of the request, Franchisee must: (1) be in compliance with the terms of this Agreement and the terms of any related or successor agreement; (2) meet all of Franchisor's then-current financial, operational and other requirements and qualifications for the right to develop within the System; (3) open the Restaurant at a location selected by Franchisee and accepted by Franchisor in accordance with site selection criteria specified by Franchisor within 270 days from the

approval of the relocation; (4) pay Franchisor a non-refundable relocation review fee in the amount of $5,000, which fee shall be due and payable when Franchisee submits the relocation request; and (5) pay to Franchisor a monthly royalty fee ("**Closure Royalty**") during the period when the Restaurant is closed equal to the average monthly royalty fee owed during the 12 months preceding the closure. If Franchisee receives business interruption insurance proceeds during the relocation process (or during any period of closure contemplated by Section 13.R(5), Franchisee shall use the same to pay the Closure Royalty. Franchisor's decision as to whether to consent to Franchisee's relocation request may be based, among other things, upon Franchisor's conclusion of the effect relocation may have on other Fridays Restaurants (whether in operation, under construction or in negotiations) in the general area of the proposed new site. Failure to relocate the Restaurant as provided in this Section after Franchisor has approved the relocation request shall constitute a default under this Agreement subject to the remedies set forth in Section 21. The Initial Term shall not be extended as a consequence of such relocation. For the avoidance of doubt, any relocation of the Restaurant shall be subject to the requirements of Sections 4 and 5.

4.      CONSTRUCTION OF THE RESTAURANT

    A.    <u>Restaurant Construction</u>.

        (1)    Franchisee assumes all cost, liability and expense for constructing the Restaurant. As used in this Agreement, "**construction**," "**constructing**," and "**construct**" refer to development, construction, equipping, renovation, reimage, remodeling, refurbishment, conversion, relocating, and maintenance of the Restaurant, whether initially, as part of a Facilities Remodeling (as hereinafter defined), or in connection with a reconstruction following casualty or condemnation, as applicable. Franchisee shall ensure that (a) only materials satisfying the System Standards are utilized in construction; and (b) such materials are purchased from approved suppliers (as described in Section 13.B).

        (2)    Franchisor will furnish to Franchisee prototypical plans and specifications for the applicable construction, including general requirements for dimensions, design, image, interior layout, décor, fixtures, equipment, signs, furnishings, storefront and color scheme. It shall be Franchisee's responsibility to have prepared all required construction plans and specifications to suit the shape and dimensions of the Premises, and Franchisee must ensure that these plans and specifications comply with applicable ordinances, building codes and permit requirements and with lease requirements and restrictions. Upon request by Franchisee, Franchisor may make available to Franchisee, at Franchisee's expense: (a) architectural consultation and advice; (b) preparation of construction plans, specifications and drawings for the relevant construction of the Restaurant (whether made available by Franchisor or obtained solely by Franchisee, "**Plans**"); and (c) consultation and advice on the purchase, display and installation of typical décor.

        (3)    Franchisee shall employ (subject to Franchisor's consent) only registered architects, registered engineers, and professional and licensed contractors in the construction of the Restaurant. Before submission of proposed Plans to Franchisor, Franchisee, if requested by Franchisor, shall furnish Franchisor with resumes of the registered architects, registered engineers and professional and licensed contractors whom Franchisee desires to retain to prepare the Plans and construct the Restaurant, along with additional information and detail concerning their training, experience and financial responsibility as Franchisor may direct. Franchisor need not consent to Franchisee's use of the Plans, and Franchisee shall not commence construction of the Restaurant before Franchisor has consented to Franchisee's use of the registered architects, registered engineers and professional and licensed contractors who will prepare the Plans and construct the Restaurant. Upon written request from

Franchisor, Franchisee shall submit to Franchisor copies of all contracts with the architects, engineers and contractors.

(4)     Franchisee shall submit the Plans to Franchisor and shall, upon Franchisor's request, submit all revised or "as-built" Plans during the course of such construction. Franchisor will approve or refuse to approve the Plans and notify Franchisee within 30 days after Franchisor receives the Plans. (Franchisor's approval shall not be unreasonably withheld.) As a condition to Franchisor's approval of the Plans, Franchisee shall deliver to Franchisor, in the form of <u>Rider 2</u>, a certification by a design professional of ADA compliance of the design of the Restaurant. Once Franchisor has approved the Plans, no substantial change shall be made to the Plans without the prior approval of Franchisor, which shall not be unreasonably withheld. If, in the course of construction, any such change in the Plans is contemplated, Franchisor's approval must first be obtained before proceeding. Franchisor shall approve or reject Plan changes within 10 business days after receipt.

(5)     Franchisee shall not begin site preparation or any other construction before receiving written notification from Franchisor that Franchisor has approved the Plans. All construction must be in accordance with Plans approved by Franchisor and must comply in all respects with applicable laws, ordinances, local rules, regulations and lease requirements. The Restaurant may not open (or re-open, as applicable) if construction has not been performed in substantial compliance with Plans approved by Franchisor, and this Agreement may be terminated if such non-compliance is not cured within a commercially reasonable amount of time (not to exceed 30 days). Franchisor may, in its sole discretion, furnish guidance to Franchisee in constructing the Restaurant and may periodically inspect the Premises during its construction.

(6)     During the course of construction, Franchisee shall, at all times, have a project manager to oversee construction ("**Project Manager**"). Not less than 60 days before the commencement of construction, Franchisee shall designate a Project Manager and, before construction commences, the Project Manager shall attend any training required by Franchisor. Any replacement Project Manager shall be designated within 10 days after the prior Project Managers resignation or termination.

(7)     Franchisee shall obtain all zoning classifications, clearances, consents, permits and licenses required in connection with the construction and operation of the Restaurant. Upon request, copies of such permits and licenses shall be provided to Franchisor.

B.     <u>Construction</u>.

(1)     For the initial construction of the Restaurant, Franchisee shall commence construction within six months from the date of Franchisor's site acceptance for the Premises and shall complete construction and open the Restaurant no later than 11 months thereafter ("**Opening Deadline**"). After the Opening Date, any construction at the Restaurant shall be conducted in accordance with System Standards and pursuant to any timeline required by Franchisor (including the date for closing [if applicable], substantial and final completion dates and the re-opening date).

(2)     Before the commencement of construction, Franchisee shall have provided Franchisor a copy of the fully executed Occupancy Contract for the Premises. Construction shall be deemed to have been commenced upon the commencement of construction-related work. Franchisee shall, within 10 days after commencement of construction, advise Franchisor of such commencement date.

[Store Name #_____]
[Franchisee]/TGIF
FRANCHISE AGREEMENT

(3)     Once construction has commenced, it shall continue uninterrupted except for interruption by reason of events constituting Force Majeure (as defined in Section 30.G) until completed. Notwithstanding the occurrence of any events, except events constituting Force Majeure, initial construction of the Restaurant as a TGI Fridays™ restaurant (if applicable) shall be completed, and the Restaurant shall be furnished, equipped and shall otherwise be ready to open for business in accordance with this Agreement not later than Opening Deadline. If events constituting Force Majeure cause a delay in the commencement of initial construction of the Restaurant, Franchisor shall proportionately extend the Opening Deadline for the Restaurant.

(4)     Franchisee agrees, at its sole expense, to do, or cause to be done, the following (which shall occur by the Opening Deadline, if applicable):

(a)     Secure all financing required to construct and operate the Restaurant;

(b)     Obtain and maintain all required building, utility, sign, health, sanitation, business, liquor and other permits and licenses applicable to the Restaurant. Upon Franchisor's request, Franchisee must promptly provide a copy of any such licenses and permits to Franchisor;

(c)     Construct all required improvements to the Premises and decorate the exterior and interior of the Restaurant in compliance with the Plans approved by Franchisor;

(d)     Purchase or lease and install all specified and required fixtures, equipment, furnishings and interior and exterior signs required for the Restaurant; and

(e)     Purchase an opening inventory for the Restaurant of only authorized and approved products and other materials and supplies.

C.     <u>Acquisition of Necessary Furnishings, Fixtures and Equipment</u>.

(1)     Franchisee agrees to use in the development and operation of the Restaurant only the fixtures, furnishings (including décor), equipment and signs that Franchisor has approved for Fridays Restaurants as meeting its specifications and standards for quality, design, appearance, function and performance. Franchisee further agrees to place or display at the Restaurant (interior and exterior) only those signs, emblems, lettering, logos and display materials that Franchisor approves in writing from time to time.

(2)     Franchisee shall purchase or lease approved brands, types or models of fixtures, furnishings, equipment and signs only from suppliers designated or approved by Franchisor, which may include Franchisor. Franchisee acknowledges that Franchisor may (a) profit from its sale of such items to Franchisee or (b) receive consideration from the third party supplier with respect to Franchisee's purchases of such items. If Franchisee proposes to purchase, lease or otherwise use any fixtures, furnishings, equipment or signs which have not been approved by Franchisor, Franchisee shall first notify Franchisor in writing and shall, at Franchisee's sole expense, submit to Franchisor upon Franchisor's request sufficient specifications, photographs, drawings and/or other information or samples for Franchisor to determine whether those fixtures, furnishings, equipment and/or signs comply with Franchisor's specifications and standards. Franchisor will, in its sole discretion, approve or disapprove the items and notify Franchisee within 30 days after Franchisor receives the request.

(3)     If Franchisee constructs any portion of the Restaurant outside of Franchisor's specifications without receiving Franchisor's prior written consent, Franchisor shall have the right to

delay the opening (or re-opening, as applicable) of the Restaurant until Franchisee, at its sole expense, brings the Restaurant's construction within full compliance of Franchisor's specifications.

      D.    <u>Inspection, Cooperation</u>.

During the course of construction, Franchisee shall (and shall cause Franchisee's architect, engineer, contractors, and subcontractors to) cooperate fully with Franchisor and its designees for the purpose of permitting Franchisor and its designees to inspect the Premises and the course of construction of the Restaurant in order to determine whether construction is proceeding according to the Plans. Without limiting the generality of the foregoing, Franchisee and Franchisee's architect, engineer, contractors and subcontractors shall: (1) supply Franchisor or its designees with samples of construction materials, test borings, corings, due diligence environmental studies, supplies, equipment and other material and reports, if any such tests, studies or reports indicate there may be material problems or as Franchisor or its designees may request; and (2) afford Franchisor representatives and its designees access to the Premises and to the construction work in order to permit Franchisor and its designees to carry out their inspections.

      E.    <u>Reports</u>.

If requested by Franchisor, Franchisee shall submit to Franchisor, on or before the first day of each month (or more frequently if Franchisor requests), a report with photographs showing progress made in connection with the construction of the Restaurant.

5.    OPENING OF THE RESTAURANT

      A.    <u>Final Inspection and Opening</u>.

Franchisee shall notify Franchisor in writing at least 30 days before the date Franchisee expects construction to be completed and a certificate of occupancy to be issued. If requested by Franchisor, Franchisee shall submit a copy of the certificate of occupancy to Franchisor. Franchisor reserves the right, after receiving Franchisee's notice, to conduct a final inspection of the Restaurant to determine if Franchisee has complied with this Agreement. Franchisor shall not be liable for delays or loss occasioned by its inability to complete its investigation and to make a determination within this period. Franchisee shall not open the Restaurant for business without Franchisor's express written authorization, which will not be granted unless Franchisee has satisfied the conditions contained in Section 5.B.

      B.    <u>Right to Open (or Re-Open) the Restaurant</u>.

For initial construction, Franchisee must open the Restaurant by the Opening Deadline. Except for a conditional opening pursuant to Section 5.C, Franchisor will not authorize the opening or re-opening (as applicable) of the Restaurant unless all the following conditions have been met:

      (1)    Franchisee is not in material default under this Agreement or any other agreements with Franchisor; Franchisee is not in default beyond the applicable cure period under any real estate lease, equipment lease or financing instrument relating to the Restaurant; Franchisee is not in default beyond the applicable cure period with any vendor or supplier to the Restaurant; and for the previous six months, Franchisee has not been in default beyond the applicable cure period under any agreement with Franchisor;

(2)    Franchisee is current on all obligations due Franchisor and its affiliates and Franchisee has signed all documents required by Franchisor including those necessary to participate in Franchisor electronic funds transfer program;

(3)    Franchisor is satisfied that the Restaurant was constructed substantially in accordance with the Plans approved by Franchisor, this Agreement and state and local codes. Franchisee must deliver to Franchisor, in the form of attached <u>Rider 2</u>, a certification by the construction contractor of ADA compliance of the actual construction of the Restaurant;

(4)    Franchisor has received a copy of the fully executed Occupancy Contract;

(5)    Franchisee has obtained a liquor license authorizing the sale of alcoholic beverages at the Restaurant;

(6)    Franchisee has obtained a certificate of occupancy and any other required health, safety or fire department certificates;

(7)    Franchisee has certified to Franchisor in writing that the installation of all items of furnishings, fixtures, equipment, signs, the Computer System and related equipment, supplies and other items has been accomplished in accordance with the System Standards;

(8)    An adequate number of Franchisee's managers as determined by Franchisor in its sole discretion have attended, successfully completed and become "validated" in the Management Training Program; and

(9)    Franchisor has been furnished with copies of all insurance policies required by Section 15 or such other evidence of insurance coverage and payment of premiums as Franchisor reasonably may request.

C.    <u>Conditional Opening or Re-Opening</u>.

Franchisor may conditionally authorize Franchisee to open or re-open and operate the Premises as a Fridays Restaurant, even though Franchisee has not fully complied with the terms of this Agreement, if Franchisee agrees to fulfill all remaining terms of this Agreement on or before a date specified by Franchisor. Franchisor's determination as to whether to authorize a conditional opening or re-opening shall be final and binding and shall be made in its sole discretion based upon those factors that Franchisor deems relevant, including its determination that a conditional opening or re-opening will not be injurious to the reputation of the System or the public health and safety. If Franchisee fails to timely fulfill all remaining terms of this Agreement, Franchisor may terminate this Agreement by providing written notice to Franchisee without opportunity to cure.

6.    FEES

A.    <u>Initial Franchise Fee</u>.

By no later than the execution of this Agreement, Franchisee shall pay to Franchisor an Initial Franchise Fee in the amount specified in <u>Exhibit A</u>. Franchisee acknowledges and agrees that the Initial Franchise Fee is fully earned by Franchisor when paid and is not refundable.

B.    Royalty Fee.

In addition to all other amounts to be paid by Franchisee to Franchisor, Franchisee shall pay Franchisor a nonrefundable and continuing Royalty Fee in an amount equal to 4% of the Gross Sales (as defined below) of the Restaurant, for the right to use the System and the Proprietary Marks at the Premises ("**Royalty Fee**").  If, due to federal, state or local laws, Franchisor is prohibited from receiving a percentage royalty based on alcoholic beverage sales, gambling device revenues or other similar percentage payouts, Franchisee shall pay Franchisor a Royalty Fee on all Gross Sales except these alcoholic beverage sales, gambling device and/or other revenues in the same dollar amount as would have been paid if Franchisee paid the specified Royalty Fee percentage on all Gross Sales.  If any taxes, fees or assessments are imposed on Franchisor by reason of its acting as franchisor or licensing the Proprietary Marks under this Agreement, Franchisee shall reimburse Franchisor for the amount of those taxes, fees or assessments within 30 days after receipt of an invoice from Franchisor.

C.    Gross Sales.

(1)    "**Gross Sales**" shall include the entire amount of the actual sales price, whether for cash, credit, check or other consideration, of all sales of food, beverages, merchandise, promotional items and services at or from the Restaurant, including, but not limited to, the following: (a) revenues from dine-in, carry-out, delivery, banquets, catering or otherwise; (b) electronic, mail, facsimile or telephone orders received or filled from the Restaurant; (c) commissions on telephone, video, game machine and vending machine revenues; (d) commissions on lotteries or legal games of chance (except to the extent prohibited by applicable law); (e) cover charges and entertainment fees; (f) stored value gift cards and gift certificates (when redeemed, but not when purchased, however, Franchisor reserves the right to change the method of accounting and collection for stored value gift cards and gift certificates sales upon six (6) months' prior written notice to Franchisee); (g) all deposits not refunded to purchasers; (h) payments to Franchisee by any manufacturer, vendor, distributor or concessionaire, franchisee or person other than bona fide rebates and volume discounts; and (i) promotional allowances to customers whether negative or positive in an amount equal to Franchisee's retail price for food and/or beverages prepared and served by Franchisee to the extent of the discount (in whole or in part) provided to the customers, but only to the extent that said amount for promotional allowances exceeds 1.5% of Gross Sales as calculated without inclusion of said amount.  Such promotional allowances shall include the retail price of food and beverages covered by appetizer and dinner cards and the customer comp cards to which Franchisor gives consent.  Promotional allowances provided in exchange for goods or services shall be includable in Gross Sales without benefit of the 1.5% discount.  Funds expended by Franchisee to comply with its Local Store Marketing requirement pursuant to Section 8.G shall not be included as promotional allowances under this section.

(2)    Gross Sales shall not include: (a) the amount of returns to shippers or manufacturers; (b) the amount of any cash or credit refunds made upon any sale where the food, beverages, merchandise or service sold or some part thereof is thereafter returned by the customer and accepted by Franchisee; (c) receipts from sales of furniture, trade fixtures or other extraordinary sales (unless bearing any Proprietary Mark) not made in the ordinary course of business; (d) any sales or value added tax required by any duly constituted taxing authority to be separately accounted for and collected on its behalf by Franchisee directly from Franchisee's customers and paid by Franchisee to the taxing authority; and (e) meals served to an employee at no cost while the employee is on duty, or the discounted portion of meals served to an employee.  Each charge or sale upon installment or credit shall be treated as a sale for the full price in the month during which such charge or sale shall be made, irrespective of whether, or of the time when, Franchisee shall receive payment (whether full or partial) thereof.

D.    <u>Advertising Contributions and Expenditures</u>.  Franchisee also shall spend and/or contribute for advertising.  The exact amount to be spent and/or contributed by Franchisee for advertising and promotional activities, and the allocation of the advertising contributions and expenditures, as of the Effective Date, is set forth in Section 8 and <u>Exhibit B</u> as such may change from time to time in accordance with Section 8.

E.    <u>Gross Sales Remittance Reports and Payment of Fees</u>.

(1)    Within seven days after the end of each fiscal period (which for purposes of this Agreement, may be a month, a week, or other accounting period as defined and prescribed by Franchisor from time to time in the Manuals), Franchisee shall: (a) report to Franchisor the amount of Gross Sales from the Restaurant and showing itemized deductions and exclusions from Gross Sales for the Restaurant during the preceding fiscal period, provide such other information as Franchisor may require and; (b) pay Franchisor (by check, electronic funds transfer or such other form or method as Franchisor may designate) the Royalty Fee and advertising contributions applicable to the Gross Sales.  The Gross Sales remittance reports shall be in writing or such other form or method as Franchisor may designate including transmittal by direct Internet connection with Franchisor, polling by Franchisor of Franchisee's Computer System, facsimile transmission, telephone, electronic data communications, or any other method that Franchisor may reasonably direct.  Franchisee also shall submit an annual accounting of Gross Sales to Franchisor within 30 days after the end of each accounting year.

(2)    Upon receipt of written notice from Franchisor, Franchisee must pay the Royalty Fees, advertising contributions and all amounts owed to Franchisor under this Agreement, including interest charges, by electronic funds transfer.  In connection with payment of these fees by electronic funds transfer, Franchisor may designate a day for payment ("**Due Date**") different than that provided in Section 6.E(1) above.  On each Due Date, Franchisor will transfer from the Restaurant's commercial bank operating account ("**Account**") the amount reported to Franchisor in Franchisee's remittance report or determined by Franchisor based on the records contained in Franchisee's Computer System.  If Franchisee has not reported Gross Sales to Franchisor for any fiscal period, Franchisor will transfer from the Account an amount calculated in accordance with its estimate of the Gross Sales during the fiscal period.  If, at any time, Franchisor determines that Franchisee has underreported the Gross Sales of the Restaurant, or underpaid the Royalty Fees, advertising contributions or other amounts due to Franchisor under this Agreement or any other agreement, Franchisor shall initiate an immediate transfer from the Account in the appropriate amount in accordance with the foregoing procedure, including interest as provided in this Agreement.  Any overpayment will be credited to the Account effective as of the first reporting date after Franchisor and Franchisee determine that such credit is due.

(3)    In connection with payment of amounts owed by electronic funds transfer, Franchisee shall: (a) comply with procedures specified by Franchisor in the Manuals or otherwise in writing; (b) perform those acts and sign and deliver those documents (including the ACH Authorization form as such form may change from time to time attached as <u>Exhibit E</u>) as may be necessary to accomplish payment by electronic funds transfer; (c) designate the Account and furnish to Franchisor an authorization in the form designated by Franchisor to initiate debit entries and/or credit correction entries to the Account for payments of the Royalty Fees, advertising contributions and other amounts payable under this Agreement, including any interest charges; and (d) make sufficient funds available in the Account for withdrawal by electronic funds transfer no later than the Due Date for payment thereof.  Failure by Franchisee to have sufficient funds in the Account shall constitute a default of this Agreement pursuant to Section 21.C(2).

(4)     Notwithstanding the provisions of this Section 6.E, Franchisor reserves the right to modify, at its option, the method by which Franchisee pays the Royalty Fees, advertising contributions and other amounts owed under this Agreement, including interest charges, upon Franchisee's receipt of written notice from Franchisor.

F.     <u>Late Charges and Interest</u>.

Any payment or report not actually received by Franchisor on or before the date due shall be deemed as late.  To compensate Franchisor for the increased administrative expense of handling late payments and reports, Franchisee shall pay a $500 late fee to Franchisor for each delinquent payment or report, due upon making the delinquent payment or submitting the delinquent report.  In addition to paying the late charge, Franchisee shall pay Franchisor interest on the amount owed from the date due until paid at the maximum rate permitted for indebtedness of this nature in the state in which the Restaurant is located, not to exceed 1.5% per month or a portion of a month.  Payment of interest by Franchisee on past due obligations is in addition to all other remedies and rights available to Franchisor pursuant to this Agreement or under applicable law.

G.     <u>Partial Payments</u>.

No payment by Franchisee or acceptance by Franchisor of any monies under this Agreement for a lesser amount than due shall be treated as anything other than a partial payment on account.  Franchisee's payment of a lesser amount than due with an endorsement, statement or accompanying letter to the effect that payment of the lesser amount constitutes full payment shall be given no effect, and Franchisor may accept the partial payment without prejudice to any rights or remedies it may have against Franchisee.  Acceptance of payments by Franchisor other than as set forth in this Agreement shall not constitute a waiver of Franchisor's right to demand payment in accordance with the requirements of this Agreement or a waiver by Franchisor of any other remedies or rights available to it pursuant to this Agreement or under applicable law.  Notwithstanding any designation by Franchisee, Franchisor shall have sole discretion to apply any payments by Franchisee to any of its past due indebtedness for Royalty Fees, advertising contributions, purchases from Franchisor or its affiliates, interest or any other indebtedness.  Franchisor has the right to accept payment from any other entity as payment by Franchisee.  Acceptance of that payment by Franchisor will not result in that other entity being substituted for Franchisee.

H.     <u>Collection Costs and Expenses</u>.

Franchisee agrees to pay to Franchisor on demand any and all costs and expenses incurred by Franchisor in enforcing the terms of this Agreement, including, without limitation, collecting any monies owed by Franchisee to Franchisor.  These costs and expenses include, but are not limited to, costs and commissions due a collection agency, reasonable attorneys' fees (including attorneys' fees for in-house counsel employed by Franchisor or its affiliates and any attorneys' fees incurred by Franchisor in bankruptcy proceedings), costs incurred in creating or replicating reports demonstrating Gross Sales of the Restaurant, court costs, expert witness fees, discovery costs and reasonable attorneys' fees and costs on appeal, together with interest charges on all of the foregoing.

I.     <u>No Offset</u>.

Franchisee shall not withhold or off-set any portion of any payment due to Franchisor's alleged non-performance under this Agreement or any other agreement by and between Franchisor and Franchisee or their respective parent corporations, subsidiaries or affiliates.

7.      RECORDKEEPING AND REPORTS

A.      <u>Recordkeeping</u>.

Franchisee agrees to use computerized cash and data capture and retrieval systems that meet Franchisor's specifications and to record sales of the Restaurant electronically or on tape for all sales at or from the Premises. Franchisee shall keep and maintain, in accordance with any procedures set forth in the Manuals, complete and accurate books and records pertaining to the Restaurant sufficient to fully report to Franchisor. Franchisee's books and records shall be kept and maintained using generally accepted accounting principles ("**GAAP**"), if Franchisee uses GAAP in any of its other operations, or using other recognized accounting principles applied on a consistent basis which accurately and completely reflect the financial condition of Franchisee. Franchisee shall preserve all of its books, records and state and federal tax returns for at least five years after the later of preparation or filing (or such longer period as may be required by any governmental entity) and make them available and provide duplicate copies to Franchisor within five days after Franchisor's written request. Franchisee shall adopt such accounting periods as Franchisor prescribes in writing.

B.      <u>Quarterly Reports</u>.

Within 30 days after the end of each fiscal quarter (as defined by Franchisor from time to time) during each fiscal year (as defined by Franchisor from time to time), Franchisee shall, at Franchisee's expense, submit to Franchisor, in the form prescribed by Franchisor (all of which may be unaudited), on both a Restaurant unit level as well as a separate consolidated basis with any other Fridays Restaurants owned by Franchisee or Franchisee's affiliates, the following: (1) a quarterly and year-to-date profit and loss statement; and, (2) a quarterly and year-to-date balance sheet; and, (3) a quarterly and year-to-date cash flow statement; and (4) financial statements, including profit and loss statements, a balance sheet and cash flow statement for all related entities, affiliates, or organizations that have any shared or commingled debt, assets, or other dependent financial interests with Franchisee. It is acknowledged by Franchisee that as part of Franchisee's disclosures, Franchisor is entitled to the information, details and specific data related to Franchisee's financing structure, debt schedule, real estate interests and related assets, distributions, dividends, capital expenditures, sales slips, coupons, purchase orders, invoices, payroll records, check stubs, bank statements, sales tax records and returns, cash receipts and disbursements, journals and ledgers, periodic guest counts, affiliates and such other information as Franchisor may require. Franchisor shall have the right, to be exercised in its sole discretion, to require that Franchisee provide Franchisor with profit and loss statements, balance sheets, and cash flow statements or other financial information listed above at other times requested by Franchisor. Each statement and balance sheet shall be signed by Franchisee or by Franchisee's treasurer or chief financial officer attesting that it is true, correct and complete and uses accounting principles applied on a consistent basis which accurately and completely reflect Franchisee's financial condition.

C.      <u>Annual Reports</u>.

At Franchisor's request, Franchisee shall, at its expense, provide to Franchisor: (1) either a reviewed or audited profit and loss statement and balance sheet for the Restaurant within 60 days after the end of each fiscal year to be signed by Franchisee or by Franchisee's treasurer or chief financial officer attesting that the financial statements present fairly the financial position of Franchisee and the results of operations of the Restaurant during the period covered; (2) financial statements, including profit and loss statements, a balance sheet and cash flow statement for all related entities, affiliates, or organizations that have any shared or commingled debt, assets, or other dependent financial interests with Franchisee; and (3) income tax statements of every Principal Owner. Franchisor shall have the right, in its reasonable

discretion, to require that Franchisee, at Franchisee's expense, submit audited financial statements prepared by a certified public accounting firm acceptable to Franchisor for any fiscal year or any period or periods of a fiscal year.

D.    Other Reports.

Franchisee shall submit to Franchisor, for review or auditing, such additional reports, records, data, information and financial statements as Franchisor may reasonably designate, in the form and at the times and places reasonably required by Franchisor, upon request and as specified from time to time in the Manuals or otherwise in writing.

E.    Data.

All data provided by Franchisee in any form, and whether required by this Section 7 or any other requirement under the System or in the Manuals, including data uploaded to Franchisor computer system from the Franchisee's Computer System and/or downloaded from Franchisor computer system to the Franchisee's Computer System, is and will be owned exclusively by Franchisor, including without limitation, Customer Data (described in Section 13.L), customer lists, any and all loyalty program data and customer lists and e-mail lists, and Franchisor will have the right to use such data in any manner that Franchisor deems appropriate without compensation to Franchisee. In addition, all other data created or collected by Franchisee in connection with the System, or in connection with Franchisee's operation of the Restaurant (including but not limited to consumer and transaction data), is and will be owned exclusively by Franchisor during the Initial Term and following termination or expiration of this Agreement. Copies and/or originals of such data must be provided to Franchisor upon Franchisor's request. Franchisor hereby licenses use of such data back to Franchisee, at no additional cost, solely for the Initial Term and solely for Franchisee to use in connection with the operation of the Restaurant. Franchisor may use all such information, data, and reports in any manner, including, without limitation, providing financial and operating reports to Franchisee's and operators operating under the System.

F.    Public Filings.

If Franchisee is or becomes a publicly-held entity in accordance with other provisions of this Agreement, Franchisee shall send to Franchisor copies of all reports (including responses to comment letters) or schedules that Franchisee may file with the U.S. Securities and Exchange Commission (certified by Franchisee's chief executive officer to be true, correct, complete and accurate) and copies of any press releases it may issue, within 3 days of the filing of those reports or schedules or the issuance of those releases.

G.    Audit Rights.

(1)    Franchisor or its designee shall have the right at all reasonable times, both during and after the Initial Term, to inspect, copy and audit Franchisee's books, records, and federal, state and local tax returns, and such other forms, reports, information and data as Franchisor reasonably may designate, applicable to the operation of the Restaurant. If an inspection or audit discloses an understatement of Gross Sales, Franchisee shall pay Franchisor, within 10 days after receipt of the inspection or audit report, the deficiency in the Royalty Fees, advertising contributions and other amounts owed plus interest (at the rate and on the terms provided in Section 6.F) from the date originally due until the date of payment.

(2)     If an inspection or audit is made necessary by Franchisee's failure to furnish reports or supporting records as required under this Agreement, or to furnish such reports, records or information on a timely basis, or if an understatement of Gross Sales for the period of any audit is determined by any audit or inspection to be greater than 1% or an underpayment of the Royalty Fee of 5% or more, Franchisee also shall reimburse Franchisor for the reasonable cost of the audit or inspection including, without limitation, the charges of attorneys and independent accountants, and the travel expenses, room, board and compensation of Franchisor employees or designees involved in the audit or inspection.

(3)     If an inspection or audit discloses an understatement of the Gross Sales of the Restaurant for any period by 1% or more three or more times during any 18 month period, or by more than 3% on any one occasion, then in addition to Franchisee's obligations in Sections 7.G(1) and (2) above, Franchisor may immediately terminate this Agreement.

(4)     If Franchisee fails to provide Franchisor on a timely basis with the records, reports and other information required by this Agreement or, upon request of Franchisor, with copies of the same, Franchisor or its designee shall have access at all reasonable times (and as often as necessary) to Franchisee's books and records for the purpose, among other things, of preparing the required records, reports and other information.  Franchisee promptly shall reimburse Franchisor or its designee for all costs and expenses associated with Franchisor obtaining such records, reports or other information.

(5)     The foregoing remedies shall be in addition to all other remedies and rights available to Franchisor under this Agreement or applicable law.

8.     ADVERTISING AND PROMOTION

A.     Marketing Contributions and Expenditures.

(1)     This Section 8 describes Franchisor's marketing, public relations and advertising programs; however, Franchisor reserves the right to modify these programs and the manner in which the marketing and advertising funds are used for such purposes from time to time, in whole or in part, as Franchisor deems necessary.  Franchisee acknowledges and recognizes the importance of the standardization of advertising programs to the furtherance of the goodwill and public image of the System and the Proprietary Marks.  During the Initial Term of this Agreement, Franchisee shall pay an advertising and promotion obligation ("**APO**") in an amount of up to 5% of the Gross Sales of the Restaurant as set forth in this Section 8 and Exhibit B.  Franchisee shall pay that portion of the APO as directed by Franchisor to the National Advertising Fund in accordance with Section 8.C and to a Regional Advertising Fund or a Regional Co-op in accordance with Section 8.D or 8.E at the time and in manner as directed by Franchisor.  The remainder of Franchisee's APO shall be spent for Local Store Marketing in accordance with Section 8.G.

(2)     Franchisor has the right, following written notice to Franchisee, to reallocate the APO and to increase the APO; however Franchisor may not increase the APO above 5% of Gross Sales.  This limitation on Franchisor does not prevent the Restaurant's Regional Co-op from requiring a contribution, that when added to Franchisee's National Advertising Fund contribution, results in a total APO in excess of 5% of Gross Sales.

B.      <u>Grand Opening Required Spending</u>.

Franchisee shall, during the period beginning 30 days before the scheduled opening of the Restaurant and continuing for 90 days after the Restaurant first opens for business ("**Grand Opening Period**"), spend at least $15,000 to conduct grand opening advertising in accordance with Franchisor Local Store Marketing Guidelines (as defined in Section 8.G and <u>Exhibit C</u>). At least 90 days before the opening of the Restaurant, Franchisee must submit to Franchisor a proposal for grand opening advertising ("**Grand Opening Plan**"). Franchisee shall not implement the Grand Opening Plan unless and until Franchisor has consented to the Grand Opening Plan in writing. Franchisee agrees to modify the Grand Opening Plan as requested by Franchisor and, thereafter, no substantial changes shall be made to the Grand Opening Plan without the advance written consent of Franchisor. Within 10 days after the end of the Grand Opening Period, Franchisee shall submit to Franchisor proof of such grand opening advertising expenditures to Franchisor. During the Grand Opening Period, Franchisee must contribute to the National Advertising Fund and a Regional Advertising Fund or Regional Co-op (if established in the area where the Restaurant is located); however, Franchisee's obligation to make Local Store Marketing expenditures pursuant to Section 8.G below will not commence until after the expiration of the Grand Opening Period.

C.      <u>National Advertising Fund</u>.

(1)      Franchisor formed a non-profit corporation, Fridays Marketing Advisory Council ("**FMAC**") to administer a national advertising fund for Fridays Restaurants ("**National Advertising Fund**"). At the same time and in the same manner as Franchisee pays its Royalty Fees to Franchisor, Franchisee shall contribute to the National Advertising Fund in the amount set forth in <u>Exhibit B</u>, as such may be subsequently modified by Franchisor pursuant to Section 8.A(2). Fridays Restaurants operated by Franchisor and its affiliates shall contribute to the National Advertising Fund on the same basis as comparable franchisees.

(2)      FMAC or its successor shall direct all advertising, marketing, and public relations programs and activities financed by the National Advertising Fund, with sole discretion over the creative concepts, materials and endorsements used in those programs and activities, and the geographic, market and media placement and allocation of advertising and marketing materials. Franchisee agrees that the National Advertising Fund may be used among other things to pay the costs of preparing and producing such associated materials and programs as Franchisor or its designee may determine, including, but not limited to, the following: (a) creative development and production of print ads, commercials, radio spots, electronic ads, point of purchase materials, direct mail pieces, door hangers, and other advertising and marketing materials; (b) creative development, preparation, production and placement of video, audio, and written materials and electronic media; (c) media placement and buying, including all associated expenses and fees; (d) administering local, regional and/or multi-regional marketing and advertising programs including the hiring of personnel or services; (e) market research, new product testing and marketing, and customer satisfaction surveys, including the use of secret shoppers; (f) the creative development of, and actual production associated with, premium items, giveaways, promotions, contests, public relation events, and charitable or nonprofit events; (g) creative development of menus, signage, posters, and individual Fridays Restaurant décor items including wall graphics and signage; (h) Digital Media, Extranet and/or Intranet development and maintenance as well as mobile creative, technology and other emerging digital initiatives; (i) development, implementation, and maintenance of an electronic commerce website and/or related strategies; (j) development and implementation of search engine optimization strategies; (k) development and administration of consumer surveys, interviews and other customer satisfaction and retention policies; (l) retention and payment of advertising and marketing agencies and other outside advisors including retainer and management fees; (m) co-branding or licensing

[Store Name #_____]
[Franchisee]/TGIF
FRANCHISE AGREEMENT

programs; (n) public relations and community involvement activities and programs; and (o) gift card and loyalty programs. From time to time, Franchisor or its designee may furnish Franchisee with marketing, advertising and promotional materials at the cost of producing them, plus any related shipping, handling and storage charges. Franchisee shall not modify any of these materials without Franchisor's prior written consent.

D.    Regional Advertising Funds.

(1)    Franchisor shall have the right, in its sole discretion, to establish one or more regional advertising funds for Fridays Restaurants ("**Regional Advertising Funds**"). If a Regional Advertising Fund is established for a geographical area that includes the Premises, at the same time and in the same manner as Franchisee pays its Royalty Fees to Franchisor, Franchisee shall contribute to that Regional Advertising Fund in the amount set forth in Exhibit B, as subsequently modified by Franchisor. Fridays Restaurants operated by Franchisor and its affiliates in an area covered by a Regional Advertising Fund shall contribute to the Regional Advertising Fund on the same basis as comparable franchisees.

(2)    Franchisor or its designee shall direct all advertising, marketing, and public relations programs and activities financed by the Regional Advertising Fund, with sole discretion over the creative concepts, materials and endorsements used in those programs and activities, and the geographic, market and media placement and allocation of advertising and marketing materials. Franchisee agrees that the Regional Advertising Fund may be used to pay the costs of preparing and producing such associated materials and programs as Franchisor or its designee may determine, including video, audio and written advertising materials; employing advertising agencies; sponsorship of sporting, charitable or similar events; administering regional and multi-regional advertising programs, including, without limitation, purchasing direct mail and other media advertising and employing advertising agencies to assist with these efforts; and supporting public relations, market research and other advertising, promotional and marketing activities. Franchisee agrees to participate in all advertising, marketing, promotions, research and public relations programs instituted by the Regional Advertising Fund.

E.    Regional Co-op.

(1)    In lieu of a Regional Advertising Fund for the area that includes the Premises, Franchisor, in its sole discretion, may establish (or permit the franchisees in the relevant geographic area to establish) a Regional Co-op. Franchisee shall contribute to the Regional Co-op in the amount and at the times set by the Regional Co-op, which will be reflected in Franchisee's APO on Exhibit B. Franchisor, if it so elects, may prepare bylaws to be used by the Regional Co-op and may require the Regional Co-op to incorporate.

(2)    Monies in the Regional Co-op may be spent for the purposes determined by the Regional Co-op Bylaws or other applicable guidelines, which will be made available to Franchisee up on request. Unless otherwise consented to in writing by Franchisor, the Regional Co-op Fund shall only conduct advertising that conforms with those advertising and sales promotions specified by Franchisor from time to time (including the media in which conducted). All advertising shall be submitted to Franchisor before first use as provided in Section 8.G, and all advertising shall adhere to the standards set forth in Section 8.G. Each franchisee who is a member of the Regional Co-op shall be entitled to vote on Regional Co-op matters; however, a franchisee shall not be entitled to vote if it is in default under its franchise agreement or any other agreement with Franchisor or its affiliates. Franchisor always shall be a member of the Regional Co-op and be entitled to attend and fully participate in Regional Co-op meetings, but Franchisor shall not have a vote unless it or its affiliates operates Fridays Restaurants in the area covered by the Regional Co-op. Franchisor shall be given at least 3 days prior written notice of Regional

Co-op meetings. If the members of the Regional Co-op are unable or fail to determine the manner in which Regional Co-op monies should be spent, Franchisor may assume this decision making authority following 10 days advance written notice to the members of the Regional Co-op.

(3)     Franchisor or its designee shall have the right to terminate (and subsequently restart) the Regional Co-op or convert the Regional Co-op to a Regional Advertising Fund. Upon termination, all monies in the Regional Co-op shall be spent for advertising and/or promotional purposes.

(4)     Franchisor or its designee may grant to any franchisee an exemption for any length of time from the requirement of membership in the Regional Co-op, upon written request of such a franchisee stating reasons supporting an exemption. Decisions regarding a request for exemption shall be final. Franchisor shall have the sole right to enforce the obligations of franchisees who are members of the Regional Co-op to contribute to the Regional Co-op, and neither Franchisee nor any other franchisees who contribute to the Regional Co-op shall be deemed a third party beneficiary with respect to the Regional Co-op obligations of other franchisees or have any right to enforce the obligation of any franchisee to contribute to the Regional Co-op.

F.     <u>Treatment of Payments to Franchisor</u>.

(1)     Franchisor shall separately account for the National Advertising Fund and any Regional Advertising Funds, but Franchisor shall not be required to segregate any of the funds from Franchisor's other monies. None of the funds shall be used to defray any of Franchisor's general operating expenses (except reasonable administrative costs and overhead related to the administration or direction of such funds). Each fund may hire employees, either full-time or part-time, for its administration. Franchisor, its affiliates, and designees may be reimbursed by each fund for administrative expenses directly related to the fund's marketing programs, including, without limitation, conducting market research, preparing advertising and marketing materials and collecting and accounting for contributions to each fund. Franchisor or its designee may spend in any fiscal year an amount greater or less than the aggregate contribution of all Fridays Restaurants to each fund during that year or cause each fund to invest any surplus for future use by the fund. An unaudited statement of monies collected and costs incurred by each fund shall be prepared annually and shall be furnished to Franchisee within a reasonable period of time following a written request. Franchisor or its designee will have the right to cause each fund to be incorporated or operated through an entity separate from Franchisor at such time as Franchisor or its designee deems appropriate, and such successor entity shall have all rights and duties of Franchisor pursuant to this Section 8.

(2)     Franchisee understands and acknowledges that each fund is intended to enhance recognition of the Proprietary Marks and patronage of Fridays Restaurants. Franchisor will endeavor to utilize each fund to develop advertising and marketing materials and programs and to place advertising that will benefit the System and all Fridays Restaurants contributing to the fund. Franchisee agrees, however, that Franchisor is not liable to Franchisee, and Franchisee forever covenants not to sue and holds Franchisor harmless of any liability or obligation to ensure that expenditures by each fund in or affecting any geographic area (including the Premises) are proportionate or equivalent to the contributions to the fund by Fridays Restaurants operating in that geographic area, or that any Fridays Restaurant will benefit directly or in proportion to its contribution to each fund from the development of advertising and marketing materials or the placement of advertising. Except as expressly provided in this Section 8, neither Franchisor nor its designee assumes any direct or indirect liability to Franchisee with respect to the maintenance, direction or administration of each fund.

[Franchisee]/TGIF
FRANCHISE AGREEMENT

(3)      Franchisor reserves the right, in its sole discretion, to: (a) suspend contributions to and operations of each fund for one or more periods that Franchisor determines to be appropriate; (b) terminate any fund upon 30 days written notice to Franchisee and establish, if Franchisor so elects, one or more new advertising funds; and (c) defer or waive, in whole or in part, upon the written request of any franchised or company restaurants, any advertising contributions required by this Section if, in Franchisor's sole judgment, there has been demonstrated unique, objective circumstances justifying any such waiver or deferral. On termination of a fund, all monies in the fund shall be spent for advertising and/or promotional purposes. Franchisor has the right to reinstate any fund upon the same terms and conditions set forth in this Agreement upon 30 days prior written notice to Franchisee. Franchisor, in its sole discretion as it deems appropriate in order to maximize media effectiveness, may transfer monies from the National Advertising Fund to any Regional Advertising Fund or from all Regional Advertising Funds to the National Advertising Fund.

G.      Local Store Marketing.

(1)      Franchisee shall spend, on a monthly basis, the difference between (a) the APO and (b) the amount Franchisee is required to contribute to the National Advertising Fund and the Regional Advertising Fund or Regional Co-Op (if any), as set forth in Exhibit B (and as such may be subsequently modified by Franchisor), on authorized advertising media and for authorized advertising expenditures to promote the Restaurant ("**Local Store Marketing**"). Franchisor or its designee periodically shall advise Franchisee of the advertising and sales promotions approved by Franchisor including: direct mail, newspapers, magazines and other periodicals; radio and television spots; outdoor advertising (e.g., billboards, highway or transit signs); geo-targeted digital advertising and local Social Media. If requested by Franchisor, Franchisee shall submit annually for Franchisor's prior consent its marketing plan and budget with respect to kinds and amounts of advertising and media intended to be used in accordance with Fridays Local Store Marketing guidelines as set forth in Exhibit C and the Manuals as such guidelines may be modified by Franchisor from time to time. Franchisee shall obtain Franchisor's consent to the marketing plan and budget and any changes to the marketing plan and budget before it may be implemented.

(2)      Within 30 days after the end of each fiscal quarter, Franchisee shall provide Franchisor or its designee copies of all documentation demonstrating the amount and types of Local Store Marketing expenditures made by Franchisee in the prior fiscal quarter. If Franchisee fails to expend the required amount annually, then Franchisee must contribute to the National Advertising Fund within 30 days after the close of Franchisor's fiscal year any amounts that Franchisee should have expended to reach the Local Store Marketing requirement. Franchisor reserves the right to require Franchisee to remit to Franchisor 100% of the Local Store Marketing obligation upon 10 days notice and, upon receipt, Franchisor will have the right to use the funds for advertising and promotion in the Restaurant's local area.

(3)      Franchisee may purchase local advertising and promotion materials from any Franchisor-approved third party. If purchased from a source other than Franchisor or its affiliates, these materials shall comply with federal and local laws and regulations and with the guidelines for advertising and promotions promulgated from time to time by Franchisor or its designee and shall be submitted to Franchisor or its designee at least 30 days before first use for its approval, which Franchisor may grant or withhold in its sole discretion. Franchisee's local advertising and marketing materials must follow Franchisor's guidelines, which may include, among other things, requirements for, or restrictions regarding, the use of the Proprietary Marks and notices of the Fridays Websites domain name(s) in the manner Franchisor designates. In no event shall Franchisee's advertising contain any statement or material which, in the sole discretion of Franchisor, may be considered: (a) in bad taste or offensive to the

public or to any group of persons; (b) defamatory of any person or an attack on any competitor; (c) to infringe upon the use, without permission, of any other persons trade name, trademark, service mark or identification; or (d) inconsistent with the public image of Franchisor or the System.

H.      Promotional Programs.

In addition to the national and regional advertising described in this Section 8, Franchisor may from time to time develop and administer advertising, marketing and sales promotion programs in which Franchisee shall participate upon such terms and conditions as established by Franchisor. Such programs are in addition to Franchisee's APO and may include, but not be limited to, liquor menu and marketing promotions, specialized menu offerings and similar programs. All phases of such advertising and promotion, including, without limitation, type, quantity, timing, placement, and choice of media (including Digital Media), market areas, promotional programs and advertising agencies, shall be determined by Franchisor.

I.      Fridays Websites.

(1)      Franchisor may establish and maintain one or more websites and/or mobile applications (collectively referred to herein as the "**Fridays Websites**") that provide information about the System and the products and services offered and sold by Fridays Restaurants. The Fridays Websites may also offer reservations, online and mobile ordering, mobile payments or similar services or sales of items bearing the Proprietary Marks, including, but not limited to, Franchisor's memorabilia, clothing and pre-packaged food and beverage products. Franchisor may require Franchisee to pay Franchisor and/or one or more third party vendors their then-current costs and fees applicable to online and mobile orders placed from Franchisee's Restaurant through the Fridays Websites, or Franchisor may use part of the National Advertising Fund contributions that Franchisor collects under this Section 8 to pay a portion or all of those costs and fees. Franchisor has absolute control over the Fridays Websites design and content. Franchisor will attempt to configure the Fridays Websites to accommodate individual Fridays Restaurant pages described in Section 8.I(2). Franchisor will have no obligation to maintain the Fridays Websites indefinitely, but may discontinue them at any time without liability to Franchisee. Furthermore, as Franchisor has no control over the stability or maintenance of the Internet generally, Franchisor is not responsible for damage or loss caused by errors of the Internet. Franchisor is not liable for any direct, indirect, special, incidental, exemplary or consequential damages arising out of the use of the Internet or the inability to use the Internet including loss of profits, goodwill or savings, downtime, damage to or replacement of programs and data, whether based in contract or tort, product liability or otherwise.

(2)      The Fridays Websites may include a series of interior pages developed by Franchisor (and, at Franchisor's sole discretion, using content provided by Franchisee as requested by Franchisor) that identify participating Fridays Restaurants by address, telephone number, and e-mail address. At Franchisee's request, Franchisor will endeavor (technology permitting) to include on the Fridays Websites one or a series of interior pages devoted to information about the Restaurant. Franchisee will not have the capability to modify such page(s) except in coordination with Franchisor and in compliance with Franchisor's policies and procedures as such may change from time to time.

(3)      Franchisor may require Franchisee to contribute an amount, as determined by Franchisor in its sole discretion (the "**Digital Marketing Fee**"), toward the cost of the development and maintenance of Digital Media (including, but not limited to, the Fridays Websites) to be used for advertising, marketing, promotional, technology, or other purposes in Franchisor's sole discretion. Franchisor will collect the Digital Marketing Fee monthly and will notify Franchisee in or before January of each year the amount of the Digital Marketing Fee for that calendar year, provided that the Digital

Marketing Fee will remain the same for that calendar year if Franchisor does not notify Franchisee before January 31 of each year of a change in the amount of the Digital Marketing Fee. In addition or alternatively, Franchisor may use part of the National Advertising Fund contributions that Franchisor collects under this Section 8 to maintain and further develop the Digital Media and may elect in conjunction therewith to establish a separate fund for the Digital Marketing Fee and such contribution amounts apart from the National Advertising Fund.

(4)    If Franchisee fails to pay when due any fees or other amounts payable to Franchisor under this Agreement or otherwise fails to comply with any policy or procedure governing the Digital Media, in addition to other remedies, Franchisor may, at its option, temporarily disable Franchisee's interior page(s) on the Fridays Websites (or other Digital Media) or Franchisee's ability to accept online or mobile orders and/or mobile payments for the Restaurant, until Franchisee pays its outstanding obligations in full and/or Franchisee fully cures the breach. Franchisee will not have any claim against Franchisor or any affiliate arising from Franchisor's actions pursuant to this Section 8.I and Franchisee hereby waives any such claim it may at any time have, and releases Franchisor and its affiliates from any liability arising therefrom.

J.    <u>E-Mail, Internet, Social Media and Other Media</u>.

Franchisee must comply with Franchisor's requirements and policies (as described in the Manuals or otherwise in writing) with respect to all Digital Media in connection with the Restaurant and the business, and in connection with discussing, advertising, or disseminating any information, or otherwise having a presence, on the Internet, in Social Media or in any other media, regarding the Restaurant and the business. Such activities include, without limitation, participation in any Internet "blogs" or Social Media sites. Any such activities which are not expressly permitted in the Manuals or otherwise in writing, or for which Franchisee has not previously received approval from Franchisor, shall be subject to Franchisor's approval as Local Store Marketing.

(1)    Franchisee may advertise and promote the Restaurant via Social Media, which shall be comprised of pages, communications, and content located on third party platforms using the Proprietary Marks as specified by Franchisor (collectively, "**Franchisee's Social Media**"). All uses of Franchisee's Social Media pages and communication channels and uses must be established in accordance, and at all time be in compliance, with the Manuals and System Standards.

(2)    Franchisee agrees not to transmit or cause any other party to transmit consumer advertisements or solicitations by e-mail or other Digital Media without Franchisor's prior written consent as to: (a) the content of such advertisements or solicitations; and (b) Franchisee's plan for transmitting such advertisements. In addition to any other provision of this Agreement, Franchisee agrees that it will be solely responsible for complying with any laws pertaining to sending e-mails, including but not limited to the Controlling the Assault of Non-Solicited Pornography and Proprietary Marketing Act of 2003 (known as the "CAN-SPAM Act of 2003").

(3)    Franchisee shall promptly discontinue any advertising or promotion using Social Media, whether or not previously agreed to by Franchisor, upon notice from Franchisor that it reasonably considers that such use of Social Media does not conform to the System Standards. Upon the expiration or termination of this Agreement, Franchisee will assign ownership (to the extent Franchisor does not already own them) of all domain names, account names, handles and user names used by Franchisee in its business under this Agreement and Franchisee will take all such actions as Franchisor reasonably requires to disassociate Franchisee from any such names and Social Media pages.

K.    Copyrights.

Copyright to all advertising and promotional materials that contain any of the Proprietary Marks or that otherwise relate to Fridays Restaurants will belong solely to Franchisor regardless of the party that created those materials. For purposes of this provision on ownership of advertising and promotional material, Fridays Websites and all material on Fridays Websites or Social Media including, without limitation, all informational text, photographs, illustrations, artwork, software, music, sound, photographs, graphics, audio, video, messages, files, documents, images or other materials, as well as all derivative works will be considered advertising and promotional material, and will therefore be owned solely by Franchisor. Franchisee will (and will cause its employees and agents to) execute all documents required by Franchisor to confirm this ownership.

9.    MANUALS

A.    Manuals and System Standards.

(1)    At the time of Franchisee's initial training, Franchisor shall deliver to Franchisee, on loan, one set of Fridays Manuals. The Manuals may be published in an electronic format. As used in this Agreement, the term "**Manuals**" includes publications, materials, drawings, memoranda, compact disks, digital video disks and electronic media that Franchisor from time to time may provide to Franchisee. The Manuals contain the System Standards for Fridays Restaurants, which include mandatory and suggested specifications, standards, operating procedures, reporting requirements and rules that Franchisor periodically prescribes for operating a Fridays Restaurant. Franchisee acknowledges that the Manuals and System Standards are designed to protect the System and the Proprietary Marks, goodwill and reputation associated with the System and to maintain the uniform quality of operation through the System, and not to control the day-to-day operation of the Restaurant. Franchisee at all times remains responsible for the operation of the Restaurant and all activities occurring in the Restaurant, including but not limited to the hiring, training, discipline, and staffing of the Restaurant's employees. Franchisee agrees to comply fully with all mandatory standards, specifications, operating procedures, and other obligations contained in the Manuals, as amended from time to time.

(2)    Franchisor has the right to amend and supplement the Manuals periodically by letter, electronic mail, bulletin, DVDs, audio tapes, compact disks, software or other communications concerning the System to reflect changes in the image, specifications and standards relating to developing, equipping, furnishing and operating a Fridays Restaurant. Franchisee shall keep its copy of the Manuals current and up-to-date with all additions and deletions provided by or on behalf of Franchisor and shall purchase whatever equipment and related services (including, without limitation, the computer, Internet service, dedicated phone line, facsimile machine, etc.) as may be necessary to receive these communications. If a dispute relating to the contents of the Manuals develops, the master copy maintained by Franchisor at its principal offices shall control. If Franchisee's copy of the Manuals are lost, destroyed, or significantly damaged, Franchisee will immediately notify Franchisor and Franchisee will be obligated to obtain from Franchisor, at the then-current charge, a replacement copy of the Manuals.

B.    Confidentiality of the Manuals.

Franchisee acknowledges that the contents of the Manuals are confidential and that the Manuals contain Franchisor's trade secrets and copyrighted material. Any passwords or other digital identifications necessary to access the Manuals on the applicable website, intranet or extranet also are deemed to be confidential and proprietary to Franchisor. Accordingly, Franchisee agrees that Franchisee

will not disclose the Manuals, passwords or other digital identifications to any person other than employees of the Restaurant who need to know its contents. Franchisee's employees with access to the Manuals will sign a confidentiality agreement before accessing the Manuals. Franchisee may not at any time copy, duplicate, record, or otherwise reproduce any part of the Manuals.

10.    MODIFICATIONS OF THE SYSTEM

A.      <u>System Modifications</u>.

Franchisor, in its sole discretion, shall be entitled from time to time to change or modify the System, including modifications to the Manuals, the System Standards, the menu and menu formats, the required equipment, the signage, the building and premises of the Restaurant (including the trade dress, décor and color schemes), the presentation of the Proprietary Marks, the adoption of new administrative forms and methods of reporting and of payment of any monies owed to Franchisor (including electronic means of reporting and payment) and the adoption and use of new or modified Proprietary Marks or copyrighted materials. Franchisee shall accept and use or display in the Restaurant any such changes or modifications to the System as if they were a part of the System at the time this Agreement was executed, and Franchisee will make such expenditures as the changes or modifications in the System may require.

B.      <u>Variations from System Standards</u>.

Franchisor has the right, in its sole discretion, to waive, defer or permit variations from the System Standards or the applicable agreement to any franchisee or prospective franchisee based on the peculiarities of a particular site, existing building configuration or circumstance, density of population, business potential, trade area population or any other condition or circumstance. Franchisor shall have the right, in its sole discretion, to deny any such request.

C.      <u>Franchisee's Development of System Improvements</u>.

If Franchisee develops any new concepts, processes or improvements relating to the System, whether or not pursuant to a Franchisor's authorized test, Franchisee promptly shall notify Franchisor and provide Franchisor with all information regarding the new concept, process or improvement, all of which shall, at Franchisor's option, automatically become the property of Franchisor and its affiliates and which may be incorporated into the System without any payment to Franchisee. If Franchisor so elects, Franchisee, at its expense, promptly shall take all actions deemed necessary or desirable by Franchisor to vest in Franchisor's ownership of such concepts, processes or improvements.

11.    TRAINING

A.      <u>Owner's Orientation Program</u>.

Franchisee's Principal Owner(s) and its Representative (as described in Section 16.E) must attend Franchisor's then current owner's orientation program ("**Owner's Orientation Program**") at Franchisor's then current corporate headquarters, which are currently located in Southlake, Texas. The Owner's Orientation Program is an expedited program consisting of training related to the overall operation and management philosophy of a Fridays Restaurant. Franchisee's Principal Owners may also participate in all or any part of the Management Training Program (defined in Section 11.B) that the Operating Principal (as described in Section 16.G) and Restaurant managers are required to attend. Franchisor does not charge a fee for the Owner's Orientation Program; however, Franchisee is responsible for any travel expenses, living expenses, wages, and other incidental expenses incurred by

the Representative and the Principal Owner(s) while attending the Owner's Orientation Program. Franchisor may in its sole discretion modify the Owner's Orientation Program.

       B.      <u>Management Training Program</u>.

       (1)      At least 90 days before the Restaurant opens for business, and during the Initial Term of this Agreement, Franchisee's Operating Principal, the Restaurant's general manager, kitchen manager and at least two other salaried Restaurant managers must attend, and successfully complete Franchisor's then-current restaurant management training course including without limitation, all course materials, activities, methods, processes, prerequisites and testing, as such may change from time to time at Franchisor's sole discretion (collectively, "**Management Training Program**"). Franchisor shall identify any management employee of Franchisee who successfully completes the Management Training Program as a "**Validated Manager**." As part of the Management Training Program, attendees must successfully complete a Certified Professional Food Manager training and certification program as specified by Franchisor. The eight-week Management Training Program includes classroom and online instruction, and on-the-job training and is held at a Fridays Restaurant that has received Franchisor's certification to conduct training programs ("**Center of Excellence Restaurant**") or at Franchisor's designated training facilities. Franchisor may offer all or portions of the Management Training Program over the Internet, Franchisor's company intranet or by webinar. Franchisor may, in its sole discretion, modify the Management Training Program for any trainee based on that trainees prior restaurant operating and management experience.

       (2)      Franchisor will not authorize the Restaurant to open until an adequate number of Franchisee's managers, as determined by Franchisor in its sole discretion, have attended, successfully completed and been "validated" in the Management Training Program. Subsequent to the opening of the Restaurant, any employee of Franchisee who assumes any management position must, within 60 days after assuming such position, attend the Management Training Program and become validated for that position after completing such training. The Management Training Program will be provided by Franchisor, unless a restaurant operated by Franchisee has been certified by Franchisor as a Center of Excellence Restaurant in accordance with Section 11.D(4). In the event that Franchisee's manager(s) must be trained at another restaurant not operated by Franchisee, whether it is owned by Franchisor or another franchisee, Franchisee must pay a fee of $500 per trainee to the owner of the restaurant in which the training takes place.

       (3)      Franchisee will be required to pay Franchisor's then-current tuition or other fees as well as all travel expenses, living expenses, wages, and other incidental expenses incurred by Franchisee and Franchisee's employees while attending the training.

       (4)      In order to facilitate all online training and testing and make it available to all managers and team members, Franchisee will be required to purchase mobile devices, the type and number of which as Franchisor may specify, and provide sufficient, reliable WiFi access within the Restaurant.

       C.      <u>New Store Opening ("**NSO**") Team and Franchisee Responsibility for All Costs and Expenses</u>.

       (1)      Franchisor will authorize Franchisee to open the Restaurant only after an adequate number of Franchisee's employees, as determined by Franchisor in its sole discretion as necessary to protect the goodwill associated with the Proprietary Marks, have attended and been validated by Franchisor. The NSO Team shall assist in the opening of the Restaurant. The NSO Team typically

consists of a combined total of approximately 12 employees of Franchisor or its designee and Franchisee's Validated Managers (the actual number of members shall be determined by Franchisor, depending upon the number of Fridays Restaurants already being operated by Franchisee or its affiliate and such other criteria as Franchisor deems reasonable). The members of the NSO Team shall be subject to Franchisor's consent. The number of Franchisor's or its designees' employees selected to serve on the NSO Team for the Restaurant is determined according to the following schedule, provided however, Franchisor may elect to modify this schedule in the event the total number of people on the NSO Team is greater or less than 12:

| No. of Fridays Restaurants Operated by Franchisee (or its affiliate) | No. of Franchisor's Validated Trainers On the NSO Team |
| --- | --- |
| 1 & 2 | 12 |
| 3 & 4 | 9 |
| 5 & 6 | 6 |
| 7 or more | 2 |

(2)    In the event Franchisor determines that more than 12 NSO team members are necessary for the opening of the Restaurant, Franchisee shall be responsible for the costs associated with the team members in excess of 12. If Franchisee fails or is unable to timely provide the number of employees noted above, Franchisor may, but shall not be obligated to, staff the NSO Team with Franchisor's or its designees' employees.

(3)    Franchisee shall be solely responsible for all costs, expenses, and liabilities incurred by the NSO team members provided by Franchisor (or its designee). Franchisor reserves the right to require Franchisee to prepay an estimated amount of these expenses in advance. Franchisor will submit a final invoice to Franchisee within 30 days after the Restaurant opens and Franchisee and Franchisor shall reconcile and reimburse the other as necessary based on the initial estimate.

D.    <u>Training by Franchisee.</u>

(1)    Franchisee's Validated Managers are responsible for training the Restaurant's staff ("**Team Member Training Program**"). Periodically, Franchisee must conduct such Team Member Training Programs as Franchisor may require, including those training programs required for Franchisee's employees to become validated for the position(s) for which each employee was hired. Franchisee may offer the Management Training Program to Franchisee's managerial employees if Franchisee operates a Center of Excellence Restaurant. Franchisee will be responsible for all costs that Franchisee incurs in training Franchisee's employees.

(2)    Franchisor or its designee may periodically visit the Restaurant to ensure that Franchisee's Validated Managers continue to meet Franchisor's standards. Franchisor has the right to de-validate any of Franchisee's Validated Managers who consistently fails to maintain System Standards as set forth in the Manuals. If Franchisee's Validated Managers are no longer qualified to train Franchisee's employees, then Franchisor may, among other things, require the Validated Managers attend and successfully complete the Management Training Program and be re-validated or designate replacement personnel to complete the Management Training Program to be validated as Franchisee's Validated Managers. Franchisor may charge a reasonable training fee to re-validate Franchisee's managers.

(3)     If Franchisee does not operate a Center of Excellence Restaurant, then Franchisee must send Franchisee's managerial employees to the Management Training Program offered by Franchisor and Franchisee must pay Franchisor's then current tuition fee for Franchisee's managers who attend the Management Training Program, in addition to paying all salaries, benefits, travel, food, lodging and other expenses incurred by Franchisee's managerial employees while attending the Management Training Program.  If Franchisee does not have Validated Managers to train Franchisee's staff, Franchisor or its designee will send a trainer to the Restaurant to train Franchisee's hourly employees on the System Standards and related topics necessary to protect the goodwill associated with the System and Proprietary Marks, and Franchisee must reimburse Franchisor for all salary, travel, food, lodging and other expenses incurred by Franchisor's or its designees' trainers.  Franchisor reserves the right to require Franchisee to pay an estimated amount of these wages and expenses in advance.  Franchisor will submit a final invoice to Franchisee within 30 days after the training and shall reimburse Franchisee for any expenses in excess of the estimate.

(4)     If Franchisee operates three or more franchised Fridays Restaurants, within 90 days after Franchisee opens its third franchised Fridays Restaurant, Franchisee may request permission from Franchisor to establish one of Franchisee's Fridays Restaurants as a Center of Excellence Restaurant at which Franchisee's employees will offer Team Training Program to Franchisee's employees and the Management Training Program to Franchisee's managers.  Franchisor must certify the Restaurant as a Center of Excellence Restaurant before Franchisee may begin training there and Franchisee shall be responsible for reimbursing Franchisor for all costs and expenses in certifying the Restaurant.  Franchisor may periodically visit Franchisee's Center of Excellence Restaurant to ensure that it continues to meet Franchisor's standards.

(5)     Franchisee is strongly encouraged to train its team members in responsible alcohol service.  Franchisor's corporate program – "S.U.R.F." (Serving Up Responsible Fun) – is available for Franchisee's use; however, Franchisor assumes no liabilities, duties or obligations by simply disclosing to others how to handle responsible alcohol service.  Other alcohol awareness programs are available through the National Restaurant Association, state restaurant associations, state beverage commissions and from hospitality industry consultants.

E.     Additional Training, Conferences and Meetings.

(1)     Franchisor shall have the right (which may be exercised at any time and in Franchisor's sole discretion) to require that Franchisee, the Operating Principal, and Franchisee's restaurant managers take and successfully complete other training courses in addition to the initial training program.  Franchisor reserves the right to require Franchisee to pay a tuition fee as established by Franchisor from time to time for these additional training programs within 30 days of receipt of an invoice from Franchisor.

(2)     In addition to training programs, Franchisee's Operating Principal must attend the Franchisor's annual meeting, convention or conference of franchisees and all meetings relating to new products or product preparation procedures, new operational procedures or programs, restaurant management, sales or sales promotion, or similar topics, at Franchisee's expense.  Franchisor reserves the right to require that the Operating Principal attend any additional meetings that Franchisor deems appropriate under special circumstances, provided, however, that Franchisor will not require more than one additional meeting every year and Franchisor will provide written notice of any such meeting at least 10 days before the meeting.

F.    <u>Training Materials and Methods</u>.

All training materials that Franchisor provides to Franchisee remain Franchisor's property. Except for the on-the-job training portions of the Management Training Program, Franchisor reserves the right to provide training programs in person, on tape, via the Internet, webinar, in printed or electronic format or by other means.

G.    <u>Expenses</u>.

Franchisee is responsible for any travel expenses, living expenses, wages, and other incidental expenses incurred by Franchisee and Franchisee's trainees while attending Franchisor's training programs.

12.    ADDITIONAL SERVICES BY FRANCHISOR

A.    <u>Pre-Opening Assistance</u>.

Franchisor may provide, at times and in a manner determined solely by Franchisor, consultation and advice to Franchisee, as Franchisor deems appropriate, with regard to the development and operation of the Restaurant, building layout, furnishings, fixtures and equipment plans and specifications, purchasing and inventory control, and such other matters as Franchisor deems appropriate.

B.    <u>General Guidance</u>.

Franchisor will advise Franchisee from time to time regarding the operation of the Restaurant based on Franchisee's reports to Franchisor and/or Franchisor's direct or indirect observations, and Franchisor will provide guidance to Franchisee with respect to: (1) the System Standards and operating procedures used by Fridays Restaurants; (2) advertising and marketing materials and programs; and (3) administrative, bookkeeping, accounting, and inventory control procedures. Franchisor will provide ongoing advice and consultation to Franchisee through the Manuals, bulletins or other written materials, electronic media, telephone, national or regional meetings and/or in person at Franchisor's corporate offices or the Restaurant. If Franchisee requests, and Franchisor agrees to provide, additional or special guidance, assistance, or training, then Franchisee must pay Franchisor's then applicable charges, including Franchisor's fees for its personnel and their related travel and living expenses.

C.    <u>Periodic Inspections</u>. At periodic intervals and at times designated by Franchisor in its sole discretion with or without notice to Franchisee, Franchisor shall inspect the Restaurant and its operations to assist Franchisee's operations and ensure compliance with the System.

D.    <u>Delegation</u>. Franchisor has the right, from time to time, to delegate the performance of any portion or all of its obligations and duties under this Agreement to designees, whether affiliates or agents of Franchisor or independent contractors with which Franchisor has contracted to provide this service.

13.    PERFORMANCE STANDARDS AND UNIFORMITY OF OPERATION

Products sold and services performed under the Proprietary Marks have a reputation for quality. This reputation has been developed and maintained by Franchisor, and it is of the utmost importance to Franchisor, Franchisee and all other franchisees of Franchisor that this reputation be maintained. In recognition of the mutual benefits that come from maintaining the reputation for quality enjoyed by the System, Franchisee covenants and agrees, with respect to the operation of the Restaurant, that Franchisee

and its employees shall comply with all of the requirements of the System as set forth in the Manuals or otherwise, and Franchisee additionally shall comply with the following:

      A.     <u>Standards and Specifications</u>.

To ensure that the highest degree of quality and service is maintained, Franchisee shall operate the Restaurant in strict conformity with such methods, standards, and specifications as Franchisor may from time to time prescribe in the Manuals or otherwise in writing. Franchisee agrees:

      (1)     To maintain in sufficient supply, and to use and/or sell at all times only such products, ingredients, materials, supplies, merchandise and paper goods as conform to Franchisor's written standards and specifications, and to refrain from deviating therefrom by the use or offer of any non-conforming items without Franchisor's specific prior written consent.

      (2)     To sell or offer for sale only such products as have been expressly approved for sale in writing by Franchisor; to sell or offer for sale all such products, utilizing the ingredients and employing the preparation standards and techniques, as specified by Franchisor; to refrain from any deviation from Franchisor's standards and specifications, including the manner of preparation of products, without Franchisor's prior written consent; and to discontinue selling and offering for sale any products which Franchisor shall have the right to disapprove, in writing, at any time. If Franchisee deviates or proposes to deviate from Franchisor's standards and specifications, whether or not such deviation is approved by Franchisor, such deviation shall become the property of Franchisor.

      (3)     To permit Franchisor or its agents, at any reasonable time, to remove samples of products, without payment therefor, in amounts reasonably necessary for testing by Franchisor or an independent laboratory to determine whether said samples meet Franchisor's then-current standards and specifications. In addition to any other remedies it may have under this Agreement, Franchisor may require Franchisee to bear the cost of such testing if the supplier of the item has not previously been approved by Franchisor or if the sample fails to conform to Franchisor's specifications.

      (4)     To purchase and install, at Franchisee's expense, all fixtures, furnishings, equipment, décor, and signs as Franchisor shall specify; and to refrain from installing or permitting to be installed on or about the Restaurant premises, without Franchisor's prior written consent, any fixtures, furnishings, equipment, décor, signs, or other items not previously approved as meeting Franchisor's standards and specifications.

      (5)     To fully and faithfully comply with all applicable governing authorities, laws and regulations. Franchisee shall immediately close the Restaurant and terminate operations in the event that: (a) any products sold at the Restaurant evidence adulteration or deviation from the standards set for products by Franchisor; (b) any products sold at the Restaurant fail to comply with applicable laws or regulations; or (c) Franchisee fails to maintain the products, Restaurant premises, equipment, personnel, or operation of the Restaurant in accordance with any applicable law or regulations. In the event of such closing, Franchisee shall immediately notify Franchisor in writing and Franchisee shall destroy immediately in accordance with procedures set forth in the Manual, or otherwise in writing by Franchisor, all products which it knows, or should know through the exercise of reasonable care, to be adulterated, tainted, contaminated, spoiled, unsafe, or otherwise unfit for human consumption and eliminate the source thereof, and remedy any unsanitary, unsafe, or other condition or other violation of the applicable law or regulation. Franchisee shall not reopen the Restaurant until after Franchisor has inspected the Restaurant premises, and Franchisor has determined that Franchisee has corrected the condition and that all products sold at the Restaurant comply with Franchisor's standards.

B.    Suppliers.

(1)    Franchisee shall purchase all products, ingredients, supplies, materials, furnishings (including décor), fixtures and equipment, merchandise and other products used in the construction and development of the Restaurant and/or offered for sale at the Restaurant solely from suppliers that Franchisor has approved in writing, which may be Franchisor or its affiliates or a buying cooperative that Franchisor organizes. In determining whether it will approve any particular supplier, Franchisor shall consider various factors, including a supplier who can demonstrate, to Franchisor's continuing reasonable satisfaction, the ability to meet Franchisor's then-current standards and specifications for such items; who possesses adequate quality controls and capacity to supply Franchisee's needs promptly and reliably; who would enable the System, in Franchisor's sole opinion, to take advantage of marketplace efficiencies; and who has been approved in writing by Franchisor before any purchases by Franchisee from any such supplier, and has not thereafter been disapproved. For the purpose of this Agreement, the term "**supplier**" shall include, but not be limited to, manufacturers, distributors, resellers, and other vendors. Franchisee recognizes that Franchisor shall have the right to appoint only one manufacturer, distributor, reseller, and/or other vendor for any particular item, and that Franchisor may so designate itself or its affiliate. Franchisee acknowledges that Franchisor may profit from its sale of such items to Franchisee or receive rebates or other consideration from the third party supplier with respect to Franchisee's purchases of such items.

(2)    If Franchisee wishes to purchase any products or any items from an unapproved supplier, Franchisee shall first submit to Franchisor a written request for such approval. Franchisee shall not purchase any products or services from any supplier until, and unless, such supplier has been approved in writing by Franchisor. Franchisor shall have the right to require that its representatives be permitted to inspect the supplier's facilities, and that samples from the supplier be delivered, either to Franchisor or to an independent laboratory designated by Franchisor for testing. A charge not to exceed the reasonable cost of the inspection and the actual cost of the test shall be paid by Franchisee or the supplier. Franchisor may also require that the supplier comply with such other requirements as Franchisor may deem appropriate, including payment of reasonable continuing inspection fees and administrative costs, or other payment to Franchisor by the supplier on account of their dealings with Franchisee or other franchisees, for use, without restriction (unless otherwise instructed by the supplier) and for services that Franchisor may render to such suppliers. Franchisor reserves the right, at its option, to reinspect from time to time the facilities and products of any such approved supplier and to revoke its approval upon the supplier's failure to continue to meet any of Franchisor's then-current criteria. Nothing in the foregoing shall be construed to require Franchisor to approve any particular supplier, nor to require Franchisor to make available to prospective suppliers, standards and specifications for formulas, which Franchisor shall have the right to deem confidential.

(3)    Notwithstanding anything to the contrary contained in this Agreement, Franchisee acknowledges and agrees that, at Franchisor's sole option, Franchisor may establish one or more strategic alliances, purchasing and/or distribution cooperatives or preferred vendor programs with one or more nationally or regionally-known suppliers who are willing to supply all or some Restaurants with some or all of the products and/or services that Franchisor requires for use and/or sale in the development and/or operation of Restaurants. In this event, Franchisor may limit the number of approved suppliers with whom Franchisee may deal, designate sources that Franchisee must use for some or all products and other products and services, and/or refuse any of Franchisee's requests if Franchisor believes that this action is in the best interests of the System or the franchised network of Restaurants. Franchisor shall have unlimited discretion to approve or disapprove of the suppliers who may be permitted to sell products to Franchisee. Franchisor may charge a surcharge to Franchisee on any items purchased from

approved suppliers for Franchisor's role in managing the purchasing and distribution contracts for the System.

(4)    Franchisee acknowledges and agrees that Franchisor shall have the right to collect and retain all manufacturing allowances, marketing allowances, rebates, credits, monies, payments or benefits (collectively, "**Allowances**") offered by suppliers to Franchisee or to Franchisor or its affiliates based upon Franchisee's purchases of products and other goods and services.  These Allowances are based on System-wide purchases of food, beverages, alcohol, paper goods, merchandise and other items. Franchisee assigns to Franchisor or its designee all of Franchisee's right, title and interest in and to any and all such Allowances and authorizes Franchisor or its designee to collect and retain any or all such Allowances without restriction (unless otherwise instructed by the supplier); provided, however, that Franchisor's current policy is to utilize such funds for purposes that Franchisor believes, in its sole discretion, may enhance the "Fridays" System and the Proprietary Marks and/or public awareness of Fridays Restaurants.

(5)    Franchisee shall comply with all terms, conditions, and obligations of all contracts and arrangements with suppliers, including contracts and arrangements negotiated by Franchisor or third parties as part of a network or multiple-franchise or multiple-restaurant supply and distribution arrangement, and Franchisee's contracts with and obligations to suppliers.  Franchisee shall promptly pay all suppliers in accordance with the agreed-upon terms.  In the event Franchisee fails to promptly pay one or more suppliers as required, Franchisor may, but is not required to, pay such supplier(s) on behalf of Franchisee, and Franchisee shall promptly reimburse Franchisor for such payment following notice from Franchisor, or Franchisor may obtain payment through the electronic process described in Section 6 above and the Manuals.

C.    <u>Authorized Menu Items and Merchandise</u>.

(1)    Within 14 days after receipt of written notice from Franchisor, Franchisee shall begin selling any newly authorized menu items and cease selling any menu items that are no longer authorized.  Within 30 days after receipt of written notice from Franchisor, Franchisee shall begin selling any and all newly authorized merchandise and cease selling any merchandise that is no longer authorized. However, if any discontinued menu item or merchandise could pose a hazard to the public or prove detrimental to the system, Franchisee must cease selling or using that item or ingredient immediately. Franchisee shall purchase any additional equipment and smallwares as Franchisor deems reasonably necessary in connection with new menu items.  If Franchisor requires Franchisee to begin offering a new menu item which requires the purchase of additional equipment, a reasonable period of time, as determined in the sole discretion of Franchisor, shall be provided for the financing, purchase and installation of any such equipment before such new menu items must be offered for sale at the Restaurant.

(2)    All food, beverage and merchandise items authorized for sale at the Restaurant shall be offered for sale under the specific name designated by Franchisor.  Franchisor, in its sole discretion, may restrict sales of menu items to certain time periods during the day.

(3)    If Franchisee has a suggestion for a new menu item or for a change to an authorized menu item or Franchisee desires to participate in a test market program, Franchisee shall provide Franchisor's written notice before implementation.  Franchisee shall not add or modify any menu item or participate in a test market program without first having obtained Franchisor's prior written approval, which may be withheld or denied in Franchisor's sole discretion.  If Franchisor grants its approval, Franchisee agrees to sign Franchisor's then-current test agreement before commencing the test.

(4)    Franchisee may not use the Restaurant for the sale of any items that promote illegal activity or for any purpose for which Franchisor determines, in its sole discretion, that may offend an appreciable segment of the public or may adversely affect the acceptance, favorable reputation or goodwill associated with the Franchisor brand.

D.    <u>Menu Formats</u>.

Franchisor shall have the right to prescribe, and subsequently vary, one or more menu formats to be utilized in the Restaurant including, but not limited to, any and all bar or alcoholic beverage menus. The menu formats may include requirements concerning organization, graphics, product descriptions, calorie counts, illustrations and other matters related to the menu. Prescribed menu formats may vary depending on region, market size or other factors deemed relevant by Franchisor. If any menu format utilized by Franchisee ceases to be an authorized menu format, Franchisee shall have a reasonable period of time (not to exceed 30 days) to discontinue use of the old menu format and begin using an authorized menu format.

E.    <u>Promotional Materials</u>.

Franchisee shall require all advertising and promotional materials, signs, decorations, paper goods (including without limitation disposable food and beverage containers, bags, napkins, menus, and all forms and stationery used in the Restaurant), any and all replacement trade dress products, and other items which may be designated by Franchisor to bear the Franchisor's then-current Proprietary Marks and logos in the form, color, location, and manner then-prescribed by Franchisor.

F.    <u>Signs and Logos</u>.

Subject to local ordinances, Franchisee shall prominently display in and upon the Premises and buildings of the Restaurant interior and exterior signs and logos using the name "Fridays," without any prefix or suffix, and those other names, marks, advertising signs and logos, of such nature, form, color, number, location and size, and containing that material as Franchisor may from time to time direct. Franchisee shall not display in or upon the Premises any sign, logo or advertising media of any kind to which Franchisor objects.

G.    <u>Entertainment</u>.

Franchisee shall refrain from: (1) offering for sale any tickets, subscriptions or chances; (2) conducting any pools, raffles or related activities; (3) installing or using any juke box, vending or game machine, gum machine, game, ride, gambling or lottery device, coin or token operated machine, or any other music, film or video device; (4) using or allowing any gaming, dancing or live entertainment; or (5) using or providing any form of delivery or catering service at, from or on the Premises without Franchisor's prior written consent.

H.    <u>Incentive and Guest Membership Programs</u>.

Franchisee shall promote, participate, offer for sale, and will honor for purchases by customers, any incentive, guest membership, loyalty or similar programs that Franchisor may institute from time to time. Franchisee shall pay any fees and purchase any equipment required by Franchisor to participate in such programs and shall do so in compliance with Franchisor's standards and procedures for such programs. Concurrent with the execution of this Agreement, Franchisee shall sign and deliver to Franchisor the TGI Fridays Loyalty Program Agreement attached to this Agreement as <u>Exhibit H</u>.

I.      Prices.

With respect to the sale of all menu items, products, merchandise or services, Franchisee shall be solely responsible for determining the prices of products offered at the Restaurant; however, Franchisee is required to comply with any maximum or minimum resale pricing restrictions Franchisor may implement so long as such pricing does not violate applicable law.

J.      Technology and Computer System.

Franchisor has the right to specify or require that certain brands, types, makes, and/or models of communications, computer systems, and hardware be used by, between, or among Fridays Restaurants, including without limitation: (1) back office and point of sale systems, mobile devices, data, audio, video, and voice storage, retrieval, and transmission systems for use at Fridays Restaurants, between or among Fridays Restaurants, and between and among Franchisee's Restaurant and Franchisor, our designee and/or Franchisee; (2) physical, electronic, and other security systems; (3) printers and other peripheral devices; (4) archival back-up systems; and (5) internet access mode (e.g., form of telecommunications connection) and speed (collectively, the "**Computer System**"). Franchisee shall purchase or lease, and thereafter maintain, the Computer System, and comply with Franchisor's requirements, specifications and policies concerning the use of technology, as they may be specified in this Agreement, or specified or modified in the Manuals or otherwise in writing.

(1)     Franchisor shall have the right at any time to retrieve and use such data and information from Franchisee's Computer System that Franchisor deems necessary or desirable, including, without limitation, the uses identified in Section 7.E above. In view of the contemplated interconnection of computer systems and the necessity that such systems be compatible with each other, Franchisee expressly agrees that it shall strictly comply with Franchisor's standards and specifications for all item(s) associated with Franchisee's Computer System, and will otherwise operate its Computer System in accordance with Franchisor's standards and specifications. To ensure full operational efficiency and optimum communication capability between and among equipment and computer systems installed by Franchisee, Franchisor, and other franchisees, Franchisee agrees, at its expense, that Franchisee shall keep its Computer System in good maintenance and repair, and, at its expense, and following the determination that Franchisor shall have the right to make, to the effect that same will prove economically or otherwise beneficial to all System franchisees, that Franchisee shall promptly install such additions, changes, modifications, substitutions and/or replacement to Franchisee's computer hardware, software, telephone and power lines, and other related facilities, as Franchisor directs periodically in writing. Franchisee shall provide to Franchisor, upon Franchisor's request, all e-mail lists and customer lists used or maintained by Franchisee on the Computer System or elsewhere.

(2)     Franchisor has the right, but not the obligation, to develop or have developed for it, or to designate, any or all of the following: (a) computer software programs and accounting system software that Franchisee must use in connection with the Computer System ("**Required Software**"), which Franchisee must install; (b) updates, supplements, modifications, or enhancements to the Required Software, which Franchisee must install; (c) the tangible media upon which such Franchisee must record or receive data; (d) the database file structure of Franchisee's Computer System; (e) an Extranet for informational assistance, which may include, without limitation, the Manuals, training, other assistance materials, and management reporting solutions; and (f) answering service requirements and/or system-wide phone, online or mobile order processing of all delivery orders, and/or to designate vendors that will provide such order processing.

(3)       Franchisee agrees to install and use the Computer System and Required Software in the manner that Franchisor requires. Franchisor may charge a reasonable software license fee for any Required Software. Franchisee agrees to implement and periodically upgrade and make other changes to the Computer System and Required Software as Franchisor requests in writing, which shall not be more often than one upgrade per year (collectively, "**Computer Upgrades**"). Franchisee agrees to comply with Franchisor's written specifications (whether in the Manuals or otherwise) with respect to the Computer System and the Required Software, and with respect to Computer Upgrades, at Franchisee's own expense.

(4)       Franchisee agrees to afford Franchisor unimpeded access to its Computer System and Required Software in the manner, form, and at the times that Franchisor requests. Franchisee shall provide Franchisor with user identifications and passwords required to access files and other information contained on the Computer System.

(5)       Because changes to technology are dynamic and not predictable within the Initial Term, and in order to provide for inevitable but unpredictable changes to technological needs and opportunities, Franchisee agrees: (a) that Franchisor will have the right to establish, in writing, reasonable new standards to address new technologies and data security, whether published in the Manuals or otherwise in writing, and that Franchisor has the right to implement those changes in technology into the System; and (b) to abide by Franchisor's new standards (and with Restaurant audits conducted by Franchisor or its designee to confirm Franchisee's compliance) as if this Section 13.J, and other technology provisions in this Agreement, were periodically revised for that purpose.

K.       Extranet.

(1)       Franchisee shall comply with Franchisor's requirements (as set forth in the Manuals or otherwise in writing) with respect to establishing and maintaining telecommunications connections between Franchisee's Computer System and Fridays Extranet and/or such other computer systems as Franchisor may reasonably require. The term "**Extranet**" means a private network based upon Internet protocols that will allow users inside and outside of Franchisor's headquarters to access certain parts of Franchisor's computer network via the Internet. Franchisor may establish an Extranet (but is not required to do so or to maintain an Extranet). Franchisee shall comply with Franchisor's requirements (as set forth in the Manuals or otherwise in writing) with respect to connecting to the Extranet, and utilizing the Extranet in connection with the operation of Franchisee's Restaurant. The Extranet may include, without limitation, the Manuals, training and other assistance materials, and management reporting solutions (both upstream and downstream, as Franchisor may direct).

(2)       Franchisee shall purchase and maintain such computer software and hardware (including but not limited to telecommunications capacity) as may be required to connect to and utilize the Extranet. Franchisor reserves the right to require Franchisee to contribute a reasonable amount toward the cost of the Extranet's maintenance and further development. If Franchisee fails to comply with any policy or procedure governing the Extranet, Franchisor may temporarily suspend Franchisee's access to all or any aspect of the Extranet (such as a chat room, bulletin board, list serve, or similar feature) until Franchisee fully cures the breach. Franchisee will not have any claim against Franchisor or any affiliate arising from such suspension from the Extranet pursuant to this Section 13.K and Franchisee hereby waives any such claim it may at any time have, and releases Franchisor and its affiliates from any liability arising therefrom.

(3)       Franchisee and Franchisor shall each be responsible for protecting their own interests in relation to electronic communications. Franchisor shall have no liability to Franchisee on any

basis, whether in contract, tort (including negligence) or otherwise, in respect of any error, damage, loss or omission arising from or in connection with electronic communication of information.

      L.     <u>Customer Data</u>.

      Franchisee agrees that all data and personally identifiable information (including, but not limited to, name, birth date, mailing address, phone number and email address) that it collects from customers and potential customers in connection with the Restaurant ("**Customer Data**") is deemed to be owned exclusively by Franchisor, and Franchisee also agrees to provide the Customer Data to Franchisor at any time that Franchisor requests. Franchisee has the right to use Customer Data during the Initial Term, but only as authorized by Franchisor in connection with operating the Restaurant and only in accordance with the policies that Franchisor establishes from time to time. Franchisee may not sell, transfer, or use Customer Data for any purpose other than operating the Restaurant and marketing Franchisor's products and services. However, if Franchisee Transfers the Restaurant (as provided in Section 18 below), as part of the Transfer, Franchisee must also Transfer use of the Customer Data to the buyer as part of the total purchase price paid for the Restaurant.

      M.     <u>Privacy Laws</u>.

      Franchisee agrees to abide by all applicable laws pertaining to the privacy of consumer, employee, and transactional information ("**Privacy Laws**"). Franchisee agrees to comply with Franchisor's standards and policies pertaining to Privacy Laws. If there is a conflict between Franchisor's standards and policies pertaining to Privacy Laws and applicable law, Franchisee shall: (1) comply with the requirements of applicable law; (2) immediately give Franchisor's written notice of said conflict; and (3) promptly and fully cooperate with Franchisor and its counsel in determining the most effective way, if possible, to meet its standards and policies pertaining to Privacy Laws within the bounds of applicable law. Franchisee agrees not to publish, disseminate, implement, revise, or rescind a data privacy policy without Franchisor's prior written consent as to said policy.

      N.     <u>POS or Cash Register Systems and Reservation and Table Management System</u>.

      (1)     Franchisee agrees to record all sales on computer-based point of sale systems or such other types of cash register systems that Franchisor has the right to designate or approve in the Manuals or otherwise in writing ("**POS System**"). The POS System is deemed to be part of Franchisee's Computer System. Franchisee agrees that only trained and qualified personnel will be assigned the responsibility for conducting transactions on the POS System.

      (2)     Franchisor may require Franchisee to use a reservation system Franchisor designates that is designed to manage reservations, guest seating and waitlists, including communication with guests who are waiting for a table. The National Advertising Fund may pay for this service, or Franchisor may require Franchisee to pay this fee and the cost of any associated hardware directly.

      O.     <u>Non-Cash Payment Systems</u>.

      (1)     Franchisee shall accept debit cards, credit cards, stored value gift cards or other non-cash systems specified by Franchisor to enable customers to purchase authorized products and shall obtain all necessary hardware and/or software used in connection with these non-cash systems. At all times, Franchisee must maintain credit-card relationships with the credit- and debit-card issuers or sponsors, check or credit verification services, financial-center services, and electronic-fund-transfer systems that Franchisor designates as mandatory, and Franchisee must not use any such services or

providers that Franchisor has not approved in writing or for which Franchisor has revoked its approval. Franchisor has the right to modify its requirements and designate additional approved or required methods of payment and vendors for processing such payments, and to revoke its approval of any service provider. Franchisee must comply with Franchisor's credit-card policies, including minimum purchase requirements for a customer's use of a credit card as prescribed in the Manuals. Franchisee must comply with the Payment Card Industry Data Security Standards ("**PCI DSS**") as these standards may be revised and modified by the Payment Card Industry Security Standards Council ("**PCISSC**") or such successor or replacement organization, and/or in accordance with other standards as Franchisor may specify. In addition, Franchisee must submit annually to Franchisor a fully completed copy of Franchisee's PCI Attestation of Compliance on the then current PCISSC form via email at informationsecurity@fridays.com or such successor or replacement form(s) and/or processes.

(2)    Franchisee agrees to participate in any gift card program(s) that Franchisor specifies. For this purpose, Franchisee must purchase the software, hardware, blank cards, and other items needed to sell and process gift cards or stored value cards, which Franchisor may specify in writing in the Manuals or otherwise. Franchisee also agrees to pay such monthly and per-swipe transaction fees as may be required by the vendor of the gift card system. Franchisee must sell or honor gift cards only in accordance with Franchisor's written standards. Franchisee must account for all gift card sales, gift card redemptions, and other gift card transactions in the manner Franchisor specifies in the Manuals. Franchisee must maintain sufficient cash reserves to pay Franchisor or other franchisees as part of any network-wide periodic reconciliation of the gift card program. Franchisee shall pay Franchisor or make payments as specified by Franchisor, in such amounts and at such times as directed by Franchisor, in accordance with Franchisor's gift card rules, programs and policies. Franchisee agrees not to sell, issue, or redeem gift certificates other than gift cards that Franchisor has approved in writing. Concurrent with the execution of this Agreement, Franchisee shall sign and deliver to Franchisor the then-current form of Gift Card Participation Agreement.

P.    <u>E-Mail and Fax Communications</u>.

(1)    Franchisee agrees that exchanging information with Franchisor by e-mail and fax is an important way to enable quick, effective, and efficient communication, and that Franchisor is entitled to rely upon each other's use of e-mail and faxes for communicating as part of the economic bargain underlying this Agreement. To facilitate the use of e-mail and fax to exchange information, Franchisee authorizes the transmission of e-mail by Franchisor and Franchisor's employees, vendors, and affiliates (on matters pertaining to the business contemplated hereunder) (together, "**Official Senders**") to Franchisee and Franchisee's employees during the Initial Term. Franchisor's list of Official Senders shall be the master and official list of Official Senders.

(2)    Franchisee agrees that: (a) Official Senders are authorized to send e-mails and faxes to Franchisee and its employees; (b) Franchisee will cause its officers, directors, and employees (as a condition of their employment or position with Franchisee) to give their consent (in an e-mail, electronically, or in a pen-and-paper writing, as Franchisor may reasonably require) to Official Senders transmission of e-mails and faxes to those persons, and that such persons shall not opt-out, or otherwise ask to no longer receive e-mails, from Official Senders during the time that such person works for or is affiliated with Franchisee; and (c) Franchisee will not opt-out, or otherwise ask to no longer receive e-mails and/or faxes, from Official Senders during the Initial Term.

(3)    The consent given above in will not apply to the provision of formal notices under this Agreement by either party using e-mail unless and until the parties have otherwise agreed, in a pen-and-paper writing that both parties have signed.

Q.    <u>Health Standards</u>.

Franchisee shall meet and maintain the highest health standards and ratings applicable to the operation of the Restaurant. Franchisee must participate in any food safety and brand standard audit program specified by Franchisor and the Restaurant must undergo the then current number of audits per year as required by Franchisor, which shall all be at Franchisee's expense. Franchisee shall furnish to Franchisor, within five days after receipt thereof, a copy of all inspection reports, warnings, citations, certificates, and/or ratings resulting from inspections conducted by any federal, state or municipal agency with jurisdiction over the Restaurant. Without limiting the foregoing, Franchisee and all required personnel shall obtain and maintain all necessary and required licenses and certificates for food service and food handling as may be required by applicable local rules and regulations and/or the Manuals.

R.    <u>Upkeep of the Restaurant</u>.

(1)    Franchisee shall constantly maintain and continuously operate the Restaurant and all furniture, fixtures, equipment, furnishings, floor coverings, interior and exterior signage, the building interior and exterior, interior and exterior lighting, landscaping and parking lot surfaces in first-class condition and repair in accordance with the requirements of the System, including all ongoing necessary remodeling, redecorating, refurbishing and repairs. In addition, Franchisee shall promptly and diligently perform all necessary maintenance, repairs and replacements to the Restaurant as Franchisor may prescribe from time to time, including periodic interior and exterior painting; resurfacing of the parking lot; roof repairs; and replacement of obsolete or worn out signage, floor coverings, furnishings, equipment and decor. Franchisee shall not make any material alterations to the Restaurant that affect operations or the image of the System without Franchisor's prior written approval. Franchisee acknowledges and agrees that the requirements of this Section are both reasonable and necessary to ensure continued public acceptance and patronage of Fridays Restaurants, to assist the Restaurant to compete effectively in the marketplace and to avoid deterioration or obsolescence of the operation of the Restaurant.

(2)    Franchisee shall cause to be completed extensive structural changes, major construction, and substantial modifications to existing furniture, fixtures, equipment and improvements to modernize and conform the Restaurant to the existing or a new image of the System for new franchised and company restaurants ("**Facilities Remodeling**") at Franchisor's request (which may not be made sooner than seven years after the later of (a) the date that Franchisee commenced construction-related work for the initial construction of the Restaurant; and (b) the date that Franchisor required the most recent Facilities Remodeling to be completed at the Restaurant, provided that, if Franchisor did not set such a date or if Franchisee completed the Facilities Remodeling before the date set by Franchisor, the date that Franchisee commenced work at the Restaurant to complete that Facilities Remodeling, as applicable. For the avoidance of doubt, (i) Sections 4 and 5 of this Agreement shall apply to all Facilities Remodeling; (ii) there shall be no cap on the cost of the Facilities Remodeling; and (iii) capital expenses necessary for the repair and maintenance of the Premises are not subject to the time limitations described in the preceding sentence. Within 60 days after receipt of Franchisor's written notice regarding the required Facilities Remodeling, Franchisee shall prepare and complete the corresponding Plans. These Plans must be submitted to, and their use approved by, Franchisor before the commencement of construction. Franchisee shall complete the required Facilities Remodeling within six months after receipt of Franchisor's written notice, or such other time reasonably specified by Franchisor in its written notice.

If Franchisee fails to complete a Facilities Remodeling in accordance with the preceding paragraph, and such failure continues for sixty (60) days ("**Remodel Cure Period**") following notice

thereof from Franchisor ("**Remodel Default**"), Franchisee shall be in a default hereunder. Notwithstanding anything to the contrary herein, no (x) grace or cure period; or (y) doctrine of force majeure, impossibility, frustration of purpose, or other legal or equitable remedy shall toll or extend beyond the Remodel Cure Period Franchisee's obligation to timely complete the Facilities Remodeling. Franchisee may elect to cure a Remodel Default ("**Royalty Increase Alternative**") by (i) paying a 2.5% increase in the Royalty Fee from the expiration of the Remodel Cure Period until Franchisee completes such Facilities Remodeling and (ii) satisfying Franchisor's then-current requirements for the Royalty Increase Alternative. Upon the earlier to occur of (i) the seventh anniversary of the expiration of the Remodel Cure Period; and (ii) Franchisee's failure to timely pay the increased Royalty Fee, Franchisee's right to cure a Remodel Default by virtue of the Royalty Increase Alternative shall automatically terminate without any notice or grace or cure period.

(3)     The limitation on the frequency or scope of Facilities Remodeling shall not include repair to, or the normal upkeep of, the Restaurant, nor shall it include Equipment Upgrades (as defined below).

(4)     In addition to Facilities Remodeling, Franchisee shall make, from time to time, such upgrades and other changes to the equipment utilized in the Restaurant (other than the Computer System) as Franchisor may request in writing (collectively, "**Equipment Upgrades**"). Franchisor shall have the right to require any Equipment Upgrades it deems necessary for the Restaurant.

(5)     During any period following a casualty when the Restaurant is closed (or has not fully re-opened), Franchisee shall pay to Franchisor the Closure Royalty. Failure to rebuild or restore the Restaurant, or relocate the Premises as provided in Section 3.E, following a casualty or condemnation shall constitute a default under this Agreement subject to the remedies set forth in Section 21. The Initial Term shall not be extended as a consequence of such taking or destruction.

S.     Maximum Operation of the Restaurant.

(1)     During the Initial Term, Franchisee shall use the Premises solely for the operation of the Restaurant and shall maintain sufficient inventories, and continuously operate the Restaurant at its maximum capacity and efficiency for the minimum number of days and hours set forth in the Manuals or as Franchisor otherwise prescribes in writing (subject to the requirements of local laws and licensing requirements).

(2)     Franchisee must obtain all necessary equipment, including hardware and software components and associated products, for an integrated music system. Franchisee shall play all recorded music required by Franchisor at the Restaurant and shall obtain all copyright licenses in connection with the use of such music.

(3)     Except as otherwise specified by Franchisor in the Manuals or otherwise, Franchisee shall immediately resolve any customer complaints regarding the quality of food or beverages, service and/or cleanliness of the Restaurant or any similar complaints. When any customer complaints cannot be immediately resolved, Franchisee shall use reasonable efforts to resolve the customer complaints as soon as practical and shall, whenever feasible, give the customer the benefit of the doubt. If Franchisor, in its sole discretion, determines that its intervention is necessary or desirable to protect the System or the goodwill associated with the System, or if Franchisor, in its sole discretion, believes that Franchisee has failed adequately to address or resolve any customer complaints, Franchisor may, without Franchisee's consent, resolve any complaints and charge Franchisee an amount sufficient to cover Franchisor's reasonable costs and expenses in resolving the customer complaints, which amount

Franchisee shall pay Franchisor immediately on demand. Franchisee must participate in, and pay all charges associated with, all customer relations programs initiated by Franchisor, which programs may include, without limitation, visibly posting any 800 numbers, email or other contact information for customers to contact Franchisor's customer relations providers and customer surveys and mystery shopper programs. Franchisee agrees to pay for all costs associated with Franchisor's customer relations providers relating to customer complaints or issues arising from its operation of the Restaurant, including but not limited to the costs of gift cards or other remuneration given to customers needed to resolve the complaint.

(4)    In order to (among other things) maintain and enhance the goodwill associated with the Proprietary Marks, the System and each Fridays Restaurant, Franchisee agrees to participate and request its customers to participate, at Franchisee's expense, in programs initiated by Franchisor to verify customer satisfaction and/or Franchisee's compliance with all operational and other aspects of the System, including (but not limited to) an 800 number, Franchisor's customer feedback and satisfaction programs, secret shoppers or other programs as Franchisor may require. Franchisor will share the results of these programs, as they pertain to the Restaurant, with Franchisee.

T.    Inspections of the Restaurant.

(1)    To determine whether Franchisee and the Restaurant are in compliance with this Agreement and with all System Standards, Franchisor or its designees shall have the right at any reasonable time and without prior notice to Franchisee to: (a) inspect the Premises; (b) observe, photograph and videotape the operations of the Restaurant for such consecutive or intermittent periods as Franchisor deems necessary; (c) remove samples of any food and beverage products, material or other inventory items for testing to determine if such samples meet the System Standards (without paying for the samples) and Franchisor may require Franchisee to bear the cost of such testing if Franchisor has not given consent to the supplier or if the sample fails to conform to Franchisor's specifications; (d) interview personnel and customers of the Restaurant; and (e) inspect and copy any books, records and documents relating to the operation of the Restaurant or, upon the request of Franchisor or its designee, require Franchisee to send copies thereof to Franchisor or its designee.

(2)    Franchisee agrees to cooperate fully with Franchisor or its designee in connection with any such inspections, observations, videotaping, product removal and interviews. Following each inspection, Franchisor will provide Franchisee an inspection report listing Franchisee's score on the inspection and those conditions at the Restaurant that must be rectified. Franchisee shall take all necessary steps to immediately correct any deficiencies detected during these inspections, including, without limitation, ceasing further sale of unauthorized menu items (regardless of Franchisee's inventory) and ceasing further use of any equipment, advertising materials or supplies that do not conform with the standards and requirements promulgated by Franchisor from time to time.

(3)    Recognizing that the failure of Franchisee to meet the System Standards may endanger the reputation and operations of other Fridays Restaurants and/or potentially endanger the general public, Franchisee and Franchisor agree that in the event that operations at the Restaurant fall below the System Standards, Franchisor may, in its sole discretion, in addition to and not in lieu of its right to terminate this Agreement pursuant to Section 21.B(11), require that Franchisee discontinue all operations at the Restaurant and close the Restaurant to the public until Franchisee is able to establish to Franchisor's reasonable satisfaction that operations at the Restaurant meet or exceed the System Standards.

(4)    If Franchisee fails to achieve a passing score on an inspection, Franchisor may, in its sole discretion, require that Franchisee, the Operating Principal and/or one or more managerial employees of the Restaurant attend and successfully complete an additional Management Training Program to be held at a location designated by Franchisor. Franchisee shall pay a tuition charge as established by Franchisor from time to time for this training program and the travel, living, food and other incidental expenses incurred by Franchisee's employees while attending this training program.

(5)    In addition, if Franchisee fails to achieve a passing score on an inspection, the inspection report shall constitute a notice of default. If Franchisee fails to achieve a passing score on the next inspection (which shall be conducted at least 30 days after Franchisee's receipt of the inspection report for the prior inspection), Franchisor may terminate this Agreement, without opportunity to cure, by providing Franchisee written notice of termination along with a copy of the inspection report.

U.    <u>Restaurant Management and Personnel</u>.

(1)    The Restaurant shall at all times be under the on-site supervision of the Operating Principal or a Validated Manager who must meet, to the satisfaction of Franchisor, Franchisor's applicable training qualifications for their designated position. Franchisee must, at all times, employ at least four Validated Managers for the Restaurant. Franchisor may require Franchisee to hire and train additional Validated Managers at any time based on the sales performance of the Restaurant. If, at any time, Franchisee ceases to employ at least four Validated Managers, Franchisee has 30 days (from the date on which Franchisee has less than four Validated Managers) to hire and enroll replacement managers in the Management Training Program. At Franchisee's option, the Operating Principal can be one of the Validated Managers.

(2)    Franchisee (or, if applicable, the Operating Principal) shall remain active in overseeing the operations of the Restaurant, including, without limitation, regular, periodic visits to the Restaurant and sufficient communications with Franchisor to ensure that the Restaurant's operations comply with the System Standards as promulgated by Franchisor from time to time in the Manuals or otherwise in written or oral communications.

(3)    Franchisee will have the sole authority and control over the day-to-day operations of the Restaurant and its employees. Franchisee shall hire all employees of the Restaurant and be exclusively responsible for the terms of their employment, including but not limited to their compensation, taxes, benefits, safety, work schedules, work conditions, assignments, discipline and termination, and for the proper training of such employees in the operation of the Restaurant. Franchisee shall establish at the Restaurant a Team Member Training Program for all employees that covers training for all System Standards as relevant to the employee's positions. Franchisor shall have the right to interview and consent to each Operating Principal, each Multi-Unit Manager (as described in Section 16.H), each Project Manager and all managers of the Restaurant. Franchisor shall endeavor to conduct such interviews at the Restaurant, but may require that such interviews occur at Franchisor's corporate headquarters. Franchisee shall bear all costs and expenses related to making these individuals available for such interviews. At no time will Franchisee or Franchisee's employees be deemed to be employees of Franchisor. Franchisor has no right or obligation to direct Franchisee's employees or to operate the Restaurant.

V.    <u>Liquor License</u>.

The right to operate a Restaurant pursuant to this Agreement is conditioned upon the ability of Franchisee to obtain and maintain required state and/or local licenses permitting the sale of alcoholic

beverages at the Restaurant. Franchisee agrees to use its best efforts to obtain such licenses and maintain same in good standing during the Initial Term. In the event that Franchisee is prohibited by a governmental authority from offering alcoholic beverages at the Restaurant (other than routine occasions on which Franchisee is prohibited by applicable law from offering alcoholic beverages for sale from the Restaurant, such as a local prohibition on the sale of alcoholic beverages on Sunday), including, but not limited to, violations of federal, state or local liquor laws, then, at the option of Franchisor, this Agreement shall be immediately terminated upon receipt by Franchisee of written notice from Franchisor to such effect.

W.    Control During Crisis Situation.

(1)    Franchisee must comply at all times with Franchisor's then-current Crisis Response Manual. If an event occurs at the Restaurant that has or reasonably may cause harm or injury to customers, guests or employees in the sole opinion of Franchisor (*i.e.*, food spoilage/poisoning, food tampering/sabotage, slip and fall injuries, natural disasters, robberies, shootings, etc.) or may damage the Proprietary Marks, the System or the reputation of Franchisor (collectively "**Crisis Situation**"), Franchisee shall: (a) immediately contact appropriate emergency care providers to assist Franchisee in curing the harm or injury; and (b) immediately inform Franchisor by telephone of the Crisis Situation. Franchisee shall refrain from making any internal or external announcements (*i.e.*, no communication with the news media) regarding the Crisis Situation (unless otherwise directed by Franchisor or public health officials).

(2)    To the extent Franchisor deems appropriate, in its sole and absolute discretion, Franchisor or its designee may control the manner in which the Crisis Situation is handled by the parties, including, without limitation, conducting all communication with the news media, providing care for injured persons and/or temporarily closing the Restaurant. The parties acknowledge that, in directing the management of any Crisis Situation, Franchisor or its designee may engage the services of attorneys, experts, doctors, testing laboratories, public relations firms and those other professionals as it deems appropriate. Franchisee and its employees shall cooperate fully with Franchisor or its designee in its efforts and activities in this regard and shall be bound by all further Crisis Situation procedures developed by Franchisor from time to time hereafter. The indemnification under Section 24 shall include all losses and expenses that may result from the exercise by Franchisor or its designee of the management rights granted in this Section 13.W.

X.    Compliance with Laws and Good Business Practices, Taxes.

(1)    Franchisee shall secure and maintain in force in its name all required licenses, permits and certificates relating to the operation of the Restaurant. Franchisee shall operate the Restaurant in full compliance with all applicable laws, ordinances and regulations including, without limitation, all laws or regulations governing or relating to the handling of food products, immigration and discrimination, occupational hazards and health insurance, employment and labor laws, including, without limitation, workers compensation insurance, unemployment insurance, and the withholding and payment of federal and state income taxes, social security taxes and sales taxes. All advertising and promotion by Franchisee shall be completely factual and shall conform to the highest standards of ethical advertising. Franchisee shall, in all dealings with Franchisee's customers, suppliers and the public, adhere to the highest standards of honesty, integrity, fair dealing and ethical conduct. Franchisee agrees to refrain from any business or advertising practice that may be injurious to the goodwill associated with the Proprietary Marks or the business of Franchisor or its affiliates, the System or other restaurants operated or franchised by Franchisor or its affiliates.

(2)     Franchisee shall promptly pay when due all taxes levied or assessed, including, without limitation, income, unemployment, and sales taxes, and all accounts and other indebtedness of every kind incurred by Franchisee in the conduct of the business franchised under this Agreement. Franchisee shall pay Franchisor an amount equal to any sales tax, gross receipts tax, or similar tax (other than income tax) imposed on Franchisor with respect to any payments to Franchisor required under this Agreement, unless the tax is credited against income tax otherwise payable by Franchisor.

(3)     In the event of any bona fide dispute as to Franchisee's liability for taxes assessed or other indebtedness, Franchisee may contest the validity or the amount of the tax or indebtedness in accordance with procedures of the taxing authority or applicable law; however, in no event shall Franchisee permit a tax sale or seizure by levy of execution or similar writ or warrant, or attachment by a creditor, to occur against the premises of the Restaurant, or any improvements thereon.

(4)     Franchisee shall notify Franchisor in writing within five days after the commencement of: (a) any action, suit or proceeding, or the issuance of any order, writ, injunction, award or decree of any court, agency or other governmental instrumentality, which may adversely affect the operation or financial condition of Franchisee or the Restaurant; or (b) of any notice of violation of any law, ordinance or regulation relating to health or sanitation at the Restaurant.

## 14.     PROPRIETARY MARKS

A.     <u>Scope</u>.

The term "**Proprietary Marks**" as used in this Agreement refers to all words, symbols, insignia, devices, designs, trade names, service marks or combinations thereof designated by Franchisor as identifying the System and the products sold and services provided in connection with the System. Franchisor shall, from time to time, advise Franchisee as to any additions or deletions to the Proprietary Marks, and Franchisee's right to use the Proprietary Marks shall be deemed modified by those additions or deletions.

B.     <u>Limited Right To Use Proprietary Marks</u>.

Franchisee's right to use the Proprietary Marks is limited to its use of the Proprietary Marks in the operation of the Restaurant at the Premises and as expressly provided in this Agreement and the Manuals. Franchisee shall not use the Proprietary Marks on any vehicles without Franchisor's prior written approval. Franchisee shall not modify the Proprietary Marks in any manner in connection with Franchisee's display of, or creation or duplication of materials bearing, the Proprietary Marks. Franchisee shall not use the Proprietary Marks or any variations of the Proprietary Marks or marks or names confusingly similar to the Proprietary Marks in any manner not authorized by Franchisor or in any corporate, limited liability company, partnership, fictitious, DBA or other name and shall not use any other trade names, service marks or trademarks in conjunction with the Restaurant. If local laws or ordinances require that Franchisee file an affidavit of doing business under an assumed name or otherwise make a filing indicating that the Proprietary Marks are being used as a fictitious or assumed name, Franchisee shall include in such filing or application an indication that the filing is made "as a franchisee of TGI Fridays Franchisor, LLC." Franchisee shall use the symbol ® with all registered marks and the symbol ™ with all pending registrations or other marks. During the Initial Term, Franchisee shall identify itself as a franchisee of Franchisor (1) in conjunction with any use of the Proprietary Marks including, without limitation, invoices, order forms, receipts, contracts, stationary and business cards; (2) in a notice of such content and form and at conspicuous locations in the Restaurant as Franchisor may designate in writing; and (3) on any authorized delivery vehicles.

C.  Use of the Proprietary Marks in Digital Media.

Franchisee shall not use the Proprietary Marks or any variations of the Proprietary Marks or marks or names confusingly similar to the Proprietary Marks in any manner not authorized by Franchisor in writing as part of any Digital Media, including but limited to any URL, domain name, meta-tag, download, application, posting, directory listing, screen name, anonymous name, blog, vlog, e-mail account, instant messaging account, texting identity, user generated content, or any other identification of Franchisee or the Restaurant in any electronic medium (collectively, and individually, "**Electronic Identifiers**"). Franchisor may grant or withhold its consent in its sole discretion and may condition its consent on such requirements as Franchisor deems appropriate, including, among other things, that Franchisee obtain Franchisor's prior written approval of: (a) any and all Electronic Identifiers related to the Restaurant; (b) the proposed form and content (including any visible and non-visible content such as meta-tags) of any Digital Media or Franchisee's Social Media related to the Restaurant (including any modification thereof); (c) Franchisee's use of any hyperlinks or other links; and (d) Franchisee's use of any materials (including text, video clips, photographs, images and sound bites) in which any third party has an ownership interest.

D.  Modifications to Proprietary Marks.

If Franchisor should elect to use a principal name other than "TGI Fridays" to identify the System, Franchisor may select another name and notify Franchisee to change all or some items bearing the Proprietary Marks to the new name within a reasonable period of time as determined by Franchisor without Franchisor incurring any liability to Franchisee, and Franchisee promptly shall adopt that name. Franchisee agrees that nothing in this Agreement gives it any right, title or interest in the Proprietary Marks (except the right to use the Proprietary Marks in accordance with the terms of this Agreement), that the Proprietary Marks are the sole property of Franchisor and its affiliates, that Franchisee shall not directly or indirectly contest the validity or ownership of the Proprietary Marks or Franchisor's right to license the Proprietary Marks, and that any and all uses by Franchisee of the Proprietary Marks and the goodwill arising therefrom shall inure exclusively to the benefit of Franchisor and its affiliates. Franchisee will not seek to register, reregister, assert claim to ownership of, license or allow others to use, or otherwise appropriate to itself, any of the Proprietary Marks or any mark or name confusingly similar thereto, or the goodwill symbolized by any of the foregoing except to the extent this action inures to the benefit of, and has the prior written approval of, Franchisor. Any unauthorized use of the Proprietary Marks by Franchisee or attempt by Franchisee, directly or indirectly, to register the Proprietary Marks in any jurisdiction shall constitute a breach of this Agreement and an infringement of Franchisor's rights in and to the Proprietary Marks.

E.  Notice of Infringement.

Franchisee promptly shall inform Franchisor in writing as to any infringement of the Proprietary Marks of which Franchisee has knowledge. Franchisee shall not make any demand or serve any notice, orally or in writing, or institute any legal action or negotiate, compromise or settle any controversy with respect to any such infringement without first obtaining Franchisor's written approval. Franchisor shall have the right, but not the obligation, to bring such action or take such steps as it may deem advisable to prevent any such infringement and to join Franchisee as a party to any action in which Franchisor is or may be a party and as to which Franchisee is or would be a necessary or proper party. Franchisee also shall promptly notify Franchisor of any litigation (including administrative or arbitration proceedings) of which Franchisee is aware instituted against Franchisor, its affiliates or Franchisee relating to the Proprietary Marks. Franchisee shall execute any and all instruments and documents, render such other assistance and do any acts and things as may, in the opinion of Franchisor's counsel, be necessary or

advisable to protect and maintain Franchisor's interests in the Proprietary Marks, including, without limitation, Franchisor's interests in litigation or proceedings before the U.S. Patent and Trademark Office or other tribunal relating to the Proprietary Marks.

15.    INSURANCE

    A.    <u>Procurement of Insurance by Franchisee</u>.

    Franchisee shall be responsible for all loss or damage arising from or related to Franchisee's development and operation of the Restaurant, and for all demands or claims with respect to any loss, liability, personal injury, death, property damage, or expense whatsoever occurring upon the premises of, or in connection with the development or operation of, the Restaurant. When Franchisee commences construction of the Restaurant, Franchisee shall obtain and, throughout the Initial Term, shall maintain in full force and effect that insurance which is required by law or which Franchisee determines is necessary or appropriate for liabilities caused by or occurring in connection with the development or operation of the Restaurant which shall include, at a minimum, insurance policies of the kinds, and in the amounts, required by Section 15.B. Franchisor, TGI Friday's Inc., a New York corporation, and any entity with an insurable interest designated by Franchisor, shall be named as an additional insured in such policies (with the exception of workers compensation insurance).

    B.    <u>Minimum Insurance Requirements</u>.

    All insurance policies shall be written by an insurance company or companies satisfactory to Franchisor, in compliance with the standards, specifications, coverages and limits Franchisor prescribes at any time and from time to time in the Manuals or otherwise provided to Franchisee in writing. Franchisor may periodically increase the minimum required coverage and require different or additional kinds of insurance (including reasonable excess liability insurance, employment practices liability insurance and cyber security insurance) at any time to reflect inflation, identification of new risks, changes in law or standards of liability, higher damage awards or other relevant changes in circumstances. Franchisee shall receive written notice of such modifications and shall take prompt action to secure the additional coverage or higher policy limits. These policies shall include, at a minimum, the following:

        (1)    <u>Commercial General Liability Insurance</u> providing coverage for bodily injury, personal injury, advertising injury, property damage, products liability, contractual liability, completed operations with a limit of not less than $10,000,000, auto liability insurance on owned, non-owned and hired automobiles with a limit of not less than $10,000,000 and liquor liability/dram shop insurance with a minimum limit of $10,000,000. This insurance shall be on an occurrence based policy form, and may be provided by a combination of primary and excess liability policies;

        (2)    <u>Workers' Compensation Insurance</u> in such amount as may be required by applicable statute or rule, <u>Unemployment Insurance and State Disability Insurance</u> (as required by governing law) for Franchisee's employees, and <u>employer's liability insurance</u> with a limit of not less than $1,000,000;

        (3)    <u>"All Risk" Property Insurance</u> on the Premises with replacement costs coverage and business interruption insurance covering Franchisor's fees, with Franchisor named as a loss payee on the policy with respect to those fees;

        (4)    <u>Builder's All Risk Insurance</u> in connection with initial construction, a Facilities Remodeling, relocation, or any other substantial construction of the Restaurant. Franchisee shall also

maintain performance and completion bonds in forms and amounts, and written by carrier(s), reasonably satisfactory to Franchisor;

(5)     Business Interruption Insurance to cover the rent of the Premises, previous profit margins, maintenance of competent personnel and other fixed expenses for the duration of the interruption to the Restaurant's operation;

(6)     Employment Practices Liability Insurance to cover an employer against employment claims made by employees with a limit of not less than $1,000,000;

(7)     Cyber Liability Insurance to cover a business liability for a data breach with a limit of not less than $1,000,000;

(8)     Insurance coverage of such type, nature and scope sufficient to satisfy Franchisee's indemnification obligations under Section 24.B below; and

(9)     Any additional insurance required by Franchisee's landlord or master landlord under the Occupancy Contract.

C.     General Insurance Requirements.

The following general requirements shall apply to each insurance policy that Franchisee is required to maintain under this Agreement:

(1)     Each liability insurance policy shall be specifically endorsed to provide that the coverages shall be primary and that any insurance carried by Franchisor shall be excess and non-contributory. No insurance policy shall contain a provision that in any way limits or reduces coverage for Franchisee in the event of a claim by Franchisor or its affiliates. Each liability insurance policy shall contain either a "cross-liability" or a "separation of insureds" provision.

(2)     Each insurance policy shall extend to, and provide indemnity for, all obligations and liabilities of Franchisee to third parties and all other items for which Franchisee is required to indemnify Franchisor under this Agreement.

(3)     Each insurance policy shall be written by an insurance company that has received and maintains an A.M. Best Rating of "(A) VII" or better (or comparable ratings from a reputable insurance rating service, in the event such A.M. Best ratings are discontinued or materially altered).

(4)     No insurance policy shall provide for a deductible amount that exceeds $5,000, unless otherwise approved in writing by Franchisor. Coinsurance shall not apply under any insurance policy.

(5)     Required coverage shall include insurers waiver of subrogation against Franchisor and Franchisee shall waive rights of recovery against Franchisor.

D.     Proof of Insurance.

No later than 30 days after the earlier of the date that Franchisee commences construction or renovation of the Restaurant or opens the Restaurant, and on each policy renewal date thereafter,

Franchisee shall submit evidence of satisfactory insurance and proof of payment therefor to Franchisor. Upon request, Franchisee also shall provide to Franchisor copies of all or any policies, and policy amendments and riders.

    E.        <u>No Representations</u>.

Franchisee acknowledges that no requirement for insurance contained in this Agreement constitutes advice or a representation by Franchisor that only such policies, in such amounts, are necessary or adequate to protect Franchisee from losses in connection with its business under this Agreement. Maintenance of this insurance, and the performance by Franchisee of its obligations under this Section, shall not relieve Franchisee of liability under the indemnification provisions of this Agreement.

    F.        <u>Procurement of Insurance by Franchisor</u>.

Should Franchisee, for any reason, fail to procure or maintain at least the insurance required by this Section 15, as revised from time to time pursuant to the Manuals or otherwise in writing, Franchisor shall have the immediate right and authority, but not the obligation, to procure such insurance and charge its cost to Franchisee. Franchisee shall reimburse Franchisor for all out-of-pocket costs incurred by Franchisor in obtaining such insurance on behalf of Franchisee immediately upon Franchisee's receipt of an invoice therefor.

    G.        <u>Blanket Insurance Policies</u>.

These insurance requirements may be satisfied by maintaining either individual policies covering only the Restaurant, or blanket insurance policies covering multiple properties, provided that with respect to any blanket insurance policies Franchisee agrees to either immediately reinstate any limits and coverages which are used, reduced or cancelled back up to the blanket policy limits approved by Franchisor, or to secure individual policy coverages for the Restaurant satisfying these insurance requirements. Franchisee will deliver to Franchisor a schedule of insured locations under any blanket insurance policy together with the related certificates of insurance.

16.    ORGANIZATION OF FRANCHISEE

    A.        <u>Representations</u>.

        (1)        If Franchisee is a corporation, a limited liability company or a partnership, Franchisee makes the following representations and warranties: (a) it is duly organized and validly existing under the laws of the state of its formation; (b) it is qualified to do business in the state in which the Restaurant is located; (c) execution of this Agreement and the development and operation of the Restaurant is permitted by its governing documents; and (d) unless waived in writing by Franchisor, Franchisee's articles of incorporation, articles of organization or written partnership agreement shall at all times provide that: (i) the activities of Franchisee are limited exclusively to the development and operation of Fridays Restaurants and other restaurants operated by Franchisee that are franchised by Franchisor or its affiliates; and (ii) all transfers of ownership in Franchisee are subject to the terms of this Agreement.

        (2)        If Franchisee is an individual, or a partnership comprised solely of individuals, Franchisee makes the following additional representations and warranties: (a) each individual has executed this Agreement; (b) each individual shall be jointly and severally bound by, and personally

liable for the timely and complete performance of, each and every provision of this Agreement; and (c) notwithstanding any Transfer for convenience of ownership, pursuant to Section 18.D, each individual shall continue to be jointly and severally bound by, and personally liable for the timely and complete performance of, each and every provision of this Agreement.

B. <u>Governing Documents</u>.

If Franchisee is a corporation, copies of Franchisee's articles of incorporation, bylaws, other governing documents and any amendments, including the resolution of the Board of Directors and all stockholders authorizing entry into and performance of this Agreement, and all shareholder agreements, including buy/sell agreements, have been furnished to Franchisor. If Franchisee is a limited liability company, copies of Franchisee's articles of organization, management agreement, other governing documents and any amendments, including the resolution of the managers authorizing entry into and performance of this Agreement, and all agreements, including buy/sell agreements, among the members have been furnished to Franchisor. If Franchisee is a partnership, copies of Franchisee's written partnership agreement, other governing documents and any amendments, as well as all agreements among the partners, including buy/sell agreements, have been furnished to Franchisor, in addition to evidence of consent or approval of the entry into and performance of this Agreement by the requisite number or percentage of partners, if that approval or consent is required by Franchisee's written partnership agreement. When any of these governing documents are modified or changed, Franchisee promptly shall provide copies to Franchisor.

C. <u>Ownership Interests</u>.

If Franchisee is a corporation, a limited liability company or a partnership, Franchisee must identify all of its owners in attached <u>Exhibit D</u>. In addition, if Franchisee is a corporation, Franchisee shall maintain a current list of all owners of record and all beneficial owners of any class of voting securities of the corporation (and the number of shares owned by each). If Franchisee is a limited liability company, Franchisee shall maintain a current list of all members (and the percentage membership interest of each member). If Franchisee is a partnership, Franchisee shall maintain a current list of all owners of an interest in the partnership (and the percentage ownership of each owner). Franchisee shall comply with Section 18 before any change in ownership interests and shall execute addenda to <u>Exhibit D</u> as changes occur in order to ensure the information contained in <u>Exhibit D</u> is true, accurate and complete at all times.

D. <u>Restrictive Legend</u>.

If Franchisee is an entity, the stock certificates, member certificates, or partnership agreement shall have the following statement: "Any assignment or transfer of any ownership interest in the entity is subject to the restrictions imposed on assignment by the TGI Fridays Restaurant Franchise Agreement(s) to which this entity is a party."

E. <u>Representative</u>.

Franchisee shall designate a Principal Owner as Franchisee's representative who is authorized to act on behalf of, and bind, Franchisee with respect to this Agreement ("**Representative**"). The Representative shall be identified in <u>Exhibit D</u> as it may be revised from time to time. Any replacement Representative shall be designated within 10 days of the prior Representatives resignation or termination. Each Representative shall attend and successfully complete Franchisor's Owner's Orientation Program.

F.    Guaranties; Confidentiality and Non-Compete Covenants.

(1)    All of Franchisee's officers, directors and Principal Owners (and their spouses) also shall jointly and severally guarantee Franchisee's payment and performance under this Agreement and also shall bind themselves to the terms of this Agreement pursuant to the attached Guaranty and Assumption of Franchisee's Obligations ("**Guaranty**"). Notwithstanding the foregoing, Franchisor reserves the right, in its sole discretion, to waive the requirement that some or all of the previously described individuals execute the attached Guaranty. Franchisor reserves the right to require any guarantor to provide personal financial statements to Franchisor from time to time. Franchisee acknowledges that, unless otherwise agreed to in writing by Franchisor, Franchisor requires individuals (and not solely corporations, limited liability companies or other entities) to execute the Guaranty. Accordingly, if any Principal Owner is not an individual, Franchisor shall have the right to have the Guaranty executed by individuals who have only an indirect ownership interest in Franchisee.

(2)    If Franchisee, any guarantor or any parent, subsidiary or affiliate of Franchisee holds any interest in other restaurants that are franchised by Franchisor or its affiliates, the party who owns that interest shall execute, concurrently with this Agreement, a form of cross-guaranty to Franchisor and its affiliates for the payment of all obligations for such restaurants, unless waived in writing by Franchisor in its sole discretion. For purposes of this Agreement, an affiliate of Franchisee is any company controlled, directly or indirectly, by Franchisee or Franchisee's parent or subsidiary.

(3)    Any direct or indirect owner of Franchisee who is not a Principal Owner but who has access to Confidential Information or who has an active role in the operation or management of the Restaurant must execute a Non-Disclosure and Non-Competition Agreement in the form attached as Exhibit G.

G.    Operating Principal.

(1)    If Franchisee is owned by more than one individual, Franchisee shall designate and retain the individual identified in Exhibit D (as it may be revised from time to time) to serve as the "**Operating Principal**." Unless waived in writing by Franchisor, the Operating Principal shall meet all of the following qualifications:

(a)    The Operating Principal, at all times, shall have at least a 5% equity ownership interest in Franchisee. This Section 16.G(1)(a) shall not apply if Franchisee was a publicly-held entity or a wholly-owned subsidiary of a publicly-held entity as of the date of the first franchise-related agreement between Franchisee and Franchisor.

(b)    The Operating Principal must sign the attached Guaranty.

(c)    The Operating Principal, at all times, shall have full control over the day-to-day activities, including operations, of the Restaurant, including control over the standards of operation and financial performance.

(d)    The Operating Principal shall devote full-time and reasonable efforts to supervising the operation of the Restaurant and shall not engage in any other business or activity, directly or indirectly, that requires substantial management responsibility.

(e)    The Operating Principal shall maintain a primary residence within a reasonable driving distance of the Restaurant.

(f)　　The Operating Principal shall successfully complete the Management Training Program (either the full Management Training Program or a modified version of the Management Training Program to meet the specific needs of the trainee, as deemed appropriate by Franchisor in its sole discretion) and any additional training required by Franchisor.

(g)　　The Operating Principal shall have been approved by Franchisor in its sole discretion, with said approval not being later withdrawn. If the Operating Principal no longer qualifies as such, Franchisee shall designate another qualified person to act as Operating Principal within 30 days after the date the prior Operating Principal ceases to be qualified. Franchisee's designee to become the Operating Principal must successfully complete the Management Training Program. Following Franchisor's approval of a new Operating Principal, that person shall execute the attached form of Guaranty and satisfy all other requirements stated in this Section 16.G.

H.　　<u>Multi-Unit Manager</u>.

(1)　　In the event this Agreement is for the third or any additional Fridays Restaurant to be operated by Franchisee and its affiliates, Franchisee shall designate a Multi-Unit Manager. The Multi-Unit Manager shall be identified in <u>Exhibit D</u> as it may be revised from time to time. Additional Multi-Unit Managers shall be designated from time to time as reasonably required by Franchisor.

(a)　　The Multi-Unit Manager must sign the Non-Disclosure and Non-Competition Agreement attached as <u>Exhibit G</u>.

(b)　　The Multi-Unit Manager shall devote full-time and reasonable efforts to supervising the operation of the Restaurant and those other restaurants (that are franchised by Franchisor or its affiliates) operated by Franchisee in the same geographic area as the Restaurant and shall not engage in any other business or activity, directly or indirectly, that requires substantial management responsibility. The Multi-Unit Manager shall maintain a primary residence within a reasonable driving distance of the Restaurants.

(c)　　The Multi-Unit Manager shall successfully complete the Management Training Program (either the full Management Training Program or a modified version of the Management Training Program to meet the specific needs of the trainee, as deemed appropriate by Franchisor in its sole discretion) and any additional training required by Franchisor. Franchisor shall have approved the Multi-Unit Manager, and not have later withdrawn that approval.

(2)　　If the Multi-Unit Manager no longer qualifies as such, Franchisee shall designate another qualified person to act as Multi-Unit Manager within 30 days after the date the prior Multi-Unit Manager ceases to be qualified. Franchisee's designee to become the Multi-Unit Manager must successfully complete the Management Training Program. Following Franchisor's approval of a new Multi-Unit Manager, that person shall execute the Non-Disclosure and Non-Competition Agreement attached as <u>Exhibit G</u> and satisfy all other requirements stated in this Section 16.H.

17.　　TRANSFERS BY FRANCHISOR

Franchisor has the absolute, unrestricted right, exercisable at any time, to change its ownership or form and/or transfer and assign all or any part of its rights and obligations under this Agreement to any person or legal entity without Franchisee's consent. After Franchisor's transfer or assignment of this Agreement to a third party who expressly assumes Franchisor's obligations under this Agreement, Franchisor no longer will have any performance or other obligations under this Agreement.

18.      TRANSFERS BY FRANCHISEE

A.      Franchisor's Prior Written Approval Required.

(1)      Franchisee understands and acknowledges that the rights and duties set forth in this Agreement are personal to Franchisee and that Franchisor has entered into this Agreement in reliance on Franchisee's business skill, financial capacity, personal character, experience and demonstrated or purported ability in developing and operating high quality foodservice operations.  Accordingly, neither Franchisee nor any immediate or remote successor to any part of Franchisee's interest in this Agreement, nor any individual, partnership, corporation or other legal entity which directly or indirectly controls Franchisee shall sell, assign, transfer, convey, give away, pledge, mortgage, or otherwise encumber any interest in Franchisee, this Agreement, the Franchise, the Restaurant, the assets of the Restaurant, the Premises or any other assets pertaining to Franchisee's operations under this Agreement (collectively "**Transfer**") without the prior written consent of Franchisor.

(2)      Except as otherwise provided in this Agreement, any purported Transfer, by operation of law or otherwise, not having the prior written consent of Franchisor shall be null and void and shall constitute a material breach of this Agreement, for which Franchisor may terminate this Agreement without providing Franchisee an opportunity to cure the breach.

B.      Transfer Considerations.

Franchisee shall advise Franchisor in writing of any proposed Transfer, submit (or cause the proposed transferee to submit) (1) a franchise application for the proposed transferee; (2) a copy of all contracts and all other agreements or proposals; (3) a nonrefundable Transfer fee in the amount of $5,000 in connection with Franchisor's review of the Transfer application; (4) background investigation fees in the amount of $10,000 per transferee entity, and each individual equity holder in transferee, who are international candidates; and (5) all other information requested by Franchisor, relating to the proposed Transfer.  If, in connection with the Transfer, Franchisor incurs out-of-pocket expenses in excess of the Transfer fee in Section 18.B(iii), Franchisee must reimburse Franchisor for those expenses upon receipt of written notice from Franchisor.   If the cost for any background investigation conducted under Section 18.B(iv) is less than $10,000, Franchisor may refund that unused portion to transferee.  If Franchisor does not exercise its right of first refusal under Section 18.K below, the decision as to whether or not to approve a proposed Transfer shall be made by Franchisor in its sole discretion and shall include numerous factors deemed relevant by Franchisor.  These factors may include, but will not be limited to, the following:

(1)      The proposed transferee (and if the proposed transferee is other than an individual, such owners of an interest in the transferee as Franchisor may request) must demonstrate that it has extensive experience in high quality restaurant operations of a character and complexity similar to the restaurants franchised by Franchisor or its affiliates; meets the managerial, operational, experience, quality, character and business standards for a franchisee promulgated by Franchisor from time to time; possesses a good character, business reputation and credit rating; has an organization whose management culture is compatible with Franchisor's management culture; has adequate infrastructure to operate the Restaurant; and has adequate financial resources and working capital to meet Franchisee's obligations under this Agreement.

(2)      The sales price shall not be so high, in Franchisor's reasonable judgment, as to jeopardize the ability of the transferee to develop, maintain, operate and promote the Restaurant and meet financial obligations to Franchisor, third party suppliers and creditors.

(3)      All of Franchisee's accrued monetary obligations to Franchisor and its affiliates (whether arising under this Agreement or otherwise) and all other outstanding obligations related to the Restaurant (including, but not limited to, bills from suppliers, taxes, judgments and any required governmental reports, returns, affidavits or bonds) have been satisfied or, in the reasonable judgment of Franchisor, adequately provided for.  Franchisor reserves the right to require that a reasonable sum of money be placed in escrow to ensure that all of these obligations are satisfied.

(4)      Franchisee is not then in material default of any provision of this Agreement or any other agreement between Franchisee and Franchisor or its affiliates, is not in default beyond the applicable cure period under any real estate lease, equipment lease or financing instrument relating to the Restaurant and is not in default beyond the applicable cure period with any vendor or supplier to the Restaurant.

(5)      Franchisee, all individuals who executed this Agreement, all guarantors of Franchisee's obligations, the proposed transferee and any other individuals or entities required by Franchisor must execute a general release and a covenant not to sue, in a form satisfactory to Franchisor.

(6)      Unless waived by Franchisor in its sole discretion, the transferee and those employees of the transferee designated by Franchisor shall complete the training provided in Section 11.

(7)      The transferee, at its expense, shall repair or replace any equipment, signs, interior and exterior décor items, fixtures and furnishings at the Restaurant as required by Franchisor, shall offer such products and services at the Restaurant as then required by Franchisor, and shall make any modifications or upgrades required for the Restaurant to comply with the current image of the System.

(8)      Franchisee, Franchisee's Principal Owners, and the proposed transferee shall comply with any other conditions that Franchisor reasonably requires from time to time as part of Franchisor's transfer policies including without limitation, evidence of third party consents to the Transfer (such as landlord, suppliers, vendors, etc.), subordination of the purchase price to monetary obligations owed by the transferee to Franchisor after the Transfer, execution of confidentiality, non-competition covenants as required by Franchisor, and disclosures, consents and releases for background investigations if the transferee or any of its equity holders are non-United States residents and/or non-United States citizens.

C.      <u>Conditions of Transfer</u>.

If Franchisor approves a proposed Transfer, before the Transfer becoming effective:

(1)      Franchisee and the proposed transferee shall execute, at Franchisor's election, either an assignment agreement and any amendments to this Agreement deemed necessary or desirable by Franchisor to reflect the Transfer or Franchisor's then-current standard form of franchise agreement for an initial term ending on the expiration date of the Initial Term of this Agreement.  In either event, a guaranty of the type required by Section 16.F shall be executed by those individuals identified in Section 16.F and a non-disclosure and non-competition agreement executed by any person as required by Franchisor.

(2)      The transferor must remain liable to Franchisor for any obligations that arose before the Transfer and the transferor shall, at Franchisor's request, execute a written guaranty pursuant to which the transferor shall remain liable for all obligations to Franchisor incurred before the date of the Transfer and for a period of two years following such Transfer.

D.      <u>Transfers for Convenience of Ownership</u>.

If Franchisee is an individual or a partnership and desires to Transfer this Agreement to a corporation or limited liability company formed for the convenience of ownership, the requirements of Sections 18.B and 18.C shall apply to such a Transfer; however, Franchisee will not be required to pay a Transfer fee. Franchisor's approval also will be conditioned on the following: (1) the corporation or limited liability company must be newly organized; (2) before the Transfer, Franchisor must receive a copy of the documents specified in Section 16.B and the transferee shall comply with the remaining provisions of Section 16; and (3) Franchisee must own all voting securities of the corporation or membership interests of the limited liability company or, if Franchisee is owned by more than one individual, each person shall have the same proportionate ownership interest in the corporation or the limited liability company as before the Transfer.

E.      <u>Issuance or Exercise of Stock Options</u>.

Notwithstanding the provisions of Section 18.B, the issuance of options or the exercise of options pursuant to a qualified stock option plan or a qualified employee stock ownership plan shall not be considered a Transfer and shall not require the prior written approval of Franchisor; provided no more than a total of 49% of Franchisee's outstanding voting securities are subject to the qualified stock option plan or qualified employee stock ownership plan.

F.      <u>Changes in Ownership of Voting Securities</u>.

If Franchisee was a publicly-held entity as of the date of the first franchise-related agreement between Franchisee and Franchisor or its affiliates, Section 18.B shall be applicable to transfers of ownership interests in Franchisee only if the proposed Transfer would result in either: (1) 50% or more of Franchisee's voting securities being held by different shareholders than as of the date of the first franchise-related agreement between Franchisee and Franchisor or its affiliates; or (2) any change in ownership of Franchisee's voting securities whereby any existing shareholder of Franchisee acquires an additional 10% or more of Franchisee's voting securities.

G.      <u>Transfers Permitted Without Franchisor's Prior Written Approval</u>.

Notwithstanding the provisions of Section 18.B, Franchisor's prior written approval is not required if: (1) the Transfer is a Transfer of an ownership interest in Franchisee of less than 10% and, after that Transfer, the original owners of Franchisee own at least 51% of Franchisee; and (2) Franchisee provides Franchisor's written notice of Franchisee's intent to undertake the Transfer at least 30 days before the effective date of the Transfer, together with documents demonstrating that the Transfer meets the requirements of this Section; and (3) at the time of Franchisee's notice to Franchisor, Franchisee is not be in default of this Agreement or any other agreements between Franchisee and Franchisor or its affiliates.

H.      <u>Transfer on Death or Disability</u>.

Franchisor shall consent to a Transfer of an equity ownership interest in Franchisee following the

death or permanent disability of Franchisee or an equity owner of Franchisee provided that: (1) immediately before and after the Transfer, the transferee franchisee meets Franchisor's then-current financial, operational and experience standards for new franchisees; and (2) such Transfer is completed within six months following the death or permanent disability. Failure to complete the Transfer as required by this Section 18.H within this period of time will constitute a breach of this Agreement. A person shall be deemed to have a "permanent disability" if he or she has any physical, emotional or mental injury, illness or incapacity which would prevent the afflicted person from performing his obligations under this Agreement for more than 90 consecutive days as determined by a licensed physician selected by Franchisor. Franchisee or any equity owner of Franchisee refusing to submit to examination with respect to a permanent disability shall be deemed permanently disabled.

      I.      <u>Grant of Security Interest</u>.

Franchisee shall not grant any security interest in its business, the Restaurant, the Premises or the assets used in the operation or development of the Restaurant without Franchisor's prior written approval. Franchisor's approval may be conditioned, in its sole discretion, on the written agreement by the secured party that, in the event of a default by Franchisee under any agreement related to the security interest, Franchisor shall have the right and option (but not the obligation) to purchase the rights of the secured party upon payment of all sums then due to the secured party.

      J.      <u>Offerings by Franchisee</u>.

Securities or partnership interests in Franchisee may be sold, by private or public offering, only with Franchisor's prior written consent (whether or not Franchisor's consent is required under any other provision of this Section). In addition to the requirements of Section 18.B, at least 30 days before any public offering or private placement of securities or partnership interests in Franchisee is made available to potential investors, Franchisee, at its expense, shall deliver to Franchisor a copy of the offering documents. Franchisee, at its expense, also shall deliver to Franchisor an opinion of Franchisee's legal counsel and an opinion of one other legal counsel selected by Franchisor (both of which shall be addressed to Franchisor and in a form acceptable to Franchisor) that the offering documents properly use the Proprietary Marks and accurately describe Franchisee's relationship with Franchisor and/or its affiliates. The indemnification provisions of Section 24.B shall also include any losses or expenses incurred by Franchisor and/or its affiliates in connection with any statements made by or on behalf of Franchisee in any public offering or private placement of Franchisee's securities. For each proposed offering, Franchisee shall pay to Franchisor a non-refundable fee of $15,000 when Franchisee submits the offering documents to Franchisor.

      K.      <u>Friday's Right of First Refusal</u>.

      (1)      If any party holding any interest in Franchisee, this Agreement, the Restaurant, or the Premises, receives a bona fide offer (as determined by Franchisor in its reasonable discretion) from a third party or otherwise desires to undertake any Transfer that would require Franchisor's approval (other than a Transfer for convenience of ownership pursuant to Section 18.D or a sale of ownership interests in Franchisee to a spouse, parent, adult child or adult sibling), that party shall notify Franchisor in writing of the terms of the proposed Transfer, and shall provide such information and documentation relating to the proposed Transfer as Franchisor may reasonably require. Franchisor or its designee may elect to purchase the interest that the seller proposes to Transfer any time within 30 days after receipt of written notification, and all documents and other information required by Franchisor, by sending written notice to the seller that Franchisor or its designee intends to purchase the sellers interest on the same financial terms and conditions offered by the third party (except that Franchisor or its designee shall not

be obligated to pay any finder's or broker's fees). In purchasing the interest, Franchisor or its designee shall be entitled to set off any monies owed to Franchisor and/or its affiliates by Franchisee and Franchisor or its designee shall be entitled to all customary representations and warranties that the assets are free and clear (or, if not, accurate and complete disclosure) as to: (a) ownership, condition and title; (b) liens and encumbrances; (c) environmental and hazardous substances; and (d) validity of contracts inuring to the purchaser or affecting the assets, whether contingent or otherwise.

(2)     If the offer to Franchisee involves assets in addition to this Agreement, the Premises, the Restaurant and other restaurants operated by Franchisee that are franchised by Franchisor or its affiliates, Franchisee's notice to Franchisor shall state the cash value of that portion of the offer received by Franchisee relating to this Agreement, the Premises, the Restaurant and those other restaurants. If the proposed Transfer provides for payment of consideration other than cash or it involves intangible benefits, Franchisor or its designee may elect to purchase the interest proposed to be sold for the reasonable equivalent in cash. If the parties are unable to agree within 30 days on the reasonable equivalent in cash of the non-cash part of the offer received by Franchisee or the cash value of that portion of the offer received by Franchisee relating to this Agreement, the Premises, the Restaurant and those other restaurants, the amount shall be determined by two professionally certified appraisers, Franchisee selecting one and Franchisor or its designee selecting one. If the amounts set by the two appraisers differ by more than 10%, the two appraisers shall select a third professionally certified appraiser who also shall determine the amount. The average value set by the appraisers (whether two or three appraisers as the case may be) shall be conclusive and Franchisor or its designee may exercise its right of first refusal within 30 days after being advised in writing of the decision of the appraisers. The cost of the appraisers shall be shared equally by the parties.

(3)     Franchisor's failure to exercise its right of first refusal shall not constitute approval of the proposed Transfer nor a waiver of any other provision of this Section 18 with respect to a proposed Transfer. If Franchisor does not exercise its right of first refusal, Franchisee may not thereafter Transfer the interest at a lower price or on more favorable terms than those that have been offered to Franchisor. Franchisor shall again be given a right of first refusal if a transaction does not close within six months after Franchisor elected not to exercise its right of first refusal. Franchisee shall not, at any time, offer any interest for sale or transfer at public auction, nor make an offer to the public to sell, transfer or assign, through any advertisement, either in the newspapers or otherwise, without first having obtained the written approval of Franchisor to the auction or advertisement.

L.     <u>No Waiver</u>.

Franchisor's consent to any Transfer shall not constitute a waiver of any claims Franchisor may have against the transferring party or transferee, nor shall it be deemed a waiver of Franchisor's right to demand exact compliance with any of the terms of this Agreement by the transferee, nor will it be deemed a waiver of Franchisor's right to give or withhold approval to future Transfers.

M.     <u>No Liability</u>.

Franchisor's decision with respect to a proposed Transfer shall not create any liability on the part of Franchisor: (1) to the transferee, if Franchisor approves the Transfer and the transferee experiences financial difficulties; or (2) to Franchisee, the transferring party or the proposed transferee, if Franchisor disapproves the Transfer pursuant to this Section 18 or for other legitimate business purposes. Franchisor, without any liability to Franchisee, the transferring party or the proposed transferee, has the right, in its sole discretion, to communicate and counsel with Franchisee and the proposed transferee regarding any aspect of the proposed Transfer.

19.    GENERAL RELEASE

Franchisee (on behalf of itself and its parent, subsidiaries and affiliates and their respective past and present members, officers, directors, shareholders, agents and employees, in their corporate and individual capacities), all individuals who execute this Agreement and all guarantors of Franchisee's obligations under this Agreement (collectively "**Releasors**"), freely and without any influence, forever release and covenant not to sue Franchisor, its parent, subsidiaries and affiliates, including without limitation, TGI Friday's Inc., and their respective past and present officers, directors, shareholders, agents and employees, in their corporate and individual capacities (collectively "**Releasees**") with respect to any and all claims, demands, liabilities and causes of action of whatever kind or nature, whether known or unknown, vested or contingent, suspected or unsuspected (collectively "**claims**"), that any Releasor now owns or holds, or may at any time have owned or held, up to and including the date of this Agreement, including, without limitation, claims arising under federal, state and local laws, rules and ordinances, claims for contribution, indemnity and/or subrogation, and claims arising out of, or relating to this Agreement and all other agreements between any Releasor and any Releasee, the sale of a franchise to any Releasor, the development and operation of the Restaurant and the development and operation of all other restaurants operated by any Releasor that are franchised by any Releasee. Notwithstanding any provision to the contrary in this Section 19, this General Release does not release any claims arising from representations made in Franchise Disclosure Document or its exhibits or otherwise impair or affect any claims arising after the date of this Agreement. **TO THE EXTENT APPLICABLE, FRANCHISEE, EACH PRINCIPAL OWNER AND EACH GUARANTOR INTEND THIS SECTION TO COVER, ENCOMPASS, RELEASE AND EXTINGUISH ALL CLAIMS AND MATTERS THAT MIGHT OTHERWISE BE RESERVED BY CALIFORNIA CIVIL CODE SECTION 1542, WHICH PROVIDES: "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM MUST HAVE MATERIALLY AFFECTED THE SETTLEMENT WITH THE DEBTOR."**

20.    COVENANTS

A.    <u>Best Efforts</u>.

During the Initial Term, Franchisee shall devote its best efforts to the development, management and operation of the Restaurant.

B.    <u>Confidentiality</u>.

(1)    As used in this Agreement, the term "**Confidential Information**" includes the System, the Manuals, the System Standards, written directives and all drawings, equipment, recipes, computer and point of sale programs (and output from such programs), and any other information, know-how, techniques, trade secrets, material and data imparted or made available by Franchisor which is (a) designated as confidential; (b) known by Franchisee to be considered confidential by Franchisor; or (c) by its nature inherently or reasonably considered confidential.

(2)    Franchisee acknowledges and agrees that: (a) Franchisor owns all right, title and interest in and to the Confidential Information; (b) the Confidential Information gives Franchisor and its affiliates a competitive advantage; (c) Franchisor and its affiliates have taken all measures necessary to protect the Confidential Information; (d) all Confidential Information now or hereafter provided or disclosed to Franchisee is disclosed in confidence; (e) Franchisee has no right to disclose any part of the Confidential Information to anyone who is not an employee of Franchisee; (f) Franchisee will disclose to

its employees only those parts of the Confidential Information that an employee needs to know; (g) Franchisee will have a system in place to ensure its employees keep confidential Fridays Confidential Information; (h) Franchisee will not acquire any interest in the Confidential Information; and (i) Franchisee's use or duplication of the Confidential Information or any part of the Confidential Information in any other business would constitute an unfair method of competition, for which Franchisor would be entitled to all legal and equitable remedies, including injunctive relief, without posting a bond. Franchisee shall not, during the Initial Term or at any time thereafter, communicate or disclose any Confidential Information to any unauthorized person, or do or perform, directly or indirectly, any other acts injurious or prejudicial to any of the Proprietary Marks or the System.

C.    <u>Restrictions</u>.

(1)    Franchisee acknowledges and agrees that: (a) pursuant to this Agreement, Franchisee will have access to valuable trade secrets, specialized training and other Confidential Information from Franchisor and its affiliates regarding the development, operation, purchasing, sales and marketing methods and techniques of Franchisor and its affiliates and the System; (b) the System and the opportunities, associations and experience established and acquired by Franchisee under this Agreement are of substantial and material value; (c) in developing the System, Franchisor and its affiliates have made and continue to make substantial investments of time, technical and commercial research, and money; (d) Franchisor would be unable to adequately protect the System and its trade secrets and other Confidential Information against unauthorized use or disclosure and would be unable to adequately encourage a free exchange of ideas and information among Fridays Restaurants if franchisees or developers were permitted to hold interests in competitive businesses; and (e) restrictions on Franchisee's right to hold interests in, or perform services for, competitive businesses will not hinder its activities.

(2)    Accordingly, Franchisee covenants and agrees that during the Initial Term and for a continuous period of two years following its expiration, termination or Transfer, Franchisee shall not, either directly or indirectly, for itself, or through, on behalf of, or in conjunction with, any person, firm, partnership, corporation, or other entity:

(a)    Divert or attempt to divert any business or customer, or potential business or customer, of any restaurant franchised or operated by Franchisor or its affiliates to any competitor, by direct or indirect inducement or otherwise; or

(b)    Own, maintain, operate, engage in, advise, help, make loans to, or have any interest in, either directly or indirectly, any restaurant business that offers the same or similar products and services as offered by Fridays Restaurants or restaurants in any other concept or system owned, operated, managed or franchised by Franchisor or an affiliate, including, without limitation, waiter/waitress service, sit-down dining and bar services.

(3)    During the Initial Term, there is no geographical limitation on the restrictions set forth in Section 20.C. For a continuous two-year period following the expiration, termination or Transfer of this Agreement, the restrictions set forth in Section 20.C shall apply within: (a) a three-mile radius of the Premises; and (b) within a three-mile radius of any then-existing Fridays Restaurant, except as otherwise approved in writing by Franchisor. These restrictions shall not apply to Franchisee's existing restaurant or foodservice operations, if any, which are identified in <u>Exhibit A</u>, nor shall it apply to other restaurants operated by Franchisee that are franchised by Franchisor or its affiliates.

(4)    If any part of these restrictions is found to be unreasonable in time or distance, each month of time or mile of distance may be deemed a separate unit so that the time or distance may be

reduced by appropriate order of the court to that deemed reasonable. If, at any time during the two-year period following expiration, termination or Transfer of this Agreement, Franchisee fails to comply with its obligations under this Section, that period of noncompliance will not be credited toward Franchisee's satisfaction of the two-year obligation.

(5)     Franchisee further covenants and agrees that, during the Initial Term and for a period of two continuous years following the expiration, termination or Transfer of this Agreement, Franchisee will not, either directly or indirectly, for itself, or through, on behalf of, or in conjunction with any person, firm, partnership, corporation, or other entity, sell, assign, lease or transfer the Premises to any person, firm, partnership, corporation, or other entity which Franchisee knows, or has reason to know, intends to operate a restaurant business at the Premises that would violate Sections 20.C(2)(c) or 20.C(3). Franchisee, by the terms of any conveyance selling, assigning, leasing or transferring its interest in the Premises, shall include these restrictive covenants as are necessary to ensure that a restaurant business that would violate Sections 20.C(2)(c) or 20.C(3) is not operated at the Premises for this two-year period, and Franchisee shall take all steps necessary to ensure that these restrictive covenants become a matter of public record.

D.     Additional Remedies for Breach.

In addition to any other remedies or damages permitted under this Agreement, if Franchisee breaches Sections 20.C(2)(c), 20.C(3) or 20.C(5) ("**Covenants Against Competition**") during the Initial Term or during the continuous two-year period following the expiration, termination or Transfer of this Agreement, for each restaurant business that violates those Sections, Franchisee shall pay to Franchisor: (1) a fee equal to Franchisor's then-current Initial Franchise Fee for franchised Fridays Restaurants; and (2) 8% of the Gross Sales of that restaurant business until the expiration of the continuous two-year period following the expiration, earlier termination, or Transfer of this Agreement. Franchisee acknowledges that a precise calculation of the full extent of Franchisor damages under these circumstances is difficult to determine and the method of calculation of such damages as set forth in this Section 20.D is reasonable. Franchisee's payment to Franchisor under this Section shall be in addition to any attorneys' fees and other costs and expenses to which Franchisor is entitled pursuant to the terms of this Agreement. Franchisee acknowledges that breach of the Covenants Against Competition by Franchisee shall cause irreparable harm to Franchisor in addition to monetary damages and nothing in this Section 20.D shall preclude Franchisor from obtaining appropriate injunctive relief to enforce the Covenants Against Competition and specific performance to enforce this Section 20.D.

E.     Modification.

Franchisor shall have the right, in its sole discretion, to reduce the scope of any covenant in this Section 20 effective immediately upon Franchisee's receipt of written notice, and Franchisee agrees that it shall comply forthwith with any covenant as so modified, which shall be fully enforceable notwithstanding the provisions of Section 27.

F.     Execution of Covenants by Third Parties.

At Franchisor's request, Franchisee shall require and obtain the execution of covenants similar to those set forth in this Section 20 (including covenants applicable upon the termination of an individual's name with Franchisee) from certain third parties such as any officer, partner, member, manager, employee or Principal Owner of Franchisee and/or its affiliates. Every covenant required by this Section 20.F shall be in a form satisfactory to Franchisor, including, without limitation, specific identification of Franchisor as a third party beneficiary of such covenants with the independent right to

enforce them. Franchisor's current form of Non-Disclosure and Non-Competition Agreement is attached as <u>Exhibit G</u>. Failure by Franchisee to obtain execution of a covenant required by this Section 20.F shall constitute a material breach of this Agreement.

G.    <u>Applicability</u>.

The restrictions contained in this Section 20 shall apply to Franchisee, Franchisee's Principal Owners, and all guarantors of Franchisee's obligations. With respect to guarantors, these restrictions shall apply for a two-year period after any guarantor is released in writing from all obligations under the applicable guaranty agreement. The restrictions contained in this Section 20 shall not apply to ownership of less than a 5% legal or beneficial ownership in the outstanding equity securities of any publicly held corporation by Franchisee or any guarantor of Franchisee's obligations. The existence of any claim Franchisee or any guarantor of Franchisee's obligations may have against Franchisor or its affiliates, whether or not arising from this Agreement, shall not constitute a defense to the enforcement by Franchisor of the covenants in this Section 20. The preceding sentence, however, does not constitute a waiver of any such claim.

21.    DEFAULT AND REMEDIES

A.    <u>Defaults Resulting in Automatic Termination – No Notice or Opportunity to Cure</u>.

Franchisee shall be deemed to be in default under this Agreement, and all rights granted herein shall automatically terminate without notice to Franchisee or an opportunity to cure, upon the occurrence of any of the following events: (1) Franchisee shall become insolvent or makes a general assignment for the benefit of creditors; (2) a petition in bankruptcy is filed by Franchisee or such a petition is filed against and not opposed by Franchisee; (3) Franchisee is adjudicated a bankrupt or insolvent; (4) a bill in equity or other proceeding for the appointment of a receiver of Franchisee or other custodian for Franchisee's business or assets is filed and consented to by Franchisee; (5) a receiver or other custodian (permanent or temporary) of Franchisee's assets or property, or any part thereof, is appointed by any court of competent jurisdiction; (6) proceedings for a composition with creditors under any state or federal law is instituted by or against Franchisee; (7) a final judgment remains unsatisfied or of record for 30 days or longer (unless on appeal or a supersedeas bond is filed); (8) Franchisee is dissolved; (9) execution is levied against Franchisee's business or property; (10) suit to foreclose any lien or mortgage against the Premises or Restaurant equipment is instituted against Franchisee and not dismissed within 30 days; or (11) the real or personal property of the Restaurant shall be sold after levy thereupon by any sheriff, marshal, or constable.

B.    <u>Defaults Resulting in Termination Upon Notice – No Opportunity to Cure</u>.

In addition to the grounds for termination that may be stated elsewhere in this Agreement, Franchisor may terminate this Agreement, and the rights granted by this Agreement, upon written notice to Franchisee without an opportunity to cure upon the occurrence of any of the following events:

(1)    Franchisee fails to obtain site acceptance during the Site Acceptance Period.

(2)    Franchisee fails to begin development, construction and equipping of the Restaurant within 6 months after Franchisor accepts the site for the Restaurant.

(3)    Franchisee fails to open the Restaurant for business on or before the Opening Deadline.

(4)       Franchisee fails to obtain and maintain a liquor license or any permit or license necessary to operate the Restaurant.

(5)       Franchisee ceases to continuously operate the Restaurant for a period in excess of three consecutive days, unless the closing is due to Force Majeure, due to government order, or is required or otherwise approved in writing in advance by Franchisor.

(6)       Franchisee understates the Gross Sales of the Restaurant for any period by 1% or more, 3 or more times during any 18 month period, or by more than 3% on any one occasion.

(7)       Franchisee (or any other person subject to any confidentiality obligation or restrictive covenant under Section 20 or Exhibit G) materially breaches any confidentiality obligation or restrictive covenant under Section 20.

(8)       Any Transfer that requires Franchisor's prior written approval occurs without Franchisee having obtained that prior written approval.

(9)       Franchisor discovers that Franchisee made a material misrepresentation or omitted a material fact in the information that was furnished to Franchisor in connection with its decision to enter into this Agreement.

(10)       Franchisee knowingly falsifies any report required to be furnished Franchisor or makes any material misrepresentation in its dealings with Franchisor or fails to disclose any material facts to Franchisor.

(11)       Franchisor determines, in its sole discretion, that continued operation of the Restaurant by Franchisee will endanger the reputation and operations of other Fridays Restaurants and/or potentially endanger the general public.

(12)       Franchisee loses possession of the Premises through its own fault or its failure to extend Occupancy Contract through the Initial Term.

(13)       Franchisee, any stockholder, member, partner, director or officer of Franchisee, or any Principal Owner is convicted of, or pleads no contest (regardless of status of any appeal) to, a felony charge, a crime involving moral turpitude or any other crime or offense that is reasonably likely, in the sole opinion of Franchisor, to adversely affect Franchisor, its affiliates or the System.

(14)       Franchisee fails to provide or refuses to have its employees attend the training programs described in Section 11.

(15)       Franchisee materially breaches any representation or warranty set forth in Section 31.I or 31.J.

(16)       Franchisee loses the right to transact business in the jurisdiction where the Restaurant is located.

(17)       Franchisee (or its affiliates) or any Principal Owner: (a) remains in default beyond any applicable cure period under any other agreement with Franchisor or its affiliates; (b) remains in default beyond the applicable cure period under any Occupancy Contract, equipment lease, or financing instrument relating to the Restaurant; (c) remains in default beyond the applicable cure period

under any contract with any vendor or supplier to the Restaurant; or (d) fails to pay when due any taxes or assessments relating to the Restaurant or its employees, unless Franchisee is actively prosecuting or defending the claim or suit in a court of competent jurisdiction or by appropriate government administrative procedure or by arbitration or mediation conducted by a recognized alternative dispute resolution organization.

(18)    Franchisee, in accordance with Section 13.R, (i) does not cure a Remodel Default by electing the Royalty Increase Alternative; (ii) does cure a Remodel Default by electing the Royalty Increase Alternative but stops paying the 2.5% increase in the Royalty Fee before Franchisee completes the required Facilities Remodeling; or, (iii) does cure a Remodel Default by electing the Royalty Increase Alternative and continues to pay the 2.5% increase in the Royalty Fee but seven years from the expiration of the Remodel Cure Period passes without Franchisee completing the required Facilities Remodeling.

C.    <u>Defaults Resulting in Termination Following Expiration of Cure Period</u>.

(1)    Except for those items listed in preceding Section 21.A and 21.B, Franchisee shall have 30 days after written notice of default from Franchisor within which to remedy the default and provide evidence of that remedy to Franchisor. If any such default is not cured within that time, this Agreement shall terminate without further notice to Franchisee effective immediately upon expiration of that time, unless Franchisor notifies Franchisee otherwise in writing. Franchisee will be in default under this Section 21.C(1) for any failure to materially comply with any of the requirements imposed by this Agreement, the Manuals or otherwise in writing, or to carry out the terms of this Agreement in good faith.

(2)    Notwithstanding the provisions of preceding Section 21.C(1), if Franchisee defaults in the payment of any monies owed to Franchisor when such monies become due and payable and Franchisee fails to pay such monies within 10 days after receiving written notice of default, then this Agreement will terminate effective immediately upon expiration of that time, unless Franchisor notifies Franchisee otherwise in writing.

(3)    If Franchisee has received two or more notices of default within the previous 12 months, Franchisor shall be entitled to send Franchisee a notice of termination upon Franchisee's next default within that 12-month period without providing Franchisee an opportunity to remedy the default.

(4)    In addition to the other provisions of this Section, if Franchisor reasonably determines that Franchisee becomes or will become unable to meet its obligations to Franchisor or its affiliates under this Agreement, Franchisor may provide Franchisee written notice to that effect and demand that Franchisee provide those assurances reasonably designated by Franchisor, which may include security or letters of credit for the payment of Franchisee's obligations to Franchisor and its affiliates. If Franchisee fails to provide the assurances demanded by Franchisor within 30 days after its receipt of written notice from Franchisor, this Agreement shall terminate without further notice to Franchisee effective immediately upon expiration of that time, unless Franchisor notifies Franchisee otherwise in writing.

D.    <u>Franchisor's Alternate Remedies Upon Franchisee's Default</u>.

In addition to, and without limiting, Franchisor's other rights and remedies under this Agreement, any other agreement or applicable law, if Franchisee fails to comply with any provision of this Agreement or upon the occurrence of (i) any event of default giving rise to Franchisor's right to terminate this Agreement under the preceding Section 21.B or (ii) any event of default under Section 21.C which,

following notice, is not timely cured, Franchisor may instead elect, in its sole discretion and upon written notice to Franchisee, to take any or all of the following actions without terminating this Agreement until such time as Franchisor confirms in writing that such default has been cured:

(1)     temporarily remove information concerning the Restaurant from any Digital Media operated for the network of Fridays Restaurants, and/or restrict Franchisee's participation in other programs or benefits offered on or through any such Digital Media;

(2)     temporarily suspend Franchisee's right to participate in any advertising, marketing, promotional, or public relations programs that Franchisor or the National Advertising Fund provides, authorizes, or administers;

(3)     withhold the provision of any services required to be performed by Franchisor under this Agreement for a period of time determined by Franchisor in its sole discretion;

(4)     assess a non-compliance fee in the amount of 1% of the Gross Sales of the Restaurant for each month in which that non-compliance has occurred or continued for one or more days, in order to compensate Franchisor for damage to the reputation of Fridays Restaurants, the Proprietary Marks and the entire System; and,

(5)     at Franchisee's expense, require Franchisee, Franchisee's Operating Principal, the Restaurant's general manager, and/or the kitchen manager to attend and successfully complete the Management Training Program.

     E.     <u>Early Termination Damages</u>.

(1)     If Franchisee defaults on its obligations and this Agreement terminates before the expiration of the Initial Term, it is hereby agreed by Franchisee and Franchisor that the amount of damages which Franchisor would incur for any such termination of this Agreement would be difficult, if not impossible, to accurately ascertain. Accordingly, within 30 days following such termination, Franchisee and its Principal Owners shall pay to Franchisor an amount equal to the average monthly Royalty Fees and advertising fund contributions that Franchisee owed for the past 36 months multiplied by the lesser of 36 months or the number of months remaining in the Initial Term ("**Early Termination Damages**"). If Franchisee has not operated the Restaurant for 36 months, the Early Termination Damages will be calculated by using the average monthly Royalty Fees and advertising contributions owed by Franchisee for the number of months that the Restaurant has been in operation. The Early Termination Damages shall also include the value of the Occupancy Contract and Permits (as hereinafter defined), if applicable, assigned to Franchisor or its designee pursuant to Section 23.A(2). These Early Termination Damages shall constitute liquidated damages and are not to be construed as a penalty and shall be the joint and several liability of Franchisee, its Principal Owners, and each Guarantor.

(2)     Franchisee and Franchisor acknowledge and agree that: (a) the Early Termination Damages are a reasonable estimation of the damages that would be incurred by Franchisor resulting from or arising out of the premature termination of this Agreement; and (b) Franchisee's payment of such Early Termination Damages is intended to fully compensate Franchisor only for any and all damages related to or arising out of the premature termination of this Agreement by Franchisor, and shall not constitute an election of remedies, waiver of any default under this Agreement, nor waiver of Franchisor's claim for other damages and/or equitable relief arising out of Franchisee's breach of this Agreement.

(3)      The imposition of Early Termination Damages shall be at Franchisor's sole option.  Franchisor is not required to impose Early Termination Damages and may, in addition or in lieu thereof, pursue other remedies available to Franchisor under the terms and conditions of this Agreement, in equity or at law in the event of Franchisee's default under this Agreement, including, without limitation, actual damages incurred by Franchisor, if such can be ascertained.  All such remedies shall be cumulative and non-exclusive.

F.      <u>Statutory Limitations</u>.

If any valid, applicable law or regulation of a competent governmental authority with jurisdiction over this Agreement requires a notice or cure period before termination longer than set forth in this Section, this Agreement will be deemed amended to conform to the minimum notice or cure period required by the applicable law or regulation.

22.      OBLIGATIONS ON TERMINATION OR EXPIRATION

A.      <u>Franchisee's Obligations</u>.

Upon termination or expiration of this Agreement (or as directed by Franchisor if Franchisor intends to exercise the Purchase Option under Section 23):

(1)      Franchisee immediately shall cease operating a Fridays Restaurant at the Premises.  All rights and licenses granted to Franchisee under this Agreement (including, without limitation, the right to use the System, the Manuals, and the Proprietary Marks) immediately shall terminate and all rights shall revert to Franchisor;

(2)      Franchisee immediately shall pay Franchisor and its affiliates all sums due and owing Franchisor or its affiliates pursuant to this Agreement.  Until all amounts are paid and any damages, costs or expenses incurred or suffered by Franchisor have been paid, Franchisor shall have, and Franchisee shall be deemed to have granted, a lien against any and all of the Assets (as defined below) and Franchisee's interest in the Premises;

(3)      Franchisee promptly shall cease use of and return to Franchisor the Manuals, any copies of the Manuals, all other Confidential Information, and all other materials and information furnished by Franchisor, and Franchisee promptly shall return to Franchisor, in good condition and repair excepting normal wear and tear, all computer software, disks, tapes and other magnetic storage media.  Franchisee shall retain no copies of the returned materials;

(4)      Franchisee immediately shall discontinue all use of the Proprietary Marks and Franchisor's trade secrets in connection with the Restaurant and of any and all items bearing the Proprietary Marks; unless acquired by Franchisor pursuant to Section 23 below, remove the Proprietary Marks from the Restaurant, and from clothing, signs, materials, motor vehicles and other items owned or used by Franchisee in the operation of the Restaurant; cease to use, in any manner whatsoever, any websites, Social Media, or other Electronic Identifiers associated with the Proprietary Marks or the System; cancel all advertising for the Restaurant that contains the Proprietary Marks (including telephone directory listings); and take such action as may be necessary to cancel any filings or registrations for the Restaurant that contain any Proprietary Marks (including any assumed name filings);

(5)      Franchisee shall, at the option of Franchisor, execute all documentation required by Franchisor to assign to Franchisor all rights to the telephone numbers of the Restaurant, any related

and other business listings, and any Electronic Identifiers related to the Restaurant. Franchisee is not entitled to any compensation from Franchisor if Franchisor exercises these rights or options. Franchisee hereby appoints Franchisor as its attorney-in-fact with full power and authority (which power and authority are coupled with an interest and irrevocable) for the purpose of assigning these rights to Franchisor and shall execute any forms or documents that Franchisor considers necessary for that appointment;

(6)      Franchisee and all persons and entities subject to the covenants contained in Section 20 shall continue to abide by those covenants and shall not, directly or indirectly, take any action that violates those covenants;

(7)      If Franchisor or its designee does not elect to assume the Occupancy Contract for the Premises and/or does not purchase the Restaurant assets in accordance with Section 23 below, then Franchisee promptly shall make such alterations and modifications to the Premises as may be necessary to clearly distinguish to the public the Premises from that of other Fridays Restaurants and also make those specific additional changes as Franchisor or its designee may request for that purpose including, but not be limited to: (1) removal of décor, including wall graphics, decorative glass elements and the racing scull; (2) removal of red and white striped outside awnings; (3) removal or painting of interior red and white ceiling elements and exterior and interior walls to a solid color other than Franchisor's proprietary blue or a color specified in the Standards; and (4) removal of signage and architectural tumbler. If Franchisee fails to promptly make these alterations and modifications, Franchisor or its designee shall have the right (at Franchisee's expense, to be paid upon Franchisee's receipt of an invoice from Franchisor) to do so without being guilty of trespass or other tort; and

(8)      Franchisee and each Principal Owner shall, jointly and severally, pay all costs and expenses (including fees of attorneys and other engaged professionals) incurred by Franchisor in connection with the enforcement of this Section 22.

B.      <u>Evidence of Compliance</u>.

Franchisee shall furnish Franchisor, within 30 days after the effective date of termination or expiration, evidence (certified to be true, complete, accurate and correct by the chief executive officer of Franchisee, if Franchisee is a corporation; by a manager of Franchisee, if Franchisee is a limited liability company; or by a general partner of Franchisee, if Franchisee is a partnership) satisfactory to Franchisor of Franchisee's compliance with Section 22.A.

C.      <u>Franchisee Prohibited from Engaging in Certain Conduct</u>.

Franchisee shall not, except with respect to a restaurant franchised by Franchisor or its affiliates which is then open and operating pursuant to an effective franchise agreement: (1) operate or do business under any name or in any manner that might tend to give the public the impression that Franchisee is connected in any way with Franchisor or its affiliates or has any right to use the System or the Proprietary Marks; (2) make, use or avail itself of any of the materials or information furnished or disclosed by Franchisor or its affiliates under this Agreement or disclose or reveal any such materials or information or any portion thereof to anyone else; or (3) assist anyone not licensed by Franchisor or its affiliates to construct or equip a foodservice outlet substantially similar to a Fridays Restaurant.

23.    OPTION TO PURCHASE

A.    Scope.

(1)    Franchisee hereby grants to Franchisor an option ("**Purchase Option**") to purchase the assets used in connection with the ownership and/or operation of the Restaurant. Franchisor may notify Franchisee between one year before and 30 days after the effective date of termination or expiration of this Agreement, if Franchisor desires to exercise its Purchase Option. Within 15 days after a request by Franchisor, Franchisee must provide to Franchisor a list of all assets used in connection with the ownership or operation of the Restaurant, and Franchisor will thereafter advise Franchisee which of such assets Franchisor desires to purchase (collectively, the "**Assets**"), which may include, without limitation, leasehold improvements, equipment, vehicles, furnishings, fixtures, signs and legally transferable inventory (non-perishable products, materials and supplies), the Occupancy Contract and, to the extent legally transferable, any Permits (as defined in Section 23.A(2)).

(2)    If Franchisor exercises the Purchase Option, Franchisee shall, at Franchisor's option, assign the Occupancy Contract for the Premises and the liquor and all other transferable licenses and permits used in connection with the ownership or operation of the Restaurant (collectively, the "**Permits**") to Franchisor or its designee. In the event that Franchisor exercises the Purchase Option after termination for Franchisee's default, the purchase price for the Occupancy Contract and the Permits shall be included in the Early Termination Damages; in the event that Franchisor exercises the Purchase Option after expiration, the purchase price for the Occupancy Contract and the Permits shall be the fair market value of the Occupancy Contract and the Permits.

(3)    At any time after Franchisor provides notice to Franchisee under Section 23.A(1), Franchisor may elect: (a) to permit Franchisee to operate the Restaurant and maintain the Assets in the usual and ordinary course of business and maintain in full force all insurance policies required under this Agreement; (b) to appoint an interim manager (which may be Franchisor or its designee), at Franchisor's expense, to control the day-to-day operations of the Restaurant, and Franchisee shall cooperate, and instruct its employees to cooperate, with that manager; or (c) to require Franchisee to close the Restaurant during such time period without removing any Assets from the Restaurant.

(4)    Franchisor shall have the unrestricted right to assign this Purchase Option and designate the assignee(s) of the Assets. Therefore, all references in this Section 23 to Franchisor shall include such assignee and/or designee, as applicable. Franchisor or its assignee shall be entitled to all customary representations and warranties that the Assets are free and clear (or, if not, accurate and complete disclosure) as to: (a) ownership, condition and title; (b) liens and encumbrances; (c) environmental and hazardous substances; and (d) validity of contracts and liabilities inuring to Franchisor or affecting the Assets, whether contingent or otherwise.

(5)    Franchisee hereby appoints Franchisor as its attorney-in-fact with full power and authority (which power and authority are coupled with an interest and irrevocable) for the purpose of consummating the transactions under this Section 23 and shall execute any forms or documents that Franchisor considers necessary for that appointment.

B.    Purchase Price.

The purchase price for the Assets ("**Purchase Price**") shall be their fair market value determined as of the effective date of purchase in a manner that accounts for reasonable depreciation and condition of the Assets; provided, however, that the Purchase Price shall take into account the termination or

expiration of this Agreement and shall be reduced by any Early Termination Damages. Further, the Purchase Price for the Assets shall not contain any factor or increment for any trademark, service mark or other commercial symbol used in connection with the operation of the Restaurant nor any goodwill or "going concern" value for the Restaurant. Franchisor may exclude from the Assets purchased in accordance with this Section any equipment, vehicles, furnishings, fixtures, signs, and inventory, including without limitation, any such Assets that are not approved as meeting then-current standards for a Fridays Restaurant or for which Franchisee cannot deliver a Bill of Sale in a form satisfactory to Franchisor. Franchisor shall have the right to set off against and reduce the Purchase Price by any and all amounts owed by Franchisee to Franchisor, and the amount of any encumbrances or liens against the Assets or any obligations assumed by Franchisor.

C.    Certified Appraisers.

If Franchisor and Franchisee are unable to agree on the fair market value of the Assets within 15 days after Franchisee's receipt of Franchisor's notice of its intent to exercise its Purchase Option, the fair market value shall be determined by two professionally certified appraisers, Franchisee selecting one and Franchisor selecting one. If the valuations set by the two appraisers differ by more than 10%, the two appraisers shall select a third professionally certified appraiser who also shall appraise the fair market value of the Assets. The average value set by the appraisers (whether two or three appraisers as the case may be) shall be conclusive and shall be the Purchase Price.

D.    Access to Restaurant and Other Assets.

Franchisor and the appraisers shall be given full access to inspect the Restaurant, the Premises and other assets, and Franchisee's books and records during customary business hours and upon 2 business days notice to conduct inspections and the appraisal. The appraisers shall value the leasehold improvements, equipment, furnishings, fixtures, signs and inventory in accordance with the standards of this Section. The appraisers fees and costs shall be borne equally by Franchisor and Franchisee.

E.    Exercise of Purchase Option.

(1)    Within 10 days after the Purchase Price has been agreed to or determined by appraisers, Franchisor may proceed with exercising its Purchase Option by so notifying Franchisee in writing ("**Fridays Purchase Notice**"). The Purchase Price shall be paid in cash or cash equivalents at the closing of the purchase ("**Closing**"), which shall take place no later than 60 days after the date of Fridays Purchase Notice. Franchisee and Franchisor agree that, if issues arise relating to the liquor license and Franchisor is not able to operate the Restaurant, among other options, the date for Closing may be extended for a reasonable amount of time, not to exceed 270 days, for the parties to resolve such issues.

(2)    Franchisee shall promptly, at Franchisor's option: (a) enter into an interim management or similar agreement whereby Franchisor or its designee (regardless of whether the Closing has occurred) may operate the Restaurant pursuant to any or all of the Permits, the Occupancy Contract and any other relevant contractual obligations; and (b) promptly take all steps necessary or helpful, including executing any forms or documents, in connection with the foregoing.

F.    Due Diligence Period.

(1)    For a period of 30 days after the date of Fridays Purchase Notice ("**Due Diligence Period**"), Franchisor shall have the right to conduct such investigations as it deems necessary and appropriate to determine: (a) the ownership, condition and title of the Assets; (b) liens and

encumbrances on the Assets; (c) environmental and hazardous substances at or upon the Premises; and (d) the validity of contracts and liabilities inuring to Franchisor or affecting the Assets, whether contingent or otherwise. Franchisee will afford Franchisor and its representatives access to the Restaurant and the Premises at all reasonable times for the purpose of conducting inspections of the Assets; provided that such access does not unreasonably interfere with Franchisee's operation of the Restaurant.

(2)      During the Due Diligence Period, at its sole option and expense, Franchisor may (a) cause the title to the Assets that consist of real estate interests ("**Real Estate Assets**") to be examined by a nationally recognized title company and conduct lien searches as to the other Assets; (b) procure "as-built" surveys of the Real Estate Assets; (c) procure environmental assessments and testing with respect to the Real Estate Assets; and/or (d) inspect the Assets that consist of leasehold improvements, equipment, vehicles, furnishings, fixtures, signs and inventory ("**Fixed Assets**") to determine if the Fixed Assets are in satisfactory working condition. Before the end of the Due Diligence Period, Franchisor shall notify Franchisee in writing of any objections that Franchisor has to any finding disclosed in any title to lien search, survey, environmental assessment or inspection. If Franchisee cannot or elects not to correct any such title defect, environmental objection or defect in the working condition of the Fixed Assets, Franchisor will have the option to either accept the condition of the Assets as they exist or rescind its exercise of the Purchase Option on or before the Closing.

G.      <u>Purchase Option Not Exercised</u>.

If Franchisor does not exercise its Purchase Option, Franchisee shall within 30 days after the expiration of Fridays Purchase Option make such alterations to the Restaurant as may be necessary, in Franchisor's reasonable judgment, to distinguish the appearance of the Premises from that of other Fridays Restaurants as set forth in Section 22.A(7) above. If Franchisor does not elect to purchase all or any portion of the assets which bear any Proprietary Mark or are otherwise proprietary in nature, Franchisee shall dispose of such assets only in a manner to which Franchisor has given consent within the same period of time as required under this Section for the removal of all other assets.

H.      <u>Ongoing Right of First Refusal</u>.

If Franchisor does not exercise its Purchase Option, for a period of one year after the termination or expiration of this Agreement, Franchisor shall have and is hereby granted a right of first refusal with respect to the sale by Franchisee of all or any portion of the assets used in connection with the ownership or operation of the Restaurant. Franchisee shall promptly notify Franchisor of any proposed sale of the assets and shall provide such information and documents relating thereto as Franchisor may require. Within 30 days after receipt of such notice, information and documents, Franchisor may notify Franchisee that it intends to exercise its right of first refusal with regard to such assets upon the same terms and conditions. If such transaction shall not be consummated within a reasonable period of time after Franchisor has given such notice, then Franchisor's right of first refusal under this Section shall be a continuing right and failure to exercise such right shall not constitute a waiver of any other provision of this Agreement, including such right of first refusal with respect to future offers.

I.      <u>Compliance with Law</u>.

Before the Closing, Franchisee and Franchisor shall comply with all applicable legal requirements, including the bulk sales provisions of the Uniform Commercial Code of the state in which the Restaurant is located and the bulk sales provisions of any applicable tax laws and regulations. Franchisee shall, before or simultaneously with the Closing, pay all tax liabilities incurred in connection with the operation of the Restaurant before Closing.

J.    <u>Premises Leased</u>.

If Occupancy Contract is assigned to Franchisor or Franchisor subleases the Premises from Franchisee, Franchisor will indemnify and hold Franchisee harmless from any ongoing liability under the Occupancy Contract from the date Franchisor assumes possession of the Premises, and Franchisee will indemnify and hold Franchisor harmless from any liability under the Occupancy Contract before and including that date.

K.    <u>Premises Owned by Franchisee</u>.

If Franchisee owns the Premises, Franchisor, at its option, will either purchase the fee simple interest or, upon purchase of the Assets, enter into a standard lease with Franchisee on terms comparable to those for which similar commercial properties in the area are then being leased.  The initial term of this lease with Franchisee shall be at least 10 years with two options to renew of five years each, and the rent shall be the fair market rental value of the Premises.  If Franchisee and Franchisor cannot agree on the fair market rental value of the Premises, then appraisers (selected in the manner described in Section 23.C) shall determine the rental value.

L.    <u>Franchisee's Obligations at Closing</u>.

At the Closing, Franchisee shall deliver instruments transferring to Franchisor or its assignee: (A) good and merchantable title to the Assets purchased, free and clear of all liens and encumbrances (other than liens and security interests acceptable to Franchisor or its assignee), with all sales and other transfer taxes paid by Franchisee; (B) all Permits for the Restaurant that may be assigned or transferred, with appropriate consents, if required; and (C) the lease or sublease for the Premises, with appropriate consents and estoppels, if required.  If Franchisee cannot deliver clear title to all of the purchased Assets as indicated in this Section, or if there are other unresolved issues, the Closing shall be accomplished through an escrow.

24.    RELATIONSHIP OF THE PARTIES AND INDEMNIFICATION

A.    <u>Relationship of the Parties</u>.

(1)    This Agreement does not create a fiduciary or other special relationship between the parties.  No agency, employment, or partnership is created or implied by the terms of this Agreement, and Franchisee is not and shall not hold itself out as agent, legal representative, partner, subsidiary, joint venturer or employee of Franchisor or its affiliates.  Franchisee shall have no right or power to, and shall not, bind or obligate Franchisor or its affiliates in any way or manner, nor represent that Franchisee has any right to do so.  Franchisee shall not issue any press releases without the prior written approval of Franchisor.

(2)    Franchisee is an independent contractor and is solely responsible for all aspects of the development and operation of the Restaurant, subject only to the conditions and covenants established by this Agreement.  Without limiting the generality of the foregoing, Franchisee acknowledges that Franchisor has no responsibility to ensure that the Restaurant is developed and operated in compliance with all applicable laws, ordinances and regulations and that Franchisor shall have no liability in the event the development or operation of the Restaurant violates any law, ordinance or regulation.  Neither this Agreement nor our course of conduct is intended, nor may anything in this

Agreement nor our course of conduct be construed to state or imply that Franchisor is the employer of Franchisee's employees.  The sole relationship between Franchisee and Franchisor is a commercial, arms length business relationship.  Franchisee's business is, and shall be kept, totally separate and apart from any that may be operated by Franchisor.  In all public records, in relationships with other persons, and on letterheads and business forms, Franchisee shall indicate its independent ownership of the Restaurant and that Franchisee is solely a franchisee of Franchisor.  Franchisee shall post a sign in a conspicuous location in the Restaurant which will contain Franchisee's name and state that the Restaurant is independently owned and operated by Franchisee under a franchise agreement with Franchisor.

      B.    <u>Indemnification</u>.

      (1)    Franchisee, Franchisee's Principal Owners, and all guarantors of Franchisee's obligations under this Agreement shall, at all times, indemnify, defend (with counsel reasonably acceptable to Franchisor), and hold harmless (to the fullest extent permitted by law) Franchisor and its affiliates, and their respective successors, assigns, past and present stockholders, directors, officers, employees, agents and representatives (collectively "**Indemnitees**") from and against all "losses and expenses" (as defined below) incurred in connection with any action, suit, proceeding, claim, demand, investigation, inquiry (formal or informal), judgment or appeal thereof by or against Indemnitees or any settlement thereof (whether or not a formal proceeding or action had been instituted), arising out of or resulting from or connected with the operation of the Restaurant; employment matters in connection with the Restaurant; any unauthorized use of Customer Data; Franchisee's breach of this Agreement; or Franchisee's activities under this Agreement, including but not limited to any violations of laws applicable to the operation of the Restaurant but excluding losses and expenses determined to be caused solely by the gross negligence or willful misconduct of Franchisor in a final, unappealable ruling issued by a court or arbitrator with competent jurisdiction.  Franchisee promptly shall give Franchisor written notice of any such action, suit, proceeding, claim, demand, inquiry or investigation filed or instituted against Franchisee and, upon request, shall furnish Franchisor with copies of any documents from such matters as Franchisor may request.

      (2)    At Franchisee's expense and risk, Franchisor may elect to assume (but under no circumstances will Franchisor be obligated to undertake), the defense and/or settlement of any action, suit, proceeding, claim, demand, investigation, inquiry, judgment or appeal thereof subject to this indemnification.  Such an undertaking shall, in no manner or form, diminish Franchisee's obligation to indemnify and hold harmless Franchisor and Indemnitees.  An Indemnitee need not seek recovery from any insurer or other third party, or otherwise mitigate its or their losses and expenses, in order to maintain and recover from third parties fully a claim against Franchisee under this Section 24.B.  Franchisee agrees that a failure to pursue a recovery or mitigate a loss will not reduce or alter the amounts that an Indemnitee may recover from Franchisee under this Section 24.B.

      (3)    Notwithstanding anything to the contrary contained in this Agreement, Franchisee is not required to indemnify Franchisor with regard to any infringement, alleged infringement or other violation or alleged violation by Franchisee or any Principal Owner of any patent, trademark, or copyright or other proprietary right owned or controlled by a third party, to the extent that such action arises in connection with Franchisee's use of the Proprietary Marks and System licensed to Franchisee when used in the manner authorized and required by Franchisor pursuant to this Agreement.  In the event Franchisee is involved in such an action, Franchisor agrees to indemnify Franchisee and Franchisee's Principal Owners in connection with the defense thereof, and to indemnify and hold Franchisee and Franchisee's Principal Owners harmless from any and all losses and expenses (as defined below), in connection with such proceedings.  Franchisee shall give notice to Franchisor of any such claim no later than 15 days after Franchisee becomes aware of or is given notice of the claim.  This indemnity shall be

inoperative to the extent that failure to have timely provided such notice to Franchisor materially impairs Franchisor's ability to defend any such claim, in whole or in part, or to minimize the costs of this indemnity. **IN NO EVENT SHALL FRANCHISOR'S INDEMNITY OBLIGATIONS TO FRANCHISEE EXCEED AN AMOUNT EQUAL TO THE AVERAGE ROYALTIES FRANCHISOR HAS RECEIVED UNDER THE AGREEMENT FOR A ONE-YEAR PERIOD.** Franchisee shall not be required to defend Franchisor with regard to Franchisee's utilization pursuant to this Agreement of the Proprietary Marks and System provided such utilization is in strict compliance with that authorized and required by Franchisor pursuant to this Agreement.

(4)    As used in this Section 24.B, the phrase "**losses and expenses**" shall include, but not be limited to, all losses; compensatory, exemplary and punitive damages; fines; charges; costs; expenses; lost profits; reasonable attorneys' fees; expert witness fees; court costs; settlement amounts; judgments; compensation for damages to Franchisor's reputation and goodwill; costs of or resulting from delays; financing; costs of advertising material and media time/space and the costs of changing, substituting or replacing the same; and any and all expenses of recall, refunds, compensation, public notices and other such amounts incurred in connection with the matters described.

25.    CONSENTS, APPROVALS AND WAIVERS

A.    <u>Approvals</u>.

Whenever this Agreement requires the prior approval, acceptance or consent of Franchisor, Franchisee shall make a timely written request to Franchisor therefor, and any approval, acceptance or consent received, in order to be effective and binding upon Franchisor, must be obtained in writing and be signed by an officer of Franchisor.

B.    <u>No Warranties</u>.

Franchisor makes no warranties or guarantees upon which Franchisee may rely by providing any waiver, approval, acceptance, consent or suggestion to Franchisee in connection with this Agreement, and assumes no liability or obligation to Franchisee therefor, or by reason of any neglect, delay, or denial of any request therefor. Franchisor shall not, by virtue of any approvals, acceptances, advice or services provided to Franchisee, assume responsibility or liability to Franchisee or to any third parties to which Franchisor would not otherwise be subject.

C.    <u>Waivers</u>.

No failure of Franchisor to exercise any power reserved to it by this Agreement or to insist upon strict compliance by Franchisee with any obligation or condition hereunder, and no custom or practice of the parties at variance with the terms of this Agreement, shall constitute a waiver of Franchisor's right to demand exact compliance with any of the terms of this Agreement. A waiver by Franchisor of any particular default by Franchisee shall not affect or impair Franchisor's rights with respect to any subsequent default of the same, similar or different nature, nor shall any delay, forbearance or omission of Franchisor to exercise any power or right arising out of any breach or default by Franchisee of any of the terms, provisions or covenants of this Agreement affect or impair Franchisor's right to exercise the same, nor shall such constitute a waiver by Franchisor of any right hereunder, or the right to declare any subsequent breach or default and to terminate this Agreement before the expiration of its term. Subsequent acceptance by Franchisor of any payments due to it hereunder shall not be deemed to be a waiver by Franchisor of any preceding breach by Franchisee of any terms, covenants or conditions of this Agreement.

26.    NOTICES

No notice, demand, request or other communication to the parties shall be binding upon the parties unless the notice is in writing, refers specifically to this Agreement, and is addressed to the addresses shown on the signature page of this Agreement, unless and until a different address has been designated by written notice to the other party. Notices shall be effective upon receipt (or first refusal of delivery) and may be: (A) delivered personally; (B) transmitted by facsimile or electronic mail with electronic confirmation of receipt; (C) mailed in the United States mail, postage prepaid, certified mail, return receipt requested; or (D) mailed via overnight courier. Notices shall be deemed received: at the time of personal delivery, at the time of transmission in the case of email, electronic delivery, facsimile or similar delivery (provided confirmation of delivery is received by the sender), on the next business day in the case of overnight delivery, or within three business days in the case of registered or certified mail.

27.    ENTIRE AGREEMENT

Franchisor and Franchisee acknowledge that each element of this Agreement is essential and material and that, except as otherwise provided in this Agreement, the parties shall deal with each other in good faith. This Agreement, the Manuals, the documents referred to herein, and the attachments hereto, constitute the entire, full and complete agreement between the parties concerning Franchisee's rights, and supersede any and all prior or contemporaneous negotiations, discussions, understandings or agreements. There are no other representations, inducements, promises, agreements, arrangements, or undertakings, oral or written, between the parties relating to the matters covered by this Agreement other than those set forth in this Agreement and in the attachments to this Agreement. Nothing in this or any other agreement, however, is intended to disclaim the representations Franchisor made in the Franchise Disclosure Document that Franchisor furnished to Franchisee. No obligations or duties that contradict or are inconsistent with the express terms of this Agreement may be implied into this Agreement. Except as expressly set forth herein, no amendment, change or variance from this Agreement shall be binding on either party unless mutually agreed upon by the parties and executed in writing.

28.    SEVERABILITY AND CONSTRUCTION

A.    <u>Severability</u>.

If any clause or provision of this Agreement is or should ever be held to be illegal, invalid, or unenforceable under any present or future law applicable to the terms hereof, then and in that event, it is the intention of the parties hereto that the remainder of this Agreement shall not be affected thereby, and that in lieu of each such clause or provision of this Agreement that is illegal, invalid, or unenforceable, such clause or provision shall be construed and interpreted to be as similar in substance and content to such illegal, invalid, or unenforceable clause or provision, as the context thereof would reasonably suggest, so as to thereafter be legal, valid, and enforceable.

B.    <u>No Third Party Beneficiaries</u>.

Except as otherwise provided in Section 24.B, nothing in this Agreement is intended, nor shall be deemed, to confer upon any person or legal entity other than Franchisee and Franchisor and its affiliates and such of their heirs, successors and assigns, any rights or remedies under or by reason of this Agreement.

C.    <u>Interpretation</u>.

No provision of this Agreement shall be interpreted in favor of, or against, any party because of the party that drafted this Agreement.

29.    GOVERNING LAW, FORUM AND LIMITATIONS

A.    <u>Choice of Law</u>.

This Agreement and any claim or controversy arising out of, or relating to, rights and obligations of the parties under this Agreement and any other claim or controversy between the parties shall be governed by and construed in accordance with the laws of the State of Texas without regard to conflicts of laws principles. Nothing in this Section is intended, or shall be deemed, to make any Texas law regulating the offer or sale of franchises or the franchise relationship applicable to this Agreement if such law would not otherwise be applicable.

B.    <u>Choice of Forum</u>.

The parties agree that, to the extent any disputes cannot be resolved directly between them, Franchisee shall file any suit against Franchisor only in the federal or state court having jurisdiction in Dallas County, Texas. Franchisor may file suit in the federal or state court located in Dallas County, Texas or in the jurisdiction where Franchisee resides or does business or where the Restaurant is or was located or where the claim arose. Franchisee consents to the personal jurisdiction of those courts over Franchisee and to venue in those courts.

C.    <u>Limitation of Actions</u>.

EXCEPT FOR PAYMENTS OWED BY ONE PARTY TO THE OTHER, AND UNLESS PROHIBITED BY APPLICABLE LAW, ANY LEGAL ACTION OR PROCEEDING (INCLUDING THE OFFER AND SALE OF A FRANCHISE TO FRANCHISEE) BROUGHT OR INSTITUTED WITH RESPECT TO ANY DISPUTE ARISING FROM OR RELATED TO THIS AGREEMENT OR WITH RESPECT TO ANY BREACH OF THE TERMS OF THIS AGREEMENT MUST BE BROUGHT OR INSTITUTED WITHIN A PERIOD OF TWO YEARS AFTER THE INITIAL OCCURRENCE OF ANY ACT OR OMISSION THAT IS THE BASIS OF THE LEGAL ACTION OR PROCEEDING, WHENEVER DISCOVERED.

D.    <u>Waiver of Certain Damages</u>.

(1)    **FRANCHISEE AND FRANCHISOR WAIVE, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY RIGHT OR CLAIM OF ANY PUNITIVE OR EXEMPLARY DAMAGES AGAINST EACH OTHER AND AGREE THAT, IN THE EVENT OF A DISPUTE BETWEEN THEM, EACH SHALL BE LIMITED TO THE RECOVERY OF ACTUAL DAMAGES SUSTAINED BY IT. FRANCHISEE AND FRANCHISOR WAIVE, TO THE FULLEST EXTENT PERMITTED BY LAW, THE RIGHT TO BRING, OR BE A CLASS MEMBER IN, ANY CLASS ACTION SUITS.**

(2)    **FRANCHISEE AND FRANCHISOR ACKNOWLEDGE AND AGREE THAT IN NO EVENT SHALL FRANCHISOR'S AGGREGATE LIABILITY TO FRANCHISEE OR ANY OF ITS OWNERS UPON ANY CAUSE OF ACTION (INCLUDING, WITHOUT LIMITATION, NEGLIGENCE, STRICT LIABILITY AND OTHER ACTIONS IN CONTRACT**

**OR TORT) ARISING OUT OF OR IN ANY WAY RELATED TO THIS AGREEMENT EXCEED THE TOTAL AMOUNT OF FEES ACTUALLY RECEIVED BY FRANCHISOR FROM FRANCHISEE PURSUANT TO THIS AGREEMENT. THE FOREGOING SHALL NOT MODIFY THE PROVISIONS OF SECTION 24.B(3) OF THIS AGREEMENT.**

       E.      <u>JURY TRIAL WAIVER</u>.

       **THE PARTIES HEREBY UNCONDITIONALLY WAIVE THEIR RIGHT TO A JURY TRIAL OF ANY AND ALL CLAIMS OR CAUSES OF ACTION ARISING FROM OR RELATING TO THEIR RELATIONSHIP. THE PARTIES ACKNOWLEDGE THAT A RIGHT TO A JURY IS A CONSTITUTIONAL RIGHT, THAT THEY HAVE HAD AN OPPORTUNITY TO CONSULT WITH INDEPENDENT COUNSEL, AND THAT THIS JURY WAIVER HAS BEEN ENTERED INTO KNOWINGLY AND VOLUNTARILY BY ALL PARTIES TO THIS AGREEMENT. IN THE EVENT OF LITIGATION, THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.**

       F.      <u>Reimbursement of Costs and Expenses</u>.

       If either party brings an action to enforce this Agreement in a judicial proceeding, the party prevailing in that proceeding shall be entitled to reimbursement of costs and expenses, including, but not limited to, reasonable accountants, attorneys, attorneys assistants and expert witness fees, the cost of investigation and proof of facts, court costs, other litigation expenses, and travel and living expenses, whether incurred during, before, in preparation for, in contemplation of, or after the filing of, the proceeding. In any judicial proceeding, the amount of these costs and expenses will be determined by the court and not by a jury.

       G.      <u>Injunctive Relief</u>.

       Franchisee recognizes that its failure to comply with the terms of this Agreement, including, but not limited to, the failure to fully comply with all post-termination obligations, is likely to cause irreparable harm to Franchisor, its affiliates and the System. Therefore, Franchisee agrees that, in the event of a breach or threatened breach of any of the terms of this Agreement by Franchisee, Franchisor shall be entitled to injunctive relief (both preliminary and permanent) restraining that breach and/or to specific performance without showing or proving actual damages and without posting any bond or security. Any equitable remedies sought by Franchisor shall be in addition to, and not in lieu of, all remedies and rights that Franchisor otherwise may have arising under applicable law or by virtue of any breach of this Agreement.

       H.      <u>Rights and Remedies Cumulative</u>.

       No right or remedy conferred upon or reserved to Franchisor or Franchisee by this Agreement is intended to be, nor shall be deemed, exclusive of any other right or remedy herein or by law or equity provided or permitted, but each shall be cumulative of every other right or remedy. The provisions of this Section 29 shall survive the expiration or earlier termination of this Agreement.

30.    MISCELLANEOUS

A.    <u>Gender and Number</u>.

All references to gender and number shall be construed to include such other gender and number as the context may require.

B.    <u>Captions</u>.

All captions in this Agreement are intended solely for the convenience of the parties and none shall be deemed to affect the meaning or construction of any provision of this Agreement.

C.    <u>Counterparts</u>.

This Agreement may be executed in counterparts, and each copy so executed and delivered shall be deemed an original.

D.    <u>Time</u>.

Time is of the essence of this Agreement for each provision in which time is a factor.  Whenever this Agreement refers to a period of days or months, the first day or month to be counted shall be the day or month of the designated action, event or notice.  Days shall be measured by calendar days, except that if the last day of a period is a Saturday, Sunday or national holiday, the period automatically shall be extended to the next day that is not a Saturday, Sunday or national holiday.

E.    <u>Outsourcing by Franchisor</u>.

Franchisor may, in its sole discretion, elect to outsource and/or subcontract certain of Franchisor's obligations under this Agreement to subsidiaries, affiliates, contract employees, third party vendors, and/or other third party suppliers; provided that any such outsourcing and/or subcontracting shall not discharge Franchisor from its obligations under this Agreement.

F.    <u>Survival</u>.

Any obligation of Franchisee or Franchisee's Principal Owners that contemplates performance of such obligations after termination, expiration or Transfer shall be deemed to survive such termination, expiration or Transfer.

G.    <u>Force Majeure</u>.

No party shall be liable for any inability to perform by reason of Force Majeure (other than financial inability or insolvency) beyond their reasonable control; provided, however, that nothing herein shall excuse or permit any delay or failure: (1) to remit any payment on the date due; or (2) for more than 180 days.  The party whose performance is affected by an event of Force Majeure shall, within three days of the occurrence of such event, give written notice of such Force Majeure event to the other party setting forth the nature thereof and an estimate of its duration.  As used in this Agreement, the term "**Force Majeure**" means any act of God, strike, lock-out or other industrial disturbance, war (declared or undeclared), riot, epidemic, act of any government or other third party, and any other cause not within the control of the party affected thereby.  Franchisee's inability to obtain financing (regardless of the reason) shall not constitute an event of Force Majeure.

31.    REPRESENTATIONS

Franchisee represents, acknowledges and warrants to Franchisor (and Franchisee agrees that these representations, acknowledgments and warranties shall survive termination of this Agreement) that:

A.    Legal and Business Rights and Risks.

This Agreement involves significant legal and business rights and risks. Franchisor does not guarantee Franchisee's success. Franchisee has read this Agreement in its entirety, conducted an independent investigation of the business contemplated by this Agreement, has been thoroughly advised with regard to the terms and conditions of this Agreement by legal counsel or other advisors of Franchisee's choosing, recognizes that the nature of the business conducted by Fridays Restaurants may change over time, has had ample opportunity to investigate all representations made by or on behalf of Franchisor, and has had ample opportunity to consult with current and former franchisees of Franchisor. The prospect for success of the business undertaken by Franchisee is speculative and depends to a material extent upon Franchisee's personal commitment, capability and direct involvement in the day-to-day management of the business.

B.    Franchisor's Acceptance of Site(s).

The acceptance of one or more sites by Franchisor and its refusal to accept other sites is not a representation that the Premises will achieve a certain sales volume or a certain level of profitability, or that the Premises will have a higher sales volume or be more profitable than a site which Franchisor did not accept. Acceptance by Franchisor merely means that the minimum criteria that Franchisor has established for identifying suitable sites for proposed Fridays Restaurants have been met. Because real estate development is an art and not a precise science, Franchisee agrees that Franchisor's acceptance, or refusal to accept a proposed site, whether or not a site application is completed and/or submitted to Franchisor, shall not impose any liability or obligation on Franchisor. The decision to develop a particular site is Franchisee's alone, subject to acceptance of the site by Franchisor. Preliminary acceptance of a proposed site by any representative of Franchisor is not conclusive or binding, because his or her recommendation may be rejected by Franchisor.

C.    Evaluation of Premises.

Franchisor assumes no liability or responsibility for: (1) evaluation of the Premises soil for hazardous substances; (2) inspection of any structure on the Premises for asbestos or other toxic or hazardous materials; (3) compliance with the Americans with Disabilities Act ("**ADA**"); or (4) compliance with any other law. It is Franchisee's sole responsibility to obtain satisfactory evidence and/or assurances that the Premises (and any structures thereon) is free from environmental contamination and in compliance with the requirements of ADA.

D.    Franchisor's Construction Representatives.

Franchisee shall not rely upon any opinions expressed by Franchisor or any of its officers, directors, stockholders, employees or agents regarding structural integrity, safety or construction procedures, building codes or ordinances or other matters properly within the responsibility of Franchisee and its architect. The duties of Franchisor's construction representatives are limited solely to ensuring that development plans and other requirements under this Agreement are met. Franchisor and its employees do not act as an architect or agent of Franchisee. Franchisor assumes no liability or responsibility for architectural or engineering plans or judgments outside the scope of the duties stated

above.  Franchisor's final inspection and authorization to open the Restaurant is not a representation or a warranty that the Restaurant has been constructed in accordance with any architectural, engineering or legal standards for design or workmanship.  It merely means that Franchisor is satisfied that the minimum requirements which Franchisor has established for consistency of design and layout have been met.  Franchisee agrees that Franchisor's final inspection and authorization to open the Restaurant shall not impose any liability or responsibility on Franchisor.

     E.     <u>No Representation of Franchisee's Success</u>.

Franchisor makes no express or implied warranties or representations that Franchisee will achieve any degree of success in the development or operation of the Restaurant and that success in the development and operation of the Restaurant depends ultimately on Franchisee's efforts and abilities and on other factors, including, but not limited to, market and other economic conditions, Franchisee's financial condition and competition.

     F.     <u>Franchisor's Agreements with Others</u>.

Franchisor has entered, and will continue to enter, into agreements with other franchisees.  The manner in which Franchisor enforces its rights and the franchisees obligations under any of those other agreements shall not affect the ability of Franchisor to enforce its rights or Franchisee's obligations under this Agreement.

     G.     <u>Initial Franchise Fee Not Refundable</u>.

The Initial Franchise Fee is fully earned by Franchisor when paid and is not refundable under any circumstances.

     H.     <u>System Modifications</u>.

Franchisor may change or modify the System, from time to time, including the Manuals, and Franchisee will be required to make such expenditures as such changes or modifications in the System may require.

     I.     <u>Franchise Application</u>.

All information Franchisee provided to Franchisor in connection with Franchisee's franchise application and Franchisor's grant of this Franchise is truthful, complete and accurate.

     J.     <u>Signatories to This Agreement</u>.

The persons signing this Agreement on behalf of Franchisee have full authority to enter into this Agreement and the other agreements contemplated by the parties.  Execution of this Agreement or such other agreements by Franchisee does not and will not conflict with or interfere with, directly or indirectly, intentionally or otherwise, with the terms of any other agreement with any other third party to which Franchisee or any person with an ownership interest in Franchisee is a party.

      K.      <u>Financial Performance</u>.

Except to the extent set forth in the Franchise Disclosure Document, Franchisee has not received from Franchisor or its affiliates or anyone acting on their behalf, any representation of Franchisee's potential sales, expenses, income, profit or loss.

      L.      <u>No Representations Other Than Franchise Disclosure Document</u>.

Franchisee has not received from Franchisor or its affiliates or anyone acting on their behalf, any representations other than those contained in Franchisor's franchise disclosure document ("**Franchise Disclosure Document**") as inducements to enter this Agreement.

      M.      <u>No Actual or Apparent Authority</u>.

Even though this Agreement contains provisions requiring Franchisee to operate the Restaurant in compliance with the System: (1) Franchisor and its affiliates do not have actual or apparent authority to control the day-to-day conduct and operation of Franchisee's business or employment decisions; and (2) Franchisee and Franchisor do not intend for Franchisor or its affiliates to incur any liability in connection with or arising from any aspect of the System or Franchisee's use of the System, whether or not in accordance with the requirements of the Manuals.

      N.      <u>Waiver of Right to Jury Trial</u>.

In the event of a dispute between Franchisor and Franchisee, the parties have waived their right to a jury trial.

      O.      <u>Product Purchases</u>.

Franchisee and each Principal Owner acknowledge that each has been offered certain products and services in connection herewith and understands that Fridays Restaurant franchisees are free to obtain these and any other products or services used in the operation of the Restaurant from sources of their own choosing, subject only to compliance with the System Standards and the requirements of this Agreement.

      P.      <u>No Exclusivity</u>.

Franchisee understands that Franchisee has received no exclusive rights under this Agreement.

*[signature page follows]*

IN WITNESS WHEREOF, the parties have duly executed, sealed and delivered this Agreement as of the Effective Date.

<u>**FRANCHISOR**</u>:

ATTEST:

TGI FRIDAYS FRANCHISOR, LLC

By: _____

By: _____

Name: _____

Name: _____

Title: _____

Address for Notices:

TGI Fridays Franchisor, LLC
500 E. State Highway 114
Suite 200
Southlake, TX 76082
Attn: General Counsel

APPROVED
AS TO
LEGAL FORM
_____
_____

**<u>FRANCHISEE</u>:**

ATTEST/WITNESS:                          **[NAME]**


By: _____        By: _____
Name: _____        Name: _____
                                     Title: _____

                                     Address for Notices:

                                     Address:
                                     Email:
                                     Fax:
                                     Attn:

4931-8848-6658.1

*ACTIVE 684889259v1*

Franchisee Signature Page

[Store Name #_____]
[Franchisee]/TGIF
FRANCHISE AGREEMENT

**EXHIBIT A TO THE**
**TGI FRIDAYS™ RESTAURANT FRANCHISE AGREEMENT**

**<u>FRANCHISE INFORMATION</u>**

1.  <u>Premises</u> (Section 1.A(1)): _____

2.  <u>Site Selection Search Area</u> (Section 3.A) (describe or attach map): _____

    _____

3.  <u>Initial Franchise Fee</u> (Section 6.A): _____

4.  <u>Interests in Other Restaurants</u> (Section 20.C(3)): _____

    _____

4931-8848-6658.1

*ACTIVE 684889259v1*

EXHIBIT A

[Store Name #_____]
[Franchisee]/TGIF
FRANCHISE AGREEMENT

**EXHIBIT B TO THE**
**TGI FRIDAYS™ RESTAURANT FRANCHISE AGREEMENT**

**<u>FRANCHISEES INITIAL ADVERTISING AND PROMOTION OBLIGATION</u>**

For the purpose of benchmarking the Franchisee's initial APO under the Franchise Agreement Section 8, the following shall constitute the APO in place as of the date of the Franchise Agreement. Thereafter, the APO rates and totals may vary and change as contemplated under Section 8 of the Franchise Agreement:

| | | |
|---|---|---|
| 1. | National Advertising Fund (Section 8.C) | 4% of Gross Sales |
| 2. | Regional Advertising Fund (Section 8.D) | 0% of Gross Sales |
| 3. | Regional Co-op (Section 8.E) | 0% of Gross Sales |
| 4. | Local Store Marketing (Section 8.G) | 0% of Gross Sales |
| | **TOTAL APO:** | **4% of Gross Sales** |

**FRANCHISEE**

_____

By:_____

Title:_____

Date:_____

**EXHIBIT C TO THE**
**TGI FRIDAYS™ RESTAURANT FRANCHISE AGREEMENT**

**<u>LOCAL STORE MARKETING GUIDELINES</u>**

1.      If required by Franchisor, Franchisee must submit an annual Local Store Marketing Plan to Franchisor marketing department for approval.  In addition to Section 8.G, Franchisor may, from time to time, provide Franchisee with an outline of the approval process for marketing plans and all advertising materials.  Franchisor may also consult with Franchisee regarding the strategy of Franchisee's marketing plan and may discuss marketing materials available to Franchisee.

2.      Franchisee must obtain prior approval from Franchisor on all advertising materials to be used for Local Store Marketing before production (including all in-store and external marketing pieces) at least 30 days before first use.

3.      All advertising materials used for Local Store Marketing must fall into the categories listed below:

A.      <u>Advertising Materials for Use Inside Restaurant</u>.  Local Store Marketing expenditures may be used to pay approved third parties, ad agencies, and/or Franchisor for costs incurred to develop, design, obtain or produce Franchisor-approved advertising materials for use inside the Restaurant (e.g., food and drink photography, table tents, menu inserts, drink coasters, poster or other promotional signage, promotional t-shirts, and special promotional in-store bounce back certificates).

B.      <u>Advertising Materials for Use Outside Restaurant</u>.  Local Store Marketing expenditures may be used to pay approved third parties, ad agencies, and/or Franchisor for costs incurred to develop, design, obtain or produce Franchisor-approved advertising materials for use outside the Restaurant (e.g., advertising on television, radio and cinema including talent and residual costs, copywriting, direct mail pieces, newspaper or magazine ads, geo-targeted digital ads, local social media, flyers, banners, door hangers, magnets, advertising on billboards, and advertising on subway, mall, airport and telephone kiosks).  Good faith effort must be made to limit the impact of local marketing on any non-participating Franchise or Company-owned restaurant or restaurants unless agreed to in writing by affected locations.

C.      <u>Public Relations or Promotional Events</u>.  Local Store Marketing expenditures may be used to pay public relations agency(ies) for costs incurred to develop, design, produce and execute Franchisor-approved public relations materials, events or sponsorships (e.g., media press releases, media kits, event invitations, promotional signage and promotional giveaway items such as pins, t-shirts, etc.).  With Franchisor's prior written approval, Local Store Marketing expenditures may be used for items such as athletic, business or community event sponsorships, contest POS materials, prizes given away for a consumer promotion, third party prize fulfillment and one time (non-recurring) remote radio broadcast events, unless and except to the extent the value of any of the foregoing is vendor, or third party funded.  Any and all consumer promotions must meet all state and federal regulations.

D.      <u>Cooperative Advertising Agreements</u>.  Local Store Marketing expenditures may be used to pay third parties approved by Franchisor for costs incurred as part of Franchisor-approved cooperative advertising efforts (e.g., advertising which may be required under the lease agreement for the Restaurant).

4.      The materials listed below, while not exhaustive, may be appropriate (and/or required) for use at the Restaurant (subject to this Agreement and Franchisor's approval), but such materials are examples of materials that will not satisfy Franchisee's obligations for Local Store Marketing expenditures.

- Value of gift certificates, Buy One Get One Free's, Be Our Guest certificates
- Value of vendor-paid materials for any of the advertising materials referenced above
- Value of any and all discounts on food or beverages
- Value of comps for food, whether for VIPs or for promotions
- Costs related to any menus (e.g., role-play menu, fax menu, kids menu, etc.)
- Costs incurred in connection with internal incentive contests (e.g., beverage contests, etc.)
- Value of vendor-funded table tents, promotional t-shirts, merchandising items, etc.
- Costs related to newspaper or magazine subscriptions
- Costs related to satellite or cable television at the Restaurant
- Costs related uniforms, logos for uniforms, name tags, etc.
- Value of salaries and benefits for Franchisee's marketing employees, or Restaurant employees engaged in local marketing activity
- Value of monthly retainer to local marketing, advertising or public relations agency
- Costs related to travel to marketing meetings (e.g., airfare, lodging, meals, rental car, etc.)
- Costs related to any signage at the Restaurant
- Costs related to music licensing subscriptions
- Value of any exchanged or bartered items
- Ongoing and regular or recurring in-restaurant entertainment such as DJ, live music, karaoke, and live radio remotes
- Groupon, Living Social, or similar type online discounted TGI Fridays certificates sold through an online site
- Value of sports or entertainment tickets or other non-consumer-intended elements as part of a sponsorship package

EXHIBIT C                                    [Store Name #_____]
[Franchisee]/TGIF
FRANCHISE AGREEMENT

**EXHIBIT D TO THE**
**TGI FRIDAYS™ RESTAURANT FRANCHISE AGREEMENT**

**LISTING OF FRANCHISEES OWNERSHIP INTERESTS**

<u>Effective Date</u>:  This <u>Exhibit D</u> is current and complete as of _____.

1.   <u>Form of Ownership</u>.

    (a)   <u>Individual Proprietorship</u>.  Franchisee's owner(s) (is) (are) as follows:

                          _____
                          _____
                          _____

    (b)   <u>Corporation, Limited Liability Company, Partnership or Trust</u>.   Franchisee is a _____ incorporated, organized or formed on _____, under the laws of the State / Commonwealth of _____.  Franchisee has not conducted business under any name other than its legal entity name and _____.  The following is a list, as applicable, of the Franchisee's partners, directors, officers, members, settlor, trustee, or beneficiary as of the effective date shown above:

<u>Name of Each Director/Officer/Member/Manager</u>
<u>Settlor/Trustee/ Beneficiary</u> _____         <u>Position(s) Held</u>

_____         _____

_____         _____

_____         _____

2.   <u>Owners</u>.  The following list includes the full name of each person who is an owner of a legal or beneficial interest in Franchisee, and fully describes the nature of each owner's interest (attach additional pages if necessary).

      <u>Name/Address/Tax Identification No.</u>         <u>Percentage/Description of Interest</u>

  (a) _____         _____
      _____         _____

  (b)_____         _____
      _____         _____
      _____         _____

  (c)_____         _____
      _____         _____
      _____         _____

  (d)_____         _____
      _____         _____

_____          _____

3.      <u>Representative</u>.  Franchisee's Representative as of the Effective Date is:_____.

4.      <u>Operating Principal</u>.  Franchisee's Operating Principal as of the Effective Date is _____.
Franchisee may not change the Operating Principal without Franchisor's prior written approval.

5.      <u>Multi-Unit Manager</u>.  Franchisee's Multi-Unit Manager as of the Effective Date is _____.
Franchisee may not change the Multi-Unit Manager without Franchisor's prior written approval.

FRANCHISEE

_____

By:_____

Title:_____

Date:_____

          EXHIBIT D

[Store Name #____]
[Franchisee]/TGIF
FRANCHISE AGREEMENT

**EXHIBIT E TO THE**
**TGI FRIDAYS™ RESTAURANT FRANCHISE AGREEMENT**

ACH AUTHORIZATION FORM

FRIDAYS RESTAURANT ADDRESS:_____

DEPOSITOR (NAME OR LEGAL ENTITY): _____

The undersigned depositor ("**Depositor**") hereby authorizes TGI Fridays Franchisor, LLC ("**Franchisor**") to initiate debit entries and credit correction entries to Depositor's checking or savings account indicated below and Depositor hereby authorizes the depository designated below ("**Bank**") to debit or credit such account pursuant to Franchisor's instructions.  This authorization is to remain in full force and effect until 60 days after Franchisor has received written notification from Depositor of its termination.

DEPOSITOR INFORMATION

| | |
|---|---|
| Depositor Name: | |
| Mailing Address: | |
| City/ State/ Zip Code: | |
| Telephone: | |
| Email: | |

DEBITING BANK ACCOUNT INFORMATION

| | |
|---|---|
| Bank Name: | |
| City / State / Zip Code: | |
| Branch: | |
| Account Number to Debit: | |
| Routing Number (9 digit #): | |
| Account Name: | |
| Telephone Number of Bank: | |
| Name of Contact Person at Bank: | |

The undersigned representative of Depositor represents and warrants to Franchisor and the Bank that the person executing this ACH Authorization Form is an authorized signatory on the account referenced above and all information regarding the account is true and accurate.

Depositor By: _____

Print Name: _____

Title: _____

Date: _____

4931-8848-6658.1                                 EXHIBIT E                                 [Store Name #_____]
[Franchisee]/TGIF
FRANCHISE AGREEMENT

**EXHIBIT F TO THE**
**TGI FRIDAYS™ RESTAURANT FRANCHISE AGREEMENT**

**GUARANTY AND ASSUMPTION OF FRANCHISEES OBLIGATIONS**

In consideration of, and as an inducement to, the execution of the TGI Fridays Restaurant Franchise Agreement dated as of _____ ("**Agreement**") by TGI Fridays Franchisor, LLC ("**Franchisor**"), entered into with _____ ("**Franchisee**"), _____ ("**Guarantor**"), who is an officer, director, or Principal Owner as defined in the Agreement (or a spouse of one of the foregoing), hereby executes this Guaranty and Assumption of Franchisee's Obligations ("**Guaranty**") and personally and unconditionally:  (1) guarantees to Franchisor and its successors and assigns, for the term of the Agreement (including extensions) and thereafter as provided in the Agreement, that Franchisee shall punctually pay and perform each and every undertaking, agreement and covenant set forth in the Agreement (including any amendments or modifications of the Agreement); and (2) agrees personally to be bound by, and personally liable for the breach of each and every provision in the Agreement (including any amendments or modifications of the Agreement), both monetary obligations and obligations to take or refrain from taking specific actions or to engage or refrain from engaging in specific activities, including the provisions of Sections 18 (Transfers), 20 (Covenants), 21.E (Early Termination Damages), 23 (Option to Purchase) and 24.B (Indemnification) of the Agreement.  All capitalized terms that are not defined in this Guaranty shall have the meaning given them in the Agreement.

Guarantor waives:  (1) acceptance and notice of acceptance by Franchisor of the foregoing undertakings; (2) notice of demand for payment of any indebtedness or nonperformance of any obligations hereby guaranteed; (3) protest and notice of default to any party with respect to the indebtedness or nonperformance of any obligations hereby guaranteed; (4) any right he may have to require that an action be brought against Franchisee or any other person as a condition of liability; (5) all rights to payments and claims for reimbursement or subrogation which Guarantor may have against Franchisee arising as a result of the execution of and performance under this Guaranty by the undersigned; (6) any law or statute which requires that Franchisor make demand upon, assert claims against or collect from Franchisee or any others, foreclose any security interest, sell collateral, exhaust any remedies or take any other action against Franchisee or any others before making any demand upon, collecting from or taking any action against Guarantor with respect to this Guaranty; (7) any and all other notices and legal or equitable defenses to which he may be entitled; and (8) any and all right to have any legal action under this Guaranty decided by a jury.

Guarantor consents and agrees that:  (1) Guarantor's direct and immediate liability under this Guaranty shall be joint and several, both with Franchisee and among other guarantors; (2) Guarantor shall render any payment or performance required under the Agreement upon demand if Franchisee fails or refuses punctually to do so; (3) such liability shall not be contingent or conditioned upon pursuit by Franchisor of any remedies against Franchisee or any other person; (4) monies received from any source by Franchisor for application toward payment of the obligations under the Agreement and under this Guaranty may be applied in any manner or order deemed appropriate by Franchisor; and (5) such liability shall not be diminished, relieved or otherwise affected by any amendment of the Agreement, any extension of time, credit or other indulgence which Franchisor may from time to time grant to Franchisee or to any other person including, without limitation, the acceptance of any partial payment or performance or the compromise or release of any claims.  None of the foregoing shall in any way modify or amend this Guaranty, which shall be continuing and irrevocable during the term of the Agreement (including all extensions, renewals, and replacements thereof and successors thereto), and for so long as any performance is or might be owed under the Agreement by Franchisee or any owner or guarantor, and for so long as Franchisor has any cause of action against Franchisee or any owner or guarantor.  In addition, if Guarantor ceases to be a Principal Owner, officer or director of Franchisee or own any interest in Franchisee (or the spouse of any of the foregoing) before termination or expiration of the Agreement, Guarantor agrees that Guarantor's obligations under this Guaranty shall continue to remain in force and effect

EXHIBIT F                              [Store Name #____]
                                                                                                   [Franchisee]/TGIF
                                                                                        FRANCHISE AGREEMENT

unless Franchisor in its sole discretion, in writing, releases Guarantor from this Guaranty. Notwithstanding the provisions of the previous sentence, unless prohibited by applicable law, the obligations contained in Section 20.C of the Agreement shall remain in force and effect for a period of one year after any such release by Franchisor. A release by Franchisor of Guarantor shall not affect the obligations of any other guarantor.

If Franchisor brings an action to enforce this Guaranty in a judicial proceeding, and Franchisor prevails in such proceeding, Franchisor shall be entitled to reimbursement of its costs and expenses, including, but not limited to, reasonable accountants, attorneys, attorneys assistants and expert witness fees, cost of investigation and proof of facts, court costs, other litigation expenses and travel and living expenses, whether incurred during, before, in preparation for or in contemplation of the filing of any such proceeding. In any judicial proceeding, these costs and expenses shall be determined by the court and not by a jury.

If Franchisor utilizes legal counsel (including in-house counsel employed by Franchisor or its affiliates) in connection with any failure by Guarantor to comply with this Guaranty, Guarantor shall reimburse Franchisor for any of the above-listed costs and expenses incurred by it.

This Guaranty shall be binding upon Guarantor and Guarantor's respective heirs, legal representatives, successors and assigns. Franchisor's interests in and rights under this Guaranty are freely assignable, in whole or in part, by Franchisor. Any assignment shall not release Guarantor from this Guaranty.

The enforcement provisions of the Agreement (including, but not limited to, Section 29 (Governing Law, Forum and Limitations)) are incorporated by reference into this Guaranty and enforceable in accordance with the terms of this Guaranty. For the avoidance of doubt, this Agreement and any claim or controversy arising out of, or relating to, rights and obligations of the parties under this Agreement and any other claim or controversy between the parties shall be governed by and construed in accordance with the laws of the State of Texas without regard to conflicts of laws principles. Guarantor agrees that, to the extent any disputes cannot be resolved directly with Franchisor, Guarantor shall file any suit against Franchisor only in the state or federal court having jurisdiction in Dallas County, Texas. Franchisor may file suit in the federal or state court located in Dallas County, Texas, or in the jurisdiction where Guarantor resides or does business or where the Restaurant is or was located or where the claim arose. Guarantor irrevocably consents to the personal jurisdiction of those courts over Guarantor and waives any objection he or she might have to either the jurisdiction of or venue in those courts.

*[signature page follows]*

IN WITNESS WHEREOF, the undersigned has hereunto affixed his signature, under seal.

GUARANTOR:

Date: _____      _____(Seal)

Print Name: _____

Address: _____

STATE OF_____      §
                              §
COUNTY OF _____      §

On this ____ day of _____ 20__, before me, the undersigned Notary Public in and for the State of _____, personally appeared _____ to me personally known who being by me duly sworn did say that s/he is the _____ of _____, a _____, executing the foregoing instrument, that the instrument was signed on behalf of said entity by authority of said entity; and s/he acknowledged the execution of the instrument to be the voluntary act and deed of said entity.

Witness my hand and official seal.

_____
Notary Public

My commission expires:_____

4931-8848-6658.1                      EXHIBIT F                      [Store Name #____]
                                                                [Franchisee]/TGIF
                                                                FRANCHISE AGREEMENT

**EXHIBIT G TO THE**
**TGI FRIDAYS™ RESTAURANT FRANCHISE AGREEMENT**

**NON-DISCLOSURE AND NON-COMPETITION AGREEMENT**
**(OWNERS, OFFICERS, DIRECTORS & MANAGERS)**

THIS NON-DISCLOSURE AND NONCOMPETITION AGREEMENT ("**Agreement**") is made as of the _____ day of _____, 20___, by and between _____ ("**Franchisee**"), and _____, who is/are an owner, officer, manager, supervisor, member, partner, or a person in a managerial position with, Franchisee ("**Member**").

BACKGROUND:

As a result of the expenditure of time, skill, effort and money, TGI Fridays Franchisor, LLC ("**Franchisor**") has developed and owns a distinctive system ("**System**") relating to the development, establishment and operation of full-service casual theme restaurants featuring a specialized menu and full bar service operating in buildings that bear Franchisor's interior and exterior trade dress under the name Fridays or related tradenames (collectively, "**Fridays Restaurants**").

Franchisor identifies the System by means of certain names and Proprietary Marks including "TGI Fridays," "Fridays" and other names, Proprietary Marks, logos, insignias, slogans, emblems, symbols and designs (collectively "**Proprietary Marks**"), which Franchisor has designated, or may in the future designate, for use with the System. The Proprietary Marks used to identify the System, including the principal Proprietary Marks, may be modified by Franchisor and/or its affiliates from time to time.

Franchisor and Franchisee have executed a TGI Fridays™ Restaurant Franchise Agreement ("**Franchise Agreement**") granting Franchisee the right to operate one (1) Fridays Restaurant (the "**Restaurant**") and to produce and distribute products and services approved by Franchisor and use the Proprietary Marks in connection therewith under the terms and conditions of the Franchise Agreement;

Member, by virtue of his or her position with Franchisee, will gain access to certain of Franchisor's Confidential Information, as defined in the Franchise Agreement, and must therefore be bound by the same confidentiality and non-competition agreement that Franchisee is bound by.

**NOW THEREFORE**, in consideration of these premises, the conditions stated herein, and for other good and valuable consideration, the sufficiency and receipt of which are hereby acknowledged, the parties agree as follows:

1.    Confidential Information. Member shall not, during the Initial Term of the Franchise Agreement or thereafter, communicate, divulge, or use for the benefit of any other person, persons, partnership, entity, association, or corporation any confidential information, knowledge, or know-how concerning the methods of operation of the business franchised thereunder which may be communicated to Member or of which Member may be apprised by virtue of Franchisee's operations under the terms of the Franchise Agreement. Any and all information, knowledge, know-how, and techniques which Franchisor designates as confidential shall be deemed confidential for purposes of this Agreement, except information which Franchisee can demonstrate came to its attention before disclosure thereof by Franchisor; or which, at or after the time of disclosure by Franchisor to Franchisee, had become or later becomes a part of the public domain, through publication or communication by others.

2.    <u>Covenants Not to Compete</u>

(A)    Member specifically acknowledges that, pursuant to the Franchise Agreement, and by virtue of its position with Franchisee, Member will receive valuable specialized training and confidential information, including, without limitation, information regarding the operational, sales, promotional, and marketing methods and techniques of Franchisor and the System.

(B)    Member covenants and agrees that during the term of Members employment with, or ownership interest in, Franchisee, and except as otherwise approved in writing by Franchisor, Member shall not, either directly or indirectly, for itself, or through, on behalf of, or in conjunction with any person, persons, partnership, corporation, or entity:

(1)    Divert or attempt to divert any business or customer, or potential business or customer, of any Fridays Restaurant to any competitor, by direct or indirect inducement or otherwise; or

(2)    Own, maintain, operate, engage in, advise, help, make loans to, or have any interest in, either directly or indirectly, any restaurant business that offers the same or similar products and services as offered by Fridays Restaurants or restaurants in any other concept or system owned, operated, managed or franchised by Franchisor or an affiliate, including, without limitation, waiter/waitress service, sit-down dining and bar services (a "**Competing Business**").

(C)    Member covenants and agrees that during the Post-Term Period (defined below), except as otherwise approved in writing by Franchisor, Member shall not, either directly or indirectly, for itself, or through, on behalf of, or in conjunction with any person, persons, partnership, corporation, or entity, own, maintain, operate, engage in, or have any interest in a Competing Business that is, or is intended to be, located: (1) within three miles of the Restaurant; and (2) within three miles of any then-existing Fridays Restaurant operating under the System.

(E)    As used in this Agreement, the term "**Post-Term Period**" shall mean a continuous uninterrupted period of two years from the date of: (1) a Transfer by Member permitted under Section 18 of the Franchise Agreement; and/or (2) termination of Members employment with, and/or ownership interest in, Franchisee.

3.    <u>Injunctive Relief.</u> Member acknowledges that any failure to comply with the requirements of this Agreement will cause Franchisor irreparable injury, and Member agrees to pay all court costs and reasonable attorneys' fees incurred by Franchisor in obtaining specific performance of, or an injunction against violation of, the requirements of this Agreement.

4.    <u>Severability.</u> All agreements and covenants contained herein are severable. If any of them, or any part or parts of them, shall be held invalid by any court of competent jurisdiction for any reason, then Member agrees that the court shall have the authority to reform and modify that provision in order that the restriction shall be the maximum necessary to protect Franchisor's and/or Franchisee's legitimate business needs as permitted by applicable law and public policy. In so doing, Member agrees that the court shall impose the provision with retroactive effect as close as possible to the provision held to be invalid.

5.    <u>Delay</u>. No delay or failure by Franchisor or the Franchisee to exercise any right under this Agreement, and no partial or single exercise of that right, shall constitute a waiver of that or any other right provided herein, and no waiver of any violation of any terms and provisions of this Agreement shall be construed as a waiver of any succeeding violation of the same or any other provision of this Agreement.

6.      <u>Jurisdiction, Venue and Choice of Law</u>.  This agreement shall be interpreted in accordance with the laws of the State of Texas.  Jurisdiction and venue shall be in the courts of the State of Texas or the United States District Court in Dallas County, Texas, or the state and county of the residence of Member or the location of the Restaurant, at the election of Franchisor.

7.      <u>Third-Party Beneficiary</u>.  Member hereby acknowledges and agrees that Franchisor is an intended third-party beneficiary of this Agreement with the right to enforce it, independently or jointly with Franchisee.

**IN WITNESS WHEREOF,** Franchisee and Member attest that each has read and understands the terms of this Agreement, and voluntarily signed this Agreement as of the _____ day of _____, 20__.

FRANCHISEE                                    MEMBER

_____      _____

By:_____      By:_____

Name:_____      Name:_____

Title:_____      Title:_____

**EXHIBIT H TO THE
TGI FRIDAYS™ RESTAURANT FRANCHISE AGREEMENT**

**TGI FRIDAYS LOYALTY PROGRAM AGREEMENT**

**TGI FRIDAYS™ LOYALTY PROGRAM AGREEMENT**

This TGI Fridays Loyalty Program Agreement ("**Agreement**") is entered into effective the _____ day of _____, 20\_\_\_, between TGI Fridays Franchisor, LLC, 500 E. State Highway 114, Suite 200, Southlake, Texas 76082 ("**Franchisor**"), and _____, _____[address] ("**Franchisee**").

**SECTION I: DEFINITIONS**

Unless otherwise specifically defined herein, capitalized terms will have the meaning attributed to them in the applicable Franchise Agreement(s) identified on the attached Exhibit 1 (each a "**Franchise Agreement**"; collectively, the "**Franchise Agreements**").

As used in this Agreement, the following words and phrases will have the meanings attributed to them in this Section:

"**Loyalty Program**" is the "Fridays Rewards" Program, and/or such other guest reward and recognition program(s) as Franchisor may institute from time to time.

"**Loyalty Program Costs**" shall mean any and all "start up" fees, use fees and any other fees charged by Vendor for the use of the Software that Franchisee must pay in connection with participation in the Loyalty Program. Franchisor does not currently charge a fee for Franchisee's participation in the Loyalty Program, however, Franchisor, in its sole discretion, reserves the right to charge a reasonable fee.

"**Participant Data**" is the Customer Data (as defined in the Franchise Agreement) entered by each participant in the Loyalty Program and may include the individual's name, mailing address, email address, phone number and birth date.

"**Software**" is the software utilized to run the Loyalty Program.

"**Vendor**" is the proprietor(s) of the Software, as the same may change from time to time.

**SECTION II: AGREEMENT**

1.  Participating Restaurants. Franchisee operates one or more Restaurants ("**Participating Restaurants**"), each pursuant to an applicable Franchise Agreement. If Franchisee opens an additional Restaurant, upon opening, that Restaurant shall automatically be deemed subject to this Agreement without the necessity of an amendment and the term "Participating Restaurants" shall include that additional Restaurant.

2.  Loyalty Program. Franchisee agrees to adopt and use the Loyalty Program at the Participating Restaurants in accordance with the terms and conditions of the Loyalty Program, as amended from time to time, and in accordance with the terms and conditions of the Franchise Agreement.

3.  Term. For each Participating Restaurant, the term of this Agreement begins on the earlier of Loyalty Program inception on April 1, 2008 or such subsequent date that Franchisee begins operating any Fridays Restaurant and continue through the balance of the term of the Franchise Agreement which is the last to expire or be terminated, unless earlier terminated as provided herein.

EXHIBIT H                              [Store Name #\_\_\_\_]
                                                                                                                        [Franchisee]/TGIF
                                                                                                                        FRANCHISE AGREEMENT

4. <u>Operations Training</u>. Franchisee agrees to train all management personnel and staff at the Participating Restaurants in accordance with the System Standards relating to the Loyalty Program, including compliance with Loyalty Program guidelines and proper execution of the Loyalty Program (such as following any in-restaurant scripting developed by Franchisor to recognize Loyalty Program participants and provide Loyalty Program benefits to participants).

5. <u>Loyalty Program Costs</u>. The Loyalty Program Costs shall constitute a Payment under the Franchise Agreement for each Participating Restaurant, which Payment shall be due on a monthly basis on the due date specified (or other mutually agreed upon basis between Vendor and Franchisee) and payable to Vendor.

6. <u>Use of Loyalty Program</u>. Franchisee may not copy, reproduce or in any way duplicate the Loyalty Program for use outside the System or in contravention of the terms of this Agreement. Franchisee shall have the right to access and use the Participant Data, limited to the aggregate performance data for each individual Participating Restaurant, solely for purposes associated with the Loyalty Program. Any unauthorized use of the Participant Data shall constitute a material default of this Agreement. Authorized uses of the Participant Data are: (a) research and analysis in support of the Participating Restaurants; and (b) site modeling for performance of obligations under existing development agreements with Franchisor.

7. <u>Compliance with Laws</u>. Franchisee is responsible for complying with all state, federal and local laws, rules, statutes and ordinances in the locale in which each Participating Restaurant is located relating to the Loyalty Program, including but not limited to the sale of alcoholic beverages, awarding of points, prizes, email and text messaging and the like.

8. <u>Fraud</u>. Franchisor assumes no responsibility to identify fraudulently obtained Loyalty Program memberships, points credits, reward issuances, reward redemptions and coupon redemptions, fraudulent creation of employee accounts, fraudulent use, trade or sale of coupons and/or rewards or the like, or to discover or report any fraud, theft or other dishonesty committed by any person not employed by Franchisor. Franchisee will be financially responsible for any fraudulent or erroneous issuance or redemption of points reward values, reward redemptions or coupon redemptions by Franchisee's personnel. Franchisee will immediately notify Franchisor if Franchisee detects fraudulent issuance or redemption of points, reward values, reward redemptions or coupon redemptions.

9. <u>Indemnification</u>. Franchisee is solely responsible for all expenses incurred in connection with this Agreement and Franchisee's participation in the Loyalty Program. Franchisee hereby indemnifies and holds Franchisor harmless for all expenses and liabilities incurred by Franchisor, its franchisees, affiliates, officers, directors, employees and agents, in connection with Franchisee's participation in the Loyalty Program in accordance with the terms of this Agreement and the Franchise Agreements.

10. <u>Ownership of Data</u>. At all times, ownership of the Loyalty Program, Participant Data, and any other data derived through Franchisee's participation in the Loyalty Program is the exclusive property of Franchisor and its affiliated companies. The Loyalty Program, the terms of this Agreement and all data, information, reports, specifications, written materials, software and computer data used with or derived from the Loyalty Program will be deemed Confidential Information as that term is defined in the Franchise Agreement.

11. <u>Transfer</u>. In the event of any Transfer under the Franchise Agreements, Franchisee and its guarantors under the Franchise Agreement will remain liable for any Payments and other obligations pursuant to this Agreement arising through the date of Transfer. The transferee and its owners must execute and

deliver to Franchisor the then-current form of agreement and related documents for any guest reward and recognition program.

12. <u>Use of Alternative Guest Reward and Recognition Programs Prohibited</u>. Franchisee shall not use any guest reward or recognition program or collect any Participant Data outside of the Loyalty Program. Franchisee's use of Participant Data or participation in any other guest reward or recognition program is a material default of this Agreement.

13. <u>Default</u>. If Franchisee fails to pay any Loyalty Program Costs or fails to comply with any term of this Agreement, and any such failure is not cured within ten (10) days after the date Franchisee receives a written notice from Franchisor, such failure will be deemed a default of this Agreement and of any other agreement with Franchisor (including the Franchise Agreements or any development agreement). Upon any uncured default, Franchisor may do any one or more of the following: (a) discontinue providing the Loyalty Program to the Participating Restaurants; (b) initiate a collection action against Franchisee for all Loyalty Program Costs due; and/or (c) pursue any and all remedies for breach available under the Franchise Agreement, including but not limited to termination of the Franchise Agreement and any development agreement. Franchisee will, on demand, pay all costs and expenses, including interest and attorneys' fees, paid or incurred by Franchisor, or its affiliates, to enforce this Agreement. Franchisee acknowledges that failure by Franchisee to timely pay all amounts due to Franchisor pursuant to any Franchise Agreement, development agreement or other agreement will entitle Franchisor to deem Franchisee ineligible to participate in the Loyalty Program and to discontinue the Loyalty Program at the Participating Restaurants.

14. <u>Integration</u>. This Agreement, the attachments, and such terms and conditions as may be adopted in writing from time to time, constitute the entire agreement between the parties concerning the subject matter hereof. All prior agreements, discussions, representations, warranties and covenants are merged herein.

IN WITNESS WHEREOF THIS AGREEMENT HAS BEEN EXECUTED ON THE DATE FIRST ABOVE WRITTEN.

**<u>FRANCHISOR:</u>**                    **<u>FRANCHISEE</u>:**

**TGI FRIDAYS FRANCHISOR, LLC**        **[NAME]**

By: _____        By: _____
Name: _____        Name: _____
Title: _____        Title: _____
Date: _____        Date: _____

EXHIBIT 1
PARTICIPATING RESTAURANTS

| Restaurant # | Franchise Agreement Date | Restaurant Address |
|---|---|---|
| | | |
| | | |
| | | |
| | | |

RIDER 1

**TGI FRIDAYS FRANCHISE AGREEMENT EXPIRATION DATE**

TO: _____

The Restaurant located at _____ first opened for business on _____. The initial term of the Franchise Agreement for the Restaurant expires on _____. If Franchisee desires to renew the Franchise Agreement, Franchisee must give Franchisor notice no earlier than _____ (18 months before the expiration date of the Franchise Agreement) and no later than _____ (12 months before the expiration date).

TGI FRIDAYS FRANCHISOR, LLC

By: _____

Print Name: _____

Title: _____

Date: _____

RIDER 2

<u>ADA CERTIFICATION</u>

(TO BE COMPLETED BY FRANCHISEES ARCHITECT, ENGINEER, ADA
CONSULTANT, OR OTHER LICENSED PROFESSIONAL)

In connection with the Fridays Restaurant located at _____ (the "**Restaurant**"), I hereby represent and certify to _____ ("**Franchisee**") and to TGI Fridays Franchisor, LLC that:

1.      I have used professionally reasonable efforts to ensure that the Restaurant conforms to and complies with the design standards and requirements of the Americans with Disabilities Act ("**ADA**"), the ADA Architectural Guidelines ("**ADAAG**"), and all other related or similar state and local laws, regulations, and other requirements governing public accommodations for persons with disabilities in effect at the time that this certification is made, and

2.      In my professional judgment, the Restaurant does in fact conform to and comply with such design standards and requirements.

By:        _____

Print Name:   _____

Firm:      _____

Date:      _____

**AMENDMENT TO THE TGI FRIDAYS RESTAURANT
FRANCHISE AGREEMENT
<u>REQUIRED FOR MARYLAND FRANCHISEES</u>**

This Amendment to the TGI Fridays Restaurant Franchise Agreement dated _____ ("Franchise Agreement") between TGI Fridays Franchisor, LLC ("Franchisor"), a Delaware limited liability company, and _____ ("Franchisee"), a _____, is entered into simultaneously with the execution of the Franchise Agreement.

1.   The provisions of this Amendment form an integral part of, and are incorporated into the Franchise Agreement.  This Amendment is being executed because: **(A)** the offer or sale of a franchise to Franchisee was made in the State of Maryland; **(B)** Franchisee is a resident of the State of Maryland; and/or **(C)** the Restaurant will be located in the State of Maryland.

2.   No statement, questionnaire or acknowledgment signed or agreed to by a franchisee in connection with the commencement of the franchise relationship shall have the effect of (i) waiving any claims under any applicable state franchise law, including fraud in the inducement, or (ii) disclaiming reliance on any statement made by any franchisor, franchise seller, or any other person acting on behalf of the franchisor.  This provision supersedes any other term of any document executed in connection with the franchise.

3.   Based upon the Franchisor's financial condition, the Maryland Securities Commissioner has required a financial assurance.  Therefore, all initial fees and payments owed by franchisees shall be deferred until the Franchisor completes its pre-opening obligations under the Franchise Agreement.

4.   The following sentence is added to the end of Sections 2.B.(2).(g) (Successor Terms), 18.B.(5) (Transfers by Franchisee) and 19 (General Release):

This release shall not apply to any liability under the Maryland Franchise Registration and Disclosure Law.

5.   The following sentence is added to the end of Section 29.B. (Choice of Forum):

Notwithstanding the foregoing, Franchisee may bring an action in Maryland for claims arising under the Maryland Franchise Registration and Disclosure Law.

6.   The following sentence is added to the end of Section 29.C. (Limitation of Claims):

Any claims arising under the Maryland Franchise Registration and Disclosure Law must be brought within 3 years after the grant of the franchise.

7.   Sections 31.A. (Legal and Business Rights and Risks), 31.B. (Franchisor's Acceptance of Site(s)), 31.E. (No Representation of Franchisee's Success), 31.K. (Financial Performance), and 31.L. (No Representations Other Than Franchise Disclosure Document) are deleted from the Franchise Agreement in their entirety.

**8.**     The following sentence is added to the end of Section 31 (Representations):

Section 14-226 of the Maryland Franchise Registration and Disclosure Law prohibits a franchisor from requiring a prospective franchisee to assent to any release, estoppel, or waiver of liability as a condition of purchasing a franchise. Representations in this Agreement are not intended to, nor shall they act as a release, estoppel, or waiver of any liability incurred under the Maryland Franchise Registration and Disclosure Law.

**9.**     Any capitalized terms that are not defined in this Amendment shall have the meaning given them in the Franchise Agreement.

**10.**    Except as expressly modified by this Amendment, the Franchise Agreement remains unmodified and in full force and effect.

**ATTEST:**                                          **TGI FRIDAYS FRANCHISOR, LLC**

By: _____                   By: _____

Print Name:_____                  Print Name:_____

Title:_____                   Title: _____

                                                Date: _____

**ATTEST:**                                          _____

By: _____                   By: _____

Print Name:_____                  Print Name:_____

Title:_____                   Title: _____

                                                Date: _____

**EXHIBIT 10.2(b)**
**FORM ASSIGNMENT OF THE ASSIGNED CONTRACTS AGREEMENT**

[Attached]

Exhibit 10.2(b)

## ASSIGNMENT AND ASSUMPTION AGREEMENT

This Assignment and Assumption Agreement (the "Agreement"), made and entered into as of _____, is delivered pursuant to the Closing under the Asset Purchase Agreement (the "Purchase Agreement") dated as of _____, by and among **TGI FRIDAY'S INC.**, a New York corporation ("Seller")[1] and _____, a Delaware limited liability company ("Buyer").  Capitalized terms used in this Agreement without definition have the respective meanings given to them in the Purchase Agreement.

WHEREAS, pursuant to the Purchase Agreement, Seller has agreed to sell, transfer, assign, convey and deliver to Buyer all of Seller's right, title and interest held immediately before the Closing in and to the Acquired Assets, including, but not limited to the Assigned Contracts and Transferable Permits;

WHEREAS, in partial consideration for such sale, assignment, transfer, conveyance and delivery of the Acquired Assets, the Purchase Agreement requires Buyer to assume and agree to discharge certain obligations and liabilities of Seller as set forth in Section 2.3 of the Purchase Agreement;

WHEREAS, the execution and delivery of this Agreement is part of the consummation of the transactions contemplated by the Purchase Agreement.

NOW, THEREFORE, intending to be legally bound and in consideration of the mutual provisions set forth in this Agreement and in the Purchase Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

Section 1.    Assignment of Acquired Assets.  Effective as of the Effective Time on the Closing Date, on the terms and subject to the conditions set forth in the Purchase Agreement, Seller does hereby assign, sell, transfer and set over to Buyer all of Seller's rights, title and interest in and to the Acquired Assets, including, but not limited to the Assigned Contracts, Transferable Permits and all goodwill associated with the Restaurants.

Section 2.    Assumption of Liabilities.    Buyer hereby accepts Seller's assignment as described above, and, Effective as of the Effective Time on the Closing Date, on the terms and subject to the conditions set forth in the Purchase Agreement, Buyer hereby assumes and undertakes and agrees to pay, perform and otherwise discharge all of the liabilities as set forth in Section 2.3 of the Purchase Agreement, including, without limitation, the Assumed Liabilities and all liabilities, rights, interests and title to the Assigned Contracts and Transferable Permits listed on Schedule 1 hereto, but excluding those liabilities expressly excluded as set forth in Section 2.4 of the Purchase Agreement, including, without limitation, the Excluded Liabilities.

---

[1] Note to Draft:  To be updated at Closing to include any other applicable Seller.

Exhibit 10.2(b)

Section 3.      OTHER THAN AS SET FORTH IN THE PURCHASE AGREEMENT, THE SALE OF THE ACQUIRED ASSETS IS MADE WITHOUT REPRESENTATION OR WARRANT OF ANY KIND OR NATURE WHATSOEVER.  Buyer shall unconditionally accept the Acquired Assets "AS IS, WHERE IS" and, except as set forth in the Purchase Agreement, neither Seller nor any Affiliate of Seller shall be deemed to have made, and each Seller hereby expressly disclaims, any representation or warranty, express or implied, as to the value, condition, design, operation, merchantability, quality of material or workmanship, fitness for use or a particular purpose, manufacture or marketability, of the Acquired Assets, against infringement of any patent or copyright or the like, or freedom from any latent or patent defect (whether or not discoverable), or compliance with laws, including, without limitation, any representation or warrant that arises or may be deemed to arise out of any course of performance, course of dealing, or usage of trade, all of which representations and warranties are hereby expressly disclaimed and waived by the parties hereto.

Section 4.    General.  This Agreement (a) is irrevocable and effective upon Buyer's signature to and delivery of a manually signed copy of this Agreement or facsimile or email transmission of the signature to this Agreement in connection with the Closing, if and only if the Closing is completed, (b) benefits and binds the parties to the Purchase Agreement and their respective successors and assigns, (c) does not modify, affect, expand or limit, and is subject to, the provisions of the Purchase Agreement and (d) may be signed in counterparts as provided in Section 13.6 of the Purchase Agreement.  In the event of any conflict or inconsistency between the provisions of the Purchase Agreement and the provisions of this Agreement, the provisions of the Purchase Agreement will control.  Sections 13.1 (*Notices*), 13.2 (*Effect of Headings; Negotiated Agreement*), 13.3 (*Entire Agreement; Modification; Waiver*), 13.4 (*Parties in Interest*), 13.5 (*Binding Effect; Assignment*), 13.7 (*Governing Law; Jurisdiction*), 13.9 (*Severability*), 13.13 (*Further Assurances*), 13.16 (*Waiver of Jury Trial*), 13.18 (*Non-Recourse*) and 13.21 (*Seller Representative*) of the Purchase Agreement are hereby incorporated herein by reference and shall apply as if fully set forth herein *mutatis mutandis*.

[signature page follows]

Exhibit 10.2(b)

4903-2558-8736, v. 1
148483277_14

IN WITNESS WHEREOF, the parties to this Agreement have duly executed it on the day and year first above written.

**SELLER**

TGI FRIDAY'S INC.,

a New York corporation

By: _____

Name: _____

Title:  _____

**BUYER**

By: _____

Name: _____

Title:  _____

Exhibit 10.2(b)

**Schedule 1**

**Assigned Contracts and Transferable Permits**

<u>Assigned Contracts</u>

<u>Transferable Permits</u>

Exhibit 10.2(b)

**EXHIBIT 10.2(c)**
**FORM BILL OF SALE**

[Attached]

Exhibit 10.2(c)

4903-2558-8736, v. 1
148483277_14

## BILL OF SALE

This Bill of Sale (the "Bill of Sale"), made and entered into as of _____, is delivered pursuant to the Closing under the Asset Purchase Agreement (as amended, the "Purchase Agreement") dated as of _____, by and among **TGI FRIDAY'S INC.**, a New York corporation ("Seller")[2] and _____, a Delaware limited liability company ("Buyer"). Capitalized terms used in this Bill of Sale without definition have the respective meanings given to them in the Purchase Agreement.

WHEREAS, pursuant to the Purchase Agreement, Buyer has agreed to acquire the Acquired Assets. Buyer and Seller now seek to consummate the assignment, conveyance and transfer of such Acquired Assets.

NOW, THEREFORE, intending to be legally bound and in consideration of the mutual provisions set forth in this Bill of Sale and in the Purchase Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

Section 1      Sale and Transfer of Acquired Assets.  Effective as of the Effective Time on the Closing Date, on the terms and subject to the conditions set forth in the Purchase Agreement, Seller hereby sells, assigns, conveys, transfers and delivers to Buyer, and Buyer hereby purchases, acquires, and accepts from Seller, all of Seller's right, title and interest in and to the Acquired Assets.  For the avoidance of doubt, the parties acknowledge and agree that each Seller sells, assigns, conveys, transfers and delivers only that portion of the Acquired Assets owned by it. In accordance with the Purchase Agreement, Buyer hereby (a) acknowledges and agrees that the sale of the Acquired Assets is on an "AS IS, WHERE IS AND WITH ALL FAULTS" basis (except for the Express Representations contained in the Purchase Agreement), and (b) accepts the Acquired Assets without representation or warranty, express or implied (except for the Express Representations contained in the Purchase Agreement). For the avoidance of doubt, Buyer is not purchasing, acquiring or otherwise accepting (and is not obligated to purchase, acquire or otherwise accept) any right, title and interest in and to the Excluded Assets.

Section 2      General.  This Bill of Sale (a) is irrevocable and effective upon Seller's signature to and delivery of a manually signed copy of this Bill of Sale or facsimile or email transmission of the signature to this Bill of Sale in connection with the Closing, if and only if the Closing is completed, (b) benefits and binds the parties to the Purchase Agreement and their respective successors and assigns, (c) does not modify, affect, expand or limit, and is subject to, the provisions of the Purchase Agreement and (d) may be signed in counterparts as provided in Section 13.6 of the Purchase Agreement.  In the event of any conflict or inconsistency between the provisions of the Purchase Agreement and the provisions of this Bill of Sale, the provisions of the Purchase Agreement will control.  Sections 13.1 (*Notices*), 13.2 (*Headings*), 13.3 (*Entire Agreement; Modification; Waiver*), 13.4 (*Parties in Interest*), 13.5 (*Binding Effect; Assignment*), 13.7 (*Governing Law/Jurisdiction*), 13.8 (*Negotiated Agreement*), 13.9 (*Severability*), 13.13

---

[2] Note to Draft:  To be updated at Closing to include any other applicable Seller.

Exhibit 10.2(c)

4903-2558-8736, v. 1
148483277_14

(*Further Assurances*), 13.16 (*Waiver of Jury Trial*), 13.18 (*Non-Recourse*) and 13.21 (*Seller Representative*) of the Purchase Agreement are hereby incorporated herein by reference and shall apply as if fully set forth herein *mutatis mutandis*.

[signature page follows]

Exhibit 10.2(c)

IN WITNESS WHEREOF, the parties to this Bill of Sale have duly executed it on the day and year first above written.


**SELLER**

TGI FRIDAY'S INC.,

a New York corporation


By: _____

Name: _____

Title: _____


**BUYER**


By: _____

Name: _____

Title: _____


Exhibit 10.2(c)

**EXHIBIT 10.2(d)**
**FORM INTERIM MANAGEMENT AGREEMENT**

[Attached]

Exhibit 10.2(d)

4903-2558-8736, v. 1
148483277_14

## INTERIM MANAGEMENT AGREEMENT

THIS INTERIM MANAGEMENT AGREEMENT (this "**Agreement**") is made as of this ___ day of _____ 2024 (the "**Effective Date**"), by and between TGI FRIDAY'S INC., a New York corporation ("**Licensee**" and/or "**Seller**") and _____ ("**Buyer**") (Buyer, Licensee, and/or Seller, each a "**Party**" and together the "**Parties**.")

## RECITALS

A.     Licensee holds the liquor licenses summarized in Schedule I (collectively, the "**Licenses**") issued by the Alcoholic Beverages Control Commission or comparable liquor licensing authority of the respective state identified therein (the "**Licensing Authority**"), which Licenses were used by Licensee in the operation of a hospitality business (the "**Business**") under the name and style of "TGI Friday's" at each of the leased premises identified therein (collectively, the "**Premises**").

B.     Simultaneously with their execution of this Agreement, Buyer and Seller closed or are in the process of closing on the Asset Purchase Agreement dated _____, 2024 (the "**APA**"), whereby Licensee agrees to sell, and Buyer agrees to purchase, the assets used by Seller in connection with the operation of the Business.  Capitalized terms used but not herein defined shall have the meanings set forth in the APA.

C.     In contemplation of consummating the transactions contemplated by the APA, Buyer and/or Seller will request the Licensing Authority to (i) allow Buyer to operate the Premises under the Licenses; (ii) approve Buyer's applications for new licenses allowing Buyer to operate the Business with alcohol beverage service and full on-premise liquor licenses issued by the Licensing Authority (the "**New Licenses**") for each of the Premises; and/or (iii) permit Buyer to operate the Premises pending Licensing Authority approval of operation of the Premises under the Licenses or issuance of New Licenses, or, until this Agreement is terminated for any reason listed in this Agreement, Seller allows Buyer to provide certain services and operations within each of the Premises (the "**Beverage Alcohol Operations**"), which services will be provided at the direction of Licensee, subject to the terms and conditions of this Agreement.  Notwithstanding anything expressed in this Agreement to the contrary, this Agreement will terminate, solely with respect to the respective and applicable Premises location, as of the date a full on-premise liquor license is issued by the Licensing Authority for the respective and applicable specific Premises location or the date on which the Licensing Authority allows Buyer to operate the respective and applicable specific Premises location under the Licenses, but will continue in full force and effect as to each of the remaining Premises locations until such time as, for each of the remaining Premises locations, either a full on-premise liquor license is issued or Buyer is permitted to operate the respective and applicable specific Premises location under the Licenses, whichever occurs first, unless this Agreement is otherwise terminated for the reasons set forth in this Agreement.

D.     Buyer will submit applications (the "**New Applications**") for the New Licenses to the extent that such New Licenses are required for Buyer to operate the Business with alcohol beverage service.  Subject to Paragraph C above, this Agreement will govern the relationship

Exhibit 10.2(d)

between Buyer and Licensee until such time as either all of the New Applications are approved and all of the New Licenses are issued to Buyer or Buyer is permitted to operate the Premises under the Licenses. Buyer will diligently complete the New Applications and then obtain the New Licenses from the Licensing Authority. Upon reasonable written request from Licensee, Buyer will promptly provide an update on the status of the New Applications through its counsel. If any New Applications are disapproved, Buyer will have six (6) months from the date of denial to (i) complete an appeal of the denial and (ii), if the appeal is denied, at Buyer's sole discretion, close on the sale of the Business (only as it relates to the specific Premises for which the issuance of the New License(s) was denied) to a third party and terminate this Agreement (only as it relates to the specific Premises for which the issuance of the New License(s) was denied). Buyer will diligently complete any applicable appeal and/or sale to a third party, and Licensee will reasonably cooperate with any applicable appeal and/or sale to a third party. Notwithstanding the foregoing, if for any reason outside the control of the Parties, Buyer has not obtained all of the New Licenses within six (6) months from the date of this Agreement, this Agreement will be automatically extended for an additional ninety (90) days so long as Buyer continues to make good-faith and demonstrably diligent efforts to obtain the New Licenses.

NOW, THEREFORE, in consideration of the foregoing recitals, which are fully incorporated into this Agreement, and for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as set forth below.

# ARTICLE I
# MANAGEMENT

1.1     <u>Appointment</u>. Upon the closing of the APA with respect to the Premises, Buyer will be the interim manager of Beverage Alcohol Operations pursuant to the terms and conditions of this Agreement pending the Licensing Authority's issuance of New Licenses or approval of Buyer operation of the Premises under the Licenses. This Agreement will have no effectiveness prior to the closing of the APA with respect to the Premises.

1.2     <u>Control over Alcoholic Beverages; Inventory; Operations</u>.

(a)     During the Term (as hereinafter defined), Licensee will control the inventory of alcoholic beverages (including wine, spirits, and beer, the "**Alcoholic Beverage Inventory**") on hand at the Premises. At the end of the Term, provided Buyer has obtained Licensing Authority approval of the New Applications or of Buyer operation of the Premises under the Licenses, Licensee will be deemed to have assigned to Buyer (in the case of New Applications approval), for no additional charge, but without warranty, any right, title, and interest in and to so much of the Alcoholic Beverage Inventory as may be on hand at the Premises as of the last day of the Term.

(b)     Subject to the terms and conditions of this Agreement, Licensee grants to Buyer, at Buyer's sole cost and expense, the authority to make all purchases necessary and/or desirable for the Beverage Alcohol Operations on behalf of the Business, provided, however, that

Exhibit 10.2(d)

all purchases of Alcoholic Beverage Inventory must be made pursuant to Licensee's Licenses and from the Operating Account (as hereinafter defined).

(c)     During the Term of this Agreement, Licensee will compensate the manager of record of the Business at the Premises as previously approved by the Licensing Authority (collectively, the "**GM**") solely to the extent that the GM continues in that position at the respective Premises and remains on the payroll of (or is otherwise paid by) Licensee for the purposes of maintaining the ability of the respective Premises to continue serving alcoholic beverages. Until such time as the Licensing Authority issues New Licenses for the Premises or approves Buyer operation of the Premises under the Licenses, Licensee will be responsible for and have exclusive control of the Beverage Alcohol Operations and the Alcoholic Beverage Inventory, and shall timely, and in conformity with all legal requirements, cause payment for all purchases of Alcoholic Beverage Inventory to the proper licensed distributors. Licensee, or any of its Affiliates, will not, under any circumstances, be liable for the wages, other compensation, actions, or omissions of any personnel retained by Buyer and used in the operation of the Business during the Term. Buyer will be responsible for, and have sole control of, (a) paying all salaries, wages, and other compensation or benefits, including vacation pay, social security taxes, federal and state disability insurance, workers' compensation insurance, unemployment insurance, medical and life insurance, and pension plan contributions that are attributable to Buyer's employment of the Business's employees; (b) determining the hours of operation and establishing a menu for the Business and engaging in effective promotion of the Business as Buyer deems appropriate; (c) maintaining appropriate inventories (other than the Alcoholic Beverage Inventory) of materials, supplies, and equipment necessary to operate the Business; (d) paying for all food, beverage, taxes, supplies materials, insurance premiums, fees, equipment expenses, and other operational expenses incurred during the Term in operating the Business; (e) maintaining complete and accurate books and records of income, expenses, and operations of the Business (other than the Beverage Alcohol Operations, which are addressed below); (f) diligently supervising the Business and complying with all requirements of all licenses; and (g) all acts and omissions of Buyer's employees.

(d)     Buyer shall submit to Licensee, within a reasonable amount of time in advance of the filing deadline, the data and funds necessary for Licensee to accurately prepare, sign, and file all required sales tax and other returns and reports. Licensee shall, on a timely basis, sign and file with any and all appropriate authorities, along with any and all appropriate payments, which Buyer shall fund (to the extent sufficient funds are not available in the Operating Account) and which Licensee may pre-pay at its discretion to the extent a pre-payment option is available, all necessary sales tax and other returns and reports (proof of which filing and payment shall be provided to Buyer upon Buyer's request therefor).

(e)     Notwithstanding anything to the contrary contained above, neither Licensee nor any of its Affiliates is assuming any of the duties or liabilities of Buyer and will not be obligated or liable for any of the expenses, liabilities or debts of Buyer.

1.3     <u>Records</u>.     Licensee, with the cooperation and at the expense of Buyer, will maintain, or cause to be maintained, full and adequate books of account and other records reflecting the operation of the Beverage Alcohol Operations, which it will make available to Buyer.

Exhibit 10.2(d)

Licensee will reasonably cooperate with Buyer in Buyer's efforts to keep full and adequate books of account and other records reflecting the results of the Beverage Alcohol Operations.

1.4    Licensee's Duties.    Without limitation, Licensee agrees, during the Term, to: (a) maintain Licensee's good standing as a New York corporation; (b) at Buyer's expense, provided that the expense is not unreasonably caused by Licensee, use reasonable efforts to obtain, maintain, and/or renew the Licenses and any other licenses and/or permits necessary to operate the Business, which efforts will include signing liquor-license renewal forms and related documentation, removing or causing the removal of "holds" on the renewal of any such licenses, and personally appearing or through counsel at the Licensing Authority and/or any other department or agency if reasonably required in order to renew the Licenses or to answer any charges, questions, or investigations relative to any of the existing Licenses; (c) at Buyer's expense, provided that the expense is not unreasonably caused by Licensee, promptly cooperate with Buyer in the completion, filing, and prosecution to completion applications Buyer files with respect to the New Licenses and the New Applications; (d) not take any action to hinder, revoke, or withdraw the Licenses or any other licenses of the Business; (e) at Buyer's expense, provided that the expense is not unreasonably caused by Licensee, assist Buyer in maintaining dram shop insurance and other insurance in conformity with any and all applicable laws, statutes, rules, and/or regulations; and (f) at Buyer's expense, provided that the expense is not unreasonably caused by Licensee, reasonably cooperate with Buyer in discharging its duties under this Agreement.

1.5    Term.    Unless terminated sooner under another provision of this Agreement, the term of this Agreement (the "**Term**") commences as provided in this Agreement and terminates on the earlier of: (a) the date Buyer delivers a written notice to Licensee electing to terminate this Agreement; (b) subject to the provisions of Paragraph D above, the date on which all of the New Applications are approved and all of the New Licenses are issued to Buyer by the Licensing Authority and/or the Licensing Authority permits Buyer to operate the remaining Premises under the Licenses; (c) upon the occurrence of an Event of Default (as hereinafter defined); or (d) the date that is six (6) months following the date of this Agreement.  Notwithstanding the foregoing, if for any reason outside of the control of the Parties, Buyer did not obtain all of the New Licenses or obtain permission to operate the remaining Premises under the Licenses within six (6) months from the date of this Agreement, this Agreement and the Term will be automatically extended an additional ninety (90) days if Buyer continues to make good-faith and demonstrably diligent effort to obtain the New Licenses or obtain permission to operate the remaining Premises under the Licenses.

**ARTICLE II**
**REVENUE AND EXPENSES**

2.1    Revenues.    All gross revenue and receipts derived from management of the Beverage Alcohol Operations (the "**Beverage Alcohol Revenues**") are the exclusive property of Licensee.  Notwithstanding the foregoing, during the Term hereof, the Beverage Alcohol Revenues will be collected and deposited by Buyer into a separate account in Licensee's name (the "**Operating Account**").  Buyer's designated employee will be given signatory authority for the Operating Account.  During the Term, Licensee will not be entitled to any payment other than for

Exhibit 10.2(d)

reimbursements, taxes, and any obligations incurred by or on behalf of Licensee or its Affiliates because of the existence of this Agreement or Buyer's responsibilities under this Agreement, and any other payments as are specifically set forth in this Agreement.

  2.2 <u>Beverage Alcohol Expenses</u>. Buyer will pay, at the direction of Licensee, all expenses of the Beverage Alcohol Operations (the "**Beverage Alcohol Expenses**"), and all such payments will be made from the Operating Account.  For the avoidance of doubt, Beverage Alcohol Expenses will include all costs and expenses incurred by or on behalf of Licensee or its Affiliates in connection with providing services under this Agreement, including costs and expenses arising out of, associated with or relating to (a) continued operation in bankruptcy and any delay in the wind-down or liquidation, including professional fees, case administration, any liabilities that come due or payable after the Closing that would otherwise not be payable absent the obligation to continue operations in connection with providing services under this Agreement or any expenses otherwise relating to the bankruptcy proceedings (each, a "**Bankruptcy Case**" and, collectively, the "**Bankruptcy Cases**"); (b) employing any individuals, including wages, benefit plans, payroll taxes, and any other related expenses, (c) maintaining insurance plans, including insurance related to continued employment of any individuals and (d) license fees and other expenses associated with maintaining systems to handle inventory, payments, and records. Licensee and its Affiliates will have no obligation to advance or supply funds under any circumstances related to this Agreement or the Business.  All Beverage Alcohol Expenses and other expenses related to or arising out of this Agreement, including payment of credit card bills used for the purchase of Alcohol Beverage Inventory, will be advanced and paid from funds in the Operating Account by Licensee or Buyer at the direction of Licensee.  If the Beverage Alcohol Expenses exceed Beverage Alcohol Revenues such that there are insufficient funds in the Operating Account to pay the Beverage Alcohol Expenses when due, Buyer shall have liability for funding the Operating Account to make up such shortfall.  If there are insufficient funds in the Operating Account to timely and fully pay any and all taxes due associated with the Beverage Alcohol Operations, Buyer will deposit into the Operating Account any such shortfall so that all such taxes due can be paid in a timely manner.  Any such deposits by Buyer can be reimbursed from the Operating Account in any later month in which sufficient cash is available for repayment of same. Buyer acknowledges and agrees that Licensee is a debtor in the Bankruptcy Cases and does not have sufficient liquidity to provide services under this Agreement unless Buyer pays all Beverage Alcohol Expenses and any other expenses required under this Agreement. If Licensee fails to perform under this Agreement solely as a result of Buyer failing to timely pay in full all such expenses, such Licensee failure to perform will not be considered a breach, gross negligence, or willful misconduct by or of Licensee.

**ARTICLE III**
**INSURANCE**

  3.1 <u>Maintenance of Insurance</u>.

    (a) During the Term, Buyer will obtain and maintain, with a company reasonably satisfactory to Licensee, at the cost and expense of Buyer, a policy of commercial general liability insurance, including liquor-liability coverage, with limits of no less than Five

Exhibit 10.2(d)

Million U.S. Dollars ($5,000,000.00), and that complies with all requirements under the leases for the Premises, as well as all applicable laws and ordinances, and names Licensee and any relevant affiliates of Licensee as an additional named insured. A certificate evidencing the described coverage will be delivered to Licensee prior to the commencement of the Term. Buyer must immediately notify Licensee of any failure to pay for any insurance premiums. Buyer's failure to do so will be an Event of Default.

(b)     The policies of insurance maintained by Buyer will (i) only be cancelable following at least thirty (30) days' written notice to Licensee and (ii) be specifically endorsed to provide that the coverage will be primary and that the insurance carried by Licensee will be excess and non-contributory.

3.2     <u>Waiver of Subrogation</u>.      Buyer waives any claims against Licensee and its Affiliates for any liability, cost, or expense (including reasonable attorneys' fees and disbursements) arising out of any insured claim, in part or in full of any nature whatsoever. To the extent it does not prevent it from obtaining coverage on commercially reasonable terms, Buyer will cause all policies of insurance maintained pursuant to this Agreement to provide that the insurance company will have no right of subrogation against Licensee or any of Licensee's agents, employees, or affiliates.

3.3     <u>Waiver and Indemnity</u>.

(a)     Licensee will not, in the performance of this Agreement or in its dealings with third parties on behalf of Buyer, be liable to Buyer because of any act or omissions, negligent, tortious, or otherwise, of any agent or employee of Licensee; nor will Licensee, in the performance of this Agreement, be liable to Buyer because of any act or omission of Licensee, unless such act or omission constitutes gross negligence or willful misconduct of Licensee (except for acts or omissions contemplated by this Agreement), and the resulting damages are not covered by insurance. Notwithstanding the foregoing, Licensee will be responsible to Buyer for the reasonable performance of the services and duties to be rendered by Licensee under this Agreement, but Licensee will not be liable to Buyer for errors whether for commission or omission in the exercise of its business judgment as long as it is an act in good faith and does not involve engaging in willful misconduct or gross negligence. Buyer will indemnify, defend, and hold Licensee, its affiliates, and the respective employees, agents, attorneys, officers, directors, managers, members, and successors and assigns harmless from any and all liabilities, damages, penalties, fines, judgments, assessments, or claims, including reasonable attorneys' fees and costs (the "**Losses**"), incurred by or on behalf of Licensee or its Affiliates in connection with this Agreement, including entering into this Agreement, or the Beverage Alcohol Operations from and after the date of this Agreement, including any such Losses caused by the negligence of Licensee, except for any such Losses caused by the gross negligence or willful misconduct of Licensee.

(b)     The Parties agree that within ten (10) days of discovery by either Party of facts giving rise to a claim for indemnity under the provisions of this Agreement (each, a "**Claim**"), including receipt of notice of any demand, assertion, claim, action, or proceeding, judicial or otherwise, by any third party that a Party to this Agreement will give notice thereof in writing to

Exhibit 10.2(d)

the other Party; provided, that failure to give notice of any such Claim within such time period shall not relieve the other Party of its obligations hereunder, except to the extent that the indemnifying Party is actually and materially prejudiced thereby.  Upon receipt of such notice, the Party entitled to indemnification may make written demand for indemnification under this Agreement.

(c)    Buyer will, at its sole cost and expense, contest and defend, by all appropriate legal proceedings, any Claim with respect to which it is called upon to indemnify Licensee or any of the individuals or entities described in this Article III under the provisions of this Agreement.  Such contest will be conducted by attorneys reasonably approved by Licensee.  Licensee will reasonably cooperate with Buyer in connection with such legal proceedings, including providing all relevant, non-privileged, and non-confidential information and documents within Licensee's possession, custody, care, or control upon reasonable request of Buyer or Buyer's counsel.  Buyer further acknowledges its full financial responsibility for the operations of Beverage Alcohol Operations at the Premises, and agrees that Buyer will pay to Licensee or any of the indemnified individuals or entities described in this Article III the amount of any damages to which Licensee or any such individuals or entities may become entitled by reason of the provisions of this Agreement, such payment to be made within thirty (30) days after any such amount of damages is finally determined either by mutual agreement of the Parties or resolution of the Claim pursuant to Section 5.5.

3.4    <u>No Joint Venture</u>.    Nothing in this Agreement will be deemed or construed by the Parties or by any third person to create the relationship of principal and agent or of partnership or joint venture.  Neither any provisions of this Agreement nor any acts of the Parties will be deemed to create any relationship between Licensee and Buyer other than the relationship set forth within the scope of this Agreement and the APA and any other agreements ancillary thereto.  Without limitation, the Parties are not partners or joint venturers, and nothing in this Agreement will be construed so as to make them such or to render either liable for any of the debts or obligations of the other.

## ARTICLE IV
## EVENTS OF DEFAULT; TERMINATION

4.1    <u>Events of Default</u>.    An "Event of Default" under this Agreement will arise if a Party fails fully to remedy any breach of its obligations under this Agreement within five (5) calendar days (or such longer time as the other Party may in writing allow), after receipt of written notice from the other Party specifying one or more of such breaches of this Agreement.

4.2    <u>Remedies</u>.    Upon an Event of Default, every right and remedy of the non-defaulting Party will be cumulative and the non-defaulting Party, in its sole discretion, may exercise any and all rights or remedies stated in this Agreement or otherwise available at law or in equity, including temporary or permanent injunctive relief.

## ARTICLE V
## MISCELLANY

Exhibit 10.2(d)

5.1  <u>Notices</u>.

(a)  All notices required or desired to be given under this Agreement must be in writing and delivered by (i) personal delivery; (ii) overnight courier; (iii) certified or registered mail, postage prepaid, return-receipt requested; or (iv) electronic mail, and addressed as follows:

If to Seller/Licensee:  TGI FRIDAY'S INC.
500 E State Highway 114, Suite 200,
Southlake, TX 76092
Attn:  General Counsel

With a copy to (which shall not constitute notice):
Ropes & Gray LLP
191 North Wacker Drive, 32nd Floor
Chicago, IL 60606
Attention: Chris L. Dickerson
Ellen Wheeler
Email: chris.dickerson@ropesgray.com
ellen.wheeler@ropesgray.com

and

Foley & Lardner LLP
2021 McKinney Avenue, Suite 1600
Dallas, TX 75201
Attention: Holland N. O'Neil
Mark C. Moore
Zachary C. Zahn
Email: honeil@foley.com
mmoore@foley.com
zzahn@foley.com

If to Buyer:  Sugarloaf Concessions, LLC
15995 N. Barkers Landing Road
Houston, TX  77079
Attn:  Raymond A. Blanchette

With a copy to:  Hoover Slovacek LLP
5051 Westheimer, Suite 1200
Houston, TX  77056
Attn:  Edward W. Engel

Exhibit 10.2(d)

or to such other address as either Party may designate from time to time by written notice to the other Party in the manner set forth herein.

(b)    All notices and other communications required or permitted under this Agreement that are addressed as provided in Section 5.1 and (i)if delivered personally or by overnight courier, will be effective upon delivery; (ii) if delivered by mail, will be effective upon receipt of delivery (as evidenced by return receipt), or upon the date of refusal to accept delivery; and (iii) if delivered by email, will be effective upon delivery if received by 5:00 PM Central Time, and otherwise the next business day following that email.  The inability to deliver notice because of a changed address for which no notice was given will constitute receipt of notice as of the date of the inability to deliver.

5.2    Survival.    Unless expressly stated to the contrary, all obligations for any payment or reimbursement by one Party to the other will survive the end of the Term or until payment or reimbursement in full of all obligations of such Party by such Party following a permitted termination of this Agreement.

5.3    No Waiver.    The waiver by either Party of the breach of any of the terms and conditions of, or any right under, this Agreement will not be deemed to constitute the waiver of any other breach of the same or any other term or condition or of any similar right.  No such waiver will be binding or effective unless expressed in writing and signed by the Party giving such waiver.

5.4    Interpretation. The Recitals set forth above are incorporated fully as part of the Parties' agreement.  The provisions of this Agreement will not be construed more strictly against one Party than the other merely by virtue of the fact that it was initially drafted by counsel to one of the Parties, it being acknowledged that each Party was advised by independent counsel with an opportunity to review and comment upon each provision thereof.  Wherever the term "including" is used in this Agreement, it means "including, but not limited to."  Wherever the term "will" is used in this Agreement, it will have the meaning of a command.

5.5    Governing Law.    This Agreement will be construed in accordance with the laws of the State of Texas without regard to conflict of laws principles.  The rights and remedies of the Parties under this Agreement are cumulative and not exclusive of one another. Each of the Parties irrevocably agrees that any action that may be based upon, arising out of, or related to this Agreement or the negotiation, execution or performance of this Agreement and the transactions contemplated hereby (each, an "**Action**" and, collectively, "**Actions**") brought by any other Party or its successors or assigns will be brought and determined only in (i) the Bankruptcy Court and any federal court to which an appeal from the Bankruptcy Court may be validly taken or (ii) in the event the Bankruptcy Case is closed, or if the Bankruptcy Court is unwilling or unable to hear such Action, any state or federal court within Dallas, Texas ((i) and (ii), each, a "**Chosen Courts**" and, collectively, the "**Chosen Courts**"), and each of the Parties hereby irrevocably submits to the exclusive jurisdiction of the Chosen Courts for itself and with respect to its property, generally and unconditionally, with regard to any such Action arising out of or relating to this Agreement and

Exhibit 10.2(d)

4903-2558-8736, v. 1
148483277_14

the transactions contemplated hereby. Each of the Parties agrees not to commence any Action relating thereto except in the Chosen Courts, other than Actions in any court of competent jurisdiction to enforce any judgment, decree or award rendered by any Chosen Court, and no Party will file a motion to dismiss any Action filed in a Chosen Court on any jurisdictional or venue-related grounds, including the doctrine of forum *non conveniens*.  The Parties irrevocably agree that venue would be proper in any of the Chosen Courts, and hereby irrevocably waive any objection that any such court is an improper or inconvenient forum for the resolution of such Action.  Each of the Parties further irrevocably and unconditionally consents to service of process in the manner provided for notices in Section 5.1. Nothing in this Agreement will affect the right of any Party to this Agreement to serve process in any other manner permitted by Law. In addition to any other right or remedy, the prevailing Party (as determined by the court) in any litigation, or other proceeding arising under this Agreement will recover its reasonable attorneys' fees and costs from the other Party or Parties, including the costs of collection proceedings.

5.6    <u>Counterparts</u>.  This Agreement may be executed in two or more counterparts, each of which will be deemed an original but all of which together shall constitute one and the same Agreement.  The counterparts of this Agreement and all ancillary documents may be executed and delivered by facsimile, email, or other electronic signature by either Party to the other Party and the receiving party may rely on the receipt of such document so executed and delivered by facsimile, email, or other electronic means as if the original had been received.

5.7    <u>Expenses</u>.     Except as otherwise provided, each Party will bear its own expenses (including all compensation and expenses of counsel, financial advisors, consultants, actuaries, and independent accountants) incurred in connection with this Agreement and consummation of the contemplated transactions.

5.8    <u>Partial Invalidity</u>.     If any part of this Agreement is declared invalid by final and non-appealable order, decree, or judgment of any court, this Agreement will be construed as if such part was not inserted, if the economic basis of this Agreement is not then altered.

5.9    <u>Assignment</u>.  This Agreement may not be assigned without the prior written consent of the other Party, which consent will not be unreasonably withheld, conditioned, or delayed; provided however, that (i) Buyer shall have the right, with the prior consent of Licensee not to be unreasonably withheld, conditioned or delayed, to delegate any of its respective obligations hereunder to any management company retained by Buyer for the purposes of the Premises and/or this Agreement and (ii) Seller shall be entitled, without the consent of Buyer, to assign its rights and obligation to any affiliate of Seller, liquidating trust or other designated third party performing any services hereunder.

5.10    <u>Confidentiality</u>.     The Parties will each maintain as strictly confidential the content of this Agreement, and will not disclose such information to any third party; provided, that a Party may disclose such material or information to (i) its advisors and to third-party professionals retained or consulted by the Party or its advisors in connection with the contemplated transaction so long as such advisors and third parties agree to maintain such material and information as confidential and not to disclose such material and information; (ii) its owners, investors,

Exhibit 10.2(d)

prospective investors or purchasers, affiliates, auditors, advisors, and third-party professionals so long as such persons agree to maintain such material and information as confidential and not to disclose such material and information; and (iii) the Licensing Authority.  No Party will make public this Agreement or any portion of it or make any public disclosure of the specific terms of this Agreement, except as required by law, including as reasonably necessary in connection with the Bankruptcy Cases, or otherwise set forth in this Agreement.  If such publication or disclosure is arguably or allegedly required by law, but an exemption from such requirement may be available, the Party seeking to make such publication or disclosure will use all reasonable efforts to obtain such exemption or otherwise avoid the necessity of such publication or disclosure, and will in no event make such publication or disclosure without first notifying the other Party to this Agreement at least three (3) business days in advance (provided, that such three (3) business day notice period shall not apply to any disclosures required in connection with the Bankruptcy Cases). In the event the contemplated transactions are not consummated, each Party will promptly return to the other Party all information, documents, and other items received from such other Party in connection with this Agreement.  The provisions of this Section 5.10 will survive the termination of this Agreement.

5.11   <u>No Oral Agreements; Amendments</u>.  The Parties acknowledge and agree that there are no oral agreements with respect to the subject matter hereof.  This Agreement may not be amended or modified in any manner without a writing signed by each of the Parties.

5.12   <u>Entire Agreement</u>.  This Agreement and the APA contains the entire agreement of the Parties with respect to the subject matter hereof and supersedes any discussions, offers, proposals, agreements or promises with respect thereto.

5.13   <u>Electronic Signatures and Counterparts</u>.  This Agreement and any signed agreement or instrument entered into in connection with this Agreement, and any amendments hereto or thereto, may be executed in one or more counterparts, all of which shall constitute one and the same instrument. Facsimile or electronic signatures to any such counterpart shall be treated in all manner and respects as an original executed counterpart for all purposes.

[*Signatures appear on the next page*]

Exhibit 10.2(d)

IN WITNESS WHEREOF, Licensee and Buyer have duly executed this Agreement to be effective as of the Effective Date.

**LICENSEE/SELLER:**                      **BUYER:**

**TGI FRIDAY'S INC.**

By: _____      By: _____

Exhibit 10.2(d)

**SCHEDULE I**

**Liquor Licenses**

| Store No. | State License# | Town License# | Premises | Expiration |
|-----------|----------------|---------------|----------|------------|
| _____    | _____     | _____        | _____ | _____ |

Exhibit 10.2(d)